ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
JAN 5 2004
U.S. COURT OF FEDERAL CLAIMS

By leave of the Judge

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner, | § | |
| Plaintiffs, | § | NO. 03-2164T |
| v. | § | JUDGE MARY ELLEN COSTER WILLIAMS |
| UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE, | § | |
| Defendant. | § | |

PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT
(RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2)

MEMORANDUM IN SUPPORT OF FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT

PROPOSED FINDINGS OF UNCONTROVERTED FACTS

CERTIFICATE OF FORMATION (JADE TRADING, LLC)
DELAWARE SECRETARY OF STATE

ARI BERGMANN AFFIDAVIT

GARY E. ERVIN AFFIDAVIT

ROBERT W. ERVIN AFFIDAVIT

David D. Aughtry, Esq.
Linda S. Paine, Esq.
Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303
Telephone: (404) 659-1410

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 03-2164T<br><br>JUDGE MARY ELLEN COSTER WILLIAMS |

---

PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT
(RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2)

---

MEMORANDUM IN SUPPORT OF FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT

---

PROPOSED FINDINGS OF UNCONTROVERTED FACTS

---

CERTIFICATE OF FORMATION (JADE TRADING, LLC)
DELAWARE SECRETARY OF STATE

ARI BERGMANN AFFIDAVIT

GARY E. ERVIN AFFIDAVIT

ROBERT W. ERVIN AFFIDAVIT

---

David D. Aughtry, Esq.
Linda S. Paine, Esq.
Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303
Telephone: (404) 659-1410

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner, | § | |
| Plaintiffs, | § | |
| | § | NO. 03-2164T |
| v. | § | |
| | § | JUDGE MARY ELLEN COSTER WILLIAMS |
| UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE, | § | |
| Defendant. | § | |

---

**PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT (RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2)**

---

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiffs, Jade Trading, LLC, by and through Robert W. Ervin and Laura Kavanaugh Ervin, on behalf of Ervin Capital, LLC, move the Court to enter an order granting partial summary judgment in their favor, holding Treas. Reg. § 1.701-2 invalid as an unconstitutionally vague, double breach of the Separation of Powers Doctrine.[1] As grounds for this Motion, Plaintiffs show unto the Court:

1. Consistent with RCFC Rule 56 (a), this Motion is filed more than 60 days from commencement of the case.

---

[1] Concurrently with the filing of this Motion, Plaintiffs are filing two other Motions for Partial Summary Judgment relating to Partnership Recognized Under Code § 761 and relating to Separate Treatment of Code § 988 Foreign Currency Transactions. Rulings on the three Partial Motions should dispose of the entire case.

2. The issue is purely legal and turns on no facts. Hence, no genuine issue exists as to any material fact and the matter is ripe for entry of partial summary judgment forthwith as a matter of law under RCFC Rule 56 (a) and (c).

3. The issue focuses upon the invalidity of Treas. Reg. § 1.701-2.

a. The Internal Revenue Service ("IRS") relies upon that regulation for four of the five substantive positions asserted in its Final Partnership Administrative Adjustment ("FPAA"). A copy of the "Explanation of Adjustments" section of that FPAA is attached as Appendix I.

b. No other regulation in the past 20 years, if not beyond, has been so severely criticized by the leading members of the federal tax bar including the ABA Tax Section, former Judges of the United States Tax Court, former Commissioners of the IRS, former IRS Chief Counsels, and the leading authority in the nation on federal partnership taxation. An annotated citation of those criticisms is attached as Appendix II.

c. While the FPAA turns upon the "principal purpose" condition precedent in the regulation, a complete copy of Treas. Reg. § 1.701-2 is attached as Appendix III.

4. The regulation violates the Separation of Powers Doctrine in every conceivable way through unconstitutionally vague language.

a. Under the authority of the Federal Circuit in *Bankers Trust of New York v. United States*, 225 F.3d 1368, 1376 (Fed. Cir. 2000), the

regulation is invalid because the IRS, an executive agency, lacks the power to reverse 60 years of judicial precedent.

b. Under the authority of the Supreme Court, the Federal Circuit, and any number of other federal courts, the regulation also constitutes an unconstitutional usurpation of Congressional powers in at least five independent ways.

c. Also under the authority of the Supreme Court the regulation is void for vagueness in the IRS' attempt to bestow upon itself subjective discretion to apply unlimited remedies to amorphous situations "even though the transaction may fall within the literal words of a particular statutory or regulatory provision."

5. The authority for this Motion is set forth in the accompanying Memorandum in Support.

6. While no fact is material in the sense it is result-altering, the background of this case is summarized in the accompanying Proposed Findings of Uncontroverted Facts. Those facts are drawn from the pleadings and affidavits from Robert W. Ervin, Gary E. Ervin, and Ari Bergmann (including a Certificate of Formation from the Delaware Secretary of State).

7. Defendant objects to the granting of this Motion.

WHEREFORE, Plaintiffs pray that this partial summary judgment be granted and an order be entered holding Treas. Reg. § 1.701-2 invalid and of no effect in this case.

Respectfully submitted,

DAVID D. AUGHTRY
Georgia Bar No. 028010

LINDA S. PAINE By express permission
Texas Bar No. 15414000

Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303
Telephone: (404) 659-1410
Facsimile: (404) 659-1852

COUNSEL FOR PLAINTIFFS

Dated: December 18, 2003

154958.6
002871-000000:12/16/2003

# Appendix First Motion

APPENDIX I

**Explanation of Adjustments – Jade Trading, LLC**

1. It is determined that Jade Trading, LLC, is a sham and, under §1.701-2, was formed or availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that the partnership is disregarded and that all transactions engaged by Jade Trading, LLC, are treated as engaged in directly by the purported partners. This includes the determination that the Euros and Xerox stock purportedly acquired by the partnership were acquired directly by purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

2. It is determined that, under §1.701-2 of the Treasury Regulations, Euro currency options, purportedly contributed to or assumed by the partnership, are treated as never having been contributed to or assumed by the partnership and any gains or losses purportedly realized by the partnership on the options are treated as having been realized by the purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.

3. It is further determined that, under §1.701-2 of the Treasury Regulations, Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC, should be treated as not being partners in the partnership.

4. It is further determined that, under §1.701-2 of the Treasury Regulations, contributions to the partnership will be adjusted to reflect clearly the partnership's or partners' income.

5. Even if Euro currency options were to be treated as contributed to the partnership, the bases of the options are reduced, both in the hands of the contributing partners and the partnership, by any amount received by the contributing partner from the contemporaneous sale of a substantially similar option to the same counter-party. Thus, any amount treated as an increase in outside basis from the contribution of Euro currency options is disallowed.

6. Accuracy-Related Penalties

   It is determined that the underpayment of tax for the taxable year 1999 is due to a gross valuation misstatement of the adjusted basis in the partners' basis in their partnership interest and the consequent basis in the Euros and Xerox stock distributed to partners to which their partnership basis attached. Therefore, the 40 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(3), 6662(e) and 6662(h) of the Internal Revenue Code.

Alternatively, it is determined that all or part of the underpayment of tax for the taxable year 1999 is due to negligence or disregard of rules and regulations for filing income tax returns. Consequently, the 20 percent penalty is imposed on the underpayment attributable to negligence or disregard of rules and regulations as provided by Sections 6662(a), 6662(b)(1), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is due to an underpayment attributable to substantial understatement of income tax. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

Alternatively, it is determined that the underpayment of tax for the taxable year 1999 is a substantial understatement of income tax because the transaction is a tax shelter, no substantial authority has been established for the position taken, and there was no reasonable belief upon the filing of the return that the position taken was more likely than not the correct treatment of the transaction. Consequently, the 20 percent penalty is imposed on the underpayment attributable to the gross valuation misstatement as provided by Sections 6662(a), 6662(b)(2), 6662(c) of the Internal Revenue Code.

## APPENDIX: ANNOTATED CITE LIST[1]

- William H. Caudill, *ABA Tax Section Members Say Antiabuse Rule is Not a Valid Exercise of IRS Authority*, 94 TAX NOTES TODAY 146-50 (Jul. 1, 1994).

> After a review of the other provisions of subchapter K it is not readily apparent that Congress has provided statutory authority, implied or express, for the Proposed Regulation [Section 1.701-2]. The Proposed Regulation's operative provisions, by design, produce a result contrary to the literal language of subchapter K or other provisions of the Code. Because Congress has refused (as discussed below) to provide this type of anti-abuse authority, and because issues of interpretation of the intent of statutes historically have been resolved in the courts, there appears to be no authority for an interpretive regulation such as this.

- William F. Nelson (former IRS Chief Counsel), *The Limits of Literalism: The Effect of Substance Over Form, Clear Reflection and Business Purpose Considerations on the Proper Interpretation of Subchapter K*, 73 TAXES 641, 658 (1995).

> As the analysis set forth above has demonstrated, the Anti-abuse Rule applies to partnership transactions a business purpose requirement that does not comport with existing authority. It also formulates a novel overarching proper reflection of income standard that has no basis in the Internal Revenue Code, its legislative history, or any judicial authority. In sum, the Anti-abuse Rule cannot be defended as either a statement of preexisting law or as an application of normal interpretive rules.
>
> What is perhaps troubling about the Anti-abuse Rule, however, is the implicit claim that it makes: no matter how clear the statute is, no matter what the cases say, the appropriate answer can only be found by following the steps set forth in the Anti-abuse Rule. Aside from the startling appropriation of Congressional authority that this claim represents, the Anti-abuse Rule exudes a certain intellectual arrogance, a sense that finally, after nearly four decades of dead reckoning that culminated in the codification of Subchapter K and an additional four decades of interpreting Subchapter K, the answers to the hard questions of partnership taxation have been uncovered and comprehensively stated in less than three pages. If

---

[1] If the Court or Defendant wishes, Plaintiffs would be pleased to supply a complete copy of these articles and comments, rather than these excerpts. Also, please note that Plaintiffs have not included the comments that the IRS solicited to support the regulation.

> the word were that simple, we would hardly need the Code, let alone regulations issued thereunder. Because the world is not that simple, Congress enacted rules which taxpayers and the government must follow in addressing partnership transactions. The history of partnership taxation, before and after 1954, demonstrates the need for these rules and the continuing Congressional endorsement of a rule-based approach. The partnership rules are subject to the same canons and vagaries of statutory interpretation that govern and afflict the Code in general. The Anti-abuse Rule, however, does not interpret Subchapter K; it purports to supplant it.

- Comments from Donald C. Alexander (former Commissioner of Internal Revenue Service), Bernard M. Shapiro (former Chief of Staff for the U.S. Congressional Joint Committee on Taxation), William A. Goffe (former United States Tax Court Judge), Harry L. Gustman (former Chief of the Joint Committee Staff), Mark L. McConaghy (former Chief of the Joint Committee Staff), Abraham N.J. Shaghy, Jr. (former IRS Chief Counsel), Samuel B. Sterrett (former Chief Judge of the U.S. Tax Court), and B. John Williams (former United States Tax Court Judge and IRS Chief Counsel) to Leslie B. Samuels, Assistant Secretary for Tax Policy, *reprinted in Commentators Say Partnership Antiabuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 TAX NOTES TODAY 175-28 (Aug. 18, 1995).

> Moreover, our concern transcends the atmosphere of uncertainty that we believe the regulation will create. We believe that the thrust of the regulation may be construed as an intrusion of the Executive Branch into the responsibilities of the Legislative and Judicial Branches. To be specific, we suspect that the delegation by the Treasury Department to the Service of the right to elevate its interpretation of the "intent" of Congress over what may be the plain meaning of a statute (the Internal Revenue Code), without specific Congressional authority, will prove to be an unfortunate attempt to enlarge the authority of the Executive Branch. Cf. RLC Industries Co. and Subsidiaries v. Commissioner of Internal Revenue (9th Cir. June 19, 1995).

- Comments by Lawrence B. Gibbs (former Commissioner of the Internal Revenue Service) and John S. Nolan (former Deputy Assistant Secretary for Tax Policy), to the Assistant Secretary for Tax Policy, *reprinted in Partnership Antiabuse Rule is Broader than Necessary, Says Miller & Chevalier Attorneys*, 95 TAX NOTES TODAY 175-27 (Aug. 23, 1995).

> We write this letter as former Government tax officials who are concerned by the approach taken by the Treasury Department to deal with abusive transactions in the partnership area. During our

> Government service, we each faced similar developments in one area or another, recognized the need to deal with such developments, and did so, but not in such a broad-based manner creating such uncertainties and potential for uneven treatment among taxpayers. Even with the changes what the final regulations make in the originally proposed partnership anti-abuse regulations, we find difficulty in advising clients with the certainty and predictability that is essential to fair and even-handed application of Subchapter K.

- Letter from Rep. Bill Archer and Sen. Bob Packwood to the Honorable Lloyd Bentsen, Secretary of the Treasury, *reprinted in Archer, Packwood Caution Treasury on Partnership Antiabuse Rule*, 94 TAX NOTES TODAY 249-6 (Dec. 16, 1994).

> We are very concerned about the implications of a proposed regulation under section 701 of the Internal Revenue Code, the so-called "partnership anti-abuse rule," which we understand is scheduled to be promulgated before the end of this year or early next year. This proposed regulation has been severely criticized by both small and large taxpayers and most of the tax professional organizations. We understand that the commentators have recommended that the regulation be withdrawn or substantially revised and reissued in proposed form.

- Sheldon I. Banoff (former Chair of the Federal Taxation Committee for the Chicago Bar), *Anatomy of an Antiabuse Rule: What's Really Wrong With Reg. Section 1.701-2.*, 95 TAX NOTES TODAY 56-84 (Mar. 20, 1995).

> The antiabuse rule appears to extend existing law and go beyond congressional principles. Because there was no grant of authority in section 701 or Subchapter K in general to issue an antiabuse rule, the government has tried to walk the tightrope as to whether or not the rule is merely consistent with existing case law or attempts to create new law. Those who believe it is founded in current law point to the principles of substance over form and valid business purpose as existing judicial glosses on any technical interpretations of tax provisions. Others contend that the regulation attempts to create new law by requiring a "substantial business purpose" -- a phrase purposely undefined in the regulation -- and the wholly new test of "proper reflection of income.

- Sheldon I. Banoff (former Chair of the Federal Taxation Committee for the Chicago Bar) et. al., *Ninth Circuit Invalidates Anti-Abuse Rule; Is Reg. 1.701-2 Similarly Flawed?*, 83 J. TAX'N 380, 380 (1995).

> No one argues that the Service should not prevent tax abuse (see Special Projects Subcommittee, Partnership Committee, ABA Tax Section, "Comments on Proposed Treas. Reg. § 1.701-2," 94 TNT 146-50). A Regulation, however, that purports to license the Service with the authority to override the literal language of a statute or Regulation on a case-by-case basis on audit confuses the power of the IRS to apply its Regulations to the facts of each case with the governmental power to make such Regulations in the first place.
>
> The Service's interpretations on audit should be considered equally with the taxpayer's brief that the statute or Regulation as written has been satisfied. If the Service's position on audit rises to the level of a Regulation without going through the regulatory rulemaking process, the IRS eventually could become both prosecutor and judge in a system where the written rule of law could be disenfranchised...

- Sheldon I. Banoff (former Chair of the Federal Taxation Committee for the Chicago Bar), *The Use and Misuse of Anti-Abuse Rules*, 48 TAX LAW. 827, 836 (1995).

> To the extent that anti-abuse rules override compliance with otherwise applicable Code provisions or regulations, such rules effectively modify or repeal the substantive law to which they relate. Since the legislative provision being overridden presumably was based upon congressional policy, the anti-abuse rule gives the Service the ability to determine which of two conflicting policies should dominate. For example, an otherwise valid special allocation of taxable income and loss, in compliance with the "substantial economic effect" policy of section 704(b), could be overridden under Regulations section 1.701-2, if the Service determined that a principal purpose of the allocation was tax avoidance and other criteria were met. Insofar as the legislative history to section 704(b), as amended in 1976, indicates that Congress expressly rejected the use of a "tax avoidance purpose" test with respect to the validity of partnership allocations, the Service's attempted use of a broad anti-abuse rule could, if judicially sustained, actually move the line for valid allocations under section 704(b).

- James A. Gouwar, *The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority,* 11 J. PARTNERSHIP TAX'N 287, 294 (1995).

> In essence, [Regulation 1.701-2] purports to give the Commissioner the authority to disregard the actual provisions of the Code or other Treasury regulations in any circumstance in which the

> Commissioner believes that taxpayers have used a partnership to achieve an unintended benefit. The Supreme Court has made it clear that statutes and regulations are not to be interpreted solely to reach what the Commissioner or the Court views as the proper outcome. Furthermore, the Tax Court has rejected attempts by the Commissioner to use general anti-abuse provisions to override the specific provisions of the Code or regulations. These precedents, which are discussed below, demonstrate that the Regulation cannot be treated as a reasonable interpretation of the authority granted to the Commissioner under Section 7805.

- Letter from Karen V. Kole & Douglas J. Antonio to Congressman David M. McIntosh, *reprinted in Chicago Bar Wants Partnership Antiabuse Reg Excluded From The Reg Moratorium's Tax Reg Exemption*, 95 TAX NOTES TODAY 32-30 (Feb. 15, 1995).

> We agree with former IRS Commissioner Donald C. Alexander, who has stated as follows:
>
> "The Final Regulations are materially different than the proposed regulations. Four new anti-taxpayer examples have been inserted, and the substantive rules have been extensively rewritten and modified. The extent of the changes calls for reproposing rather than finalizing the anti-abuse rule, so that Treasury could have the benefit of taxpayer comments on the revised rules. We can discern no emergency requiring a "gotcha" approach and the abandonment of Treasury's traditional fairness in turning square corners with taxpayers. In view of the major changes made in the Final Regulations, moreover, a retroactive effective date clearly is not justified. In addition to the specific new anti-taxpayer examples, a new "proper reflection of income" test has been added that even Treasury admits is at odds with some to the provisions of Subchapter K. All these changes cry out for reproposing the regulations or, at a minimum, utilizing a prospective effective date."

- Richard M. Lipton, *IRS Improves Partnership Anti-Abuse Regs., but Major Problems Remain,* 82 J. TAX'N 132, 138-139 (1995).

> The Regulations appear to be a significant expansion of current law by administrative action. If IRS has the authority to change the law through interpretative Regulations, Congress would not have needed to enact most of the recent legislative changes used to attack "abusive" partnership transactions (i.e., Sections 707(a)(2)(B), 704(c)(2), and 737), because the Service could have dealt with such transactions under its regulatory authority. The fact that the Treasury and Congress previously believed that legislation

> was necessary to accomplish the goal of reining in abusive partnerships raises the question of whether the Service can now change the law simply by administrative fiat.

- Richard M. Lipton, *The Partnership Anti-Abuse Regs. Revisited: Is there Calm After the Storm?*, 83 J. TAX'N 68, 74 (1995).

> Further reflection on these questions shows how radical the anti-abuse Regulations are. What the IRS is saying in these Regulations is that there is no such thing as a statutory or regulatory "loophole," and the IRS has the inherent power to override any provision of the Code or Regulations to reach the "right" tax result. The Service has taken for itself the ability to "right any wrong," even if the taxpayer has merely been following the literal words of Congress (or, in the case of Regulations, the IRS).

- Pamela Olson (current Assistant Secretary Treas. for Tax Policy), *Some Thoughts on Anti-Abuse Rules*, 48 TAX LAW. 817, 822 (1995).

> When the taxpayer has succeeded in using a rule for the avoidance of tax, the courts increasingly have been willing to allow that avoidance, a position that does not seem wholly unreasonable. After all, if the taxpayer has succeeded in navigating the complex and detailed rules--a time-consuming, expensive, and unpleasant task--to reach a favorable result which, though unintended, clearly follows the rules, why should a court deny the result? The courts are not in the business of rewriting the rules. Congress and the Service have the pen; if they don't like the result, they should reformulate the rules.

- Comment by J.D. Dell to the Courier's Desk of the Internal Revenue Service, *reprinted in Attorney Finds No Connection Between Antiabuse* Rule and Code Provisions It 'Interprets', 94 TAX NOTES TODAY 141-30 (Jun. 30, 1994).

> First and foremost, I strongly believe that the Proposed Regulation goes beyond Treasury's rulemaking authority in issuing "interpretive" regulations under Section 7805(a). Upon review of Section 701 under which the Proposed Regulation purports to be promulgated, I see no relationship between the broad anti-abuse language and the text of Section 701 or its legislative history. Unfortunately, the same can be said for the balance of the provisions of subchapter K and their respective legislative histories -- the language of the Proposed Regulations bears no relationship to these provisions.

- Comment by Ronald A. Shellan (former Chair of the Taxation Section of the Oregon State Bar), to the Internal Revenue Service, *reprinted in Attorney Sees 'Fatal Flaw' in Anti-Abuse Regs.*, 94 TAX NOTES TODAY 119-25 (May 23, 1994).

  > I am writing this letter to state my views on Proposed Regulation Section 1.701-2, the so-called "anti-abuse" rule.
  >
  > I believe that the regulation should be withdrawn. Almost all tax practitioners are opposed to abuses in the tax system. However, this new regulation is simply too vague.
  >
  > The new regulation's use of the term "inconsistent with the intent of subchapter K" is too vague. No one knows what is the intent of subchapter K. There is no criteria for determining the intent of subchapter K. There are no books, records, testimony, court cases, or other information available as to the intent of subchapter K.

- Comment by Barbara C. Spudis and James H. Barrett to the Commissioner of the Internal Revenue Service, *reprinted in Commentators Say Partnership Antiabuse Rule should be Withdrawn*, 94 TAX NOTES TODAY 152-37 (Jul. 25, 1994).

  > The proposed regulation, if finalized as proposed, would appear to be invalid. The regulation must be considered an interpretive regulation rather than a legislative one, since there has been no statutory mandate to develop such a regulation. See, e.g., Rowan Companies, Inc. v. U.S., 452 U.S. 247, 253 (1981). Interpretive regulations must interpret existing statutory provisions, however. See, e.g., U.S. v. Vogel Fertilizer Co., 455 U.S. 16, 26 (1982) (holding a Treasury regulation invalid, because it failed to "harmonize" with a statute's "origin and purpose," and thus failed reasonably to interpret that statute). This proposed regulation goes beyond any statutory provision, however, and as such would be considered invalid. (See. e.g., Government of Guam v. Koster, 362 F.2d 248, 252 (9th Cir. 1966)(explaining that the Commissioner may not "prescribe any regulations which are not consistent with the federal tax statutes or which add a restriction to a statute which is not justified by the statutory language or the intent of Congress").

- Comment by Jere W. Glover (Chief Counsel for Advocacy at U.S. Small Business Administration) to the Commissioner of the Internal Revenue Service, *reprinted in SBA Criticizes Partnership Antiabuse Rule*, 94 TAX NOTES TODAY 228-27 (Aug. 26, 1994).

  > The proposed regulation does not in fact interpret section 701 or any other tax statute. A second and more important factor

> indicating that the anti-abuse rule is legislative rather than interpretative is that it would allow the Service to disregard existing subchapter K provisions as well as other tax statutes and regulations. Thus, Treasury is attempting to create new law via the proposed regulation.

- Comment by Anthony Ilardi, Jr. to the Internal Revenue Service, *reprinted in Partnership Reg. Adds Confusion, Attorney Asserts*, 94 TAX NOTES TODAY 151-42 (Jul. 29, 1994).

> The proposed regulation should not be adopted. It is defective in numerous ways.

- Comment by Ernst & Young to the Internal Revenue Service, *reprinted in Ernst & Young Criticizes Partnership Antiabuse Reg.*, 94 TAX NOTES TODAY 141-32 (Jun. 27, 1994).

> Ernst & Young wishes to register its deep concern over the proposed regulation issued under Section 701. We seriously question the validity of the regulation.

- Comment by Price Waterhouse to the Commissioner of the Internal Revenue Service, *reprinted in Partnership Antiabuse Reg Is Overly Broad, Price Waterhouse Asserts*, 95 TAX NOTES TODAY 52-32 (Feb. 14, 1995).

> In response to the issuance of the final version of Regulation Section 1.701-2, we acknowledge Treasury's effort to provide taxpayers and practitioners with additional clarification with respect to the proposed regulation and further guidance through the issuance of additional examples. However, we believe this final regulation is still ambiguous and excessively broad in scope.

- Comment by Harvey L. Coustan to the Commissioner of the Internal Revenue Service, *reprinted in AICPA Calls For Changes in Partnership Antiabuse Reg.*, 94 TAX NOTES TODAY 139-64 (Jul. 13, 1994).

> If a transaction complies with the literal language of a statute or regulation, it should not be recast unless it is a sham with no economic substance or reality. If the literal language of a statute causes abuse, Congress should change it; if a regulation causes abuse, Treasury should change it. If taxpayers cannot rely on statutes and regulations, uncertainty will always exist with any transaction, resulting in a tax law that can not be fairly administered.

- Comment by Stephen J. Albanna to the Commissioner of the Internal Revenue Service, *reprinted in Commentator Finds Fault With Partnership Regs.*, 94 TAX NOTES TODAY 125-24 (Jun. 10, 1994).

> This regulation is an attempt to diminish the taxpayers ability to plan for tax minimization. Currently, the Service has the ability to challenge the application of the code and regulations through the audit process. In addition the Service seeks the broad authority to promulgate their view as law. This authority is to be enforced after it is determined that the traditional route of audit and appeal does not a favorable outcome. The Commissioner should not have the final authority to discern the Congressional intent of subchapter K.

- Comment by Douglas J. Antonio (former Chair of Federal Taxation Committee for the Chicago Bar Association) to the Internal Revenue Service, *reprinted in Partnership Antiabuse Regs should be Subject to Executive Order, Attorney Asserts*, 94 TAX NOTES TODAY 121-11 (Jun. 10, 1994).

> The language of the Proposed Regulation is so broad that it captures transactions that undoubtedly have tens of billions of dollars of effect on the economy

- Comment by Coopers & Lybrand to the Commissioner of the Internal Revenue Service, *reprinted in Coopers & Lybrand Urges Withdrawal Partnership Antiabuse Rule*, 94 TAX NOTES TODAY 172-25 (Jul. 7, 1994).

> We recognize the government's interest in assuring that the partnership tax rules are not used in an abusive manner to achieve unwarranted tax results. However, Prop. Reg. Sec. 1.701-2 is so overly broad that it has "chilled" legitimate economic transactions, and therefore, needs to be withdrawn immediately.

- Comment by Steven A. Wechsler to Internal Revenue Service, *reprinted in Realty Committee Recommends Withdrawal of Antiabuse Reg.*, 94 TAX NOTES TODAY 146-48 (Jul. 20, 1994).

> Under the Proposed Partnership Anti-Abuse Regulation, if a partnership (not a C corporation, not a real estate investment trust, and not an individual, but only a partnership) is involved in a transaction and the Internal Revenue Service makes the determination that A principal purpose (as opposed to THE principal purpose test set forth in Code Section 269) of the use of the partnership was substantially to reduce the present value of the partners' aggregate Federal tax liability in a manner inconsistent with the "intent" of Subchapter K, then the Service may disregard the form of the transaction. Surprisingly, the Revenue Service can do this even though the taxpayer undertook the transaction in full

> compliance with all applicable provisions of the Code and Regulations (referred to in the Proposed Regulation as "literal language") and case law.

- Comment by Michael S. Wolff to the Internal Revenue Service, *reprinted in Grant Thornton Calls Antiabuse Rule an Invitation to Unfairness*, 94 TAX NOTES TODAY 141-34 (Jun. 27, 1994).

> If the Proposed Regulation attempts to expand tax law governing partnerships, one must question its validity absent congressional authorization. The creation of tax law is the domain of Congress.

152817.6
002871-000000:12/3/2003

C
Treas. Reg. § 1.701-2

**CODE OF FEDERAL REGULATIONS**
**TITLE 26--INTERNAL REVENUE**
**CHAPTER I--INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY**
**SUBCHAPTER A--INCOME TAX**
**PART 1--INCOME TAXES**
**NORMAL TAXES AND SURTAXES**
**PARTNERS AND PARTNERSHIPS**
**DETERMINATION OF TAX LIABILITY**
Current through November 21, 2003; 68 FR 65827

§ 1.701-2 Anti-abuse rule.

(a) Intent of subchapter K. Subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements--

(1) The partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose.

(2) The form of each partnership transaction must be respected under substance over form principles.

(3) Except as otherwise provided in this paragraph (a)(3), the tax consequences under subchapter K to each partner of partnership operations and of transactions between the partner and the partnership must accurately reflect the partners' economic agreement and clearly reflect the partner's income (collectively, proper reflection of income). However, certain provisions of subchapter K and the regulations thereunder were adopted to promote administrative convenience and other policy objectives, with the recognition that the application of those provisions to a transaction could, in some circumstances, produce tax results that do not properly reflect income. Thus, the proper reflection of income requirement of this paragraph (a)(3) is treated as satisfied with respect to a transaction that satisfies paragraphs (a)(1) and (2) of this section to the extent that the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision. See, for example, paragraph (d) Example 6 of this section (relating to the value-equals-basis rule in § 1.704-1(b)(2)(iii)(c)), paragraph (d) Example 9 of this section (relating to the election under section 754 to adjust basis in partnership property), and paragraph (d) Examples 10 and 11 of this section (relating to the basis in property distributed by a partnership under section 732). See also, for example, § § 1.704-3(e)(1) and 1.752-2(e)(4) (providing certain de minimis exceptions).

(b) Application of subchapter K rules. The provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in paragraph (a) of this section (intent of subchapter K). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K--

(1) The purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners;

(2) One or more of the purported partners of the partnership should not be treated as a partner;

(3) The methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income;

(4) The partnership's items of income, gain, loss, deduction, or credit should be reallocated; or

(5) The claimed tax treatment should otherwise be adjusted or modified.

(c) Facts and circumstances analysis; factors. Whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. The factors set forth below may be indicative, but do not necessarily establish, that a partnership was used in such a manner. These factors are illustrative only, and therefore may not be the only factors taken into account in making the determination under this section. Moreover, the weight given to any factor (whether specified in this paragraph or otherwise) depends on all the facts and circumstances. The presence or absence of any factor described in this paragraph does not create a presumption that a partnership was (or was not) used in such a manner. Factors include:

(1) The present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership's assets and conducted the partnership's activities directly;

(2) The present value of the partners' aggregate federal tax liability is substantially less than would be the case if purportedly separate transactions that are designed to achieve a particular end result are integrated and treated as steps in a single transaction. For example, this analysis may indicate that it was contemplated that a partner who was necessary to achieve the intended tax results and whose interest in the partnership was liquidated or disposed of (in whole or in part) would be a partner only temporarily in order to provide the claimed tax benefits to the remaining partners;

(3) One or more partners who are necessary to achieve the claimed tax results either have a nominal interest in the partnership, are substantially protected from any risk of loss from the partnership's activities (through distribution preferences, indemnity or loss guaranty agreements, or other arrangements), or have little or no participation in the profits from the partnership's activities other than a preferred return that is in the nature of a payment for the use of capital;

(4) Substantially all of the partners (measured by number or interests in the partnership) are related (directly or indirectly) to one another;

(5) Partnership items are allocated in compliance with the literal language of § § 1.704-1 and 1.704-2 but with results that are inconsistent with the purpose of section 704(b) and those regulations. In this regard, particular scrutiny will be paid to partnerships in which income or gain is specially allocated to one or more partners that may be legally or effectively exempt from federal taxation (for example, a foreign person, an exempt organization, an insolvent taxpayer, or a taxpayer with unused federal tax attributes such as net operating losses, capital losses, or foreign tax credits);

(6) The benefits and burdens of ownership of property nominally contributed to the partnership are in substantial part retained (directly or indirectly) by the contributing partner (or a related party); or

(7) The benefits and burdens of ownership of partnership property are in substantial part shifted (directly or indirectly) to the distributee partner before or after the property is actually distributed to the distributee partner (or a related party).

(d) Examples. The following examples illustrate the principles of paragraphs (a), (b), and (c) of this section. The examples set forth below do not delineate the boundaries of either permissible or impermissible types of transactions. Further, the addition of any facts or circumstances that are not specifically set forth in an example (or the deletion of any facts or circumstances) may alter the outcome of the transaction described in the example. Unless otherwise indicated, parties to the transactions are not related to one another.

Example 1. Choice of entity; avoidance of entity-level tax; use of partnership consistent with the intent of subchapter K. (i) A and B form limited partnership PRS to conduct a bona fide business. A, the corporate general partner, has a 1% partnership interest. B, the individual limited partner, has a 99% interest. PRS is properly classified as a partnership under § § 301.7701-2 and 301.7701-3. A and B chose limited partnership form as a means to provide B with limited liability without subjecting the income from the business operations to an entity-level tax.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. Although B has retained, indirectly, substantially all of the benefits and burdens of ownership of the money or property B contributed to PRS (see paragraph (c)(6) of this section), the decision to organize and conduct business through PRS under these circumstances is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. The Commissioner therefore cannot

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

invoke paragraph (b) of this section to recast the transaction.

Example 2. Choice of entity; avoidance of subchapter S shareholder requirements; use of partnership consistent with the intent of subchapter K. (i) A and B form partnership PRS to conduct a bona fide business. A is a corporation that has elected to be treated as an S corporation under subchapter S. B is a nonresident alien. PRS is properly classified as a partnership under § § 301.7701-2 and 301.7701-3. Because section 1361(b) prohibits B from being a shareholder in A, A and B chose partnership form, rather than admit B as a shareholder in A, as a means to retain the benefits of subchapter S treatment for A and its shareholders.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Although it may be argued that the form of the partnership transaction should not be respected because it does not reflect its substance (inasmuch as application of the substance over form doctrine arguably could result in B being treated as a shareholder of A, thereby invalidating A's subchapter S election), the facts indicate otherwise. The shareholders of A are subject to tax on their pro rata shares of A's income (see section 1361 et seq.), and B is subject to tax on B's distributive share of partnership income (see sections 871 and 875). Thus, the form in which this arrangement is cast accurately reflects its substance as a separate partnership and S corporation. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 3. Choice of entity; avoidance of more restrictive foreign tax credit limitation; use of partnership consistent with the intent of subchapter K. (i) X, a domestic corporation, and Y, a foreign corporation, form partnership PRS under the laws of foreign Country A to conduct a bona fide joint business. X and Y each owns a 50% interest in PRS. PRS is properly classified as a partnership under § § 301.7701-2 and 301.7701-3. PRS pays income taxes to Country A. X and Y chose partnership form to enable X to qualify for a direct foreign tax credit under section 901, with look-through treatment under § 1.904-5(h)(1). Conversely, if PRS were a foreign corporation for U.S. tax purposes, X would be entitled only to indirect foreign tax credits under section 902 with respect to dividend distributions from PRS. The look- through rules, however, would not apply, and pursuant to section 904(d)(1)(E) and § 1.904-4(g), the dividends and associated taxes would be subject to a separate foreign tax credit limitation for dividends from PRS, a noncontrolled section 902 corporation.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS in order to take advantage of the look-through rules for foreign tax credit purposes, thereby maximizing X's use of its proper share of foreign taxes paid by PRS, is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 4. Choice of entity; avoidance of gain recognition under sections 351(e) and 357(c); use of partnership consistent with the intent of subchapter K. (i) X, ABC, and DEF form limited partnership PRS to conduct a bona fide real estate management business. PRS is properly classified as a partnership under § § 301.7701-2 and 301.7701-3. X, the general partner, is a newly formed corporation that elects to be treated as a real estate investment trust as defined in section 856. X offers its stock to the public and contributes substantially all of the proceeds from the public offering to PRS. ABC and DEF, the limited partners, are existing partnerships with substantial real estate holdings. ABC and DEF contribute all of their real property assets to PRS, subject to liabilities that exceed their respective aggregate bases in the real property contributed, and terminate under section 708(b)(1)(A). In addition, some of the former partners of ABC and DEF each have the right, beginning two years after the formation of PRS, to require the redemption of their limited partnership interests in PRS in exchange for cash or X stock (at X's option) equal to the fair market value of their respective interests in PRS at the time of the redemption. These partners are not compelled, as a legal or practical matter, to exercise their exchange rights at any time. X, ABC, and DEF chose to form a partnership rather than have ABC and DEF invest directly in X to allow ABC and DEF to avoid recognition of gain under sections 351(e) and 357(c). Because PRS would not be treated as an investment company within the meaning of section 351(e) if PRS were incorporated (so long as it did not

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

elect under section 856), section 721(a) applies to the contribution of the real property to PRS. See section 721(b).

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS, thereby avoiding the tax consequences that would have resulted from contributing the existing partnerships' real estate assets to X (by applying the rules of sections 721, 731, and 752 in lieu of the rules of sections 351(e) and 357(c)), is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Although it may be argued that the form of the transaction should not be respected because it does not reflect its substance (inasmuch as the present value of the partners' aggregate federal tax liability is substantially less than would be the case if the transaction were integrated and treated as a contribution of the encumbered assets by ABC and DEF directly to X, see paragraph (c)(2) of this section), the facts indicate otherwise. For example, the right of some of the former ABC and DEF partners after two years to exchange their PRS interests for cash or X stock (at X's option) equal to the fair market value of their PRS interest at that time would not require that right to be considered as exercised prior to its actual exercise. Moreover, X may make other real estate investments and other business decisions, including the decision to raise additional capital for those purposes. Thus, although it may be likely that some or all of the partners with the right to do so will, at some point, exercise their exchange rights, and thereby receive either cash or X stock, the form of the transaction as a separate partnership and real estate investment trust is respected under substance over form principles (see paragraph (a)(2) of this section). The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 5. Special allocations; dividends received deductions; use of partnership consistent with the intent of subchapter K. (i) Corporations X and Y contribute equal amounts to PRS, a bona fide partnership formed to make joint investments. PRS pays $100x for a share of common stock of Z, an unrelated corporation, which has historically paid an annual dividend of $6x. PRS specially allocates the dividend income on the Z stock to X to the extent of the London Inter-Bank Offered Rate (LIBOR) on the record date, applied to X's contribution of $50x, and allocates the remainder of the dividend income to Y. All other items of partnership income and loss are allocated equally between X and Y. The allocations under the partnership agreement have substantial economic effect within the meaning of § 1.704-1(b)(2). In addition to avoiding an entity-level tax, a principal purpose for the formation of the partnership was to invest in the Z common stock and to allocate the dividend income from the stock to provide X with a floating-rate return based on LIBOR, while permitting X and Y to claim the dividends received deduction under section 243 on the dividends allocated to each of them.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Section 704(b) and § 1.704-1(b)(2) permit income realized by the partnership to be allocated validly to the partners separate from the partners' respective ownership of the capital to which the allocations relate, provided that the allocations satisfy both the literal requirements of the statute and regulations and the purpose of those provisions (see paragraph (c)(5) of this section). Section 704(e)(2) is not applicable to the facts of this example (otherwise, the allocations would be required to be proportionate to the partners' ownership of contributed capital). The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 6. Special allocations; nonrecourse financing; low-income housing credit; use of partnership consistent with the intent of subchapter K. (i) A and B, high-bracket taxpayers, and X, a corporation with net operating loss carryforwards, form general partnership PRS to own and operate a building that qualifies for the low-income housing credit provided by section 42. The project is financed with both cash contributions from the partners and nonrecourse indebtedness. The partnership agreement provides for special allocations of income and deductions, including the allocation of all depreciation deductions attributable to the building to A and B equally in a manner that is reasonably consistent with allocations that have substantial economic effect of some other significant partnership item attributable to the building. The section 42 credits are allocated to A and B in accordance with the allocation of depreciation deductions. PRS's allocations comply with all applicable regulations, including the requirements of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

§ § 1.704- 1(b)(2)(ii) (pertaining to economic effect) and 1.704-2(e) (requirements for allocations of nonrecourse deductions). The nonrecourse indebtedness is validly allocated to the partners under the rules of § 1.752-3, thereby increasing the basis of the partners' respective partnership interests. The basis increase created by the nonrecourse indebtedness enables A and B to deduct their distributive share of losses from the partnership (subject to all other applicable limitations under the Internal Revenue Code) against their nonpartnership income and to apply the credits against their tax liability.

(ii) At a time when the depreciation deductions attributable to the building are not treated as nonrecourse deductions under § 1.704-2(c) (because there is no net increase in partnership minimum gain during the year), the special allocation of depreciation deductions to A and B has substantial economic effect because of the value-equals-basis safe harbor contained in § 1.704- 1(b)(2)(iii)(c) and the fact that A and B would bear the economic burden of any decline in the value of the building (to the extent of the partnership's investment in the building), notwithstanding that A and B believe it is unlikely that the building will decline in value (and, accordingly, they anticipate significant timing benefits through the special allocation). Moreover, in later years, when the depreciation deductions attributable to the building are treated as nonrecourse deductions under § 1.704-2(c), the special allocation of depreciation deductions to A and B is considered to be consistent with the partners' interests in the partnership under § 1.704-2(e).

(iii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1), (2), and (3) of this section have been satisfied. Section 704(b), § 1.704-1(b)(2), and § 1.704-2(e) allow partnership items of income, gain, loss, deduction, and credit to be allocated validly to the partners separate from the partners' respective ownership of the capital to which the allocations relate, provided that the allocations satisfy both the literal requirements of the statute and regulations and the purpose of those provisions (see paragraph (c)(5) of this section). Moreover, the application of the value-equals-basis safe harbor and the provisions of § 1.704-2(e) with respect to the allocations to A and B, and the tax results of the application of those provisions, taking into account all the facts and circumstances, are clearly contemplated. Accordingly, even if the allocations would not otherwise be considered to satisfy the proper reflection of income standard in paragraph (a)(3) of this section, that requirement will be treated as satisfied under these facts. Thus, even though the partners' aggregate federal tax liability may be substantially less than had the partners owned the partnership's assets directly (due to X's inability to use its allocable share of the partnership's losses and credits) (see paragraph (c)(1) of this section), the transaction is not inconsistent with the intent of subchapter K. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 7. Partner with nominal interest; temporary partner; use of partnership not consistent with the intent of subchapter K. (i) Pursuant to a plan a principal purpose of which is to generate artificial losses and thereby shelter from federal taxation a substantial amount of income, X (a foreign corporation), Y (a domestic corporation), and Z (a promoter) form partnership PRS by contributing $9,000x, $990x, and $10x, respectively, for proportionate interests (90.0%, 9.9%, and 0.1%, respectively) in the capital and profits of PRS. PRS purchases offshore equipment for $10,000x and validly leases the equipment offshore for a term representing most of its projected useful life. Shortly thereafter, PRS sells its rights to receive income under the lease to a third party for $9,000x, and allocates the resulting $9,000x of income $8,100x to X, $891x to Y, and $9x to Z. PRS thereafter makes a distribution of $9,000x to X in complete liquidation of its interest. Under § 1.704-1(b)(2)(iv)(f), PRS restates the partners' capital accounts immediately before making the liquidating distribution to X to reflect its assets consisting of the offshore equipment worth $1,000x and $9,000x in cash. Thus, because the capital accounts immediately before the distribution reflect assets of $19,000x (that is, the initial capital contributions of $10,000x plus the $9,000x of income realized from the sale of the lease), PRS allocates a $9,000x book loss among the partners (for capital account purposes only), resulting in restated capital accounts for X, Y, and Z of $9,000x, $990x, and $10x, respectively. Thereafter, PRS purchases real property by borrowing the $8,000x purchase price on a recourse basis, which increases Y's and Z's bases in their respective partnership interests from $1,881x and $19x, to $9,801x and $99x, respectively (reflecting Y's and Z's adjusted interests in the partnership of 99% and 1%, respectively). PRS subsequently sells the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

offshore equipment, subject to the lease, for $1,000x and allocates the $9,000x tax loss $8,910x to Y and $90x to Z. Y's and Z's bases in their partnership interests are therefore reduced to $891x and $9x, respectively.

(ii) On these facts, any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes (see paragraph (c) of this section). Accordingly, the transaction lacks a substantial business purpose (see paragraph (a)(1) of this section). In addition, factors (1), (2), (3), and (5) of paragraph (c) of this section indicate that PRS was used with a principal purpose to reduce substantially the partners' tax liability in a manner inconsistent with the intent of subchapter K. On these facts, PRS is not bona fide (see paragraph (a)(1) of this section), and the transaction is not respected under applicable substance over form principles (see paragraph (a)(2) of this section) and does not properly reflect the income of Y (see paragraph (a)(3) of this section). Thus, PRS has been formed and availed of with a principal purpose of reducing substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under judicial principles or the validity of the allocations under § 1.704-1(b)(2) (see paragraph (h) of this section)), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

Example 8. Plan to duplicate losses through absence of section 754 election; use of partnership not consistent with the intent of subchapter K. (i) A owns land with a basis of $100x and a fair market value of $60x. A would like to sell the land to B. A and B devise a plan a principal purpose of which is to permit the duplication, for a substantial period of time, of the tax benefit of A's built-in loss in the land. To effect this plan, A, C (A's brother), and W (C's wife) form partnership PRS, to which A contributes the land, and C and W each contribute $30x. All partnership items are shared in proportion to the partners' respective contributions to PRS. PRS invests the cash in an investment asset (that is not a marketable security within the meaning of section 731(c)). PRS also leases the land to B under a three-year lease pursuant to which B has the option to purchase the land from PRS upon the expiration of the lease for an amount equal to its fair market value at that time. All lease proceeds received are immediately distributed to the partners. In year 3, at a time when the values of the partnership's assets have not materially changed, PRS agrees with A to liquidate A's interest in exchange for the investment asset held by PRS. Under section 732(b), A's basis in the asset distributed equals $100x, A's basis in A's partnership interest immediately before the distribution. Shortly thereafter, A sells the investment asset to X, an unrelated party, recognizing a $40x loss.

(ii) PRS does not make an election under section 754. Accordingly, PRS's basis in the land contributed by A remains $100x. At the end of year 3, pursuant to the lease option, PRS sells the land to B for $60x (its fair market value). Thus, PRS recognizes a $40x loss on the sale, which is allocated equally between C and W. C's and W's bases in their partnership interests are reduced to $10x each pursuant to section 705. Their respective interests are worth $30x each. Thus, upon liquidation of PRS (or their interests therein), each of C and W will recognize $20x of gain. However, PRS's continued existence defers recognition of that gain indefinitely. Thus, if this arrangement is respected, C and W duplicate for their benefit A's built-in loss in the land prior to its contribution to PRS.

(iii) On these facts, any purported business purpose for the transaction is insignificant in comparison to the tax benefits that would result if the transaction were respected for federal tax purposes (see paragraph (c) of this section). Accordingly, the transaction lacks a substantial business purpose (see paragraph (a)(1) of this section). In addition, factors (1), (2), and (4) of paragraph (c) of this section indicate that PRS was used with a principal purpose to reduce substantially the partners' tax liability in a manner inconsistent with the intent of subchapter K. On these facts, PRS is not bona fide (see paragraph (a)(1) of this section), and the transaction is not respected under applicable substance over form principles (see paragraph (a)(2) of this section). Further, the tax consequences to the partners do not properly reflect the partners' income; and Congress did not contemplate application of section 754 to partnerships such as PRS, which was formed for a principal purpose of producing a double tax benefit from a single economic loss (see paragraph (a)(3) of this section). Thus, PRS has been formed and availed of with a principal purpose of reducing substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under judicial principles or other statutory authorities, such as the substance over form doctrine or the disguised sale rules under section 707 (see paragraph (h) of this section)), the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

Example 9. Absence of section 754 election; use of partnership consistent with the intent of subchapter K. (i) PRS is a bona fide partnership formed to engage in investment activities with contributions of cash from each partner. Several years after joining PRS, A, a partner with a capital account balance and basis in its partnership interest of $100x, wishes to withdraw from PRS. The partnership agreement entitles A to receive the balance of A's capital account in cash or securities owned by PRS at the time of withdrawal, as mutually agreed to by A and the managing general partner, P. P and A agree to distribute to A $100x worth of non-marketable securities (see section 731(c)) in which PRS has an aggregate basis of $20x. Upon distribution, A's aggregate basis in the securities is $100x under section 732(b). PRS does not make an election to adjust the basis in its remaining assets under section 754. Thus, PRS's basis in its remaining assets is unaffected by the distribution. In contrast, if a section 754 election had been in effect for the year of the distribution, under these facts section 734(b) would have required PRS to adjust the basis in its remaining assets downward by the amount of the untaxed appreciation in the distributed property, thus reflecting that gain in PRS's retained assets. In selecting the assets to be distributed, A and P had a principal purpose to take advantage of the facts that A's basis in the securities will be determined by reference to A's basis in its partnership interest under section 732(b), and because PRS will not make an election under section 754, the remaining partners of PRS will likely enjoy a federal tax timing advantage (i.e., from the $80x of additional basis in its assets that would have been eliminated if the section 754 election had been made) that is inconsistent with proper reflection of income under paragraph (a)(3) of this section.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1) and (2) of this section have been satisfied. The validity of the tax treatment of this transaction is therefore dependent upon whether the transaction satisfies (or is treated as satisfying) the proper reflection of income standard under paragraph (a)(3) of this section. A's basis in the distributed securities is properly determined under section 732(b). The benefit to the remaining partners is a result of PRS not having made an election under section 754. Subchapter K is generally intended to produce tax consequences that achieve proper reflection of income. However, paragraph (a)(3) of this section provides that if the application of a provision of subchapter K produces tax results that do not properly reflect income, but application of that provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision (and the transaction satisfies the requirements of paragraphs (a)(1) and (2) of this section), then the application of that provision to the transaction will be treated as satisfying the proper reflection of income standard.

(iii) In general, the adjustments that would be made if an election under section 754 were in effect are necessary to minimize distortions between the partners' bases in their partnership interests and the partnership's basis in its assets following, for example, a distribution to a partner. The electivity of section 754 is intended to provide administrative convenience for bona fide partnerships that are engaged in transactions for a substantial business purpose, by providing those partnerships the option of not adjusting their bases in their remaining assets following a distribution to a partner. Congress clearly recognized that if the section 754 election were not made, basis distortions may result. Taking into account all the facts and circumstances of the transaction, the electivity of section 754 in the context of the distribution from PRS to A, and the ultimate tax consequences that follow from the failure to make the election with respect to the transaction, are clearly contemplated by section 754. Thus, the tax consequences of this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 10. Basis adjustments under section 732; use of partnership consistent with the intent of subchapter K. (i) A, B, and C are partners in partnership PRS, which has for several years been engaged in substantial bona fide business activities. For valid business reasons, the partners agree that A's interest in PRS, which has a value and basis of $100x, will be liquidated with the following assets of PRS: a nondepreciable asset with a value of $60x and a basis to PRS of $40x, and related equipment with two years of cost recovery remaining and a value and basis to PRS of $40x. Neither asset is described in section 751 and the transaction is not

described in section 732(d). Under section 732(b) and (c), A's $100x basis in A's partnership interest will be allocated between the nondepreciable asset and the equipment received in the liquidating distribution in proportion to PRS's bases in those assets, or $50x to the nondepreciable asset and $50x to the equipment. Thus, A will have a $10x built-in gain in the nondepreciable asset ($60x value less $50x basis) and a $10x built-in loss in the equipment ($50x basis less $40x value), which it expects to recover rapidly through cost recovery deductions. In selecting the assets to be distributed to A, the partners had a principal purpose to take advantage of the fact that A's basis in the assets will be determined by reference to A's basis in A's partnership interest, thus, in effect, shifting a portion of A's basis from the nondepreciable asset to the equipment, which in turn would allow A to recover that portion of its basis more rapidly. This shift provides a federal tax timing advantage to A, with no offsetting detriment to B or C.

(ii) Subchapter K is intended to permit taxpayers to conduct joint business activity through a flexible economic arrangement without incurring an entity-level tax. See paragraph (a) of this section. The decision to organize and conduct business through PRS is consistent with this intent. In addition, on these facts, the requirements of paragraphs (a)(1) and (2) of this section have been satisfied. The validity of the tax treatment of this transaction is therefore dependent upon whether the transaction satisfies (or is treated as satisfying) the proper reflection of income standard under paragraph (a)(3) of this section. Subchapter K is generally intended to produce tax consequences that achieve proper reflection of income. However, paragraph (a)(3) of this section provides that if the application of a provision of subchapter K produces tax results that do not properly reflect income, but the application of that provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision (and the transaction satisfies the requirements of paragraphs (a)(1) and (2) of this section), then the application of that provision to the transaction will be treated as satisfying the proper reflection of income standard.

(iii) A's basis in the assets distributed to it was determined under section 732 (b) and (c). The transaction does not properly reflect A's income due to the basis distortions caused by the distribution and the shifting of basis from a nondepreciable to a depreciable asset. However, the basis rules under section 732, which in some situations can produce tax results that are inconsistent with the proper reflection of income standard (see paragraph (a)(3) of this section), are intended to provide simplifying administrative rules for bona fide partnerships that are engaged in transactions with a substantial business purpose. Taking into account all the facts and circumstances of the transaction, the application of the basis rules under section 732 to the distribution from PRS to A, and the ultimate tax consequences of the application of that provision of subchapter K, are clearly contemplated. Thus, the application of section 732 to this transaction will be treated as satisfying the proper reflection of income standard under paragraph (a)(3) of this section. The Commissioner therefore cannot invoke paragraph (b) of this section to recast the transaction.

Example 11. Basis adjustments under section 732; plan or arrangement to distort basis allocations artificially; use of partnership not consistent with the intent of subchapter K. (i) Partnership PRS has for several years been engaged in the development and management of commercial real estate projects. X, an unrelated party, desires to acquire undeveloped land owned by PRS, which has a value of $95x and a basis of $5x. X expects to hold the land indefinitely after its acquisition. Pursuant to a plan a principal purpose of which is to permit X to acquire and hold the land but nevertheless to recover for tax purposes a substantial portion of the purchase price for the land, X contributes $100x to PRS for an interest therein. Subsequently (at a time when the value of the partnership's assets have not materially changed), PRS distributes to X in liquidation of its interest in PRS the land and another asset with a value and basis to PRS of $5x. The second asset is an insignificant part of the economic transaction but is important to achieve the desired tax results. Under section 732(b) and (c), X's $100x basis in its partnership interest is allocated between the assets distributed to it in proportion to their bases to PRS, or $50x each. Thereafter, X plans to sell the second asset for its value of $5x, recognizing a loss of $45x. In this manner, X will, in effect, recover a substantial portion of the purchase price of the land almost immediately. In selecting the assets to be distributed to X, the partners had a principal purpose to take advantage of the fact that X's basis in the assets will be determined under section 732(b) and (c), thus, in effect, shifting a portion of X's basis economically allocable to the land that X intends to retain to an inconsequential asset that X intends to dispose of quickly. This shift provides a federal tax timing advantage to X, with no offsetting detriment to any of PRS's other partners.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(ii) Although section 732 recognizes that basis distortions can occur in certain situations, which may produce tax results that do not satisfy the proper reflection of income standard of paragraph (a)(3) of this section, the provision is intended only to provide ancillary, simplifying tax results for bona fide partnership transactions that are engaged in for substantial business purposes. Section 732 is not intended to serve as the basis for plans or arrangements in which inconsequential or immaterial assets are included in the distribution with a principal purpose of obtaining substantially favorable tax results by virtue of the statute's simplifying rules. The transaction does not properly reflect X's income due to the basis distortions caused by the distribution that result in shifting a significant portion of X's basis to this inconsequential asset. Moreover, the proper reflection of income standard contained in paragraph (a)(3) of this section is not treated as satisfied, because, taking into account all the facts and circumstances, the application of section 732 to this arrangement, and the ultimate tax consequences that would thereby result, were not clearly contemplated by that provision of subchapter K. In addition, by using a partnership (if respected), the partners' aggregate federal tax liability would be substantially less than had they owned the partnership's assets directly (see paragraph (c)(1) of this section). On these facts, PRS has been formed and availed of with a principal purpose to reduce the taxpayers' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. Therefore (in addition to possibly challenging the transaction under applicable judicial principles and statutory authorities, such as the disguised sale rules under section 707, see paragraph (h) of this section), the Commissioner can recast the transaction as appropriate under paragraph (b) of this section.

(e) Abuse of entity treatment--(1) General rule. The Commissioner can treat a partnership as an aggregate of its partners in whole or in part as appropriate to carry out the purpose of any provision of the Internal Revenue Code or the regulations promulgated thereunder.

(2) Clearly contemplated entity treatment. Paragraph (e)(1) of this section does not apply to the extent that--

(i) A provision of the Internal Revenue Code or the regulations promulgated thereunder prescribes the treatment of a partnership as an entity, in whole or in part, and

(ii) That treatment and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision.

(f) Examples. The following examples illustrate the principles of paragraph (e) of this section. The examples set forth below do not delineate the boundaries of either permissible or impermissible types of transactions. Further, the addition of any facts or circumstances that are not specifically set forth in an example (or the deletion of any facts or circumstances) may alter the outcome of the transaction described in the example. Unless otherwise indicated, parties to the transactions are not related to one another.

Example 1. Aggregate treatment of partnership appropriate to carry out purpose of section 163(e)(5). (i) Corporations X and Y are partners in partnership PRS, which for several years has engaged in substantial bona fide business activities. As part of these business activities, PRS issues certain high yield discount obligations to an unrelated third party. Section 163(e)(5) defers (and in certain circumstances disallows) the interest deductions on this type of obligation if issued by a corporation. PRS, X, and Y take the position that, because PRS is a partnership and not a corporation, section 163(e)(5) is not applicable.

(ii) Section 163(e)(5) does not prescribe the treatment of a partnership as an entity for purposes of that section. The purpose of section 163(e)(5) is to limit corporate-level interest deductions on certain obligations. The treatment of PRS as an entity could result in a partnership with corporate partners issuing those obligations and thereby circumventing the purpose of section 163(e)(5), because the corporate partner would deduct its distributive share of the interest on obligations that would have been deferred until paid or disallowed had the corporation issued its share of the obligation directly. Thus, under paragraph (e)(1) of this section, PRS is properly treated as an aggregate of its partners for purposes of applying section 163(e)(5) (regardless of whether any party had a tax avoidance purpose in having PRS issue the obligation). Each partner of PRS will therefore be treated as issuing its share of the obligations for purposes of determining the deductibility of its distributive share of any interest on the obligations. See also section 163(i)(5)(B).

Example 2. Aggregate treatment of partnership appropriate to carry out purpose of section 1059. (i) Corporations X and Y are partners in partnership PRS, which for several years has engaged in

substantial bona fide business activities. As part of these business activities, PRS purchases 50 shares of Corporation Z common stock. Six months later, Corporation Z announces an extraordinary dividend (within the meaning of section 1059). Section 1059(a) generally provides that if any corporation receives an extraordinary dividend with respect to any share of stock and the corporation has not held the stock for more than two years before the dividend announcement date, the basis in the stock held by the corporation is reduced by the nontaxed portion of the dividend. PRS, X, and Y take the position that section 1059(a) is not applicable because PRS is a partnership and not a corporation.

(ii) Section 1059(a) does not prescribe the treatment of a partnership as an entity for purposes of that section. The purpose of section 1059(a) is to limit the benefits of the dividends received deduction with respect to extraordinary dividends. The treatment of PRS as an entity could result in corporate partners in the partnership receiving dividends through partnerships in circumvention of the intent of section 1059. Thus, under paragraph (e)(1) of this section, PRS is properly treated as an aggregate of its partners for purposes of applying section 1059 (regardless of whether any party had a tax avoidance purpose in acquiring the Z stock through PRS). Each partner of PRS will therefore be treated as owning its share of the stock. Accordingly, PRS must make appropriate adjustments to the basis of the Corporation Z stock, and the partners must also make adjustments to the basis in their respective interests in PRS under section 705(a)(2)(B). See also section 1059(g)(1).

Example 3. Prescribed entity treatment of partnership; determination of CFC status clearly contemplated. (i) X, a domestic corporation, and Y, a foreign corporation, intend to conduct a joint venture in foreign Country A. They form PRS, a bona fide domestic general partnership in which X owns a 40% interest and Y owns a 60% interest. PRS is properly classified as a partnership under § § 301.7701-2 and 301.7701-3. PRS holds 100% of the voting stock of Z, a Country A entity that is classified as an association taxable as a corporation for federal tax purposes under § 301.7701-2. Z conducts its business operations in Country A. By investing in Z through a domestic partnership, X seeks to obtain the benefit of the look-through rules of section 904(d)(3) and, as a result, maximize its ability to claim credits for its proper share of Country A taxes expected to be incurred by Z.

(ii) Pursuant to sections 957(c) and 7701(a)(30), PRS is a United States person. Therefore, because it owns 10% or more of the voting stock of Z, PRS satisfies the definition of a U.S. shareholder under section 951(b). Under section 957(a), Z is a controlled foreign corporation (CFC) because more than 50% of the voting power or value of its stock is owned by PRS. Consequently, under section 904(d)(3), X qualifies for look-through treatment in computing its credit for foreign taxes paid or accrued by Z. In contrast, if X and Y owned their interests in Z directly, Z would not be a CFC because only 40% of its stock would be owned by U.S. shareholders. X's credit for foreign taxes paid or accrued by Z in that case would be subject to a separate foreign tax credit limitation for dividends from Z, a noncontrolled section 902 corporation. See section 904(d)(1)(E) and § 1.904-4(g).

(iii) Sections 957(c) and 7701(a)(30) prescribe the treatment of a domestic partnership as an entity for purposes of defining a U.S. shareholder, and thus, for purposes of determining whether a foreign corporation is a CFC. The CFC rules prevent the deferral by U.S. shareholders of U.S. taxation of certain earnings of the CFC and reduce disparities that otherwise might occur between the amount of income subject to a particular foreign tax credit limitation when a taxpayer earns income abroad directly rather than indirectly through a CFC. The application of the look-through rules for foreign tax credit purposes is appropriately tied to CFC status. See sections 904(d)(2)(E) and 904(d)(3). This analysis confirms that Congress clearly contemplated that taxpayers could use a bona fide domestic partnership to subject themselves to the CFC regime, and the resulting application of the look-through rules of section 904(d)(3). Accordingly, under paragraph (e) of this section, the Commissioner cannot treat PRS as an aggregate of its partners for purposes of determining X's foreign tax credit limitation.

(g) Effective date. Paragraphs (a), (b), (c), and (d) of this section are effective for all transactions involving a partnership that occur on or after May 12, 1994. Paragraphs (e) and (f) of this section are effective for all transactions involving a partnership that occur on or after December 29, 1994.

(h) Scope and application. This section applies solely with respect to taxes under subtitle A of the Internal Revenue Code, and for purposes of this section, any reference to a federal tax is limited to any tax imposed under subtitle A of the Internal Revenue Code.

(i) Application of nonstatutory principles and other statutory authorities. The Commissioner can

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

continue to assert and to rely upon applicable nonstatutory principles and other statutory and regulatory authorities to challenge transactions. This section does not limit the applicability of those principles and authorities.

[T.D. 8588, 60 FR 27, Jan. 3, 1995; 60 FR 9776, 9777, Feb. 22, 1995; T.D. 8592, 60 FR 18741, April 13, 1995]

26 C. F. R. § 1.701-2

26 CFR § 1.701-2

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT (RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2)

## TABLE OF CONTENTS


ISSUE ..... 2

STATEMENT OF MATERIAL FACTS ..... 2

OVERVIEW ..... 5

DISCUSSION ..... 9

A. TREAS. REG. § 1.701-2 REVERSES 60 YEARS OF PRECEDENT BY SUBSTITUTING A "PRINCIPAL PURPOSE" TEST. ..... 9

B. AS THE FEDERAL CIRCUIT REASONED IN *BANKERS TRUST*, TREAS. REG. § 1.701-2 CANNOT TRUMP 60 YEARS OF PRECEDENT WITHOUT VIOLATING *STARE DECISIS* AND THE SEPARATION OF POWERS DOCTRINE. ..... 14

C. THE REGULATION ALSO VIOLATES THE SEPARATION OF POWERS DOCTRINE BY TRESPASSING UPON THE POWER OF CONGRESS. ..... 16

1. No regulation is needed or appropriate where, as here, Congress has already spoken with clarity. ..... 19

2. Treas. Reg. § 1.701-2 violates the *National Muffler* standard. ..... 20

3. Treas. Reg. § 1.701-2 is contrary to the law of the Federal Circuit. ..... 21

4. Interpretative regulations are limited to interpreting *Congress' actual intent* and cannot rewrite the substantive rule to give effect to Treasury's ideas about policy, fitness, and desirability. ..... 23

5. Above all else, an interpretative regulation cannot restrict, alter, expand, or otherwise modify a statute. ..... 24

6. An example of Treasury's inventiveness is the addition of the of the "clear reflection of income" test found nowhere in Subchapter K. ..... 25

D. THE REGULATION IS UNCONSTITUTIONALLY VAGUE. ..... 29

1. Treas. Reg. § 1.701-2 "Intent of Subchapter K" .......... 33

2. Aside from defying 60 years of precedent, has there ever been a phrase with more ambiguities than the second condition precedent ("*a* principal purpose…")? .......... 34

3. The two conditions precedent in turn create ambiguities and uncertainties about when and how a partnership will be disregarded in its entirety, in part, or not at all. .......... 38

4. Treas. Reg. § 1.701-2(d) - The examples do little or nothing to help clarify the application of the regulation. .......... 39

CONCLUSION .......... 40

# TABLE OF AUTHORITIES

## Cases

*A.P. Green Export Co. v. United States*, 284 F.2d 383 (Ct. Cl. 1960) .......... 10

*Andantech L.L.C. v. Commissioner*, 331 F.3d 972 (D.C. Cir. 2003) .......... 10

**Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 1, 2

*Ann Jackson Family Found. v. Commissioner*, 15 F.3d 917 (9th Cir. 1994) .......... 18

*Ansley-Sheppard-Burgess Co. v. Commissioner*, 104 T.C. 367 (1995) .......... 26

*Avon Prods., Inc., et al. v. United States*, 97 F.3d 1435 (Fed. Cir. 1996) .......... 13

*Baltimore & Ohio R.R. Co. v. United States*, 603 F.2d 165 (Ct. Cl. 1979) .......... 25

**Bankers Trust of New York v. United States*, 225 F.3d 1368, 1376 (Fed. Cir. 2000) .......... *passim*

*Basic Inc. v. United States*, 549 F.2d 740 (Ct. Cl. 1977) .......... 10

**Beneficial Corp. v. United States*, 840 F.2d 1570 (1987) .......... 21, 40

*Buchanan v. United States*, 87 F.3d 197 (7th Cir 1996) .......... 35

**Busse v. Commissioner*, 479 F.2d 1147 (1973), acq., 1978-2 C.B. 1 .......... 23, 31

*Callaway v. Commissioner*, 231 F.3d 106 (2d Cir. 2000) .......... 18

*Campbell County State Bank v. Commissioner*, 37 T.C. 430, 441-442 (1961), *rev'd and remanded on other issues*, 311 F.2d 374 (8th Cir. 1963) .......... 12

*Chisholm v. Commissioner*, 79 F.2d 14 (2d Cir. 1935) .......... 12

*City of Tucson, Ariz. v. Commissioner*, 820 F.2d 1283 (D.C. Cir. 1987) .......... 17

**Coggin Auto. Corp. v. Commissioner*, 292 F.3d 1326 (11th Cir. 2002) .......... 11, 38

**Commissioner v. Culbertson*, 337 U.S. 733 (1949) .......... 10, 12, 40

---

* Asterisk indicates significant authority.

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) .............11, 37

*Connally v. General Const. Co.*, 269 U.S. 385 (1926) ..........................................32

*Deluxe Corp. v. United States*, 885 F.2d 848, 853 (Fed. Cir. 1989) ..............................8

*Deputy v. du Pont*, 308 U.S. 488 (1940) ..................................................................13

**Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283 (1983) ......................16, 28

*Eli Lilly & Co. v. Commissioner*, 84 T.C. 996 (1985), *aff'd in part, rev'd and remanded in part*, 856 F.2d 855 (7th Cir. 1988) ..........................................................27

*Estate of Cowart v. Nicklos Drilling, Co.*, 505 U.S. 469 (1992) ....................................19

**Estate of Strangi v. Commissioner*, 293 F.3d 279 (5th Cir. 2002) ..........................11, 40

**Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ............................................10

*G. D. Searle & Co. v. Commissioner*, 88 T.C. 252 (1987) ..........................................27

*Galedridge Constr., Inc. v. Commissioner*, T.C. Memo 1997-240 ..............................26

*Gitlitz v. Commissioner*, 531 U.S. 206 (2001) ......................................................7, 38

*Goodson-Todman Enters. v. Commissioner*, 784 F.2d 66 (2d Cir. 1986) .....................17

**Grayned v. City of Rockford*, 408 U.S. 104 (1972) ....................................................31

*Hallmark Cards, Inc. v. Commissioner*, 90 T.C. 26 (1988) ..........................................26

*Hanlin v. Commissioner*, 38 B.T.A. 811 (1938), *aff'd*, 108 F.2d 429 (3d Cir. 1939) ..............................................................................................................35

*Helmer v. Commissioner*, T.C. Memo 1975-160 (1975) ..............................................13

*Helvering v. Gregory*, 69 F.2d 809 (CA2 1934), aff'd, 293 U.S. 465 (1935) ..................13

*Hughes Int'l Sales Corp. v. Commissioner*, 100 T.C. 293 (1993) ..........................18, 23

*In Re CM Holdings Inc.*, 301 F.3d 96 (3d Cir. 2002) ..................................................10

*Jordan v. United States*, 863 F.Supp. 270 (E.D.N.C. 1994) .........................................39

*Knight v. Commissioner*, 115 T.C. 506 (2000) ................................................11, 35, 40

* Asterisk indicates significant authority.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 2 L.Ed. 60 (1803)....................7, 9

**Moline Props., Inc. v. Commissioner*, 319 U.S. 436 (1943).................... *passim*

**Nalle III v. Commissioner*, 997 F.2d 1134 (5th Cir. 1993) ....................18, 19

**National Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979)....................20

*Neal v. United States*, 516 U.S. 284 (1996)....................14

**Neill v. Phinney*, 245 F.2d 645 (5th Cir. 1957)....................13

*Professional Equities, Inc. v. Commissioner*, 89 T.C. 165 (1987), acq., 1988-2 C.B.1 ....................15

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985) ....................10

**Rite Aid Corp. v. United States*, 255 F. 3d 1357 (Fed. Cir. 2001)....................16, 17, 28

*RLC Indus. Co. v. Commissioner*, 58 F.3d 413 (9th Cir. 1995)....................15, 28

*Rowan Cos. v. United States*, 452 U.S. 247 (1981)....................16, 18

*Rutkin v. United States*, 343 U.S. 130 (1952) ....................32

*Schuler Indus., Inc. v. United States*, 109 F.3d 753 (Fed. Cir. 1997)....................17

*Shriver v. Commissioner*, 899 F.2d 724 (8th Cir. 1990)....................11

**Transpac Drilling Venture v. United States*, 83 F.3d 1410 (Fed. Cir. 1996)....................5, 18

*United States v. Calamaro*, 354 U.S. 351 (1957)....................28

*United States v. Carlton*, 512 U.S. 26 (1994)....................12

**United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982) ....................8, 16, 18

*Williams v. Commissioner*, 94 T.C. 464 (1990)....................27

**Treasury Decisions**

T. D. 8588, 1995-1 C.B. 109, 112....................19, 31

T.D. 8592, 1995 -1 C.B. 109....................20

T. D. 8841....................19

**Internal Revenue Code of 1986 (26 U.S.C.)**


Subchapter E of the Internal Revenue Code (§§ 441-483) .......... 25

Subchapter J of the Internal Revenue Code .......... 28

Subchapter K of the Internal Revenue Code (§§ 701-775) .......... 5, 19, 26

Subchapter O of the Internal Revenue Code (§§ 721-723) .......... 25

I.R.C. § 42 .......... 35

I.R.C. § 269A .......... 27

I.R.C. § 446 .......... 26, 27

I.R.C. § 448 .......... 27

I.R.C. § 467 .......... 35

I.R.C. § 471 .......... 27

I.R.C. § 472 .......... 27

I.R.C. § 482 .......... 27

I.R.C. § 483 .......... 35

*I.R.C. § 701 .......... *passim*

I.R.C. § 704 .......... 16, 22

I.R.C. § 721 .......... 27

I.R.C. § 722 .......... 27

I.R.C. § 723 .......... 27

I.R.C. § 754 .......... 16, 17

I.R.C. § 755(a)(2) .......... 16, 17

*I.R.C. § 761 .......... 16, 19, 20, 24, 27

I.R.C. § 811 .......... 35


* Asterisk indicates significant authority.

I.R.C. § 857 ........................................ 27

I.R.C. § 904 ........................................ 27

I.R.C. § 953 ........................................ 27

I.R.C. § 1271 ........................................ 35

I.R.C. § 1274(d) ........................................ 35

I.R.C. § 1286 ........................................ 27

I.R.C. § 1366(a)(1)(A) ........................................ 7

I.R.C. § 1502 ........................................ 16, 27

I.R.C. § 6662 ........................................ 27

I.R.C. § 7805 ........................................ 18

I.R.C. § 7872 ........................................ 35

**Congressional Reports**

H.Rep. No. 1337 ........................................ 33

H.R. Rep. No. 1337, 83d Cong., 2d Sess. 65 (1954) ........................................ 21

S. Rep. No. 781, 82d Cong., 1st Sess. 38 (1951) ........................................ 22

S. Rep. No. 1622, 83d Cong., 2d Sess. 89 (1954) ........................................ 21

**Revenue Procedures**

Rev. Proc. 89-12 ........................................ 39

Rev. Proc. 91-31 ........................................ 25

Rev. Proc. 2002-9 ........................................ 25

Rev. Proc. 2002-327 ........................................ 25

Rev. Proc. 2002-335 ........................................ 25

**Treasury Regulations**

Treas. Reg. § 1.446-1(e)(2)(b) ........ 25

Treas. Reg. § 1.701-1 ........ 17

Treas. Reg. § 1.701-2 ........ *passim*

Treas. Reg. § 1.701-2(a)(3) ........ 26

Treas. Reg. § 1.701-2(b) ........ 24, 34, 38

Treas. Reg. § 1.701-2(b)(3) ........ 26

Treas. Reg. § 1.701-2(d) ........ 39

Miscellaneous

1 William S. McKee, et al., *Federal Taxation of Partnerships and Partners*, ¶ 1.05[1][a] (3d ed. 1997) ........ *passim*

*AICPA Calls For Changes in Partnership Anti-abuse Reg.*, 94 Tax Notes Today 139-64 (Jul. 13, 1994) ........ 31

*Commentators Say Partnership Anti-abuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 Tax Notes Today 175-28 (Aug. 18, 1995) ........ 30

*Commentators Say Partnership Anti-abuse Rule Should Be Withdrawn*, 94 Tax Notes Today 152-37 (Jul. 25, 1994) ........ 30

*Coopers & Lybrand Urges Withdrawal Partnership Anti-abuse Rule*, 94 Tax Notes Today 172-25 (Jul. 7, 1994) ........ 30

*Ernst & Young Criticizes Partnership Anti-abuse Reg.*, 94 Tax Notes Today 141-32 (Jun. 27, 1994) ........ 31

*IRS Attorney Sees 'Fatal Flaw' in Anti-Abuse Regs.*, 94 Tax Notes Today 119-25 (May 23, 1994) ........ 30

James A. Gouwar, *The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority*, 11 J. Partnership Tax'n 287, 292 (1995) ........ 29

*Partnership Anti-abuse Reg. Is Overly Broad, Price Waterhouse Asserts*, 95 Tax Notes Today 52-32 (Feb. 14, 1995) ........ 31

*Partnership Anti-abuse Regs. Should be Subject to Executive Order, Attorney Asserts*, 94 Tax Notes Today 121-11 (Jun. 10, 1994)....30

*Partnership Reg. Adds Confusion, Attorney Asserts*, 94 Tax Notes Today 151-42 (Jul. 29, 1994)....30

Sheldon I. Banoff, *Anatomy of an Anti-abuse Rule: What's Really Wrong With Reg. Section 1.701-2*, 95 Tax Notes Today 56-84 (Mar. 20, 1995)....29

Sheldon I. Banoff, *The Use and Misuse of Anti-Abuse Rules*, 48 Tax Law. 827, 834 (1995)....29

William H. Caudill, *ABA Tax Section Members Say Anti-abuse Rule is Not a Valid Exercise of IRS Authority*, 94 Tax Notes Today 146-50 (Jul. 1, 1994)....29

William S. McKee, et al., *Federal Taxation of Partnerships and Partners* § 1.05 (3d. ed. 1997)....29

**Rules of the United States Court of Federal Claims**

RCFC 56(c) ....1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 03-2164T<br><br>JUDGE WILLIAMS |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT (RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2)**

Plaintiffs offer this memorandum in support of their First Motion for Partial Summary Judgment more than 60 days from the commencement of the action, pursuant to Rule 56 of the United States Court of Federal Claims ("RCFC"). That Motion, coupled with the two accompanying motions for partial summary judgment, address the three discrete questions of law that – consistent with the fundamental purpose of summary judgments endorsed by the Supreme Court - dispose of the entire case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); RCFC 56(c) ("[S]ummary judgment *shall be rendered forthwith* if the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law": emphasis added).

## ISSUE

Whether Treas. Reg. § 1.701-2, the single most criticized Treasury regulation in the past 20 years, constitutes an invalid and unconstitutionally vague attempt by an executive agency to reverse 60 years of judicial precedent and to override the plain and unaltered meaning of the statutory language chosen by Congress 50 years ago?

## STATEMENT OF MATERIAL FACTS

This Motion turns entirely upon matters of law relating to the invalidity of Treas. Reg. § 1.701-2. No facts are material in the sense they are result-altering. *Anderson,* 477 U.S. at 248. By way of background, however, Plaintiffs invite the attention of the Court to the following foundational facts:

1. Jade Trading, LLC ("Jade") was formed as a limited liability company under Delaware law. Del. Sec. of State Cert. of Formation.

2. Sentinel Advisors, LLC ("Sentinel") formed Jade as a limited liability company to provide limited liability and centralized trading powers for itself as the Managing Member. As authorized in the "LIMITED LIABILITY COMPANY AGREEMENT OF JADE TRADING, LLC" ("Jade LLC Agreement"), Jade was formed for the purpose of investing substantially all of its assets in securities such as foreign currency derivatives, spot contracts, equities, etc. Bergmann Aff. ¶¶ 2-4, Ex. 2 (Jade LLC Ag'm't. § 1.06).

3. As of October 6, 1999, Jade consisted of five Members following the investments in Jade by Ervin Capital, LLC, Ervin Holdings, LLC, and Ervin Investments, LLC. Bergmann Aff. ¶ 6, Ex. 3.

4. At all times, the Members of Jade shared ownership in Jade's capital. Further, the Jade Members generally shared profits and losses in accordance with their capital accounts, subject to the "Incentive Allocation" to its Managing Member for Net Capital Appreciation. Bergmann Aff. ¶ 7, Ex. 2 (Jade LLC Ag'm't., §§ 3.03-3.05).

5. During Jade's 1999 taxable year, Jade engaged in various activities and transactions, including:

   a. entering into enforceable binding option contracts in its own name as a party;

   b. maintaining trading accounts in its own name at Salomon Smith Barney;

   c. acquiring (by contribution to capital from its members) foreign currency positions in its own name;

   d. buying foreign currency positions in its own name;

   e. selling foreign currency positions in its own name;

   f. acquiring equities in its own name; and

   g. carrying on its ordinary financial operations as a business entity. Bergmann Aff. ¶ 8.

6. During 1999, Jade invested in more than 25 trading positions between buys and sells of foreign currencies, foreign exchange options, equities, and equity options. During 2000, Jade continued to trade in various investment activities. Bergmann Aff. ¶¶ 12, 13.

7. As the Managing Member, Sentinel Advisors treated Jade as a partnership for federal tax purposes and filed a 1999 U.S. Partnership Return (Form 1065) on behalf of Jade with the Internal Revenue Service ("IRS"). Bergmann Aff. ¶ 9; Compl. ¶ 5; Ans. ¶ 5.

8. The IRS also treated Jade as a partnership in a number of different notices and requests, including:

   a. An IRS Notice of Beginning of Administrative Proceeding with respect to Jade pursuant to the unified partnership procedures;

   b. Various IRS information document requests with respect to Jade pursuant to the unified partnership procedures; and

   c. An IRS Notice of Final Partnership Administrative Adjustment (the "FPAA") with respect to Jade's 1999 taxable year pursuant to the unified audit and litigation partnership procedures under the TEFRA provisions. Bergmann Aff. ¶ 10; Compl. ¶ 5; Ans. ¶ 5.

9. In that FPAA, the IRS further recognized Jade's status as a partnership for federal tax purposes in at least two respects:

   a. The FPAA asserts "Partnership Adjustments" increasing partnership income to $22,401.

   b. It also asserts "Partnership Adjustments" allowing partnership deductions of $11,273. Compl., Ex. A and B; Ans. ¶¶ 3-4.

10. Nonetheless, the IRS disregards Jade's partnership status in four of the FPAA's five substantive explanations. Compl., Exs. A and B, "Explanation of Adjustments" ¶¶ 1-4.

## OVERVIEW

The IRS based four of its five substantive adjustments to Jade's partnership return on Treas. Reg. § 1.701-2 – the single most criticized regulation in the past 20 years. The first three positions stated in the FPAA rely upon the regulation to disregard the existence of the partnership, while the fourth relies upon it to adjust partnership capital contributions in some unspecified way at some unspecified date in the future. FPAA, "Explanation of Adjustments" p. 8, Items 1-4.

To set the regulation in context, Subchapter K of the Internal Revenue Code (§§ 701-775) contains an intricate statutory structure for taxing partnership activities. It generally deals with those activities at the partnership level and then "passes-through" each partner's distributive share of those activities to be reported on the individual partner's return. The Subchapter K partnership statutory scheme begins with the partnership pass-through provisions of Code § 701:

> A partnership[1] as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for

---

[1] As the Federal Circuit held in *Transpac Drilling Venture v. United States*, 83 F.3d 1410, 1414 (Fed. Cir. 1996), Congress defines the "partnerships" covered by Subchapter K in the most expansive terms:

> **SEC. 761. TERMS DEFINED.**
> (a) PARTNERSHIP. – For purposes of this subtitle, the term "partnership" includes a syndicate, group, pool, joint venture or other **unincorporated organization through or by means of which any business, financial operation, or venture is carried on**, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. Under regulations the Secretary may, **at the election of all the members of an unincorporated organization**, exclude such organization from the application of all or part of this subchapter, if it is availed of [for investment purposes, etc.] (emphasis added).

Notably, the members of the partnership NEVER ELECTED to be excluded from part or all of Subchapter K. Hence, the sole exclusion recognized by Congress does not apply.

income tax only in their separate or individual capacities.

On this foundation, Congress built the statutory structure for the "pass-through" taxation of partnerships. The regulation wrecks that structure by bestowing upon the IRS the power to ignore authorities (including statutes) directly on point and to dismiss categorically the partnership statutory scheme in its entirety for a substantial segment of the universe of Subchapter K partnerships.

The most respected members of the federal tax bar, including the American Bar Association Tax Section, former Judges of the United States Tax Court, former Commissioners of the Internal Revenue Service, former Chief Counsels of the Internal Revenue Service, and the leading authority in the nation on federal partnership taxation, told the IRS that, no matter how well intentioned it may have been, this self-anointed power grab was invalid. "Although the abuse-of-Subchapter-K rule is couched in familiar terms, it is in fact a stunning departure from existing law." 1 William S. McKee, et al., *Federal Taxation of Partnerships and Partners*, ¶ 1.05[1][a] (3d ed. 1997). The overwhelming majority of the comments questioned the validity, authority, and/or vagueness of what became known as the "anti-rule" rule. An annotated index of the most significant criticisms may be found in Appendix II accompanying the Motion. The IRS defied that advice, adopted the regulation, and left it outstanding for some vague *in terrorem* effect over nine years following its inception. Until recently, however, the IRS never pressed this essentially abandoned threat in litigation.

Plaintiffs ask this Court to invalidate this executive agency's extraordinary usurpation of both judicial and legislative powers by fairly applying the precedent of this

Circuit and following the carefully considered analysis of the leading members of the federal tax bar. The independent grounds for invalidation include:

(a) For over 60 years, the Supreme Court and virtually every court in the land have recognized that a legally constituted entity cannot be disregarded if it serves ANY non-tax purpose. With Treas. Reg. § 1.701-2, the IRS simply seeks to reverse that precedent by substituting a "principal [tax] purpose" test for disregarding partnerships.

(b) By unilaterally overruling 60 years of judicial precedent, the IRS (an executive agency within the Treasury Department) usurps *the exclusive power of the judiciary to interpret the laws.* This nullifies the Constitutional Separation of Powers in Articles I, II, and III of the Constitution and ignores the precedent of this Circuit in *Bankers Trust of New York v. United States,* 225 F.3d 1368, 1376 (Fed. Cir. 2000) (*citing Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803) for the rule that courts cannot "give the IRS or any executive branch agency the power to overrule an established statutory construction of the court – a power that, with regard to our prior precedents, even a later panel of this court lacks").

(c) Congress crafted Code § 701 in clear and unambiguous language whose plain and unaltered meaning Treas. Reg. § 1.701-2 overrides – now fifty years after the fact. This regulation contravenes the principle reaffirmed by the Supreme Court in *Gitlitz v. Commissioner,* 531 U.S. 206, 220 (2001) (reversing the Tax Court and 10th Circuit's interpretation of Code Section 1366(a)(1)(A), "[b]ecause the Code's plain text permits the

taxpayers here to receive these benefits, we need not address [the alleged abuse] policy concern"). Even resorting to the legislative history of Code §§ 701, *et seq.* does nothing but reinforce the view that Treas. Reg. § 1.701-2 is a rogue regulation that must be stricken. "A regulation serves to implement the law, not to change it." *Deluxe Corp. v. United States*, 885 F.2d 848, 853 (Fed. Cir. 1989) *citing United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982). By process of elimination, the regulation is at most an interpretative regulation. *Id.* at 24. Yet, it violates every independent standard required by the Supreme Court and every other court to address the validity of interpretative regulations – including the Federal Circuit.

(d) Even if the regulation had been authorized by Congress and did not reverse precedent, it would be *void for vagueness*. Ironically, Treas. Reg. § 1.701-2 violates this basic due process principle in the face of the explicit Congressional purpose for enacting the Subchapter K partnership provisions – predictability. Indeed, the regulation directs the IRS to divine an amorphous Subchapter K purpose by disregarding "the literal words of particular statutory or regulatory provisions" directly on point. The IRS FPAA *in this case* proves this unpredictable approach to the regulation's "now you see it, now you don't" partnership rules. That same FPAA that honors Jade's existence when it suits the IRS' financial interests, simultaneously ignores Jade's existence when it does not.

## DISCUSSION

When an executive agency unilaterally bestows upon itself broad powers to overrule precedent adopted by the Judiciary, repeal the plain meaning of statutes adopted by Congress, and ignore entities recognized by State law, it offends our most fundamental principles of government. As recognized by this Circuit in *Banker's Trust*, the wisdom of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803) is not dead. The separate nature of those powers protects the freedoms the founders of this country held so dear, with a system of checks and balances. It falls to Congress to adopt the law, the Courts to interpret it on a case-by-case basis, and the Executive Branch to enforce it. Treas. Reg. § 1.701-2 ignores these and other fundamental principles and is therefore invalid under the precedent of the Supreme Court and the Federal Circuit.

### A. TREAS. REG. § 1.701-2 REVERSES 60 YEARS OF PRECEDENT BY SUBSTITUTING A "PRINCIPAL PURPOSE" TEST.

The regulation reverses 60 years of precedent by disregarding the existence of a legally constituted partnership if it engages in a transaction with a "principal purpose" of tax reduction. The FPAA specifically identifies that "principal purpose" passage as the basis for disregarding Jade under Treas. Reg. § 1.701-2. It thereby:

i. Nullifies *Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 439 (1943) (holding that so long as the purpose of establishing a corporation "is the equivalent of business activity **or** is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity"; emphasis added);

ii. Overturns *Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (confirming that a partnership should be recognized, irrespective of tax motive, if "the parties in good faith and acting with **a business purpose** intended to join together in the present conduct of the enterprise": emphasis added).

iii. Abrogates *Frank Lyon Co. v. United States*, 435 U.S. 561, 584-85 (1978) (the existence of transactions will be respected so long as they serve **some** useful non-tax business purpose).

iv. Contradicts the holding of this and other Courts, as exemplified by *Basic Inc. v. United States*, 549 F.2d 740, 745 (Ct. Cl. 1977) ("That transaction clearly had **a business purpose**, namely, to effect the sale and purchase of a business; hence, tax minimization considerations would be irrelevant"); *A.P. Green Export Co. v. United States*, 284 F.2d 383, 390 (Ct. Cl. 1960) ("**legitimate business purpose** apart from the expected tax consequences"); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985) (interpreting *Frank Lyon* consistently with *Moline* – under both, an entity or transaction must be recognized for federal tax purposes if it is engaged in **a business activity or formed for a business purpose**); *Andantech L.L.C. v. Commissioner*, 331 F.3d 972 (D.C. Cir. 2003) ("**a non-tax business purpose**"); *In Re CM Holdings Inc.*, 301 F.3d 96 (3d Cir. 2002) ("**legitimate business purpose**"); *Coggin Auto. Corp. v. Commissioner*, 292 F.3d 1326

(11th Cir. 2002) ("a **legitimate business purpose**"); *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001) ("a **business purpose**"); *Shriver v. Commissioner*, 899 F.2d 724, 726 (8th Cir. 1990) ("a **legitimate business purpose**") (emphasis added).

v. Defies the line of cases culminating in *Estate of Strangi v. Commissioner*, 293 F.3d 279, 282 (5th Cir. 2002), holding that a partnership legally constituted under State law should be recognized for federal tax purposes "in the absence of persuasive evidence that the [partnership] agreement is not susceptible to enforcement or would not be enforced by the parties to the agreement." *Accord*, *Knight v. Commissioner*, 115 T.C. 506, 513-515 (2000).

Through the regulation, the IRS attempts to bootstrap legitimacy onto the IRS positions rejected by the courts. The rule established by the Supreme Court in *Moline* that an entity will be respected for tax purposes if there is **any** business purpose in forming the entity **OR** the entity **carries on business** after its formation is still good law today. In *Moline*, a taxpayer had established a corporation that owned property and carried on a fairly minimal amount of business. Later, the taxpayer found it beneficial to ignore the entity, but the Supreme Court resisted and laid down this rule:

> Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the

> corporation, the corporation remains a separate taxable entity. *Moline*, 319 U.S. at 438-39.

A few years later, the Supreme Court was faced with whether to recognize an entity in which a partnership interest had been acquired by gift, and held that the entity must be respected. *Culbertson*, 337 U.S. at 742. *Culbertson* does **not** require that the *primary* purpose of the enterprise be business – much less an exclusively non-tax form of business purpose. "[F]or present purposes, *Culbertson* stands for the proposition (later codified) that if the putative partners actually share the ownership of capital interests in an unincorporated business enterprise, the requisite business purpose exists and they will be recognized for tax purposes as partners." McKee at ¶ 1.05[3][a]. Justice Frankfurter, in his (codified) concurring opinion in *Culbertson*, 337 U.S. at 754, put it simply:

> In plain English, if an arrangement among men is not an arrangement which puts them all in the same business boat, then they cannot get into the same boat merely to seek the benefits of [the partnership tax provisions]. But if they are in the same business boat, although they may have varying rewards and varied responsibilities, they do not cease to be in it when the tax collector appears.

*Culbertson* falls squarely within a line of cases that recognizes partnerships formed primarily for tax avoidance purposes. *See Chisholm v. Commissioner*, 79 F.2d 14 (2d Cir. 1935) (respecting, for tax purposes, a partnership formed for the stated purpose of tax avoidance); *Campbell County State Bank v. Commissioner*, 37 T.C. 430, 441-442 (1961), *rev'd and remanded on other issues*, 311 F.2d 374 (8th Cir. 1963), acq., 1966-2 C.B.3 (applying *Moline* doctrine to partnerships). Every second year law student learns the passage from Learned Hand reiterated by Justice O'Connor in her concurring opinion in *United States v. Carlton*, 512 U.S. 26, 35-36 (1994):

> [I]t was entirely appropriate for Carlton to seek to reduce the estate taxes. And like all taxpayers, Carlton was entitled to structure the estate's affairs to comply with the tax laws while minimizing tax liability. As Learned Hand observed with characteristic acerbity: "[A] transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (CA2 1934), *aff'd*, 293 U.S. 465 (1935) (citations omitted).

The Federal Circuit embraces the same principle. *Avon Prods., Inc., et al. v. United States*, 97 F.3d 1435, 1443 (Fed. Cir. 1996) ("The fact that the transaction may have been structured for tax purposes does not, of course, render it impermissible") *citing Gregory.*[2] The regulation simply seeks to reverse 60 years of precedent relating to the freedom to structure one's affairs to minimize taxes and 60 years of precedent relating to recognition of legally constituted entities.

---

[2] The tax planning that enhanced Jade's investments simply follows the path paved by the Commissioner. The crux of the IRS' complaint is that Jade and its partners relied upon the point of law the IRS established in *Deputy v. du Pont*, 308 U.S. 488 (1940) (a short position - *i.e.*, an obligation to deliver securities in the future - is not an indebtedness) and *Helmer v. Commissioner*, T.C. Memo 1975-160 (1975) (the obligation to deliver property pursuant to a call option does not constitute a partnership liability or indebtedness). The Commissioner has known about that point and its utility to citizens since he established it. He chose **not** to go to Congress to change the rule because he wants to have it both ways. When *Helmer* works to his financial advantage, why then it is good law. But when it works to the advantage of a citizen, it is an evil form of abuse. That facile choice defies the fundamental fairness noted in *Neill v. Phinney*, 245 F.2d 645, 647 (5th Cir. 1957):

> ...the rule is the rule whosever's ox is being gored. With that approach... our job is to assure that what was once the goose's sauce shall for the gander now be the same. (Citations omitted).

B. **AS THE FEDERAL CIRCUIT REASONED IN *BANKERS TRUST*, TREAS. REG. § 1.701-2 CANNOT TRUMP 60 YEARS OF PRECEDENT WITHOUT VIOLATING *STARE DECISIS* AND THE SEPARATION OF POWERS DOCTRINE.**

The ABA Tax Section and most commentators told this executive agency that it was violating firmly established precedent -- yet, the IRS persisted. That persistence brings this regulation directly in line with the reasoning of the Federal Circuit in *Bankers Trust*. The challenge in that case was actually more daunting, for two other appellate courts had already sustained the foreign tax credit regulation under review. Nonetheless, this Circuit identified the threat to the judicial function and pointed out the perils of empowering an executive agency to unilaterally reverse unfavorable precedent.

The analysis in *Bankers Trust* – standing alone – requires that this Motion be granted, for reasons the Federal Circuit states better than we. Relying largely upon the Supreme Court's holding in *Neal v. United States*, 516 U.S. 284 (1996), the Federal Circuit started in *Bankers Trust* with this predicate (225 F.3d at 1375):

> The [Supreme] Court [in *Neal*] summarily (and unanimously) concluded that its prior precedent must trump any effort by the Commissioner to modify that precedent:
>
> > Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of stare decisis, and we assess an agency's later interpretation of the statute against that settled law. *Neal*, 516 U.S. at 295.
>
> The Court's pronouncement in *Neal* is unequivocal in its assertion that the Court's interpretation of a statutory provision trumps a subsequent agency interpretation that is inconsistent with the Court's precedent.... the Supreme Court's reasons for adhering to its prior decisions in this context reflect the relationship of the Judiciary to Congress and the ability of Congress to change its statutes to correct a misinterpretation by the Court. *See Neal*, 516 U.S. at 295-96.

On that foundation, the Federal Circuit held (225 F.3d at 1376):

> [w]e conclude that the Court of Federal Claims erred in holding that, on the facts of this case, an Executive agency regulation could effectively construe a statute in a manner different from a prior definitive court ruling. The *Chevron* doctrine, properly understood, does not change this basic application of the Separation of Powers doctrine. The *Chevron* doctrine, which requires us to defer to reasonable agency 'gap-filling' interpretations of a statute as expressed in agency regulations, is not in conflict with stare decisis as it applies to this case....

Perhaps most poignant, the Federal Circuit explained why it chose the bold path of departing from the rulings by the Seventh and Eighth Circuits (225 F.3d at 1376):

> [W]e also recognize that to hold otherwise, giving priority to the regulation, creates its own set of problems, not the least of which **would be to countenance an agency's ability to overturn any unfavorable court decision by way of regulations**. ...It is a fundamental principle of Constitutional law that the duty to interpret the statutes as set forth by Congress is a duty that rests with the judiciary: "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). In executing this duty, we may not give the IRS or any executive branch agency the power to overrule an established statutory construction of the court... (emphasis added).

Protecting judicial precedent against administrative reversal has been embraced by other courts focusing on that question. *See, Professional Equities, Inc. v. Commissioner*, 89 T.C. 165, 181 (1987), acq., 1988-2 C.B.1 (Tax Court invalidated anti-abuse interpretative regulation which effectively reversed judicial precedent without Congressional authorization); *RLC Indus. Co. v. Commissioner*, 58 F.3d 413, 419 (9th Cir. 1995) (regulation authorizing case-by-case determinations by IRS held invalid as intrusion upon the judicial function). However, the Federal Circuit authority in *Bankers Trust* alone is sufficient: Treas. Reg. § 1.701-2 cannot stand.

## C. THE REGULATION ALSO VIOLATES THE SEPARATION OF POWERS DOCTRINE BY TRESPASSING UPON THE POWER OF CONGRESS.

Separate and apart from overruling 60 years of precedent, this executive agency also violates the Separation of Powers Doctrine by trespassing upon the power of Congress in three ways: it usurps Congressional authority to enact the law, it adds new restrictions to both Code §§ 701 and 761, and it repeals Subchapter K in its entirety for a substantial segment of the statutorily defined universe of partnerships. The IRS could have and should have sought statutory authority upon a proper vote by both Houses of Congress – if it thought Congress would pass it. The IRS, however, chose to circumvent the democratic process in the name of anti-abuse – just as it did in the general anti-abuse trust regulations stricken by the Tax Court in *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283, 288 (1983).

Because only Congress can constitutionally make law, Treasury regulations cannot exist in their own vacuum. They can only exist by specific delegation of Congressional authority (known as a "legislative" regulation) or as an interpretation of a Congressional statute (known as an "interpretative" regulation"). *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982). Legislative regulations, which are authorized by explicit statutory language to fill a specified gap,[3] are entitled to far greater deference than are interpretive regulations. *See, e.g., Rowan Cos. v. United States*, 452 U.S. 247, 252 (1981); *Rite Aid Corp. v. United States*, 255 F. 3d 1357, 1359 (Fed. Cir. 2001);

---

[3] The Code contains many examples of such gaps. Code § 1502, the provision implicated in the Federal Circuit's opinion in *Rite Aid*, authorizes a legislative regulation with the standard grant: "The Secretary shall prescribe such regulations as he may deem necessary…." Several partnership provisions, such as § 704(c), § 754, § 755(a)(2), leave large or small gaps to be filled by "regulations prescribed by the Secretary" within defined areas.

*Schuler Indus., Inc. v. United States*, 109 F.3d 753 (Fed. Cir. 1997). Even legislative regulations do not, however, reduce courts to rubber stamps. "The 'bitter with the sweet' does not include the invalid." *Rite Aid Corp.*, 255 F.3d at 1360 (Federal Circuit rejected IRS argument that its legislative regulation should be sustained because taxpayers should take "the bitter with the sweet").[4]

Congress left no gaps in Code § 701 for Treasury to fill and delegated no authority. Code § 701 has remained unchanged since Congress drafted the principal partnership provisions in 1954:

> A partnership as such shall not be subject to the income tax imposed by this chapter. Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities.

Contrast this with other sections of Subchapter K, such as Code §§ 754 or 755(a)(2), where elections may be made or revoked in accordance with "regulations prescribed by the Secretary." In enacting Code § 701, Congress chose to delegate no such authority.

Following the enactment of Code § 701, Treasury promptly drafted Treas. Reg. § 1.701-1, which for almost 50 years provided a complete and reasonable interpretation of the statute and its Congressional intent. That regulation is the model of clarity and simplicity. It contemporaneously confirms that Congress intended to say what it said:

---

[4] Even legislative regulations must be stricken as invalid whenever they are arbitrary, capricious, or manifestly contrary to a statute. *See, e.g., City of Tucson, Ariz. v. Commissioner*, 820 F.2d 1283, 1290 (D.C. Cir. 1987) (invalidating a final legislative regulation, where the interpretation of "the disputed regulation stretches the language of [the Code] beyond the breaking point . . . ."); *Goodson-Todman Enters. v. Commissioner*, 784 F.2d 66, 74 (2d Cir. 1986) (invalidating a final legislative regulation because "[i]t is thus apparent that the deference paid to Treasury regulations is not boundless. The Commissioner's interpretation of the Code is subject to review by the courts, whose 'duty . . . is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.'" (citation omitted)).

while partnerships are not taxed, taxes are imposed on their partners on a pass-through basis. The "pass-through" nature of partnerships has been understood and embraced by the courts. *Transpac Drilling Venture v. United States*, 16 F.3d 383, 387 (Fed. Cir. 1994). ("Each partner is liable for income tax in his or her individual capacity with respect to his or her share of partnership items of income, loss, deduction and credit"). *Accord Callaway v. Commissioner*, 231 F.3d 106, 107 (2d Cir. 2000).

Since Code § 701, the nominal statutory foundation for Treas. Reg. § 1.701-2, delegates no legislative authority and directs Treasury to fill no gap, Treas. Reg. § 1.701-2 is not a "legislative" regulation. The most it can be is an "interpretative" regulation adopted under the auspices of Code § 7805.[5] *Vogel Fertilizer Co.*, 455 U.S. at 24. The broad terms of Code § 7805 authorize the issuance of interpretative, not legislative regulations. *Id.; Nalle III v. Commissioner*, 997 F.2d 1134, 1138 (5th Cir. 1993); *Ann Jackson Family Found. v. Commissioner*, 15 F.3d 917, 920 (9th Cir. 1994). As such, interpretative regulations are subject to greater judicial scrutiny.

---

[5] Specifically, Code § 7805 provides in pertinent part:

> (a) AUTHORIZATION.–except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

Code § 7805 permits the adoption of regulations relating to IRS "enforcement" – that is, operation. Courts also view it as permitting "interpretations" of Congressional intent, so long as the regulation does not adopt, expand, alter, restrict, or modify substantive rules of law. *Vogel Fertilizer*, 455 U.S. at 24; *Rowan Cos. v. United States*, 452 U.S. at 252-253; *Hughes Int'l Sales Corp. v. Commissioner*, 100 T.C. 293, 306 (1993).

Treas. Reg. § 1.701-2 violates **every independent requirement** for a proper interpretative regulation, because it does not seek to interpret Code § 701: it seeks to legislate without a vote from either House of Congress.

**1. No regulation is needed or appropriate where, as here, Congress has already spoken with clarity.**

As the Supreme Court stated in *Estate of Cowart v. Nicklos Drilling, Co.*, 505 U.S. 469, 475 (1992):

> [W]hen a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished.

*Accord Nalle III*, 997 F.2d at 1138-39 ("interpretative" regulation invalidated because, as here, statute is unambiguous: inappropriate to engraft additional rules from excerpts in legislative history).

The peculiar aspect of this "interpretative" regulation - like the interpretative regulation in *Nalle III* – is just this: it does not appear to spring from anything within its nominal statutory source, Code § 701. Treasury admitted as much when it responded to this criticism by expanding the alleged statutory source from Code § 701 in the original proposal to the shotgun blast reference to Code §§ 701 *through* 761 in the final proposal. *Compare* T. D. 8588 and T. D. 8841. The inability of the Treasury to point to a single statute (much less a single statutory phrase) that the regulation "interprets" is, of course, insightful. More importantly, that expansion encompasses Code § 761(a) where Congress defined partnerships in the broadest of terms (any "unincorporated organization [in] which any... venture is carried on") and specified the sole statutory mechanism for excluding Subchapter K. Again, no further inquiry is needed, for the clarity of Code §§ 701 and 761(a) leaves no room for "interpretative" modification.

### 2. Treas. Reg. § 1.701-2 violates the *National Muffler* standard.

The Supreme Court specifically prescribed the standard for testing interpretative Treasury regulations in *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 477 (1979) when it said:

> In determining whether a particular regulation carries out the congressional mandate in a proper manner, we look to see whether the regulation harmonizes with the plain language of the statute, its origin, and its purpose.

The Court then listed a series of factors questioning the correlation between the Congressional intent and the "interpretation." As applied to Treas. Reg. § 1.701-2, all of those factors prove the obvious – the mission of this regulation is not fulfilling Congressional intent:

i. Treas. Reg. § 1.701-2 is not a regulation promulgated contemporaneously with enactment of the statute. This regulation misses being a contemporaneous interpretation of the statute by over 40 years. While the statute was comprehensively enacted in **1954**, the regulation is new, having just been published in final form in **1995.** T.D. 8592, 1995 -1 C.B. 109.

ii. The regulation is untested and has never been relied upon by any court or even relied upon by the IRS **until recently**.

iii. The IRS has been inconsistent in applying the regulation **in this very case**, and the regulation itself is internally inconsistent.

iv. Congress has not reenacted, amended, or extended Code § 701 since Treas. Reg. § 1.701-2 was issued.

v. Congress changed the Code § 761(a) expansive definition of partnerships covered by Subchapter K only once since 1954: the sole statutory exclusion was modified in 1978 well before this regulation was proposed to define precisely who could be excluded from Subchapter K.

Under the controlling precedent of the Supreme Court, the regulation makes no real attempt to "interpret" – much less reasonably interpret – the plain statutory language or actual Congressional intent. For this reason alone, it must also be stricken.

### 3. Treas. Reg. § 1.701-2 is contrary to the law of the Federal Circuit.

Under the precedent of the Federal Circuit, "[i]f the agency interpretation contravenes clearly discernible legislative intent... [it] should not stand." *Beneficial Corp. v. United States*, 840 F.2d 1570, 1574 (1987). The regulation resurrects the ultimate problem Congress sought to cure in enacting Subchapter K - unpredictability:

> The existing tax treatment of partners and partnerships is among the most confused in the entire income tax field. The present statutory provisions are wholly inadequate. The published regulations, rulings, and court decisions are incomplete and frequently contradictory. ***As a result, partners today cannot form, operate or dissolve a partnership with any assurance as to tax consequences.*** This confusion is particularly unfortunate in view of the great numbers of business enterprises and ventures carried on in the partnership form. It should also be noted that the partnership form of organization is much more commonly employed by small business and in farming operations than the corporate form.
>
> ***Because of the vital need for clarification, your committee has undertaken the first comprehensive treatment of partners and partnerships in the history of the income tax laws.*** In establishing a broad pattern applicable to partnerships generally, the principal objectives have been simplicity, flexibility, and equity as between the partners.

H.R. Rep. No. 1337, 83d Cong., 2d Sess. 65 (1954); S. Rep. No. 1622, 83d Cong., 2d Sess. 89 (1954) (emphasis added). Interestingly, the regulation justifies itself by citing the means ("simplicity, flexibility, and equity as between the partners") in this passage, while avoiding the ultimate purpose – a comprehensive clarification to avoid continued confusion.

Indeed, Congress specifically considered but rejected as unworkable just such a general anti-abuse rule based on tax avoidance motives, and made clear, in connection with the predecessor to § 704(e), that "[i]f the ownership [of shared capital] is real, **it does not matter what motivated the transfer**... or whether the business benefited from the entrance of a new partner." S. Rep. No. 781, 82d Cong., 1st Sess. 38 (1951) (emphasis added).

In 1952, the IRS itself publicly announced that the presence of a tax motive was irrelevant:

> **Motive and Business Purpose.** The Bureau considers that the test of business purpose may be satisfied by the single act (if it be a fact) that the alleged partner has invested in the business money or other property, useful to the business, of which he or she is the real owner.
>
> That is not to say that the presence or absence of a tax avoidance motive behind intra family transactions and partnership arrangements is to be ignored. The presence or absence of a tax avoidance motive is one of many factors to be weighed in the determination of the reality of an intra family gift, sale or loan, and the existence of bona fide partnership intent. ***The presence of a tax motive, however, is of no consequence if the reality of the transfer of interest and the good faith of the parties are satisfactorily satisfied.*** *Mim.* 6767, 1952-1 C.B. 111, 117 (emphasis added).

While rejecting tax motive for family partnerships, Congress tried motive as a test for disallowing special allocations. After some 20 plus years of that unworkable test, **Congress deliberately deleted all references to tax avoidance purposes**, and, in 1976, substituted the objective rule that special allocations may be disregarded if they objectively lack substantial economic effect. Treas. Reg. § 1.701-2 is simply an attempt by an executive agency to enact an idea Congress has repeatedly rejected.

**4. <u>Interpretative regulations are limited to interpreting *Congress' actual intent* and cannot rewrite the substantive rule to give effect to Treasury's ideas about policy, fitness, and desirability.</u>**

While Plaintiffs question why Treasury chose to circumvent Congress, no one questions that Treasury genuinely believed in the underlying policy considerations. That is the critical point, however. Under a democratic code system of laws, rules must be enacted based upon the intent of Congress (as most clearly reflected in the words Congress enacted) -- not upon the policy considerations of an executive agency 40 years after the fact. Just as the Treasury Department has done with such success and frequency, the Constitution directs that agency to Congress to enact proposed rules into law.

As the United States Court of Appeals for the Seventh Circuit stated in *Busse v. Commissioner*, 479 F.2d 1147, 1152 (1973), acq., 1978-2 C.B. 1:

> Courts have no power (just as the Commissioner has no power in his capacity as an administrative official) "to rewrite legislative enactments to give effect to" their "ideas of policy and fitness or the desirability of symmetry in statutes." *United States v. Shirah*, 4 Cir., 253 F.2d 798, 800 (1958). **The powers of repeal and amendment are uniquely legislative in their nature**. *See Lang v. Commissioner*, 289 U.S. 109, 113, 53 S.Ct. 534, 77 L.Ed. 1066 (1933)...(emphasis added) (footnote omitted).

*Accord: Hughes Int'l*, 100 T.C. at 306 ("Respondent has no power to promulgate a regulation adding provisions he believes Congress should have included, but did not...").

Hence, the Commissioner must follow the actual intent of Congress in adopting specific statutory language -- not his own changing views as to right and wrong.

5. <u>**Above all else, an interpretative regulation cannot restrict, alter, expand, or otherwise modify a statute.**</u>

As noted, Treas. Reg. § 1.701-2 restricts the pass-through provisions of Code § 701 by excluding all partnerships within the universe covered by Code § 761(a) that engage in any transaction with a principal purpose of tax reduction. That, however, is not its most remarkable claim.

The most extraordinary power the IRS bestows upon itself is the power of those entrusted with enforcement of the law TO IGNORE THE LAW:

> Thus, **even though the transaction may fall within the literal words of a particular statutory or regulatory provision**, the Commissioner can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent [in the Commissioner's view] with the intent of Subchapter K –
>
> (1) The purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners;
>
> (2) One or more of the purported partners of the partnership should not be treated as a partner;
>
> (3) The methods of accounting used by the partnership or partner should be adjusted to reflect clearly the partnership's or the partner's income;
>
> (4) The partnership's items of income, gain, loss, deduction, or credit should be reallocated; or
>
> (5) The claimed tax treatment should otherwise be adjusted or modified. Treas. Reg. § 1.701-2(b) (emphasis added).

The IRS is apparently above the law. To be sure, these powers need not be reached here since the regulation explicitly conditions their application upon the invalid "principal purpose" test *and* the unconstitutionally vague "Subchapter K intent" test. Treas. Reg. § 1.701-2(b). The assertion is, nonetheless, both remarkable and real.

6. **An example of Treasury's inventiveness is the addition of the "clear reflection of income" test found nowhere in Subchapter K.**

In the FPAA's fourth alternative assertion, the IRS threatens to assert the power "to reflect clearly the partner's or the partnership's income" in some unspecified way at some unspecified point in the future. FPAA, p. 8, Item 4. The threat targets the partnership contributions and presumably their impact on the calculation of basis.

Nothing in § 701 or Subchapter K bestows this extraordinary power upon the IRS. While Congress granted the Commissioner limited powers to clearly reflect income in the accounting method area, the calculation of basis is NOT an accounting method. The accounting rules are contained in Subchapter E of the Code (§§ 441 – 483), while general basis rules are found under Subchapter O "Gain or Loss on Dispositions of Property" or in special provisions, such as §§ 721 – 723 applicable to partnerships.[6] Moreover, Congress obviously believed that Congressional action was required to bestow that power in the accounting method arena and took care to impose substantial safeguards. For example, as long as a taxpayer uses a method permitted by law, the IRS may not force an accounting change to a method preferred by the IRS.

---

6 An accounting method only applies to items that involve timing, and does not include permanent differences in income. *See Baltimore & Ohio R.R. Co. v. United States*, 603 F.2d 165, 169 (Ct. Cl. 1979) (holding that determining the value of an asset is not an accounting method); Treas. Reg. § 1.446-1(e)(2)(b); Rev. Proc. 2002-9, 2002-327, 335 (providing that "if the practice does not permanently affect the taxpayer's lifetime income, but does or could change the taxable year in which income is reported, it involves timing and is therefore a method of accounting."); Rev. Proc. 91-31, 1991-1 C.B. 566 (same). *See also* Kleinrock's Online Analysis § 501.2 "What an Accounting Method Is And Is Not" ("If the practice does not permanently affect the taxpayer's lifetime taxable income, but changes or could change the taxable year in which income is reported, the practice involves timing and is therefore a method of accounting. Conversely, if the treatment does permanently affect the taxpayer's lifetime taxable income, it is not an accounting method, but an issue of treatment.")

*See, e.g., Ansley-Sheppard-Burgess Co. v. Commissioner,* 104 T.C. 367, 377 (1995) (IRS cannot force a taxpayer to change from a legally acceptable method of accounting to one that better serves the IRS); *Hallmark Cards, Inc. v. Commissioner,* 90 T.C. 26, 34 (1988) (IRS cannot force change from a permissible method to a preferred method); *Galedridge Constr., Inc. v. Commissioner,* T.C. Memo 1997-240 ("The best method is not necessarily the one that produces the most tax in a particular year").

Treas. Reg. § 1.701-2(b)(3), in conjunction with § 1.701-2(a)(3), actually takes words that appear in Code § 446, *et seq.* – words that have context and history - and combines them with other familiar sounding words. With those common ingredients, it makes a completely new and toxic potion: "[T]he tax consequences under subchapter K . . .must . . .clearly reflect the partner's income . . . ." According to the IRS, this requirement is satisfied "to the extent that the application of such a provision to the transaction and the ultimate tax results, taking into account all the relevant facts and circumstances, are clearly contemplated by that provision." As stated by McKee at ¶ 1.05[4], "[l]ike the other stated elements of the 'intent of subchapter K,' this requirement sounds familiar, but it is not." It is a license to circumvent the letter of the law.

Subchapter K nowhere contains a requirement that superimposes a "clear reflection," "proper reflection," or "accurate reflection" of income test on top of the otherwise stated provisions of §§ 701-761. Congress knows how and when to impose such requirements and thought Congressional action was required to do so in 12 Code provisions that specifically require a clear reflection of income. Each of these provisions authorizes the Treasury to issue regulations or the IRS to exercise limited discretion

within their restricted areas.[7] If there were some requirement for results to "clearly reflect income" lurking beneath the surface of all Code provisions, then the specific delegations of authority would be superfluous. As the Tax Court noted in *Williams v. Commissioner*, 94 T.C. 464, 470 (1990):

> [The IRS] may not use the general provisions of Section 446(b) [relating to clear reflection of income] to override specific provisions of [other Code sections]. Otherwise, [the IRS] could attempt to use sections 446(b) to override any statutory provision that he believes does not clearly reflect income.

There are as many reasons why the application of many Code sections will not "clearly reflect income" as there are policies served by the Code, other than a proper reflection of income. *See, e.g.*, Code §§ 721 (where gain or loss is specifically not recognized on the contribution of property to a partnership); 722 (where the partners basis in the partnership assumes the historical basis of the exchanged property); and 723 (where the partnership taxes the "carryover" basis of the property from the partner). In these circumstances, courts have demanded that the less specific concept of proper reflection of income must yield to the clear non-recognition provisions and to their accompanying basis rules. *See, e.g.*, *G. D. Searle & Co. v. Commissioner*, 88 T.C. 252 (1987); *Eli Lilly & Co. v. Commissioner*, 84 T.C. 996 (1985), *aff'd in part, rev'd and remanded in part*, 856 F.2d 855 (7th Cir. 1988).

In these and other ways, Treas. Reg. § 1.701-2 adds unauthorized restrictions to both Code §§ 701 and 761(a). It is therefore:

---

[7] *See* Code § 269A (relating to personal service corporations); § 446 (general rule for methods of accounting); § 448 (limitation on use of cash method); § 471 (general rule for inventories); § 472 (last-in, first-out inventories); § 482 (allocation of income and deductions); § 857 (taxation of real estate investment trusts); § 904 (limitations on certain credits); § 953 (insurance income); § 1286 (tax treatment of stripped bonds); § 1502 (consolidated returns); § 6662 (imposition of accuracy related penalties).

i. Contrary to the precedent of the Supreme Court as articulated in *United States v. Calamaro*, 354 U.S. 351, 359 (1957) (Treasury regulation held invalid as "an attempted addition to the statute of something which is not there");

ii. Contrary to the precedent of this Circuit in *Rite Aid Corp.*, 255 F.3d at 1359-60 (Regulation is invalid where it enacts substantive rules of law beyond the statutory authorization);

iii. Contrary to the precedent of the Tax Court invalidating **virtually identical anti-abuse powers** the IRS attempted to bestow upon itself in *Edward L. Stephenson Trust v. Commissioner*, 81 T.C. 283, 288 (1983) ("General anti-abuse" trust regulations in Subchapter J stricken as invalid on basis that Treasury "may not usurp the authority of Congress by adding restrictions to a statute which are not there"); and

iv. Contrary to the law as articulated by other Circuits such as *RLC Indus. Co. v. Commissioner*, 58 F.3d 413, 419 (9th Cir. 1995) (Regulation "invalid because it is not consistent with the rulemaking authority granted to the Secretary . . . .").

Interpretative regulations simply cannot add, adopt, delete, restrict, or modify substantive rules of law. Once again, this regulation must be stricken as a violation of the Separation of Powers Doctrine for each of these five independent reasons.

## D. THE REGULATION IS UNCONSTITUTIONALLY VAGUE.

"Vague" and "overly broad" are the words most commonly used to describe Treas. Reg. § 1.701-2. William H. Caudill, *ABA Tax Section Members Say Anti-abuse Rule is Not a Valid Exercise of IRS Authority*, 94 Tax Notes Today 146-50 (Jul. 1, 1994) ("Another common complaint against the Proposed Regulation is that it is **too broadly and vaguely worded** to provide an administrable standard"); William S. McKee, et al., *Federal Taxation of Partnerships and Partners* § 1.05 (3d. ed. 1997) ("Regulations § 1.701-2 was proposed in 1994 and finalized in 1995, over the protests of most practitioners, including the authors. This Regulation is a **broad** two-part anti-abuse rule aimed at partnerships."); James A. Gouwar, *The Proposed Partnership Anti-Abuse Regulation: Treasury Oversteps Its Authority*, 11 J. Partnership Tax'n 287, 292 (1995) ("This Regulation, by removing the predictability as to the tax treatment of any transaction, has returned partnership taxation to its pre-1954 state where partners 'cannot form, operate, or dissolve a partnership with any assurance as to tax consequences.' It is hardly a valid method of interpretation to issue a **vague** regulation that is directly contrary to the statute's legislative history."); Sheldon I. Banoff, *The Use and Misuse of Anti-Abuse Rules*, 48 Tax Law. 827, 834 (1995) ("Given **such vague and ambiguous standards**, faint-hearted taxpayers and conservative tax advisors are not likely to approach the bright line of the law; to that extent, the anti-abuse rule effectively has moved the line, as a practical matter"); Sheldon I. Banoff, *Anatomy of an Anti-abuse Rule: What's Really Wrong With Reg. Section 1.701-2*, 95 Tax Notes Today 56-84 (Mar. 20, 1995) ("Government officials admit that this regulation suffers from being **inherently vague, ambiguous, and overly broad**..."); Letter from B. John Williams (former Tax

Court Judge and IRS Chief Counsel), *et al.* to the Assistant Secretary for Tax Policy, reprinted in *Commentators Say Partnership Anti-abuse Rule Doesn't Satisfy Fundamental Principles for a Workable Tax System*, 95 Tax Notes Today 175-28 (Aug. 18, 1995) ("We do not believe that the best interests of either the Government or the taxpayers will be served by this regulation or similar **broad** anti-abuse rules not grounded in or authorized by statutory provisions in the Code..."); *IRS Attorney Sees 'Fatal Flaw' in Anti-Abuse Regs.*, 94 Tax Notes Today 119-25 (May 23, 1994) ("However, this new regulation is **simply too vague**. The new regulation's use of the term "inconsistent with the intent of subchapter K" is **too vague**. No one knows what is the intent of subchapter K. There is no criteria for determining the intent of subchapter K. There are no books, records, testimony, court cases, or other information available as to the intent of subchapter K."); *Partnership Anti-abuse Regs. Should be Subject to Executive Order, Attorney Asserts*, 94 Tax Notes Today 121-11 (Jun. 10, 1994) ("The Proposed Regulation as currently worded is **so vague and ambiguous** that it creates a stifling effect on legitimate economic transactions that will have an annual effect on the economy of more than $100 million"); *Commentators Say Partnership Anti-abuse Rule Should Be Withdrawn*, 94 Tax Notes Today 152-37 (Jul. 25, 1994) ("The proposed regulation would also be **invalid as vague and overbroad**... These standards are so **vague and broad** as to be meaningless."); *Partnership Reg. Adds Confusion, Attorney Asserts*, 94 Tax Notes Today 151-42 (Jul. 29, 1994) ("[T]he regulation is **so vague** that it is likely that a Court would find it void); *Coopers & Lybrand Urges Withdrawal Partnership Anti-abuse Rule*, 94 Tax Notes Today 172-25 (Jul. 7, 1994) ("The regulation appears to be **too vague and overbroad** to provide meaningful guidance as to its

scope. The regulation is **so overly broad** that it fails to provide objective guidance to taxpayers"); *AICPA Calls For Changes in Partnership Anti-abuse Reg.*, 94 Tax Notes Today 139-64 (Jul. 13, 1994)("As written [1.701-2] is **vague** and fails to provide clear and certain direction to taxpayers"); *Partnership Anti-abuse Reg. Is Overly Broad, Price Waterhouse Asserts*, 95 Tax Notes Today 52-32 (Feb. 14, 1995) ("[W]e believe this final regulation is **still ambiguous and excessively broad** in scope"); and *Ernst & Young Criticizes Partnership Anti-abuse Reg.*, 94 Tax Notes Today 141-32 (Jun. 27, 1994) ("The regulation is **so broad as to defy meaningful interpretation**").

Treas. Reg. § 1.701-2 is intentionally unpredictable in its application because its *in terrorem* purpose is intimidation rather than illumination. The Treasury Department admitted that Treas. Reg. § 1.701-2 is vague, although it claimed that the uncertainty of the regulation reflects the uncertainty that already exists under current law. T.D. 8588, 1995-1 C.B. 109, 112. This claim is untrue. Casting aside 60 years of caselaw and clear statutory language creates chaos. Treas. Reg. § 1.701-2 is an unacceptable excuse for an interpretation. As a matter of commonsense, the Court in *Busse v. Commissioner*, 479 F.2d 1147, 1151 (7th Cir. 1973) captured the folly of Treas. Reg. § 1.701-2:

> [T]o turn from a clear statute to an unclear regulation for guidance is hardly an accepted method of interpretation.

The due process clause of the 5th Amendment entitles a taxpayer to fair notice as to what the law provides. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). The Supreme Court continued:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*See also, Rutkin v. United States*, 343 U.S. 130, 144 (1952), *quoting Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926), ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law").

Cataloguing the ambiguities and uncertainties created by this regulation is daunting. Critics and commentators, some of which have been cited or included with this memorandum, have emphasized different problems. The over-arching problem is that the regulation by design and intent is meant to give the IRS the right to "take the law into its own hands." It threatens all involved in partnership tax planning since the predictability of all tax consequences has been sacrificed to the whim or judgment of the IRS after the fact.

The Treasury Department ties Treas. Reg. § 1.701-2 to two conditions precedent ("intent of Subchapter K" and "principal purpose") that the regulation reduces to imponderables.

1. <u>**Treas. Reg. § 1.701-2 "Intent of Subchapter K".**</u>

The problem here lies with the IRS overriding existing law with indecipherable discretion. Congress certainly never conditioned its enactment of Code §§ 701-761 upon the Commissioner's divining the "intent of Subchapter K." All agree that "Subchapter K is intended to permit taxpayers to conduct joint business (investment) activities through a flexible economic arrangement without incurring an entity-level tax." Further, all agree that among the objectives of Subchapter K are "simplicity, flexibility, and equity as between the partners." That much of the regulation has foundation. The Commissioner, however, converts order into chaos through two enormously destructive devices. First, the IRS excludes any reference to Congress' overriding purpose of predictability ("the vital need for clarification [through]...the first comprehensive treatment of partners and partnerships": H.Rep. No. 1337, *supra*). The regulation then compounds that confusion by instructing revenue agents to divine the "intent of Subchapter K" through ignoring the reality that the transaction falls within "the literal words of a particular statute or regulation" directly on point.

How does any business person of normal intelligence divine with any confidence what is meant by "the intent of Subchapter K" – much less predict today how the revenue agent reviewing the partnership transactions years into the murky future, will construe the "intent of Subchapter K" - when the same regulation instructs him to IGNORE THE LAW? That license prompted one commentator to state:

> No one knows what is the intent of Subchapter K.

IRS ATTORNEY SEES 'FATAL FLAW' IN ANTI-ABUSE REGS., *supra*.

2. **<u>Aside from defying 60 years of precedent, has there ever been a phrase with more ambiguities than the second condition precedent ("*a* principal purpose...")?</u>**

The subjective, undefined nature of this next "condition" highlights the unconstitutional vagueness that permeates the rest of the regulation. The regulation states that it will be applied when (a) "*a principal* purpose" of a transaction is (b) to "reduce *substantially*" (c) the "*present value*" (d) of the "partner's *aggregate* tax liability" (e) "in a manner *inconsistent* with the *intent* of Subchapter K." Treas. Reg. § 1. 701-2(b). No one can tell from that string of subjective invitations to self-serving IRS conclusions drawn by way of hindsight when the regulation will be invoked, and if invoked, what the consequences will be.

i. "*<u>A principal purpose</u>*." The first circumstance which purports to justify the regulation is not only patently contrary to the law as interpreted by the courts (see discussion at pp. 8-12, *supra*) but, as several commentators noted, use of the indefinite article "a" connotes that a partnership may have more than one "principal purpose" and still be disregarded. That indefinite article and the adjective "principal" senselessly create ambiguities by contradicting each other.

ii. *<u>Reduce substantially</u>*. What is substantial? Is it to be expressed as a per cent or in absolute dollars? Courts have found relatively small amounts to be "substantial" in different contexts, leaving the door open for this regulation to disrupt virtually all partnership transactions. *See, e.g., Buchanan v.*

*United States*, 87 F.3d 197 (7th Cir 1996) (finding that $480,000, or even a much smaller amount, is substantial in both absolute and relative terms); *Knight-Ridder Newspapers, Inc. v. United States*, 743 F.2d 781 (11th Cir. 1984) ($240,000 or 17.1% fluctuation in inventories found substantial). Is it to be judged by the year of the transaction in issue, or are future years to be taken into account, when the transaction might "turn around"? Is it to be judged by comparing the tax liabilities under "flow through" concepts with a tax that might be imposed if the partners had chosen a corporate form? Who can say? Only the IRS at the time of audit. *See Hanlin v. Commissioner*, 38 B.T.A. 811 (1938), *aff'd*, 108 F.2d 429 (3d Cir. 1939) (Court criticized use of word "substantially" as a "**lax, indefinite expression**").

iii. *Present value*. What interest or discount or tax rates apply for what period? What compounding factor applies? Elsewhere in the Code, different interest rates are prescribed for a variety of purposes. For example, Code §§ 42, 467, 483, 811, 1271, and 7872, all specify the "applicable federal rate" as defined by Code § 1274(d). There are three rates which might be applicable under that section, based on the federal short-term, mid-term or long-term rate. There are over 50 Code sections that refer to an interest rate, but no

where is there a definition of "interest rate," "discount rate," or "present value" in Subchapter K. Due to the complexity of "present value" concepts, Congress resisted injecting present value into the Code for decades. The one exception is the mind-numbing complexity of the "Original–Issue-Discount" rules for bonds and specified debt instruments in Code §§ 1271-1275. The scope of those rules are painstakingly restricted and nothing supports their application beyond the Congressional authorization to tax liabilities. Thus, neither the Code nor Treas. Reg. § 1.701-2 suggests the appropriate benchmark for determining the present value of tax liabilities. Again, what in Code § 701 or its legislative history provides any indication that Congress ever intended to adopt such substantive rules?

iv. _Partners' aggregate tax liability_. Aggregating the partners' tax liabilities is patently contrary to the language of Code § 701: "Persons carrying on business as partners shall be liable for income tax only in their separate or individual capacities." Nowhere does Subchapter K suggest that the tax liabilities of the partners are to be "aggregated" for any purpose. Furthermore, the examples suggest that the IRS might pick and choose which partners to include in the aggregate, so that if some of the partners' tax liabilities were

increased, those might not be netted against the liabilities of partners whose liabilities were reduced. *See* Examples 7 and 8. What is the authority for that lop-sided formula?

There are no mechanics suggested in the regulation or even parallels in the Code to guide the IRS in reaching a meaningful aggregate of tax liabilities. Would the aggregate tax liability be determined by aggregating the taxable incomes and then applying an assumed tax rate? What table would be used to determine the rates to compute this aggregate tax liability? Or would the IRS compute the hypothetical tax liability for each partner and then add those together? Since, any tax liability would be strictly hypothetical, would the IRS be free to make hypothetical elections that would maximize the hypothetical aggregate liability? In aggregating tax liabilities, would the IRS ignore the effects of foreign taxes -- an IRS argument rejected in *Compaq Computer Corp. v. Commissioner,* 277 F.3d 778, 785-786 (5th Cir. 2001)? Beyond *Compaq*, where is any statutory, regulatory, or judicial authority for the substantive answers to each of these many questions? Since, under these regulations, the IRS is free to make up the rules as it goes along, there are an infinite number of possibilities that exist for the IRS, but no guidance for taxpayers.

### 3. The two conditions precedent in turn create ambiguities and uncertainties about when and how a partnership will be disregarded in its entirety, in part, or not at all.

Treas. Reg. § 1.701-2(b) theoretically allows the Commissioner to recognize the partnership as an entity or fragment into the aggregation of its partners into splinters – as the IRS deems appropriate to carry out the purpose of **any** provision of the Code or regulations. Leaving the IRS with unfettered discretion to recognize a partnership (or not) after the fact is a fiat, not a rule of law. In *Coggin Auto. Corp. v. Commissioner*, 292 F.3d 1326 (11th Cir. 2002), the Eleventh Circuit expressed the concern that goes to the heart of the infirmity of Treas. Reg. § 1.701-2:

> It is worrisome to think that a taxpayer may not know in advance whether this would be the day that the fictional aggregate or the fictional entity theory of partnerships will be applied on an ad hoc basis. Relying upon the plain meaning of the statute, in a legitimate business transaction, a taxpayer deserves the right to be able to predict in advance what the tax consequences of such transaction will be with reasonable certainty.[10]

The Eleventh Circuit, therefore, held that, no matter how well intentioned the IRS allegations of abuse may be, the Court was obligated to follow the precedent of the Supreme Court in *Gitlitz* and apply the plain meaning of the statute.

The evil of uncertainty starts but does not end with the regulation's reserving to the Commissioner the ultimate discretion to determine whether or not to treat a business arrangement as a partnership or an aggregate, ignore or recognize a partner, bless or condemn an accounting method, or reallocate income, deductions, credits or losses. As may be seen in this case, the regulations may be used to permit the IRS to recognize the partnership for some purposes and ignore it for others – to cherry pick the

[10] Note that Treas. Reg. 1.701-2 had been promulgated after the transaction questioned in that case and was not reached by the Court.

results so that "heads, taxpayer loses and tails, IRS wins." This regulation is not tax neutral. "If the statutory scheme produces a result which is so unfair to a taxpayer that the result clearly could not have been contemplated, the taxpayer is nevertheless stuck with the result." McKee at ¶ 1.05[1][c].

In other words, if the regulation is deemed to apply, there is absolutely no way to predict the tax results that might follow. Treasury might as well have said: "Citizens, enter into partnerships at your peril."

**4. Treas. Reg. § 1.701-2(d) - The examples do little or nothing to help clarify the application of the regulation.**

The examples of Treas. Reg. § 1.701-2(d) assert that the IRS will "balance" the business and tax motives in some fashion, but no clear pattern emerges. In some examples, tax motives are permissible (Examples 1 – 6 and 9), and in others (Examples 7, 8, and 10), the motives are impermissible.

Example 7 of Treas. Reg. § 1.701-2(d) poses an example of a "partner with nominal interest" of 0.1%. Along with other negative factors, the example concludes that the transaction lacks a substantial business purpose. Yet, when it benefits the IRS' financial interests, the IRS treats very small interests as "real." *See, e.g., Jordan v. United States*, 863 F.Supp. 270, 271 (E.D.N.C. 1994) (where partner's investment entitled him to only a 0.0018260 (or 18/100ths of one percent) interest in partnership); Ltr. Rul. 7952057 (where a partner's 0.1% interest was recognized); Rev. Proc. 89-12, 1989-1 C.B. 798, 800 (requiring that the collective interests of all general partners equal 1%, thereby admitting that each such interest could be insubstantial).

Example 8 of Treas. Reg. § 1.701-2(d) ignores a family partnership in which all partners invested substantial capital because the business purpose is insignificant in

comparison to the tax benefits. That example overtly overrules judicial precedent in *Moline, Culbertson, Strangi,* and *Knight* – the very violation prohibited by this Circuit in *Bankers Trust.* As the leading partnership authority recognized (McKee ¶ 1.05[3][a]), "[This example] is an attempt to simultaneously reopen and pre-empt a debate the Service lost in the courts and in Congress more than forty years ago."

**CONCLUSION**

Treasury Reg. § 1.701-2 purports to be aimed at "abuse," but the greater potential for abuse lies in the breadth and uncertainty of the regulation that runs roughshod over statutes enacted by Congress, reverses 60 years of judicial precedent, and ignores partnerships legally constituted under State law. As this Circuit held in *Beneficial Corp.*, 814 F.2d at 1574, even "the courts [much less the IRS] are not at liberty to construe statutory language contrary to its meaning."

Respectfully submitted,

[signature]
DAVID D. AUGHTRY
Georgia Bar No. 028010

[signature]
LINDA S. PAINE By express permission D. Aughtry
Texas Bar No. 15414000

Chamberlain, Hrdlicka, White,
Williams & Martin
191 Peachtree Street, N.E., Ninth Floor
Atlanta, Georgia 30303
Telephone: (404) 659-1410
Facsimile: (404) 659-1852

COUNSEL FOR PLAINTIFFS

Dated: December 18, 2003
154244.11
002871-000000:12/16/2003

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE,<br><br>Defendant. | § | NO. 03-2164 T<br><br>Judge Mary Ellen Coster Williams |

**AFFIDAVIT OF GARY E. ERVIN**

COMMONWEALTH OF KENTUCKY )
)
COUNTY OF UNION )

BEFORE ME, an officer duly authorized to take acknowledgements and administer oaths, this day personally appeared, **GARY E. ERVIN**, who being over the age of eighteen (18) years and having personal knowledge of the facts contained herein, and being first duly sworn on oath, states as follows:

1. My name is Gary E. Ervin. I suffer no legal disabilities and am competent to give this affidavit.

2. I am a U.S. Citizen and have resided in Morganfield, Kentucky since 1969.

3. Over the last 20 years, I have invested extensively in stock, bonds, different sorts of investment funds and real estate. Over the last 20 years I have also

made investment decisions on behalf of my two younger brothers, Tim and Robert, who rely almost exclusively on me to manage their money.

4. When we sold our interest in several family companies in 1999, Tim and Robert relied upon me to investigate opportunities and invest most of their share in a way that would achieve diversification. At that stage, we were heavily concentrated in Dycom stock, which concerned me since one big market downturn could severely eat away at our wealth. Overall, the diversification plan has worked out well even though some of our investments have been unsuccessful.

5. As part of my desire to diversify our family's new-found wealth, I met personally with representatives from Sentinel Advisors during the summer of 1999.

6. I was impressed by the credentials of the Sentinel people and was intrigued by the idea of sophisticated foreign currency trading.

7. I specifically recall the Sentinel people discussing options on the Euro, and how similar options on the Swiss Franc in years past would have ended up profitable around 20% of the time. If those Swiss Franc options were profitable, their average return was around 14 to 1. The Sentinel people provided graphs and charts which described these options.

8. I also specifically recall the Sentinel people discussing how they felt the Euro was an exciting buying opportunity.

9. Shortly thereafter, I decided to begin investing with the people at Sentinel.

10. I talked with Tim and Robert about foreign currency investing opportunities at Sentinel and they both told me to put their money wherever I was putting mine.

11. I then negotiated with Sentinel on the investment advisory fee they wanted to charge my brothers and I. After bringing them down to a number I felt comfortable with, we agreed to proceed.

12. Sentinel, through a related entity by the name of New Vista, LLC, advised Robert, Tim and myself on the structuring of our Euro options.

13. New Vista later recommended that we invest in a hedge fund run by them.

14. Tim, Robert and myself followed New Vista's advice and each contributed the Euro options and $75,000 cash to Jade Trading.

15. New Vista sent us monthly reports discussing Sentinel's views on the financial markets, as well as performance data relating to our investments.

16. I read these reports and would occasionally talk about the performance of our foreign currency investment with Tim and Robert.

17. After two months of poor results, I told Tim and Robert that I wanted to take my money out of Jade Trading. As usual, they both told me they would follow my lead and do the same thing.

18. I believe Tim, Robert and myself informed Sentinel of our wish to take our money out of Jade sometime during the first week of December, 1999, and we received stock and Euro as a liquidating distribution a few weeks later.

Further affiant sayeth not.

GARY E. ERVIN

Sworn to and Subscribed
before me this 12th day of
December, 2003.

Vickie A. Davis
Notary Public

My Commission Expires: 07/03/07

[Notary Seal]

154560.1
002871-000000:12/5/03

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JADE TRADING, LLC, by and through ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner, | § | |
| Plaintiffs, | § | |
| v. | § | NO. 03-2164 T |
| UNITED STATES OF AMERICA, by and through its agent, the INTERNAL REVENUE SERVICE, | § | Judge Williams |
| Defendant. | § | |

**AFFIDAVIT OF ROBERT W. ERVIN**

STATE OF KENTUCKY )
)
COUNTY OF UNION )

BEFORE ME, an officer duly authorized to take acknowledgements and administer oaths, this day personally appeared, **ROBERT W. ERVIN**, who being over the age of eighteen (18) years and having personal knowledge of the facts contained herein, and being first duly sworn on oath, states as follows:

1. My name is Robert W. Ervin. I suffer no legal disabilities and am competent to give this affidavit.

2. I am a U.S. citizen and have resided in Morganfield, Kentucky since 1969.

3. My two older brothers and I started a cable construction business. In time, I was primarily responsible for subterranean operations, my brother Tim was primarily

responsible for aerial operations, and my oldest brother Gary was primarily responsible for handling finances and administration.

4. We do almost everything as equal one-third partners. Generally, we make our charitable contributions as equal one-third partners, we work together as equal one-third partners, and we invest together as equal one-third partners. Over time, we have been in approximately 50 ventures together as equal one-third partners. We follow our lawyers advice as to whether to structure the venture as direct ownership, a limited partnership, a limited liability company, an S corporation, or other entity but we split our participation three ways.

5. Over the last 20 years, I have relied upon my oldest brother Gary Ervin for most of my investment decisions and that has worked out better than I could ever have hoped.

6. When we sold our interest in several family companies in 1999, I relied upon Gary to investigate and invest most of my share in a way where I did not have most of my eggs in one basket. At that stage, most of my share was stuck in Dycom stock and Gary was trying to help us diversify our investments as well as he could. Overall, that has worked out well even though some of our investments have been unsuccessful.

7. During 1999, Gary investigated many different investments for us through different companies. He narrowed those to four or five for us to invest in.

8. One of those involved foreign currency trading through a company named Sentinel.

9. Based on advice he received, Gary recommended that a separate limited liability company be formed for each of us. I am the sole member of Ervin Capital, LLC ("Ervin Capital"). Ervin Capital is a limited liability company.

10. It was formed as a limited liability company for the purpose of protecting my and my family's personal assets against unlimited liability.

11. Ervin Capital entered into two separate Eurodollar options that I signed. The confirmation documents relating to those two options are attached as Exhibits 1 and 2.

12. I also signed the Master Trading Agreement between Ervin Capital and AIG that is attached as Exhibit 3.

13. In early October, 1999, Ervin Capital contributed $75,000 in U.S. dollars and the two options to Jade Trading, LLC ("Jade Trading") in exchange for a membership interest.

14. My understanding is that Jade Trading was also formed as a limited liability company which provided further protection for my family, my brothers, their families, the other members, and me.

15. It too provided us with an opportunity to diversify our investments by investing more in Eurodollar options.

16. The Eurodollar went the wrong way and so, we decided to get out.

17. We lost a lot of money but made more back on the other investments Gary handled for my brother Tim and me.

Further affiant sayeth not.

Robert W. Ervin
ROBERT W. ERVIN

Sworn to and Subscribed
before me this 12th day of
December, 2003.

Vickie A. Davis
Notary Public

My Commission Expires: 07/03/07

[Notary Seal]

154103.1
002871-000000:12/1/2003

AIG
INTERNATIONAL

ERVIN CAPITAL, LLC
11655 ST. RT. 141 S
MORGANFIELD, KY 42437

CONFIRMATION OF A FOREIGN CURRENCY OPTION
TRADE DATE: 29SEP99

WE CONFIRM HAVING BOUGHT FROM YOU THE FOLLOWING EUROPEAN OPTION:

TYPE OF OPTION: EUR CALL AGAINST USD
AMOUNT: EUR 290,540,000.00
USD 315,235,900.00
STRIKE PRICE: 1.085000
SPOT PRICE: SPOT RATE IS TO BE DETERMINED BY AIG ACTING IN A COMMERCIALLY REASONABLE MANNER.
EXPIRATION DATE: 29SEP00 10:00 AM NEW YORK TIME
SETTLEMENT DATE: TWO (2) BUSINESS DAYS AFTER EXERCISE
PREMIUM AMOUNT: USD 14,850,018.00
PREMIUM DUE DATE: 29SEP99
REFERENCE NUMBER: 4666420

OTHER TERMS AND CONDITIONS:
CASH SETTLEMENT:
IN THE EVENT THAT THIS OPTION IS EXERCISED, THE OPTION WILL BE SETTLED IN U.S. DOLLARS (AND THUS NO DELIVERY OF THE UNDERLYING CURRENCY OR COUNTER CURRENCY AMOUNT OF THIS OPTION WILL TAKE PLACE) BY THE GRANTOR OF THIS OPTION PAYING TO THE HOLDER OF THIS OPTION ON THE SETTLEMENT DATE AN AMOUNT EQUAL TO THE "IN THE MONEY" AMOUNT OF THIS OPTION AT THE TIME OF EXERCISE (AS DETERMINED BY AIG).

"IN THE MONEY" AMOUNT

PUT OPTIONS:
THE EXCESS OF THE STRIKE PRICE OVER THE SPOT PRICE, MULTIPLIED BY THE EUR AMOUNT OF THE OPTION.

CALL OPTIONS:
THE EXCESS OF THE SPOT PRICE OVER THE STRIKE PRICE, MULTIPLIED BY THE EUR AMOUNT OF THE OPTION.

THIS OPTION SHALL BE SUBJECT TO THE MASTER TRADING AGREEMENT ENTERED INTO BY THE TWO PARTIES ON 15SEP99.
THIS OPTION WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CHOICE OF THE LAW DOCTRINE.

REGARDS,
AIG INTERNATIONAL INC.
CONNECTICUT

BY: Ann B. Reed
AUTHORIZED SIGNATURE

Ann B. Reed
Vice President and Treasurer

AGREED AND ACCEPTED
ERVIN CAPITAL, LLC

BY: Robert Ervin
AUTHORIZED SIGNATURE



EXHIBIT
1

AIG
INTERNATIONAL

ERVIN CAPITAL, LLC
11655 ST. RT. 141 S
MORGANFIELD, KY 42437

CONFIRMATION OF A FOREIGN CURRENCY OPTION
TRADE DATE: 29SEP99

WE CONFIRM HAVING SOLD TO YOU THE FOLLOWING EUROPEAN OPTION:

TYPE OF OPTION: EUR CALL AGAINST USD
AMOUNT: EUR 290,540,000.00
USD 314,945,360.00
STRIKE PRICE: 1.084000
SPOT PRICE: SPOT RATE IS TO BE DETERMINED BY AIG ACTING IN A COMMERCIALLY REASONABLE MANNER.
EXPIRATION DATE: 29SEP00 10:00 AM NEW YORK TIME
SETTLEMENT DATE: TWO (2) BUSINESS DAYS AFTER EXERCISE
PREMIUM AMOUNT: USD 15,000,020.00
PREMIUM DUE DATE: 29SEP99
REFERENCE NUMBER: 4666410

OTHER TERMS AND CONDITIONS:
CASH SETTLEMENT:
IN THE EVENT THAT THIS OPTION IS EXERCISED, THE OPTION WILL BE SETTLED IN U.S. DOLLARS (AND THUS NO DELIVERY OF THE UNDERLYING CURRENCY OR COUNTER CURRENCY AMOUNT OF THIS OPTION WILL TAKE PLACE) BY THE GRANTOR OF THIS OPTION PAYING TO THE HOLDER OF THIS OPTION ON THE SETTLEMENT DATE AN AMOUNT EQUAL TO THE "IN THE MONEY" AMOUNT OF THIS OPTION AT THE TIME OF EXERCISE (AS DETERMINED BY AIG).

"IN THE MONEY" AMOUNT

PUT OPTIONS:
THE EXCESS OF THE STRIKE PRICE OVER THE SPOT PRICE, MULTIPLIED BY THE EUR AMOUNT OF THE OPTION.

CALL OPTIONS:
THE EXCESS OF THE SPOT PRICE OVER THE STRIKE PRICE, MULTIPLIED BY THE EUR AMOUNT OF THE OPTION.

THIS OPTION SHALL BE SUBJECT TO THE MASTER TRADING AGREEMENT ENTERED INTO BY THE TWO PARTIES ON 15SEP99.
THIS OPTION WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO CHOICE OF THE LAW DOCTRINE.

REGARDS,
AIG INTERNATIONAL INC.
CONNECTICUT

BY: Ann B Reed
AUTHORIZED SIGNATURE

Ann B. Reed
Vice President and Treasurer

AGREED AND ACCEPTED
ERVIN CAPITAL, LLC

BY: Robert Ervin
AUTHORIZED SIGNATURE

AIG International Inc.
One Greenwich Plaza, Greenwich, Connecticut 06830
Tel: 203 861 3000 Fax: 203 861 3824

EXHIBIT
2

AIG
INTERNATIONAL

September 15, 1999

Ervin Capital, LLC
11655 St. Rt. 141 S
Morganfield, KY 42437

Attention: Robert Wayne Ervin

Ladies/Gentlemen:

This letter agreement sets forth the terms and conditions which will govern all Transactions between AIG International Inc. ("AIG") and Ervin Capital, LLC ("Counterpart"). Unless defined elsewhere in this Agreement, terms are as defined in paragraph 9.

1. Terms of & Responsibility for Transactions

1.1 Each Transaction shall be governed by the terms and conditions set forth in this Master Agreement and in the Confirmation relating to such Transaction. Each Confirmation shall supplement and form a part of this Master Agreement and shall be read and construed as one with this Master Agreement and with each other Confirmation, so that this Master Agreement and all Confirmations, Schedules and amendments hereto constitute a single agreement between the parties (collectively referred to as this "Agreement"). The parties acknowledge that all Transactions are entered into in reliance upon such fact, it being understood that the parties would not otherwise enter into any Transaction.

1.2 A Transaction is entered into upon agreement of the parties, by telephone, telex, Reuters Direct Dealing or otherwise. However, nothing in this Agreement shall be deemed to require a party to enter into any Transaction.

1.3 AIG shall confirm each Transaction as provided in the applicable Schedule (each a "Confirmation"). Unless objected to within two Business Days after receipt, each Confirmation is final and binding on the parties, absent manifest error. Failure to send or agree upon a Confirmation shall not affect a Transaction entered into by the parties under paragraph 1.2.

2. Netting & Novation of Transactions

If the parties enter into a Transaction which, when taken together with one or more outstanding Transactions, constitute Offsetting Transactions as provided in any Schedule then (unless the parties otherwise specifically agree in writing or by exchange of telexes or signed telecopies evidencing mutual agreement with respect to one or more such Transactions) all such Offsetting Transactions shall be netted into a single Transaction with the effect specified in the applicable Schedule. Each resulting Transaction shall be deemed entered into automatically, whether or not either party confirms such netting or reflects such netting in its records, and, once such resulting Transaction is so entered into, outstanding obligations under the Offsetting Transactions shall terminate.

3. Netting of Payments; Settlement

3.1 If on any day payments (other than Margin) in the same Currency are due from AIG and Counterpart to each other under this Agreement, then (subject to any right to liquidate under this Agreement) the amounts owing shall be offset against each other, so that only the net amount of that Currency owing on that day shall be paid by the party owing the larger amount to the other party.

t:\docs\multi\ervincap 915



EXHIBIT
3

3.2 AIG is not required to pay any Currency or perform any obligation to Counterpart unless Counterpart shall have first paid all Currency and performed all obligations which it owes to AIG on or before that date.

4. Non-Performance/Liquidation

4.1 Notwithstanding any other provision of this Agreement, in the event (each a "Default") either party (the "Defaulting Party") shall (a) become bankrupt or insolvent, however evidenced, or be unable to pay its debts as they fall due, (b) file a petition or otherwise commence a proceeding under any bankruptcy, insolvency, reorganization or similar law, or have any such petition filed or proceeding commenced against it, (c) have a liquidator, administrator, conservator, receiver, trustee or similar official appointed with respect to it or any substantial portion of its property or assets, (d) fail to pay or perform any obligation to the other party (the "Performing Party") when due, whether under this Agreement or otherwise (unless such failure results from a processing, clerical or similar error, in which case such failure shall only be a Default if not corrected within one business day of receipt of notice of such failure from the Performing Party), or (e) fail to provide adequate assurance of its ability to perform all of its outstanding obligations to the Performing Party, whether under this Agreement or otherwise, within 48 hours (or if termination of the 48 hours does not fall on a Business Day, or the opening of business on the next following Business Day) of a demand therefor when the Performing Party has reasonable grounds for insecurity; then in any such event the Performing Party shall have the right, on prior notice to the Defaulting Party (except in the case of a Default specified in clause (b), in which case no notice is required) and at any time or from time to time thereafter, to liquidate any or all Transactions (limited, at the Performing Party's election, to any or all Transactions which are "forward contracts" and/or "swap agreements" as defined in the U.S. Federal Bankruptcy Code) then outstanding by:

(i) closing out each Transaction being liquidated, so that each such Transaction is canceled except for a Settlement Payment for that Transaction to be determined by the Performing Party; and

(ii) setting off (A) all Settlement Payments which the Performing Party owes to the Defaulting Party as a result of such liquidation, plus (as determined by the Performing Party) any or all Margin then held by the Performing Party and/or any or all other amounts which the Performing Party owes the Defaulting Party under this Agreement (whether or not then due), against (B) all Settlement Payments which the Defaulting Party owes to the Performing Party as a result of such liquidation, plus (as determined by the Performing Party) any or all Margin then held by the Defaulting Party and/or any or all other amounts which the Defaulting Party owes the Performing Party under this Agreement (whether or not then due), so that all such amounts are netted to a single liquidated amount payable by one party to the other party.

The net amount due after such liquidation shall be paid by the close of business in New York City on the next Business Day.

4.2 If a Default occurs, the Performing Party (at its election) may set off any or all amounts which the Defaulting Party owes to it (whether under this Agreement or otherwise and whether or not then due) against any or all amounts which it owes to the Defaulting Party (whether under this Agreement or otherwise and whether or not then due).

4.3 Any amount not then due (other than a Settlement Payment) which is included in a setoff under paragraph 4.1(ii) or 4.2 shall be discounted to present value as at the time of setoff (to take account of the period between the date of setoff and the date on which such amount would have otherwise been due), at a rate of interest based on the London Interbank Rate for the applicable Currency and period, as determined by the Performing Party in any commercially reasonable manner.

4.4 The Performing Party's rights under this paragraph 4 shall be in addition to, and not in limitation or exclusion of, any other rights which the Performing Party may have (whether by agreement, operation of law, in equity or otherwise). If a liquidation occurs, the Performing Party shall use reasonable efforts to notify the Defaulting Party by the following Business Day. Such notice, however, is only advisory, and failure to give such notice shall not affect a liquidation or subject the Performing Party to any liability.

4.5 After a Default, (a) the Performing Party may suspend any payments it owes under this Agreement, pending a liquidation or setoff under this paragraph 4, (b) the Defaulting Party shall be responsible for all costs and expenses incurred by the Performing Party as a result of a Default (including, without limitation, reasonable attorneys' fees and disbursements), and (c) any amount which is not paid by the Defaulting Party when due shall bear interest until paid at the publicly announced prime rate of Citibank, N.A. as from time to time in effect, plus two percent per annum (but not to exceed the maximum rate permitted by law).

5. Early Termination

If (a) either party is prevented from or hindered or delayed by reason of force majeure or act of State in the delivery or receipt of any Currency, (b) it becomes or, in the good faith judgment of one of the parties, may become unlawful or impossible for either party to deliver or receive a Currency which is the subject of a Transaction or due under this Agreement, or (c) an Acceleration Event specified in a Schedule or a Confirmation occurs, the parties agree that each Transaction affected thereby (but no other Transactions) will, on notice from either party, be liquidated as provided in paragraph 4 (with the Settlement Payment determined in the manner set forth in this paragraph 5), and the resulting net payment due for all such Transactions shall be made within one Business Day after such liquidation. For purposes of this paragraph, the parties shall attempt to agree on the Settlement Payment for each Transaction being liquidated and, for such Transactions as to which agreement cannot be reached, the Settlement Payment shall be determined based upon the average of quotations for a comparable Transaction by three mutually acceptable dealers in the relevant commodity.

6. Payments

All payments under this Agreement (a) if of U.S. Dollars, shall be in Funds made to the bank account in New York City designated by the party receiving payment, and (b) if of Foreign Currency, shall be made by wire transfer of immediately available funds to the bank account in the major financial center in the country in which that Currency is legal tender designated by the party receiving payment; provided that each such bank designated by a party must be reasonably acceptable to the other party. Each payment must be of Currency which is unrestricted, unblocked and free from exchange controls. Each party shall promptly advise the other of the appropriate bank account whenever it is to receive payment, but each party may in lieu thereof designate standing payment instructions from time to time.

7. Notices

Except as otherwise provided in this Agreement, all notices, requests and other communications under this Agreement shall be in writing (which includes telex or telecopy), delivered to the address or transmitted to the telex or telecopy numbers specified in the Information for Notices Schedule, and deemed to have been given on the date received or when transmitted to the telex address of the respective party set forth in such Schedule (if confirmed by the respective answerback set forth therein), and in any case to the attention of the person or department indicated; provided that (a) notice of exercise of any option can only be given as provided in the Schedule concerning those options, (b) each party's notice information may be changed by notice to the other party which shall only be effective upon receipt, and (c) any notice received outside of business hours or on a day which is not a Business Day in the city where the recipient is located shall be deemed given at the next opening of business at such location. Each party may rely on any communication relating to this Agreement which it reasonably believes to have come from the other party.

8. Representations & Warranties

8.1 Each party represents and warrants to the other party that, on the date of this Master Agreement and at the time it enters into a Transaction, (a) it possesses all power, authority and applicable approvals (if any) necessary for it to enter into this Agreement and each Transaction, (b) this Agreement constitutes the valid and binding obligation of such party enforceable against it in accordance with its terms, (c) the execution, delivery and performance of this Agreement will not cause such party to be in violation of any other agreement or law, regulation, order or court process or decision to which it is a party or by which it or its properties are bound or affected, (d) it is a "merchant" as that term is defined in the New York Uniform Commercial Code, (e) with respect to AIG only, when it enters into a Transaction which is an option, it is a commercial user of, or a merchant handling, each Currency covered by that option, and is entering into such option solely for purposes related to its business as such, (f) upon delivery of any Currency to the other party, good title thereto will be transferred to such other party free and clear of any lien, claim, encumbrance or security interest of any kind whatsoever, and (g) it is an "eligible swap participant" as defined in Section 35.1(b) of the Regulations of the Commodity Futures Trading Commission.

8.2 Each party further represents, warrants and covenants to and with the other party that, on the date of this Master Agreement and at the time it enters into a Transaction, (a) it is not relying upon any representations (whether written or oral) of the other party other than the representations expressly set forth in this Agreement, (b) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment, hedging and trading decisions (including decisions regarding the suitability of any Transaction pursuant to this Agreement) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party, (c) it understands the terms, conditions and risks (economic and otherwise) of the Master Agreement and each Transaction and is capable of assuming and willing to assume (financially and otherwise) those risks, (d) it is entering into this Agreement and each Transaction as principal, and not as agent, fiduciary or any other capacity, and (e) the other party is not acting as a fiduciary or financial, investment or commodity trading advisor for it.

8.3 Each representation and warranty in this Agreement shall survive any delivery and payment under and termination of this Agreement.

9. Definitions

In addition to terms defined elsewhere in this Agreement, the following terms shall have the meanings specified below:

"Business Day" means a day on which banks in the applicable city (or if no city is specified, New York City) are open for business, except that for purposes of settlement under a Transaction a Business Day must also be a day on which banks are open for business in the principal financial centers of the countries whose Currencies are covered by that Transaction.

"Currency" means the lawful currency of any country (or any composite currency such as the European currency unit).

"Foreign Currency" means any Currency other than the U.S. Dollar.

"Forward Contract" means any Transaction with a maturity date more than two Business Days (or for purposes of paragraph 4, more than two days) after the date on which such Transaction is entered into.

"Funds" means U.S. Dollars paid by wire transfer of immediately available funds.

The term "liquidate" means liquidate and/or terminate.

"Margin" has the meaning given to it in the Margin Schedule, if applicable.

"Settlement Payment" with respect to a Transaction and the party calculating such amount at any time means the losses and costs (or gain) at such time, expressed in U.S. Dollars, which such party incurs as a result of the liquidation of such Transaction (other than consequential damages), including (at the election of the party calculating such amount) without limitation, all losses and costs which such party incurs as a result of its maintaining, terminating and/or re-establishing any hedge or related trading positions, in each case as determined by AIG (or if AIG is the Defaulting Party, by Counterpart) in any commercially reasonable manner. The Settlement Payment shall be due to the party calculating the Settlement Payment if it reflects a loss and shall be due from such party if it reflects a gain. In making this calculation, such party shall discount to present value (in good faith and in a commercially reasonable manner based on London Interbank Rates for the applicable period and Currency) any amount which would be due at a later date and shall add interest (at a rate determined in the same manner) to any amount originally due prior to the date of calculation.

"Spot Contract" means any Transaction which is not a Forward Contract.

A "Transaction" is any type of agreement between the parties covered by a Schedule. "Currency Transaction" means a Transaction identified as such in a Schedule.

10. Law & Jurisdiction

10.1 THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, U.S.A., WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW. THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE INTERNATIONAL SALE OF GOODS SHALL NOT APPLY TO THIS AGREEMENT. EACH PARTY SUBMITS TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK CITY, BOROUGH OF MANHATTAN, FOR ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT, AND EXPRESSLY WAIVES ANY OBJECTION IT MAY HAVE TO SUCH JURISDICTION OR THE CONVENIENCE OF SUCH FORUM.

10.2 Each party may record all telephone conversations between them and any tape recordings may be submitted in evidence to any court in any legal proceeding for the purpose of establishing any matter relating to this Agreement.

11. Miscellaneous

11.1 This Agreement is for the benefit of the parties hereto and their respective successors and permitted assigns. No other person or entity (including, without limitation, any customer of either party) shall have any rights under this Agreement. This Agreement may not be assigned by either party in whole or in part without the prior written consent of the other party. Transactions may be assigned to a new counterparty solely upon credit and legal approval of the new counterparty by AIG, such approval to occur in writing prior to any such assignment. Time is of the essence in all aspects of each party's performance under this Agreement and (subject to paragraph 5) each party irrevocably waives any defense of act of State or force majeure which it might have in connection with this Agreement.

11.2 In the event of a conflict or inconsistency between a Confirmation and this Master Agreement, the Confirmation shall govern as to the specific terms of that Transaction and otherwise this Master Agreement shall govern.

11.3 This Agreement (a) constitutes the entire agreement between the parties with respect to the subject matter of this Agreement, (b) supersedes all prior agreements with respect to the subject matter of this Agreement, (c) may not be amended, modified or supplemented, except by a writing signed by both parties or by telexes or signed telecopies evidencing mutual agreement sent by each party to the other, and (d) supersedes all standard terms and conditions of trading of either party, regardless of how denominated and whether or not the same are printed on one or more confirmations or purchase or sales orders relating thereto. No delay on the part of either party in exercising any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of either party, nor any single or partial exercise of any right under this Agreement, preclude any other or further exercise thereof or any other right under this Agreement. Each party's rights and remedies under this Agreement are cumulative and are not exclusive of any rights and remedies provided for by law, in equity or otherwise.

11.4 The paragraph headings in this Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision of this Agreement. In the event that any provision (or portion of a provision) of this Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction, the remainder of this Agreement (and of such provision) shall not be affected except to the extent necessary to delete such illegal, invalid or unenforceable provision (or portion thereof), unless the deletion of such provision (or portion thereof) shall substantially impair the benefits of the remaining portions of this Agreement. The parties agree that paragraphs 4 and 5 do not provide for a penalty but, rather, reflect the intent of the parties that each Transaction be settled at open-market prices and rates. To the extent applicable, the obligations of the parties are to be construed in accordance with the practices in the international currency dealer markets.

11.5 This Agreement may be terminated on five Business Days' prior written notice by one party to the other, but such termination shall not affect any Transaction outstanding at the time such termination is effective, which shall remain subject to the terms and conditions of this Agreement until all outstanding obligations are performed or liquidated.

11.6 Unless otherwise agreed, Counterpart shall, from time to time and as requested by AIG, pay to AIG a fee equal to 0.0275% multiplied by the notional amount of any Call spread or Put spread Option Transaction.

12. <u>Schedules</u>

The following Schedules are attached hereto:

| Schedule | Title |
|---|---|
| A | Information for Notices |
| B | Spot & Forward Currency Contracts |
| C | Currency Options |
| D | Swap Transactions |
| E | Margin |

13. <u>Margin & Credit Enhancement</u>

The parties will mark-to-market and provide Margin and any other credit enhancement as may be provided in any Schedule.

14. Limitation of Liability

Notwithstanding anything to the contrary contained in this Agreement or any schedule, addendum, confirmation, or other document issued or delivered in connection with any transaction entered into under this Agreement, any amounts owed or liabilities incurred by Counterpart in respect of any transaction entered into under this Agreement, may be satisfied solely from the assets of Counterpart. Without limiting the generality of the foregoing, in no event shall AIG or any of its affiliates have recourse, whether by setoff or otherwise, with respect to any such amounts owed or liabilities incurred, to or against (a) any assets of any person or entity other than Counterpart, or (b) any assets of any affiliate of Counterpart.

15. Calculations

All calculations and determinations to be made by either AIG or Counterpart in connection with this Master Agreement or any Confirmation shall be made in good faith and in a commercially reasonable manner.

Please indicate your acceptance of and agreement with the foregoing by signing in the space provided.

Very truly yours,

AIG INTERNATIONAL INC.

By: [signature]
Ann B. Reed
Vice President and Treasurer

ACCEPTED AND AGREED:

ERVIN CAPITAL, LLC

By: [signature]
Name:
Title:

i:\docs\multi\ervincap 9.15

Schedule A

## INFORMATION FOR NOTICES

If to AIG: AIG International Inc.
One Greenwich Plaza
Greenwich, Connecticut 06830

For Confirmations and Operational Matters:

For Currency Transactions--
Attention--Foreign Exchange Department
Telex No.--170131
Answerback--AIG3
Telecopy No.--(203) 861-3825

For Other Notices and Communications:
Attention--Legal Department
Telecopy No.--203-861-3822

If to Counterpart: Ervin Capital, LLC
11655 St. Rt. 141 S
Morganfield, KY 42437
Attention: Robert Wayne Ervin

AGREED:

ERVIN CAPITAL, LLC

By: ______________________
Name:
Title:

AIG INTERNATIONAL INC.

By: ______________________
Ann B. Reed
Vice President and Treasurer

Schedule B

## SPOT & FORWARD CURRENCY CONTRACTS

The following terms and conditions apply to Currency Contracts:

1. Definitions. In this Schedule, the following terms have the meanings set forth below:

"Currency Contract" means any agreement between the parties for the purchase of one Currency against the sale of another Currency on an agreed maturity date. Each Currency Contract is a Transaction and a Currency Transaction.

"Offsetting Transactions" with respect to Currency Contracts means any two or more outstanding Currency Contracts having the same maturity date where under one or more of such Contracts AIG has agreed to receive one Currency in exchange for a second Currency and under the other of such Contracts AIG has agreed to receive such second Currency in exchange for such first Currency; provided that Forward Contracts shall only be netted with Forward Contracts and Spot Contracts shall only be netted with Spot Contracts.

2. Confirmations. Each Confirmation shall specify, in such form as AIG shall determine, the amount and type of Currency to be paid by each party, the maturity date and any other agreed terms.

3. Result of Netting & Novation. The netting and novation of Currency Contracts which are Offsetting Transactions shall result in a new Currency Contract under which the party owing the larger aggregate amount of each Currency shall owe to the other party the difference between the aggregate amount of such Currency which it owes and the aggregate amount of such Currency owed to it under the Offsetting Transactions.

AGREED:

ERVIN CAPITAL, LLC

By: ____________________
Name:
Title:

AIG INTERNATIONAL INC.

By: ____________________
Ann B. Reed
Vice President and Treasurer

Schedule C

## CURRENCY OPTIONS

The following terms and conditions apply to Options on Currency:

1. Definitions. In this Schedule, the following terms have the meanings set forth below:

"Offsetting Transactions" with respect to Options means two outstanding Options identical in all respects (other than the Premium) except that the respective status of each party as Holder and Grantor is reversed.

"Option" means an agreement between the parties under which one party (the "Holder") acquires from the other party (the "Grantor") for a purchase price (the "Premium") the right, but not the obligation, to exchange a specified amount of one Currency for a specified amount of another Currency based on a specified price (the "Strike Price"), by exercising such right on (in the case of a "European-style Option") or on or before (in the case of an "American-style Option") a specified date (the "Expiration Date"). An Option may be further designated as an "Asian Option" in which case the parties shall agree on a period during which an average settlement price for an Option shall be calculated (an "Average Price") and such Option shall be cash settled. An Option under which the Holder has the right to (a) buy a specified Currency is a "Call Option" with respect to that Currency and (b) sell a specified Currency is a "Put Option" with respect to that Currency. Each Option is a Transaction, and a Currency Transaction.

2. Confirmations. Each Confirmation shall be in substantially the form attached as Exhibit I to this Schedule.

3. Result of Netting. The netting of Options which are Offsetting Transactions shall liquidate the same, so that they are canceled and no longer outstanding, except for the obligation (if any) to pay any unpaid Premium under either such Option.

4. Terms.

4.1 Premium. The Holder will pay the Premium, which is non-refundable, to the Grantor within two Business Days after the date the parties agree to buy and sell an Option (one Business Day in the case of Options covering U.S. and Canadian Dollars), unless otherwise stated in the Confirmation or agreed in writing.

4.2 For American- and European-style Options: (a) Notice of exercise of any American-style Option may be given by the Holder on any Business Day during the period of time commencing on the date the parties agree to buy and sell an Option (the "Transaction Date") and terminating at 10:00 a.m. (New York time) on the Expiration Date and shall cause an exercise immediately; provided that notice of exercise received by the Grantor on any day (i) after 4:00 p.m. (New York time) shall be deemed to cause an exercise at 9:00 a.m. (New York time) on the following Business Day, and (ii) before 9:00 a.m. (New York time) shall be deemed to cause an exercise at 9:00 a.m. (New York time) on that day.

(b) Notice of exercise of any European-style Option may be given by the Holder at any time prior to 10:00 a.m. (New York time) on the Expiration Date but shall only be deemed to cause an exercise at 10:00 a.m. (New York time) on the Expiration Date.

(c) Any Option for which notice of exercise is not given as provided herein by the Holder prior to 10:00 a.m. (New York time) on the Expiration Date shall cease to be outstanding and shall become void and of no effect.

(d) Notice of exercise may be given by telex, telephone or Reuters Direct Dealing, except on an Option's Expiration Date when such notice can only be given by telephone or by Reuters Direct Dealing; notice of exercise is irrevocable once given. Telephone numbers for this purpose are (203) 861-3550 for AIG and (212) 391-1818 for Counterpart (and may be changed in the same manner as notice information under paragraph 7).

(e) There shall be no automatic exercise of Options. It is the responsibility of the Holder of an Option to advise the Grantor of the Holder's exercise of an Option.

(f) If an Option is exercised, settlement shall occur (unless the Confirmation states otherwise) on the date (the "Value Date") which is two Business Days (one Business Day if the Currencies are the U.S. and Canadian Dollar) after the day on which the Option is deemed exercised in accordance with this Schedule (subject to liquidation under this Agreement), by each party's paying the agreed amount of each Currency to the other party.

4.3 For Asian (Average Price) Options: Exercise shall be automatic and settlement shall be in cash (based on the agreed formula).

AGREED:

ERVIN CAPITAL, LLC

By: ______________________
Name:
Title:

AIG INTERNATIONAL INC.

By: ______________________
Ann B. Reed
Vice President and Treasurer

Exhibit 1 to Currency Options Schedule

FOREIGN EXCHANGE OPTIONS TELEX CONFIRMATION

TRANSACTION I.D.: ____________

DATE: __________

TO: [NAME OF COUNTERPART]

ATTN: _______________

THIS IS CONFIRMATION OF THE FOLLOWING OPTION BUSINESS DONE WITH YOU TODAY.

WE HAVE [BOUGHT FROM YOU/SOLD TO YOU] A [CALL/PUT] OPTION ON THE [TYPE OF CURRENCY] ON THE FOLLOWING TERMS:

AMOUNT: ______________

STRIKE PRICE: __________

PREMIUM AMOUNT: ________

EXPIRATION DATE: _________ 10:00 AM NEW YORK TIME

VALUE DATE: __________

TERMS: [EUROPEAN, AMERICAN OR ASIAN]

OTHER TERMS: **[FOR ASIAN OPTIONS: AVERAGE PRICE CALCULATION; FINANCIAL EXERCISE]**

**[ADD APPROPRIATE LANGUAGE FOR CROSS-CURRENCY OPTIONS.]**

THIS OPTION IS SUBJECT TO THE STANDARD TERMS AND CONDITIONS IN OUR LETTER AGREEMENT ON POINT.

PLEASE ADVISE IF YOUR RECORDS INDICATE ANY DISCREPANCIES.

MANY THANKS FOR THIS BUSINESS.

AIG INTERNATIONAL INC.
GREENWICH, CONNECTICUT

Schedule D

## SWAP TRANSACTIONS

The following terms and conditions apply to Swap Transactions:

1. Definitions. In this Schedule, the following terms have the meanings set forth below:

"Average Floating Price" for a Pricing Period means the arithmetic mean of all Floating Prices occurring during that Pricing Period.

"Base Quantity" means the quantity of the designated Commodity as to which pricing is to occur during each Pricing Period.

"Cap Price" means the Cap Price per unit of the relevant Commodity agreed by the parties.

"Cap Price Amount" means, with respect to each Pricing Period, an amount equal to the Cap Price multiplied by the Base Quantity.

"Commodity" means Foreign Currency, interest rate or any other commodity which the parties agree will be the subject of a Swap Transaction.

"Fallback Price" for a Swap Transaction means the price per unit of the relevant Commodity as announced, published or determined, for each Business Day, by a source designated by the parties (such as a commodity exchange, an over-the-counter market, trade publication or quotations from a specified dealer or dealers).

"Fixed Price" for a Swap Transaction means the fixed price per unit of the relevant Commodity agreed by the parties.

"Fixed Price Amount" means, with respect to each Pricing Period, an amount equal to the Fixed Price multiplied by the Base Quantity.

"Fixed Price Payor" means the party designated as such in the relevant Confirmation.

"Floating Price" for a Swap Transaction means the price per unit of the relevant Commodity as announced, published or determined, for each Business Day, by a source designated by the parties (such as a commodity exchange, an over-the-counter market, trade publication or quotations from a specified dealer or dealers), or if such price is not available on any day on which, in the ordinary course of business, it would be available or if such price does not reflect open-market prices, then for such day in lieu of such price the Floating Price shall be (a) the Fallback Price or (b) if no Fallback Price is specified or available, the price per unit of the relevant Commodity as determined by AIG in any commercially reasonable manner.

"Floating Price Amount" means, with respect to each Pricing Period, an amount equal to the Average Floating Price multiplied by the Base Quantity.

"Floating Price Payor" means the party designated as such in the relevant Confirmation.

"Floor Price" means the floor price per unit of the relevant Commodity agreed by the parties.

"Floor Price Amount" means, with respect to each Pricing Period, an amount equal to the Floor Price multiplied by the Base Quantity.

"Net Payment" for a Pricing Period means an amount equal to the absolute value of the difference between (as applicable) (a) the Floating Price Amount and the Fixed Price Amount, (b) the Floating Price Amount and the Cap Price Amount or Floor Price Amount, or (c) the two Floating Price Amounts.

"Pricing Period" means a fixed period consisting of a number of days, weeks or months agreed to by the parties. The Pricing Periods of a Swap Transaction may be of the same length or varying lengths and do not have to be run consecutively.

"Swap Transaction" means a transaction in which the parties agree to exchange, for each Pricing Period, Net Payments in accordance with paragraph 4 of this Schedule. A Swap Transaction is a Transaction and a Currency Transaction if it only involves the price of one or more Currencies or interest rates.

2. Confirmations. Each Confirmation shall be in substantially the form attached as Exhibit 1 to this Schedule.

3. No Netting. There are no Offsetting Transactions with respect to Swap Transactions.

4. Terms.

4.1 AIG shall determine the Average Floating Price(s) and Floating Price Amount(s) for each Pricing Period and advise Counterpart thereof by no later than the third Business Day after the end of such Pricing Period. The Net Payment for each Pricing Period shall be paid as follows:

(a) If there is a Fixed Price, by the Floating Price Payor if the Floating Price Amount exceeds the Fixed Price Amount and by the Fixed Price Payor if the Fixed Price Amount exceeds the Floating Price Amount. No Net Payment shall be made if the Fixed Price Amount equals the Floating Price Amount;

(b) If there is a Cap Price or a Floor Price, by the appropriate party if the Floating Price is greater than the Cap Price or less than the Floor Price. No Net Payment shall be made if the Floating Price is greater than or equal to the Floor Price or less than or equal to the Cap Price; and

(c) If there are two Floating Prices, by the party owing the larger Floating Price Amount. No Net Payment shall be made if the two Floating Price Amounts are equal.

4.2 The party obligated to make the Net Payment, if any, shall pay such amount to the other party on the fifth Business Day following the end of each Pricing Period unless the parties agree to a different date (a "Payment Date"). Each Net Payment shall be made without offset, deduction, discount or counterclaim (except as otherwise expressly provided herein). No deliveries of a Commodity are required or permitted under any Swap Transaction.

AGREED:

ERVIN CAPITAL, LLC

By: ______________________
Name:
Title:

AIG INTERNATIONAL INC.

By: ______________________
Ann B. Reed
Vice President and Treasurer

Exhibit 1 to Swap Transaction Schedule

Swap Transaction Confirmation

Date: ________
To: [Counterpart]
Attn: ________

This is confirmation of the following Swap Transaction done with you on ________, 199_.

Commodity:

Base Quantity:

[Pricing Term:]

Pricing Periods:

Fixed Price:

Floating Price:

[Floor Price:]

[Cap Price:]

[Fallback Price:]

Fixed Price Payor:
Floating Price Payor:

[Transaction Fee:
Amount: $______________
Payable to: ______________]

Other Terms (if any):

This Swap Transaction is subject to the terms and conditions set forth in our letter agreement, dated ________, ___, relating to Swap Transactions between us.

Please advise by return telex if your records indicate any discrepancies.

Best regards,
AIG International Inc.
Greenwich, Connecticut

Schedule E

## MARGIN

Counterpart's obligations under outstanding Transactions shall be margined and marked-to-market as follows:

1. Counterpart shall provide such original margin ("Original Margin") as follows:

(a) For each Currency Contract, 5% of the Contract Value of that Transaction where the underlying currency pairs consist of Group A Currencies, as defined herein, and otherwise, between 10% and 20% of the Contract Value of that Transaction, as determined by AIG in its sole discretion. Except as otherwise agreed by the parties, "Group A Currencies" shall include the following: Austrian Shilling, Australian Dollar, Belgian Franc, Canadian Dollar, Swiss Franc, Deutsche Mark, Danish Krone, Spanish Peseta, Finnish Mark, French Franc, British Pound, Irish Punt, Italian Lira, Dutch Guilder, Norwegian Kroner, New Zealand Dollar, Swedish Krona, Euro and the US Dollar.

(b) For each Swap Transaction, 5% of the Contract Value of that Transaction; provided that there will be no Original Margin requirement for Swap Transactions with a Cap Price or Floor Price and in which AIG is paying the Floating Price.

(c) For each Currency Option under which AIG is the Holder, the product of (i) 5% of the Contract Value of that Transaction where the underlying currency pairs consist of Group A Currencies, and otherwise, between 10% and 20% of the Contract Value of that Transaction, as determined by AIG in its sole discretion, and (ii) the delta for that Transaction (as determined by AIG in any commercially reasonable manner).

1.2 "Contract Value" equals the amount (expressed in U.S. Dollars) set forth below:

(a) For a Currency Contract, the U.S. Dollar amount covered by that Contract.

(b) For a Currency Option, the Contract Value that would apply based on the above provisions assuming such Option was exercised.

(c) For a Swap Transaction, the notional amount.

(d) If the purchase price or notional amount is not expressed in U.S. Dollars or if a Currency Contract covers two Foreign Currencies, the Contract Value shall be determined based upon the then open-market value (expressed in U.S. Dollars) of such price or notional amount or of one of such Currencies (in each case, bid or asked, as appropriate) for delivery on the relevant date, as determined by AIG in any commercially reasonable manner.

2. As of the close of business on each Business Day, AIG shall calculate the Settlement Payment for each Transaction which is a Forward Contract and the party to which it would be due as if such Transaction were to be liquidated at that time. AIG's "Net Exposure" means an amount equal to (a) the sum of the Settlement Payments so determined to be due to AIG, less (b) the sum of the Settlement Payments so determined to be due to Counterpart (provided that AIG's Net Exposure can never be less than zero). AIG, at its election, may calculate Net Exposure as of any day on which it is open for business (even if that day is not a Business Day) and require Margin on the following Business Day.

3. If, at the close of business on any Business Day, AIG's Net Exposure exceeds U.S. $250,000, then variation margin ("Variation Margin" and, collectively with Original Margin, "Margin") shall be provided or returned so that AIG holds Variation Margin in an amount equal to such excess. If, at the close of business on any Business Day, AIG's Net Exposure is less than U.S. $250,000, all Variation Margin provided in the form of Funds then held by AIG shall be returned. All payments or returns of Variation Margin shall be rounded to the nearest integral multiple of U.S. $100,000 (and rounded up if exactly between two integral multiples of U.S. $100,000). All Variation Margin due shall be provided (or returned) by the close of business on the next Business Day following the day as of which the calculation determining that such Variation Margin is due or is to be returned occur

4. All Margin shall be delivered in the form of Funds or U.S. Treasury Bills ("Acceptable Collateral"). Acceptable Collateral delivered as Margin shall be transferred to AIG, or such other party as AIG designates, in such manner and form as AIG shall specify. If AIG is to return Margin when it holds Acceptable Collateral, it may determine what form of Margin to return and, if it returns Acceptable Collateral, which items of Acceptable Collateral. AIG need not return any item of Acceptable Collateral held as Margin unless the entire value thereof (determined pursuant to this paragraph) is required to be returned. For purposes of determining the amount of Margin held by AIG at any time, Acceptable Collateral shall be valued at 100% of its then current market value as determined by AIG in a commercially reasonable manner. AIG shall not be required to provide Margin, but only to return Margin when and if so provided in this Agreement.

5. Counterpart grants to AIG a security interest in all Margin from time to time provided to AIG, in order to secure all present and future obligations of Counterpart to AIG under this Agreement (other than obligations under Spot Contracts). AIG shall have the free and unrestricted right to use and dispose of all Margin which it holds, subject only to its obligations to return Margin if and when so required under this Agreement.

6. Counterpart further agrees in connection with the enforcement by AIG of its rights under this Agreement that, in the event of a sale or other disposition of Acceptable Collateral: (i) if notice is necessary under applicable law, written notice given to Counterpart at the address specified herein three business days prior to the date of public sale of any Acceptable Collateral or three business days prior to the date after which private sale or any other disposition of any Acceptable Collateral will be made shall constitute reasonable notice, (ii) AIG may be the purchaser of all or any part thereof (unless prohibited by applicable law) and shall thereafter hold the same free from any right or claim of any kind whatsoever, (iii) AIG may apply the proceeds of any such sale or disposition to the satisfaction of its reasonable attorneys' fees and disbursements and other costs and expenses incurred in connection with its taking, re-taking, holding, preparing for sale and selling of any Acceptable Collateral, with only the remaining amount being applied under paragraph 4 of this Agreement, (iv) Acceptable Collateral may be sold for cash, upon credit or for future delivery, and for such price or prices as AIG may deem satisfactory, and (v) Counterpart shall remain responsible for any deficiency. After a Default, AIG (if it is the Performing Party) may liquidate any Acceptable Collateral held as Margin at public or private sale or liquidate or value the same in anyother commercially reasonable manner; AIG may include Acceptable Collateral and/or any amounts so realized or determined in the setoff under paragraphs 4.1 and/or 4.3 of this Agreement.

7. AIG, at its election, may also calculate a separate Net Exposure in a comparable manner for Spot Contracts, and require Counterpart to deliver additional Margin to cover any such Net Exposure separately from the Margin provided under such preceding provisions. Margin provided under this paragraph 6 also secures Counterpart's obligations to AIG under Spot Contracts.

8. AIG may from time to time make intra-day Margin calls and/or change the Margin provisions contained in this Schedule (including, without limitation, by increasing and/or decreasing the percentages and/or amounts in paragraphs 1 and 3 of this Schedule), effective immediately on notice to Counterpart. Such changed Margin provisions shall apply to Transactions outstanding at the time such provisions become effective as well as to Transactions entered into thereafter.

AGREED:

ERVIN CAPITAL, LLC

By: ______________________
Name:
Title:

AIG INTERNATIONAL INC.

By: ______________________
Ann B. Reed
Vice President and Treasurer

t:\docs\multi\ervincap.915

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT (RELATING TO INVALIDITY OF TREAS. REG. § 1.701-2), MEMORANDUM IN SUPPORT OF FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT, PROPOSED FINDINGS OF UNCONTROVERTED FACTS, CERTIFICATE OF FORMATION (JADE TRADING, LLC), and AFFIDAVITS BY A. BERGMANN, G. ERVIN, and R. ERVIN** was sent via Federal Express on this 18th day of December, 2003, addressed to:

William K. Drew, Esq.
Eileen J. O'Connor, Esq.
David Gustafson, Esq.
U.S. Department of Justice
Tax Division
Court of Federal Claims
Post Office Box 26
Ben Franklin Station
Washington, D.C. 20044

Mr. Ari Bergmann
Sentinel Advisors, LLC
68 Carman Avenue
Cedarhurst, New York 11516

Robert W. Ervin and Laura Kavanaugh
Ervin Capital, LLC
450 Pryor Boulevard, P.O. Box 409
Sturgis, Kentucky 42459

Timothy W. Ervin and Vicki L. Ervin
Ervin Investments, LLC
450 Pryor Boulevard, P.O. Box 409
Sturgis, Kentucky 42459

Gary Ervin and Lisa A. Ervin
Ervin Holdings, LLC
450 Pryor Boulevard, P.O. Box 409
Sturgis, Kentucky 42459

Banque Safra – Luxembourg
c/o Jean-Luc Collot
10A Boulevard Joseph II, B.P. 887
Luxembourg, L-2018

David D. Aughtry

# Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "JADE TRADING, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIRST DAY OF DECEMBER, A.D. 2003.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "JADE TRADING, LLC" WAS FORMED ON THE TWENTY-FIRST DAY OF SEPTEMBER, A.D. 1999.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

EXHIBIT

1

Harriet Smith Windsor

Harriet Smith Windsor, Secretary of State

3099864 8300

030767268

AUTHENTICATION: 2778877

DATE: 12-01-03

# LIMITED LIABILITY COMPANY AGREEMENT

OF

JADE TRADING, LLC

Dated as of September 23, 1999

EXHIBIT

2

# TABLE OF CONTENTS


Page

ARTICLE I General Provisions .......... 1

Sec. 1.01 Company Name and Address .......... 1
Sec. 1.02 Fiscal Year .......... 1
Sec. 1.03 Registered Office and Registered Agent .......... 1
Sec. 1.04 The Members .......... 1
Sec. 1.05 Liability of Members .......... 2
Sec. 1.06 Purposes of the Company .......... 2
Sec. 1.07 Assignability of Interest .......... 3

ARTICLE II Management of the Company .......... 3

Sec. 2.01 Management Generally .......... 3
Sec. 2.02 Authority of the Managing Member .......... 4
Sec. 2.03 Reliance by Third Parties .......... 5
Sec. 2.04 Activity of the Managing Member .......... 5
Sec. 2.05 Exculpation .......... 5
Sec. 2.06 Indemnification of the Managing Member .......... 6
Sec. 2.07 Management Fee; Payment of Certain Costs and Expenses .......... 6

ARTICLE III Capital Accounts of Members and Operation Thereof .......... 7

Sec. 3.01 Definitions .......... 7
Sec. 3.02 Capital Contributions .......... 8
Sec. 3.03 Capital Accounts .......... 9
Sec. 3.04 Capital Percentages .......... 9
Sec. 3.05 Allocation of Net Capital Appreciation or Net Capital Depreciation; Incentive Allocation .......... 9
Sec. 3.06 Amendment of Incentive Allocation .......... 11
Sec. 3.07 Valuation of Assets .......... 11
Sec. 3.08 Liabilities .......... 12
Sec. 3.09 Overriding Allocations .......... 12
Sec. 3.10 Allocation for Tax Purposes .......... 12
Sec. 3.11 Determination by Managing Member of Certain Matters; Managing Member's Discretion .......... 13
Sec. 3.12 Adjustments to Take Account of Interim Year Events .......... 13

ARTICLE IV Withdrawals and Distributions of Capital .......... 14

Sec. 4.01 Withdrawals and Distributions in General .......... 14
Sec. 4.02 Withdrawals .......... 14
Sec. 4.03 Limitation on Withdrawals .......... 15
Sec. 4.04 Distributions .......... 15




NY #158295 v1

Page

ARTICLE V Admission of New Members ....................16

Sec. 5.01 New Members ....................16

ARTICLE VI Withdrawals, Death, Disability ....................16

Sec. 6.01 Withdrawal, Death, etc. of Non-Managing Members ....................16
Sec. 6.02 Required Withdrawals ....................17
Sec. 6.03 Effective Date of Withdrawal ....................17
Sec. 6.04 Limitations on Withdrawal of Capital Account ....................17

ARTICLE VII Duration and Dissolution of the Company ....................18

Sec. 7.01 Duration ....................18
Sec. 7.02 Dissolution ....................18

ARTICLE VIII Tax Returns; Reports to Members ....................19

Sec. 8.01 Independent Auditors ....................19
Sec. 8.02 Filing of Tax Returns ....................19
Sec. 8.03 Tax Matters Partner ....................19
Sec. 8.04 Reports to Current Members ....................19
Sec. 8.05 Reports to Members and Former Members ....................20

ARTICLE IX Miscellaneous ....................20

Sec. 9.01 General ....................20
Sec. 9.02 Power of Attorney ....................20
Sec. 9.03 Amendments to the Agreement ....................21
Sec. 9.04 Choice of Law ....................21
Sec. 9.05 Adjustment of Basis of Company Property ....................21
Sec. 9.06 No Third Party Rights ....................22
Sec. 9.07 Notices ....................22
Sec. 9.08 Goodwill ....................22
Sec. 9.09 Headings ....................22
Sec. 9.10 Pronouns ....................22

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# JADE TRADING, LLC

Dated as of September 23, 1999

The undersigned (the "Members", which term shall include any persons hereafter admitted to the Company pursuant to Article V of this Agreement and shall exclude any persons who cease to be Members pursuant to Article VI of this Agreement) hereby agree to form and hereby form, as of the time of the filing of a Certificate of Formation with the Secretary of State of the State of Delaware, a limited liability company (herein called the "Company"), pursuant to the provisions of the Delaware Limited Liability Company Act (6 Del. C. § 18-101, *et seq.*) (the "Act"), which shall be governed by, and operated pursuant to, the terms and provisions of this Limited Liability Company Agreement (herein called the "Agreement").

## ARTICLE I

## General Provisions

Sec. 1.01 Company Name and Address. The name of the Company is JADE TRADING, LLC. Its principal office is located at c/o Sentinel Advisors, LLC, 546 Fifth Avenue, New York, New York 10036, or at such other location as the Managing Member (as defined in Sec. 1.04) in the future may designate. The Managing Member shall promptly notify the Non-Managing Members (as defined in Sec. 1.04) of any change in the Company's address.

Sec. 1.02 Fiscal Year. The fiscal year of the Company (herein called the "fiscal year") shall end on December 31 of each calendar year.

Sec. 1.03 Registered Office and Registered Agent. The address of the registered office of the Company in the State of Delaware is c/o National Corporate Research, Ltd., 9 East Loockerman Street, Dover, Delaware 19901. The name and address of the registered agent of the Company in the state of Delaware is National Corporate Research, Ltd., 9 East Loockerman Street, Dover, Delaware 19901. The registered office or agent of the Company may be changed by the Managing Member from time to time through appropriate filings with the Delaware Secretary of State.

Sec. 1.04 The Members. The names and addresses of all of the Members and the amounts of their respective contributions to the Company (herein called the "Capital Contributions") are set forth in a schedule entitled "Schedule of Capital Contributions" (herein called the "Schedule"), which shall be filed with the records of the Company at the Company's principal office (as set forth in Sec. 1.01) and is hereby incorporated by reference and made a part of this Agreement. Sentinel Advisors, LLC shall serve as the managing member (herein

called the "Managing Member"). All Members, other than the Managing Members, are non-managing members (herein called the "Non-Managing Members").

Sec. 1.05 Liability of Members. Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member. Except as otherwise expressly provided in the Act, the liability of each Member shall be limited to the amount of capital contributions required to be made by such Member in accordance with the provisions of this Agreement, but only when and to the extent the same shall become due pursuant to the provisions of this Agreement.

Sec. 1.06 Purposes of the Company. The Company is organized for the purposes of investing substantially all of its assets in Securities (as hereinafter defined) and engaging in all activities and transactions as the Managing Member may deem necessary or advisable in connection therewith, including, without limitation:

(a) to invest, on margin or otherwise, in securities and other financial instruments of U.S. and foreign entities, including, without limitation: capital stock; shares of beneficial interest; partnership interests and similar financial instruments; equities; warrants; bonds; convertible bonds; convertible preferred stocks; notes; debentures (whether subordinated, convertible or otherwise); commodities; currencies; interest rate, currency, commodity, equity and other derivative products, including, without limitation: (i) futures contracts (and options thereon) relating to stock indices, currencies, U.S. Government securities and securities of foreign governments, other financial instruments and all other commodities; (ii) swaps, options, warrants, caps, collars, floors and forward rate agreements; (iii) spot and forward currency transactions; and (iv) agreements relating to or securing such transactions; accounts and notes receivable and payable held by trade or other creditors; trade acceptances; contract and other claims; executory contracts; mutual funds; money market funds; obligations of the United States or any state thereof, foreign governments and instrumentalities of any of them; commercial paper; certificates of deposit; banker's acceptances; trust receipts; and other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "Security" or "Securities"), and to sell Securities short and cover such sales;

(b) to engage in such other lawful Securities transactions as the Managing Member may from time to time determine;

(c) to possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities and other property and funds held or owned by the Company;

(d) to acquire a long position or a short position with respect to any Security and to make purchases or sales increasing, decreasing or liquidating such

position or changing from a long position to a short position or from a short position to a long position, without any limitation as to the frequency of the fluctuation in such positions or as to the frequency of the changes in the nature of such positions;

(e) to purchase Securities and hold them for investment;

(f) to maintain for the conduct of Company affairs one or more offices and in connection therewith rent or acquire office space, and do such other acts as the Managing Member may deem necessary or advisable in connection with the maintenance and administration of the Company;

(g) to lend, with or without security, any of the Securities, funds or other properties of the Company, including by entering into reverse repurchase agreements, and, from time to time without limit as to amount, borrow or raise funds, including by entering into repurchase agreements, and secure the payment of obligations of the Company by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Company;

(h) to engage personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons as the Managing Member may deem necessary or advisable;

(i) to enter into custodial arrangements regarding Securities owned beneficially by the Company with banks and brokers wherever located; and

(j) to do such other acts as the Managing Member may deem necessary or advisable in connection with the maintenance and administration of the Company.

Sec. 1.07 Assignability of Interest. Without the consent of the Managing Member, which may be withheld in its sole discretion, a Member may not pledge, transfer or assign its interest in the Company in whole or in part to any person except by operation of law. In no event will any transferee or assignee be admitted as a Member without the consent of the Managing Member which may be withheld in its sole discretion. Any attempted pledge, transfer or assignment not made in accordance with this Sec. 1.07 shall be void.

ARTICLE II

Management of the Company

Sec. 2.01 Management Generally. The management of the Company shall be vested exclusively in the Managing Member. Except as authorized by the Managing Member, the Non-Managing Members shall have no part in the management of the Company, and shall have no authority or right to act on behalf of the Company in connection with any matter. The Managing Member, and any Affiliate of the Managing Member (as defined in Sec. 2.04), may engage in any other business venture, whether or not such business is similar to the Company,

and neither the Company nor any Non-Managing Member will have any rights in or as to such ventures or in the income or profits derived therefrom.

Sec. 2.02 Authority of the Managing Member. The Managing Member shall have the power on behalf and in the name of the Company to carry out, either directly or though persons or entities, any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a) open, maintain and close accounts, including margin accounts, with brokers, including brokers affiliated with the Managing Member, which power shall include the authority to issue all instructions and authorizations to brokers regarding the Securities and/or money therein; to pay, or authorize the payment and reimbursement of, brokerage commissions that may be in excess of the lowest rates available that are paid to brokers who execute transactions for the account of the Company and who supply or pay for (or rebate a portion of the Company's brokerage commissions to the Company for payment of) the cost of property or services (such as custodial services, rent for office space, research services, telephone lines, news and quotation equipment, computer facilities and publications) utilized by the Company, it being recognized that certain of such arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, which permits the use of "soft dollars" in certain circumstances, provided that the Company does not pay a rate of commissions in excess of what is competitively available from comparable brokerage firms for comparable services, taking into account various factors, including commission rates, financial responsibility and strength of the broker and ability of the broker to efficiently execute transactions and the broker's provision or payment of the costs of research and other services or property which are of benefit to the Company and the Other Accounts (as defined in Sec. 2.02(f) below);

(b) open, maintain and close accounts, including custodial accounts, with banks, including banks located outside the United States, and draw checks or other orders for the payment of monies;

(c) enter into contracts for or in connection with investments in Securities;

(d) lend, either with or without security, any Securities, funds or other properties of the Company, and borrow or raise funds and secure the payment of obligations of the Company by pledges or hypothecation of all or any part of the property of the Company, including entering into repurchase agreements and reverse repurchase agreements;

(e) do any and all acts on behalf of the Company, and exercise all rights of the Company, with respect to its interest in any person, including, without limitation, the voting of Securities, participation in arrangements with creditors, the

institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(f) combine purchase or sale orders on behalf of the Company with orders for other accounts to whom the Managing Member or any of its Affiliates provides investment services ("Other Accounts") and allocate the securities or other assets so purchased or sold, on an average price basis, among such accounts;

(g) enter into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Company and Other Accounts and are allocated among such accounts using an average price;

(h) organize one or more corporations or other entities formed to hold record title, as nominee for the Company (whether alone or together with the Other Accounts), to Securities or funds of the Company; and

(i) authorize any partner, employee or other agent of the Managing Member or agent or employee of the Company to act for and on behalf of the Company in all matters incidental to the foregoing.

Sec. 2.03 Reliance by Third Parties. Persons dealing with the Company are entitled to rely conclusively upon the certificate of the Managing Member, to the effect that it is then acting as the Managing Member and upon the power and authority of the Managing Member as herein set forth.

Sec. 2.04 Activity of the Managing Member. The Managing Member and persons controlling, controlled by or under common control with the Managing Member and any of their respective members, partners, officers and employees (collectively, "Affiliates"), shall devote so much of their time to the affairs of the Company as in the judgment of the Managing Member the conduct of its business shall reasonably require, and none of the Managing Member or Affiliates shall be obligated to do or perform any act or thing in connection with the business of the Company not expressly set forth herein. Nothing herein contained in this Sec. 2.04 shall be deemed to preclude the Managing Member or Affiliates of the Managing Member from exercising investment responsibility, from engaging directly or indirectly in any other business or from directly or indirectly purchasing, selling, holding or otherwise dealing with any Securities for the account of any such other business, for their own accounts, for any of their family members or for other clients. No Non-Managing Member shall, by reason of being a partner in the Company, have any right to participate in any manner in any profits or income earned or derived by or accruing to the Managing Member or any Affiliate from the conduct of any business other than the business of the Company (to the extent provided herein) or from any transaction in Securities effected by the Managing Member or such Affiliate for any account other than that of the Company.

Sec. 2.05 Exculpation. None of the Managing Member or Affiliates shall be liable to any Member or the Company for mistakes of judgment or for action or inaction which said person reasonably believed to be in the best interests of the Company, or for losses or

expenses due to such mistakes of judgment or for action or inaction or to the negligence, dishonesty or bad faith of any broker or other agent of the Company, provided that such broker or agent was selected, engaged or retained by the Company with reasonable care. The Managing Member and Affiliates may consult with counsel and/or accountants in respect of Company affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel and/or accountants, provided that they shall have been selected with reasonable care.

Notwithstanding the foregoing, the provisions of this Sec. 2.05 shall not be construed so as to provide for the exculpation of the Managing Member or Affiliates for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.05 to the fullest extent permitted by law.

Sec. 2.06 Indemnification of the Managing Member. To the fullest extent permitted by law, the Company shall indemnify and hold harmless the Managing Member, Affiliates and the legal representatives of any of them (an "Indemnified Party"), from and against any loss or expense suffered or sustained by an Indemnified Party by reason of any action or inaction by such Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such loss or expense resulted from a mistake of judgment on the part of an Indemnified Party, or from action or inaction that said Indemnified Party reasonably believed to be in the best interests of the Company or for losses due to the negligence, dishonesty or bad faith of any broker or other agent of any Indemnified Party provided that such broker or agent was selected, engaged or retained by the Indemnified Party with reasonable care. The Company shall, in the sole discretion of the Managing Member, advance to any Indemnified Party reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. In the event that such an advance is made by the Company, the Indemnified Party shall agree to reimburse the Company for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification under this Sec. 2.06.

Notwithstanding the foregoing, the provisions of this Sec. 2.06 shall not be construed so as to provide for the indemnification of the Managing Member or Affiliate for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Sec. 2.06 to the fullest extent permitted by law.

Sec. 2.07 Management Fee; Payment of Certain Costs and Expenses. Subject to the other provisions of this Sec. 2.07, on the first day of each fiscal quarter, a fee for management services (the "Management Fee") equal to 0.5% (2% on an annualized basis) of each Non-Managing Member's Capital Account balance on the first day of such quarter shall be debited to

each such Non-Managing Member's Capital Account and be paid to the Managing Member. A *pro rata* portion of the quarterly 0.5% fee shall be debited to the Capital Account of any Non-Managing Member who is permitted to make a withdrawal prior to the end of a quarter or who is admitted to the Company after the first day of a quarter, based on the actual number of days that such Non-Managing Member was a Non-Managing Member in the Company for such fiscal quarter. In the discretion of the Managing Member, the Management Fee may be calculated differently with respect to, or may not be charged to, certain Non-Managing Members including the Non-Managing Members affiliated with the Managing Member and their principals and members of the immediate families of such persons or trusts or other entities for their benefit.

The Managing Member shall bear all of its own normal and recurring operating expenses, including all necessary office space and utilities, telephone, news, quotation and computer equipment and administrative and bookkeeping services (except to the extent that all or a portion of its costs in respect of research-related services or products are borne or provided through "soft dollars").

The Company will bear directly its own expenses including the Management Fee, investment expenses (*e.g.*, expenses which the Managing Member reasonably determines to be related to the investment of the Company's assets, such as brokerage commissions, interest expense and consultant expenses relating to short sales, clearing and settlement charges, custodial fees and bank service fees), legal expenses, professional fees (including, without limitation, expenses of consultants and experts) accounting expenses, auditing and tax preparation expenses, organizational expenses, expenses incurred in connection with the offering and sale of the membership interests and other similar expenses related to the Company and extraordinary expenses. If any of the above expense are incurred jointly for the account of the Company and any other trading accounts managed by the Managing Member or its Affiliates, such expenses will be allocated among the Company and such other accounts in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the Managing Member considers fair and reasonable.

## ARTICLE III

### Capital Accounts of Members and Operation Thereof

Sec. 3.01 Definitions. For the purposes of this Agreement, unless the context otherwise requires:

(a) The term "Accounting Period" shall mean the following periods: The initial Accounting Period shall commence upon the initial opening of the Company. Each subsequent Accounting Period shall commence immediately after the close of the next preceding Accounting Period. Each Accounting Period hereunder shall close at the close of business on the first to occur of: (i) the last day of each fiscal quarter of the Company; (ii) the date immediately prior to the effective date of the admission of a new Member pursuant to Sec. 5.01; (iii) the date immediately prior to the effective date of an

increase in a Member's Capital Account as a result of an additional Capital Contribution pursuant to Sec. 3.02; (iv) the effective date of any withdrawal pursuant to Articles IV or VI hereof; or (v) the date when the Company shall dissolve.

(b) The term "Beginning Value" shall mean, with respect to any Accounting Period, the value (as determined pursuant to Sec. 3.07) of the Company's Net Assets at the beginning of such Accounting Period (after deduction of the Management Fee), including any capital contributions.

(c) The term "Ending Value" shall mean, with respect to any Accounting Period, the value (as determined pursuant to Sec. 3.07) of the Company's Net Assets at the end of such Accounting Period (before giving effect to withdrawals).

(d) The term "Net Assets" shall mean the excess of the Company's assets over its liabilities at market value (as determined pursuant to Sec. 3.07), including unrealized gains or losses.

(e) The term "Net Capital Appreciation" shall mean, with respect to any Accounting Period, the excess, if any, of the Ending Value over the Beginning Value and, with respect to any fiscal year of the Company or other period used to determine the Incentive Allocation (as defined in Sec. 3.05(b)) shall mean the aggregate Net Capital Appreciation for such period less the aggregate Net Capital Depreciation for such period.

(f) The term "Net Capital Depreciation" shall mean, with respect to any Accounting Period, the excess, if any, of the Beginning Value over the Ending Value.

Sec. 3.02 Capital Contributions.

(a) Each Member has paid or conveyed by way of contribution to the Company cash and/or Securities having an aggregate value equal to the amount set forth opposite such Member's name in the Schedule (herein called the "Initial Capital Contribution"). Additional Capital Contributions may be made by Non-Managing Members only in accordance with the provisions of this Sec. 3.02. In connection with a contribution of Securities by a Member, the Company may agree to assume liabilities of such Member with respect to such or other Securities. For purposes of determining such Member's Initial Capital Contribution, the Managing Member should value such Securities and assumed liabilities as it reasonably determines and the amount of the Capital Contribution shall be the net value as so determined.

(b) With the consent of the Managing Member and subject to its discretion to accept lesser amounts, a Non-Managing Member may make additional Capital Contributions to the Company in cash and/or Securities in amounts of at least $100,000. Generally, such additional contributions may be made on the first business day of each month or at such time as may be determined by the Managing Member. Whether Securities will be accepted as a contribution to the Company will be determined in the discretion of the Managing Member.

(c) The Managing Member may make Capital Contributions to the Company in cash and/or Securities effective as of such times as it may determine.

Sec. 3.03 Capital Accounts. A capital account (herein called the "Capital Account") shall be established on the books of the Company for each Member. The Capital Accounts shall be determined and maintained in accordance with the rules of Treasury Regulation Section 1.704-1(b)(2)(iv).

The Capital Account of each Member shall be in an amount equal to such Member's Initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Member shall be increased by the amount of any Capital Contributions to the Company made by such Member (net of any liabilities assumed by the Company) as of the first day of such Accounting Period. At the end of each Accounting Period, the Capital Account of each Member shall be: (i) increased or decreased by the amount credited or debited to the Capital Account of such Member pursuant to Sec. 3.05; (ii) decreased by the amount of any withdrawals made by such Member pursuant to Sec. 4.02 or any distributions made to such Member pursuant to Sec. 4.04; and (iii) decreased by the amount of the Management Fee calculated in respect of such Capital Account pursuant to Sec. 2.07.

Sec. 3.04 Capital Percentages. A Capital Percentage shall be determined for each Member for each Accounting Period of the Company by dividing the amount of each Member's Capital Account, by the aggregate Capital Accounts of all Members as of the beginning of such Accounting Period (including capital contributions). The sum of the Capital Percentages shall equal 100 per cent.

Sec. 3.05 Allocation of Net Capital Appreciation or Net Capital Depreciation; Incentive Allocation.

(a) At the end of each Accounting Period, the Capital Account of each Member (including the Managing Member) for such Accounting Period shall be credited (in the case of Net Capital Appreciation) or debited (in the case of Net Capital Depreciation) the Net Capital Appreciation or Net Capital Depreciation, as the case may be, in proportion to their respective Capital Percentages.

(b) Subject to Secs. 3.05(c) and 3.05(d), for each six-month period ending on June 30th and December 31st of each year (each such period being referred to herein as an "Incentive Allocation Period"), 20% of the excess of the Net Capital Appreciation allocated to a Non-Managing Member's Capital Account for such Incentive Allocation Period pursuant to Sec. 3.05(a), over the Management Fee debited, in the aggregate, to such Non-Managing Member's Capital Account pursuant to Sec. 2.07 for such Incentive Allocation Period, shall be debited from the Capital Account of each Non-Managing Member, the sum of which shall be reallocated to the Capital Account of the Managing Member (the "Incentive Allocation"); provided, however, that the Net Capital Appreciation upon which the calculation of the Incentive Allocation is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (defined below) maintained on the books and records of the Company for such Non-Managing Member. The amount of the unrecovered balance remaining in the Loss

Recovery Account at the time of calculating the Incentive Allocation shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of Sec. 3.05(c). The initial Incentive Allocation Period shall begin on the date hereof and end on December 31, 1999. Subsequent Incentive Allocation Periods shall commence immediately after the end of the prior Incentive Allocation Period. In the sole discretion of the Managing Member, the Incentive Allocation may be calculated differently with respect to, or may not be charged to, certain Non-Managing Members, including affiliates of the Managing Member, their principals and members of the immediate families of such persons or trusts or other entities for their benefit.

(c) There shall be established on the books of the Company for each Non-Managing Member a memorandum account (the "Loss Recovery Account"), the opening balance of which shall be zero. At the end of each Incentive Allocation Period, the balance in each Non-Managing Member's Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, Net Capital Depreciation (as adjusted pursuant to the last sentence of this paragraph) with respect to such Non-Managing Member since the immediately preceding date as of which a calculation of an Incentive Allocation was made (or if no calculation has yet been made with respect to such Non-Managing Member, since its admission to the Company), an amount equal to such Net Capital Depreciation shall be debited to such Non-Managing Member's Loss Recovery Account, and, second, if there has been, in the aggregate, Net Capital Appreciation (as adjusted pursuant to the last sentence of this paragraph) with respect to such Non-Managing Member since the immediately preceding date as of which a calculation of an Incentive Allocation was made, an amount equal to such Net Capital Appreciation, before any Incentive Allocation to the Managing Member, shall be credited to and reduce any unrecovered balance in such Non-Managing Member's Loss Recovery Account, but not beyond zero. Solely for purposes of this paragraph, in determining a Non-Managing Member's Loss Recovery Account, aggregate Net Capital Appreciation and aggregate Net Capital Depreciation for any Incentive Allocation Period shall be calculated by taking into account the amount of the Management Fee, if any, debited to such Non-Managing Member's Capital Accounts for such period.

In the event that a Non-Managing Member with an unrecovered balance in its Loss Recovery Account withdraws all or a portion of its Capital Accounts, the unrecovered balance in such Non-Managing Member's Loss Recovery Account shall be reduced as of the beginning of the next Incentive Allocation Period by an amount equal to the product obtained by multiplying the balance in such Non-Managing Member's Loss Recovery Account by a fraction, the numerator of which is the amount of the withdrawal made by such Non-Managing Member as of the last day of the prior Incentive Allocation Period and the denominator of which is the balance in such Non-Managing Member's Capital Accounts on the last day of the prior Incentive Allocation Period (prior to the withdrawal made by the Non-Managing Member as of the last day of the Incentive Allocation Period). Additional Capital Contributions shall not affect any Non-Managing Member's Loss Recovery Account.

(d) In the event the Company is dissolved other than at June 30 or December 31, or the effective date of a Non-Managing Member's withdrawal is other than at

June 30 or December 31, then for purposes of determining the Incentive Allocation, the date of dissolution or withdrawal (for the withdrawing Member only) shall be deemed the last day of an Incentive Allocation Period.

Sec. 3.06 Amendment of Incentive Allocation. The Managing Member shall have the right to amend, without the consent of the Non-Managing Members, Sec. 3.05 of this Agreement so that the Incentive Allocation therein provided conforms to any applicable requirements of the Securities and Exchange Commission and other regulatory authorities; *provided, however,* that no such amendment shall increase the Incentive Allocation as so amended to more than 20% of the excess of the Net Capital Appreciation allocated to any Non-Managing Member's Capital Account over the Management Fee debited therefrom.

Sec. 3.07 Valuation of Assets.

(a) The value of each Security (and any related liability) will be based on a decision by the Managing Member as to the broadest and most representative market for such security. Any security for which the primary market is on a securities exchange shall be valued as at the last sale price on such exchange on the valuation date or if no sale occurred on that day, at the most recent quoted "bid" price for long positions and "asked" price for short positions. Such securities as well as other securities for which the primary market is believed to be over-the-counter shall be valued at the most recent quoted "bid" price for long positions and "asked" price for short positions provided by one or more principal market-makers unless, in the opinion of the Managing Member, the value so obtained does not fairly indicate the market value of any security, in which case the Managing Member may rely on the value obtained from a reputable broker-dealer. Securities or other assets for which market quotations are not readily available will be valued at their fair value as determined in good faith in accordance with the procedures adopted by or on behalf of the Managing Member. If on any valuation date a relevant exchange or market is not open for business, the Managing Member may determine the value of securities traded thereon as at the last preceding day on which such exchange or market will open. Securities to be held by the Company could be traded with bid-ask spreads which may, in the opinion of the Managing Member, be significant. Quotations used to value a security from a particular dealer may differ from prices quoted by other dealers who trade in the same security, and such differences may be significant. Securities for which no such market prices are available shall be valued at such value as the Managing Member may reasonably determine.

(b) All other assets of the Company (except goodwill, which shall not be taken into account) shall be assigned such value as the Managing Member may reasonably determine.

(c) If the Managing Member determines that the valuation of any Securities or other property pursuant to Sec. 3.07(a) does not fairly represent market value, the Managing Member shall value such Securities or other property as it reasonably determines and shall set forth the basis of such valuation in writing in the Company's records.

(d) All values assigned to Securities and other assets by the Managing Member in accordance with this Sec. 3.07 shall be final and conclusive as to all Members.

Sec. 3.08 Liabilities. Liabilities shall be determined based upon generally accepted accounting principles and as the Managing Member shall otherwise determine. The Managing Member in its discretion may provide reserves for estimated accrued expenses, liabilities or contingencies, even if such reserves are not required by generally accepted accounting principles.

Sec. 3.09 Overriding Allocations.

Notwithstanding any other provision of this Agreement, the following allocations shall be made prior to any other allocations under this Agreement and in the following order of priority:

(a) If there is a net decrease in partnership minimum gain during any fiscal year so that an allocation is required by Regulations § 1.704-2(f)(1), items of income and gain shall be allocated to Members in the manner and to the extent required by such provision of the Regulation. This provision is intended to be a minimum gain chargeback within the meaning of Regulation § 1.704-2(f) and shall be interpreted and applied consistently therewith.

(b) If there is a net decrease in the minimum gain attributable to a partner nonrecourse loan during any fiscal year so that an allocation is required by Regulation § 1.704-2(i)(4) (minimum gain chargeback attributable to a partner nonrecourse debt), items of income and gain shall be allocated in the manner and to the extent required by such provision of the Regulations.

(c) If a Member unexpectedly receives any adjustment, allocation, or distribution, described in Regulations § 1.704-2(b)(2)(ii)(d)(4), (5), or (6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the adjusted capital account deficit of such Member as quickly as possible, provided that an allocation pursuant to this paragraph (c) shall be made only if, and to the extent that, such Member would have an adjusted capital account deficit after all other allocations provided for in section 3.05 or this section 3.09 of this Agreement tentatively have been made as if this paragraph (c) were not in the Agreement.

Sec. 3.10 Allocation for Tax Purposes.

(a) For each fiscal year, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Members in such manner as to reflect equitably amounts credited or debited to each Member's Capital Account for the current and prior fiscal year (or relevant portions thereof). Allocations under this Sec. 3.10 shall be made pursuant to the principles of Section 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations Sections 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3(e) promulgated thereunder, as applicable, or the successor provisions to such Section and Regulations.

(b) If the Company realizes capital gains (including short-term capital gains) for Federal income tax purposes ("gains") for any fiscal year during or as of the end of

which one or more Positive Basis Members (as hereinafter defined) withdraw from the Company pursuant to Articles IV, VI or VII, the Managing Member may elect to allocate such gains as follows: (i) to allocate such gains among such Positive Basis Members, pro rata in proportion to the respective Positive Basis (as hereinafter defined) of each such Positive Basis Member, until either the full amount of such gains shall have been so allocated or the Positive Basis of each such Positive Basis Member shall have been eliminated and (ii) to allocate any gains not so allocated to Positive Basis Members to the other Members in such manner as shall equitably reflect the amounts allocated to such Members' Capital Accounts pursuant to Sec. 3.05.

(c) As used herein, (i) the term "Positive Basis" shall mean, with respect to any Member and as of any time of calculation, the amount by which its interest in the Company (determined in accordance with Sec. 3.03) as of such time exceeds its "adjusted tax basis", for Federal income tax purposes, in its interest in the Company as of such time (determined without regard to any adjustments made to such "adjusted tax basis" by reason of any transfer or assignment of such interest, including by reason of death, and without regard to such Member's share of the liabilities of the Company under Section 752 of the Code), and (ii) the term "Positive Basis Member" shall mean any Member who withdraws from the Company and who has Positive Basis as of the effective date of its withdrawal, but such Member shall cease to be a Positive Basis Member at such time as it shall have received allocations pursuant to clause (i) of the preceding sentence equal to its Positive Basis as of the effective date of its withdrawal.

Sec. 3.11 Determination by Managing Member of Certain Matters; Managing Member's Discretion. All matters concerning the valuation of Securities and other assets of the Company, the allocation of profits, gains and losses among the Members, including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Managing Member, whose determination shall be final and conclusive as to all of the Members. Whenever in this Agreement the Managing Member is permitted or required to make a decision: (i) in its "sole discretion" or "discretion", or under a similar grant of authority or latitude, the Managing Member shall be entitled to consider only such interests and factors as it desires and may consider its own interests and the interests of its Affiliates, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or the Managing Member; or (ii) in its "good faith" or under another express standard, the Managing Member shall act under such express standards and shall not be subject to any other or different standards imposed by this Agreement or by law or any other agreement contemplated herein.

Sec. 3.12 Adjustments to Take Account of Interim Year Events. If the Code or regulations promulgated thereunder require a withholding or other adjustment to the Capital Account of a Member or some other interim year event occurs necessitating in the Managing Member judgment an equitable adjustment, the Managing Member shall make such adjustments in the determination and allocation among the Members of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Capital Percentages, Incentive Allocation, Management Fee, items of income, deduction, gain, loss, credit or withholding for tax purposes, accounting procedures or such other financial or tax items as shall equitably take into account such interim

year event and applicable provisions of law, and the determination thereof by the Managing Member shall be final and conclusive as to all Members.

## ARTICLE IV

### Withdrawals and Distributions of Capital

Sec. 4.01 Withdrawals and Distributions in General. No Member shall be entitled to: (i) receive distributions from the Company, except as provided in Sec. 4.04 and Sec. 7.02; or (ii) withdraw any amount from such Member's Capital Account other than upon its withdrawal from the Company or as provided in Sec. 4.02, or upon such terms as may be determined by, the Managing Member in its sole discretion.

Sec. 4.02 Withdrawals.

(a) Subject to Sec. 4.02(b), each Member shall have the right at any time, upon five business days' prior written notice (the "Notice Period") to the Managing Member, to withdraw any amount of its Capital Account based on the value of the Capital Account as of the date of receipt of such notice; provided, however, that the Member has been a Member for at least twelve full months as of the withdrawal date. Payment of any amount withdrawn pursuant to this Sec. 4.02 shall be made within five business days after the end of the Notice Period; provided, however, that any Member giving notice that it elects to withdraw greater than 80% of its Capital Account (computed on the basis of unaudited data) shall withdraw completely from the Company pursuant Sec. 6.01. The Managing Member may suspend withdrawal rights for any or all Members for any period during which, in the opinion of the Managing Member, there exists a state of affairs as a result of which disposal or distribution of part or all of the assets of the Company would not be reasonable or practicable or would be prejudicial to the Members.

(b) Notwithstanding any provision of this Agreement to the contrary, the Managing Member shall withhold and pay over to the Internal Revenue Service, pursuant to Section 1441, 1442, 1445 or 1446 of the Code, any successor provisions or any other provisions as may be enacted into law, at such times as required by such provisions, such amounts as the Company is required to withhold under such provisions, as from time to time in effect. To the extent that a foreign Non-Managing Member claims to be entitled to a reduced rate of, or exemption from, U.S. withholding tax pursuant to an applicable income tax treaty, or otherwise, the foreign Non-Managing Member shall furnish the Managing Member with such information and forms as he may require and are necessary to comply with the regulations governing the obligations of withholding tax agents. Each foreign Non-Managing Member represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Company and each of the Members from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes.

(c) Any amount of withholding taxes withheld and paid over by the Managing Member with respect to a foreign Member's distributive share of the Company's gross income, income or gain shall be treated as a distribution to such foreign Member and shall be charged against the Capital Account of such foreign Member.

(d) Withdrawals by a Non-Managing Member shall be subject to a withdrawal fee equal to 5% of the value of such Non-Managing Member's Capital Account at the time of withdrawal if such Member's Capital Account has been in existence for less than twelve full months. A withdrawal fee shall be reallocated to the Capital Accounts of non-withdrawing Non-Managing Members, to the extent of 15% of their Initial Capital Contribution. The remaining withdrawal fee shall be allocated to the Managing Member.

Sec. 4.03 Limitation on Withdrawals. The right of any Member to withdraw any amount from its Capital Account pursuant to the provisions of Sec. 4.02 is subject to the provision by the Managing Member for all Company liabilities in accordance with the Act, and for reserves for estimated accrued expenses, liabilities and contingencies in accordance with Sec. 3.08.

Sec. 4.04 Distributions.

(a) The Managing Member may, in its discretion, make distributions in cash or in kind: (i) in connection with a withdrawal of funds from the Company by a Member or in connection with a Member's complete withdrawal from the Company pursuant to Article VI; and (ii) at any time to all of the Members on a *pro rata* basis in accordance with the Members' Capital Percentages.

(b) If a distribution is made in kind, immediately prior to such distribution, the Managing Member shall determine the fair market value of the property distributed and adjust the Capital Accounts of all Members upwards or downwards to reflect the difference between the book value and the fair market value thereof, as if such gain or loss had been recognized upon an actual sale of such property and allocated pursuant to Sec. 3.05. Each such distribution shall reduce the Capital Account of the distributee Member by the fair market value thereof (as determined in accordance with Sec. 3.07).

(c) The Managing Member may withhold taxes from any distribution to any Member to the extent required by the Code or any other applicable law. For purposes of this Agreement, any taxes so withheld by the Company with respect to any amount distributed by the Company to any Member shall be deemed to be a distribution or payment to such Member, reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the Capital Account of such Member.

ARTICLE V

Admission of New Members

Sec. 5.01 New Members. Subject to the condition that each new Member shall execute an appropriate supplement to this Agreement pursuant to which it agrees to be bound by the terms and provisions hereof, the Managing Member may admit one or more new Members as of the beginning of any month, or at such other times as the Managing Member may decide. Admission of a new Member shall not be a cause for dissolution of the Company. Notwithstanding any other provision in this Agreement, prior to admitting any Member that shall cause the Company to have more than 100 Members (as computed in accordance with Treasury Regulation §1.7704-1(h)), the Managing Member shall consult with counsel to the Company to ensure that such admission will not cause the Company to be treated as a "publicly traded partnership" taxable as a corporation.

ARTICLE VI

Withdrawals, Death, Disability

Sec. 6.01 Withdrawal, Death, etc. of Non-Managing Members

(a) Subject to Sec. 6.04, a Non-Managing Member shall have the right to withdraw from the Company (i) in accordance with the terms provided in Sec. 4.02, or (ii) at any time with the consent of, and upon such terms as may be determined by, the Managing Member in its discretion.

The withdrawal, death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Non-Managing Member shall not dissolve the Company. The legal representatives of a Non-Managing Member shall succeed as assignee to the Non-Managing Member's interest in the Company upon the death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Non-Managing Member, but shall not be admitted as a substituted member without the consent of the Managing Member.

(b) In the event of the death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of a Non-Managing Member or the giving of notice of withdrawal by a Non-Managing Member, the interest of such Non-Managing Member shall continue at the risk of the Company until the last day of the fiscal year in which such event takes place. If the Company is continued after the expiration of such fiscal year, such Non-Managing Member or its legal representatives shall be paid within five business days after the end of such fiscal year.

(c) The interest of a Non-Managing Member that is permitted to withdraw from the Company shall not be included in calculating the Capital Percentages of the Non-Managing Members required to take any action under this Agreement.

(d) The Managing Member may suspend withdrawal rights for any or all Members for any period during which, in the opinion of the Managing Member, there exists a state of affairs as a result of which disposal or distribution of part or all of the assets of the Company would not be reasonable or practicable or would be prejudicial to the Members.

(e) Withdrawals by a Non-Managing Member shall be subject to a withdrawal fee pursuant to Sec. 4.02(d).

(f) The proceeds payable to a withdrawing Non-Managing Member may, in the discretion of the Managing Member, be reduced on account of estimated unaccrued expenses, including expenses in connection with such withdrawal, all as the Managing Member may determine.

Sec. 6.02 Required Withdrawals. The Managing Member may terminate the interest of (i) any Non-Managing Member in the Company seeking to withdraw part or all of its Capital Account, upon at least five days' prior written notice; (ii) any Non-Managing Member in the Company at the end of any month upon at least 10 days' prior written notice if the Managing Member determines that such termination is in the best interest of the Managing Member or the Company; and/or (iii) any Member in the Company at any time upon five days' prior written notice if the Managing Member determines that the continued participation of any such Member would cause the Company or any Member to violate any law or cause the Company to fail to qualify for the "private placement" safe harbor from publicly traded partnership status set forth in Treasury Regulation Section 1.7704-1(h), or if any litigation is commenced or threatened against the Company or any of its Members arising out of, or relating to, such Member's participation in the Company. The Member receiving such notice shall be treated for all purposes and in all respects as a Member who has given notice of withdrawal under Sec. 6.01.

Sec. 6.03 Effective Date of Withdrawal. The Capital Account of a withdrawing Member shall be determined as of the effective date of its withdrawal. For purposes of this Sec. 6.03, the effective date of a Member's withdrawal shall mean (as the case may be): (i) the date on which such Member shall cease to be a Member pursuant to Sec. 6.01; or (ii) the date determined by the Managing Member if such Member shall be required to withdraw from the Company pursuant to Sec. 6.02.

Sec. 6.04 Limitations on Withdrawal of Capital Account. The right of any withdrawn Member or its legal representatives to have distributed the Capital Account of such Member pursuant to this Article VI is subject to the provision for reserves for contingencies and estimated accrued expenses and liabilities in accordance with Sec. 3.08, and the provisions for withdrawal fees and expenses in accordance with Secs. 6.01(e) and 6.01(f).

# ARTICLE VII

## Duration and Dissolution of the Company

Sec. 7.01 Duration. The Company shall continue until the earlier of: (i) December 31, 2050; (ii) the bankruptcy, insolvency or dissolution of the Managing Member; or (iii) a determination by the Managing Member that the Company should be dissolved; provided, however, that if the Managing Member voluntarily dissolves the Company prior to the first anniversary of the date hereof, the Managing Member shall be subject to a dissolution fee equal to 20% of the total value of all of the Non-Managing Members' Capital Accounts at the time of the dissolution. Such dissolution fee shall be paid to the Non-Managing Members pro rata in accordance with their Capital Percentages on the date of the dissolution.

Sec. 7.02 Dissolution.

(a) On dissolution of the Company, the Managing Member shall, within no more than 30 days after completion of a final audit of the Company's financial statements (which shall be performed within 90 days of such termination), make distributions out of Company assets, in the following manner and order:

(i) to creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or by establishment of reserves); and

(ii) to the Members in the proportion of their respective Capital Accounts.

(b) The Managing Member, in its discretion, at any time and from time to time, may designate one or more liquidators, including, without limitation, one or more members or Affiliates of the Managing Member, who shall have full authority to wind up and liquidate the business of the Company and to make final distributions as provided in this Sec. 7.02. The appointment of any liquidator may be revoked or a successor or additional liquidator or liquidators may be appointed at any time by an instrument in writing signed by the Managing Member. Any such liquidator may receive compensation as shall be fixed, from time to time, by the Managing Member.

(c) In the event that the Company is dissolved on a date other than the last day of a fiscal year, the date of such dissolution shall be deemed to be the last day of a fiscal year for purposes of adjusting the Capital Accounts of the Members pursuant to Sec. 3.05. For purposes of distributing the assets of the Company upon dissolution, the Managing Member shall be entitled to a return, on a *pari passu* basis with the Non-Managing Members, of the amount standing to its credit in its Capital Accounts and, with respect to its share of profits, based upon its Capital Percentage.

ARTICLE VIII

Tax Returns; Reports to Members

Sec. 8.01 Independent Auditors. The financial statements of the Company shall be audited by an independent certified public accountant selected by the Managing Member as of the end of each fiscal year of the Company.

Sec. 8.02 Filing of Tax Returns. The Managing Member shall prepare and file, or cause the accountants of the Company to prepare and file, a Federal information tax return in compliance with Section 6031 of the Code, and any required state and local income tax and information returns for each tax year of the Company.

Sec. 8.03 Tax Matters Partner. The Managing Member shall be designated on the Company's annual Federal information tax return, and have full powers and responsibilities, to act as the "tax matters partner" within the meaning of Section 6231(a)(7) of the Code (the "Tax Matters Partner"). Each person (for purposes of this Sec. 8.03, called a "Pass-Thru Member") that holds or controls an interest as a Non-Managing Member on behalf of, or for the benefit of, another person or persons, or which Pass-Thru Member is beneficially owned (directly or indirectly) by another person or persons shall, within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the Company holding such interests through such Pass-Thru Member. In the event the Company shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Company is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and its decision shall be final and binding upon, the Company and each Member thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company.

Sec. 8.04 Reports to Current Members. Within 90 days after each fiscal year or as soon as practicable thereafter, the Company shall prepare and mail to each Member, together with the report thereon of the accountants selected by the Managing Member, an audited financial report setting forth as of the end of such fiscal year:

(a) a balance sheet of the Company;

(b) a statement showing the Net Capital Appreciation or Net Capital Depreciation as the case may be, for such year;

(c) such Member's Capital Account as of the end of such year; and

(d) such Member's Capital Account and Capital Percentage for the then current Accounting Period.

The Company will also provide to the Non-Managing Members periodic unaudited performance information, no less frequently than quarterly.

Sec. 8.05 Reports to Members and Former Members. Within 90 days of the end of each fiscal year or as soon thereafter as is reasonably possible, the Company shall prepare and mail, or cause its accountants to prepare and mail, to each Member and, to the extent necessary, to each former Member (or its legal representatives), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representatives) to prepare their respective Federal income tax returns in accordance with the laws, rules and regulations then prevailing.

## ARTICLE IX

### Miscellaneous

Sec. 9.01 General. This Agreement: (i) shall be binding on the legal successors and representatives of the Members; and (ii) may be executed, through the use of separate signature pages or supplemental agreements in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart; *provided, however,* that each such counterpart shall have been executed by the Managing Member and that the counterparts, in the aggregate, shall have been signed by all of the Members.

Sec. 9.02 Power of Attorney. Each of the Members hereby appoints the Managing Member as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a) a certificate of formation and any amendments thereto as may be required under the Act;

(b) any duly adopted amendment to this Agreement;

(c) any and all instruments, certificates, and other documents that may be deemed necessary or desirable to effect the dissolution and winding-up of the Company; and

(d) any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable Federal, state or local law.

The power of attorney hereby granted by each of the Non-Managing Members is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Non-Managing Member; *provided, however,* that such power of attorney will terminate upon the substitution of another non-managing member for all of such Non-Managing

Member's interest in the Company or upon the complete withdrawal of such Non-Managing Member from participation in the Company.

Sec. 9.03 Amendments to the Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of Non-Managing Members having in excess of 50% of the Capital Percentages of the Non-Managing Members and the affirmative vote of the Managing Member, insofar as is consistent with the laws governing this Agreement; *provided, however,* that without the consent of the Non-Managing Members, the Managing Member may amend the Agreement or the Schedule hereto to: (i) reflect changes validly made in the membership of the Company and the Capital Contributions and Capital Percentages of the Members; (ii) change the provisions relating to the Incentive Allocation as provided in, and subject to the provisions of, Sec. 3.06; (iii) reflect a change in the name of the Company; (iv) make a change that is necessary or, in the opinion of the Managing Member, advisable to qualify the Company as a limited liability company in which the Members have limited liability under the laws of any state or foreign jurisdiction, or ensure that the Company will not be treated as an association or a publicly traded partnership taxable as a corporation for Federal income tax purposes; (v) make a change that does not adversely affect the Non-Managing Members in any material respect; (vi) make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement, in each case so long as such change does not adversely affect the Non-Managing Members in any material respect; (vii) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any Federal, state or foreign governmental entity, so long as such change is made in a manner which minimizes any adverse effect on the Non-Managing Members; (viii) make a change that is required or contemplated by this Agreement; (ix) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the Managing Member or the Company pursuant to applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; (x) prevent the Company from in any manner being deemed an "Investment Company" required to register under the Investment Company Act of 1940, as amended; or (xi) make any other amendments similar to the foregoing. Each Member, however, must approve of any amendment which would: (a) reduce its Capital Account or rights of contribution or withdrawal; or (b) amend the provisions of this Agreement relating to amendments.

Sec. 9.04 Choice of Law. Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware and, without limitation thereof, that the Act as now adopted or as may be hereafter amended shall govern this Agreement.

Sec. 9.05 Adjustment of Basis of Company Property. In the event of a distribution of Company property to a Member or an assignment or other transfer of all or part of

the interest of a Non-Managing Member in the Company, the Managing Member may, in its discretion, cause the Company to elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Company property as provided by Sections 734 and 743 of the Code.

Sec. 9.06 No Third Party Rights. Except for the provisions of Sec. 2.06, the provisions of this Agreement are not intended to be for the benefit of any creditor or other person (other than the Members in their capacities as such) to whom any debts, liabilities or obligations are owed by (or who otherwise have a claim against or dealings with) the Company or any Member, and no such creditor or other person shall obtain any rights under any of such provisions (whether as a third party beneficiary or otherwise) or shall by reason of any such provisions make any claim in respect to any debt, liability or obligation (or otherwise) against the Company or any Member.

Sec. 9.07 Notices. Each notice relating to this Agreement shall be in writing and delivered in person, by registered or certified mail, by overnight courier or telecopied. All notices to the Company shall be addressed to its principal office and place of business. All notices addressed to a Member shall be addressed to such Member at the address set forth in the Schedule. Any Member may designate a new address by notice to that effect given to the Company. Unless otherwise specifically provided in this Agreement, all such notices and other communications shall be effective (i) if mailed (by certified mail, postage prepaid and return receipt requested) or sent by overnight courier, upon receipt, (ii) if telecopied, when transmitted and a confirmation is received, provided the same is on a business day and, if not, on the next business day, or (iii) if delivered in person, upon delivery, provided the same is on a business day and, if not, on the next business day.

Sec. 9.08 Goodwill. No value shall be placed on the name or goodwill of the Company, which shall belong exclusively to the Managing Member.

Sec. 9.09 Headings. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

Sec. 9.10 Pronouns. All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons, firm or corporation may require in the context thereof.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands to this Limited Liability Company Agreement as of the date first set forth above.

MANAGING MEMBER:
Sentinel Advisors, LLC

By:______________________________
Name: Ari Bergmann
Title: Managing Member

NON-MANAGING MEMBERS:

Each person who shall sign a Non-Managing Member Signature Page in the form attached hereto and who shall be accepted by the Managing Member to the Company as a Non-Managing Member.

# JADE TRADING, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

## NON-MANAGING MEMBER SIGNATURE PAGE

By its signature below, the undersigned hereby agrees that effective as of the date of its admission to JADE TRADING, LLC as a Non-Managing Member it shall: (i) be bound by each and every term and provision of the Limited Liability Company Agreement of JADE TRADING, LLC, as the same may be duly amended from time to time in accordance with the provisions thereof; and (ii) become and be a party to said Limited Liability Company Agreement of JADE TRADING, LLC

Ervin Investments, LLC
(Type Name)

[signature]
(Signature)

Manager
(Representative capacity, if any)

October 6, 1999
Date

Accepted and agreed this 6 day of October, 1999:

By: Sentinel Advisors, LLC
Managing Member

By: [signature]
Name: Ari Bergmann
Title: Managing Member



NY #158295 v1

Form **1065** Department of the Treasury Internal Revenue Service

# U.S. Partnership Return of Income

For calendar year 1999, or tax year beginning SEP 21, 1999, and ending DEC 31, 1999

OMB No. 1545-0099 **1999**

A Principal business activity: TRADER

B Principal product or service: SECURITIES

C Business code number: 523900

Use the IRS label. Otherwise, please print or type.

Name of partnership: JADE TRADING, LLC

Number, street, and room or suite no. (If a P.O. box, see page 12 of the instructions.): 546 5TH AVENUE, 19TH FLOOR

City or town, state, and ZIP code: NEW YORK, NY 10036

D Employer identification number: 13-4079142

E Date business started: 09/21/1999

F Total assets: $ 2,611,905.

G Check applicable boxes: (1) [X] Initial return (2) [ ] Final return (3) [ ] Change in address (4) [ ] Amended return

H Check accounting method: (1) [ ] Cash (2) [X] Accrual (3) [ ] Other (specify) ▶

I Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ 5

**Caution:** Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

**Income**

| Line | Description | | Amount |
|---|---|---|---|
| 1a | Gross receipts or sales | 1a | |
| b | Less returns and allowances | 1b | |
| 1c | | | |
| 2 | Cost of goods sold (Schedule A, line 8) | | |
| 3 | Gross profit. Subtract line 2 from line 1c | | |
| 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach schedule) | | |
| 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | | |
| 6 | Net gain (loss) from Form 4797, Part II, line 18 | | |
| 7 | Other income (loss) (attach schedule) | | |
| 8 | **Total income (loss).** Combine lines 3 through 7 | | |

**Deductions (see instructions for limitations)**

| Line | Description | | Amount |
|---|---|---|---|
| 9 | Salaries and wages (other than to partners) (less employment credits) | | |
| 10 | Guaranteed payments to partners | | |
| 11 | Repairs and maintenance | | |
| 12 | Bad debts | | |
| 13 | Rent | | |
| 14 | Taxes and licenses | | |
| 15 | Interest | | |
| 16a | Depreciation (if required, attach Form 4562) | 16a | |
| b | Less depreciation reported on Schedule A and elsewhere on return | 16b | |
| 16c | | | |
| 17 | Depletion **(Do not deduct oil and gas depletion.)** | | |
| 18 | Retirement plans, etc. | | |
| 19 | Employee benefit programs | | |
| 20 | Other deductions (attach schedule) | | |
| 21 | **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | |
| 22 | **Ordinary income (loss)** from trade or business activities. Subtract line 21 from line 8 | | 0. |

**Please Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

**CLIENT'S COPY**

Signature of general partner or limited liability company member ▶ Date

**Paid Preparer's Use Only**

Preparer's signature ▶ [signature] Date 3/23/00 Check if self-employed ▶ [ ] Preparer's SSN or PTIN P00161568

Firm's name (or yours if self-employed) and address ▶ UNTRACHT & ASSOCIATES, 325 COLUMBIA TURNPIKE, FLORHAM PARK, NJ

EIN ▶ 22-3207666

ZIP code ▶ 07932

JWA 911001 11-24-99

For Paperwork Reduction Act Notice, see separate instructions.

EXHIBIT 3

Form **1065** (1999)

Form 1065 (1999) JADE TRADING, LLC 13-4079142 Page 2

## Schedule A Cost of Goods Sold

| | | | |
|---|---|---|---|
| 1 | Inventory at beginning of year | 1 | |
| 2 | Purchases less cost of items withdrawn for personal use | 2 | |
| 3 | Cost of labor | 3 | |
| 4 | Additional section 263A costs *(attach schedule)* | 4 | |
| 5 | Other costs *(attach schedule)* | 5 | |
| 6 | **Total.** Add lines 1 through 5 | 6 | |
| 7 | Inventory at end of year | 7 | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 8 | |

9 a Check all methods used for valuing closing inventory:

(i) ☐ Cost as described in Regulations section 1.471-3

(ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

(iii) ☐ Other (specify method used and attach explanation) ▶

b Check this box if there was a writedown of "subnormal" goods as described in Regulations section 1.471-2(c) ▶ ☐

c Check this box if the LIFO inventory method was adopted this tax year for any goods *(if checked, attach Form 970)* ▶ ☐

d Do the rules of section 263A (for property produced or acquired for resale) apply to the partnership? ☐ Yes ☐ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? ☐ Yes ☐ No

If "Yes," attach explanation.

## Schedule B Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box: a ☐ General partnership b ☐ Limited partnership c ☒ Limited liability company d ☐ Limited liability partnership e ☐ Other ▶ | | |
| 2 | Are any partners in this partnership also partnerships? | X | |
| 3 | Is this partnership a partner in another partnership? | | X |
| 4 | Is this partnership subject to the consolidated audit procedures of sections 6221 through 6233? If "Yes," see **Designation of Tax Matters Partner** below | X | |
| 5 | Does this partnership meet **ALL THREE** of the following requirements?<br>a The partnership's total receipts for the tax year were less than $250,000;<br>b The partnership's total assets at the end of the tax year were less than $600,000; ***AND***<br>c Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return.<br>If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; Item F on page 1 of Form 1065; or Item J on Schedule K-1 | | X |
| 6 | Does this partnership have any foreign partners? | X | |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, **Form 8264**, Application for Registration of a Tax Shelter? | | X |
| 9 | At any time during the calendar year 1999, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? (See the instructions for exceptions and filing requirements for Form TD F 90-22.1.) If "Yes," enter the name of the foreign country. ▶ | | X |
| 10 | During the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520 or 926. See page 18 of the instructions | | X |
| 11 | Was there a distribution of property or a transfer (e.g., by sale or death) of a partnership interest during the tax year? If "Yes," you may elect to adjust the basis of the partnership's assets under section 754 by attaching the statement described under **Elections Made By the Partnership** | X | |

### Designation of Tax Matters Partner

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

Name of designated TMP ▶ SENTINEL ADVISORS, LLC

Identifying number of TMP ▶ 13-3939116

Address of designated TMP ▶ 546 5TH AVE, 19TH FLOOR NEW YORK, NY 10036

Form **1065** (1999)

Form 1065 (1999) JADE TRADING, LLC 13-4079142 Page 3

**Schedule K** **Partners' Shares of Income, Credits, Deductions, etc.**

| | (a) Distributive share items | | (b) Total amount |
|---|---|---|---|
| Income (Loss) | 1 Ordinary income (loss) from trade or business activities (page 1, line 22) | 1 | 0. |
| | 2 Net income (loss) from rental real estate activities (attach Form 8825) | 2 | |
| | 3 a Gross income from other rental activities — 3a | | |
| | b Expenses from other rental activities (attach schedule) — 3b | | |
| | c Net income (loss) from other rental activities. Subtract line 3b from line 3a | 3c | |
| | 4 Portfolio income (loss): | | |
| | a Interest income | 4a | |
| | b Ordinary dividends | 4b | |
| | c Royalty income | 4c | |
| | d Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | 4d | |
| | e Net long-term capital gain (loss) (attach Schedule D (Form 1065)): (1) 28% rate gain (loss) ▶ (2) Total for year ▶ | 4e(2) | |
| | f Other portfolio income (loss) (attach schedule) | 4f | |
| | 5 Guaranteed payments to partners | 5 | |
| | 6 Net section 1231 gain (loss) (other than due to casualty or theft) (attach Form 4797) | 6 | |
| | 7 Other income (loss) (attach schedule) SEE STATEMENT 1 | 7 | -292,015. |
| Deductions | 8 Charitable contributions (attach schedule) | 8 | |
| | 9 Section 179 expense deduction (attach Form 4562) | 9 | |
| | 10 Deductions related to portfolio income (itemize) | 10 | |
| | 11 Other deductions (attach schedule) SEE STATEMENT 2 | 11 | 11,273. |
| Credits | 12 a Low-income housing credit: | | |
| | (1) From partnerships to which section 42(j)(5) applies for property placed in service before 1990 | 12a(1) | |
| | (2) Other than on line 12a(1) for property placed in service before 1990 | 12a(2) | |
| | (3) From partnerships to which section 42(j)(5) applies for property placed in service after 1989 | 12a(3) | |
| | (4) Other than on line 12a(3) for property placed in service after 1989 | 12a(4) | |
| | b Qualified rehabilitation expenditures related to rental real estate activities (attach Form 3468) | 12b | |
| | c Credits (other than credits shown on lines 12a and 12b) related to rental real estate activities | 12c | |
| | d Credits related to other rental activities | 12d | |
| | 13 Other credits | 13 | |
| Investment Interest | 14 a Interest expense on investment debts | 14a | |
| | b (1) Investment income included on lines 4a, 4b, 4c, and 4f above | 14b(1) | |
| | (2) Investment expenses included on line 10 above | 14b(2) | |
| Self-Employment | 15 a Net earnings (loss) from self-employment | 15a | |
| | b Gross farming or fishing income | 15b | |
| | c Gross nonfarm income | 15c | |
| Adjustments and Tax Preference Items | 16 a Depreciation adjustment on property placed in service after 1986 | 16a | |
| | b Adjusted gain or loss | 16b | |
| | c Depletion (other than oil and gas) | 16c | |
| | d (1) Gross income from oil, gas, and geothermal properties | 16d(1) | |
| | (2) Deductions allocable to oil, gas, and geothermal properties | 16d(2) | |
| | e Other adjustments and tax preference items (attach schedule) | 16e | |
| Foreign Taxes | 17 a Type of income ▶ | | |
| | b Name of foreign country or U.S. possession ▶ | | |
| | c Total gross income from sources outside the United States (attach schedule) | 17c | |
| | d Total applicable deductions and losses (attach schedule) | 17d | |
| | e Total foreign taxes (check one): ▶ ☐ Paid ☐ Accrued | 17e | |
| | f Reduction in taxes available for credit (attach schedule) | 17f | |
| | g Other foreign tax information (attach schedule) | 17g | |
| Other | 18 Section 59(e)(2) expenditures: a Type ▶ b Amount ▶ | 18b | |
| | 19 Tax-exempt interest income | 19 | |
| | 20 Other tax-exempt income | 20 | |
| | 21 Nondeductible expenses | 21 | |
| | 22 Distributions of money (cash and marketable securities) | 22 | |
| | 23 Distributions of property other than money | 23 | 398,279. |
| | 24 Other items and amounts required to be reported separately to partners (attach schedule) | | |

Form **1065** (1999)

Form 1065 (1999) JADE TRADING, LLC 13-4079142 Page 4

## Analysis of Net Income (Loss)

1 Net income (loss). Combine Schedule K, lines 1 through 7 in column (b). From the result, subtract the sum of Schedule K, lines 8 through 11, 14a, 17e, and 18b ... 1 -303,288.

| 2 Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| a General partners | | | | | | |
| b Limited partners | -8,187. | | | -295,101. | | |

## Schedule L Balance Sheets per Books (Not required if Question 5 on Schedule B is answered "Yes.")

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | | | 31,662. |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach schedule) | | | | |
| 7 Mortgage and real estate loans | | | | |
| 8 Other investments (attach schedule) | STATEMENT 3 | | | 2,580,243. |
| 9a Buildings and other depreciable assets | | | | |
| b Less accumulated depreciation | | | | |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | | | | |
| b Less accumulated amortization | | | | |
| 13 Other assets (attach schedule) | | | | |
| 14 Total assets | | 0. | | 2,611,905. |
| **Liabilities and Capital** | | | | |
| 15 Accounts payable | | | | |
| 16 Mortgages, notes, bonds payable in less than 1 year | | | | |
| 17 Other current liabilities (attach schedule) | STATEMENT 4 | | | 8,250. |
| 18 All nonrecourse loans | | | | |
| 19 Mortgages, notes, bonds payable in 1 year or more | | | | |
| 20 Other liabilities (attach schedule) | STATEMENT 5 | | | 2,542,837. |
| 21 Partners' capital accounts | | | | 60,818. |
| 22 Total liabilities and capital | | 0. | | 2,611,905. |

## Schedule M-1 Reconciliation of Income (Loss) per Books With Income (Loss) per Return

(Not required if Question 5 on Schedule B is answered "Yes." See page 29 of the instructions.)

| | | | |
|---|---|---|---|
| 1 Net income (loss) per books | -312,657. | 6 Income recorded on books this year not included on Schedule K, lines 1 through 7 (itemize): | |
| 2 Income included on Schedule K, lines 1 through 4, 6, and 7, not recorded on books this year (itemize): | | a Tax-exempt interest $ | |
| 3 Guaranteed payments (other than health insurance) | | 7 Deductions included on Schedule K, lines 1 through 11, 14a, 17e, and 18b, not charged against book income this year (itemize): | |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 11, 14a, 17e, and 18b (itemize): | | a Depreciation $ | |
| a Depreciation $ | | | |
| b Travel and entertainment $ STMT 7 9,369. | 9,369. | 8 Add lines 6 and 7 | |
| 5 Add lines 1 through 4 | -303,288. | 9 Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | -303,288. |

## Schedule M-2 Analysis of Partners' Capital Accounts (Not required if Question 5 on Schedule B is answered "Yes.")

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year | | 6 Distributions: a Cash | |
| 2 Capital contributed during year | 771,754. | b Property | 398,279. |
| 3 Net income (loss) per books | -312,657. | 7 Other decreases (itemize): | |
| 4 Other increases (itemize): | | | |
| | | 8 Add lines 6 and 7 | 398,279. |
| 5 Add lines 1 through 4 | 459,097. | 9 Balance at end of year. Subtract line 8 from line 5 | 60,818. |

911041 11-24-99



15070323 784380 1016.9 1999.04202 JADE TRADING, LLC Form 1065 (1999) 1016_9_1

**SCHEDULE D (Form 1065)**

Department of the Treasury
Internal Revenue Service

# Capital Gains and Losses

▶ Attach to Form 1065.

OMB No. 1545-0099

**1999**

Name of partnership: JADE TRADING, LLC

Employer identification number: 13-4079142

**Part I** Short-Term Capital Gains and Losses - Assets Held 1 Year or Less

| (a) Description of property (e.g., 100 shares of "Z" Co.) | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Sales price | (e) Cost or other basis | (f) Gain or (loss) ((d) minus (e)) |
|---|---|---|---|---|---|
| 1 NET CAPITAL GAIN FROM TRADER ACTIVITIES (DETAILS UPON REQUEST) | VARIOUS | VARIOUS | | | 334. |

| | | |
|---|---|---|
| 2 Short-term capital gain from installment sales from Form 6252, line 26 or 37 | 2 | |
| 3 Short-term capital gain (loss) from like-kind exchanges from Form 8824 | 3 | |
| 4 Partnership's share of net short-term capital gain (loss), including specially allocated short-term capital gains (losses), from other partnerships, estates, and trusts | 4 | |
| 5 **Net short-term capital gain or (loss).** Combine lines 1 through 4 in column (f). Enter here and on Form 1065, Schedule K, line 4d or 7 | 5 | 334. |

**Part II** Long-Term Capital Gains and Losses - Assets Held More Than 1 Year

| (a) Description of property (e.g., 100 shares of "Z" Co.) | (b) Date acquired (mo., day, yr.) | (c) Date sold (mo., day, yr.) | (d) Sales price | (e) Cost or other basis | (f) Gain or (loss) ((d) minus (e)) | (g) 28% rate gain or (loss) * (see instr. below) |
|---|---|---|---|---|---|---|
| | | | | | | |

| | | | |
|---|---|---|---|
| 7 Long-term capital gain from installment sales from Form 6252, line 26 or 37 | 7 | | |
| 8 Long-term capital gain (loss) from like-kind exchanges from Form 8824 | 8 | | |
| 9 Partnership's share of net long-term capital gain (loss), including specially allocated long-term capital gains (losses), from other partnerships, estates, and trusts | 9 | | |
| 10 Capital gain distributions | 10 | | |
| 11 Combine lines 6 through 10 in column (g). Enter here and on Form 1065, Schedule K, line 4e(1) or 7 | 11 | | |
| 12 **Net long-term capital gain or (loss).** Combine lines 6 through 10 in column (f). Enter here and on Form 1065, Schedule K, line 4e(2) or 7 | 12 | | |

* **28% rate gain or (loss)** includes all "collectibles gains and losses" as defined in the instructions.

**For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**

Form **4562** Department of the Treasury Internal Revenue Service (99)

# Depreciation and Amortization
**(Including Information on Listed Property)** OTHER

▶ See separate instructions. ▶ Attach this form to your return.

OMB No. 1545-0172 **1999** Attachment Sequence No. 67

| Name(s) shown on return | Business or activity to which this form relates | Identifying number |
|---|---|---|
| ADE TRADING, LLC | OTHER DEPRECIATION | 13-4079142 |

**Part I** Election To Expense Certain Tangible Property (Section 179) (Note: If you have any "listed property," complete Part V before you complete Part I.)

| | | | |
|---|---|---|---|
| 1 | Maximum dollar limitation. If an enterprise zone business, see instructions | 1 | 19,000. |
| 2 | Total cost of section 179 property placed in service. See instructions | 2 | |
| 3 | Threshold cost of section 179 property before reduction in limitation | 3 | $200,000 |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- | 4 | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions | 5 | |

| 6 (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| 7 Listed property. Enter amount from line 27 | 7 | |

| | | | |
|---|---|---|---|
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7 | 8 | |
| 9 | Tentative deduction. Enter the smaller of line 5 or line 8 | 9 | |
| 10 | Carryover of disallowed deduction from 1998 | 10 | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5 | 11 | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but do not enter more than line 11 | 12 | |
| 13 | Carryover of disallowed deduction to 2000. Add lines 9 and 10, less line 12 ▶ | 13 | |

**Note:** *Do not use Part II or Part III below for listed property (automobiles, certain other vehicles, cellular telephones, certain computers, or property used for entertainment, recreation, or amusement). Instead, use Part V for listed property.*

**Part II** MACRS Depreciation For Assets Placed in Service ONLY During Your 1999 Tax Year (Do Not Include Listed Property.)

**Section A - General Asset Account Election**

14 If you are making the election under section 168(i)(4) to group any assets placed in service during the tax year into one or more general asset accounts, check this box. See instructions ▶ ☐

**Section B - General Depreciation System (GDS)** (See instructions.)

| (a) Classification of property | (b) Month and year placed in service | (c) Basis for depreciation (business/investment use only - see instructions) | (d) Recovery period | (e) Convention | (f) Method | (g) Depreciation deduction |
|---|---|---|---|---|---|---|
| 15 a 3-year property | | | | | | |
| b 5-year property | | | | | | |
| c 7-year property | | | | | | |
| d 10-year property | | | | | | |
| e 15-year property | | | | | | |
| f 20-year property | | | | | | |
| g 25-year property | | | 25 yrs. | | S/L | |
| h Residential rental property | / | | 27.5 yrs. | MM | S/L | |
| | / | | 27.5 yrs. | MM | S/L | |
| i Nonresidential real property | / | | 39 yrs. | MM | S/L | |
| | / | | | MM | S/L | |

**Section C - Alternative Depreciation System (ADS)** (See instructions.)

| (a) Classification of property | (b) | (c) | (d) | (e) | (f) | (g) |
|---|---|---|---|---|---|---|
| 16 a Class life | | | | | S/L | |
| b 12-year | | | 12 yrs. | | S/L | |
| c 40-year | / | | 40 yrs. | MM | S/L | |

**Part III** Other Depreciation (Do Not Include Listed Property.) (See instructions.)

| | | | |
|---|---|---|---|
| 17 | GDS and ADS deductions for assets placed in service in tax years beginning before 1999 | 17 | |
| 18 | Property subject to section 168(f)(1) election | 18 | |
| 19 | ACRS and other depreciation | 19 | |

**Part IV** Summary (See instructions.)

| | | | |
|---|---|---|---|
| 20 | Listed property. Enter amount from line 26 | 20 | |
| 21 | **Total.** Add deductions on line 12, lines 15 and 16 in column (g), and lines 17 through 20. Enter here and on the appropriate lines of your return. Partnerships and S corporations - see instructions | 21 | |
| 22 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs | 22 | |

LHA **For Paperwork Reduction Act Notice, see the separate instructions.** Form **4562** (1999)

916251 01-24-00

6

15070323 784380 1016.9 1999.04202 JADE TRADING, LLC 1016_9_1

Form 4562 (1999) JADE TRADING, LLC 13-4079142 Page 2

**Part V** **Listed Property - Automobiles, Certain Other Vehicles, Cellular Telephones, Certain Computers, and Property Used for Entertainment, Recreation, or Amusement**

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 23a, 23b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A - Depreciation and Other Information (Caution:** See instructions for limits for passenger automobiles.)

23a Do you have evidence to support the business/investment use claimed? ☐ Yes ☐ No 23b If "Yes," is the evidence written? ☐ Yes ☐ No

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/ investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| **24** Property used more than 50% in a qualified business use: | | | | | | | | |
| | | % | | | | | | |
| | | % | | | | | | |
| | | % | | | | | | |
| **25** Property used 50% or less in a qualified business use: | | | | | | | | |
| | | % | | | | S/L - | | |
| | | % | | | | S/L - | | |
| | | % | | | | S/L - | | |

26 Add amounts in column (h). Enter the total here and on line 20, page 1 ..... 26

27 Add amounts in column (i). Enter the total here and on line 7, page 1 ..... 27

**Section B - Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other "more than 5% owner," or related person.
If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle | | (b) Vehicle | | (c) Vehicle | | (d) Vehicle | | (e) Vehicle | | (f) Vehicle | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 Total business/investment miles driven during the year (DO NOT include commuting miles) | | | | | | | | | | | | |
| 29 Total commuting miles driven during the year | | | | | | | | | | | | |
| 30 Total other personal (noncommuting) miles driven | | | | | | | | | | | | |
| 31 Total miles driven during the year. Add lines 28 through 30 | | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| 32 Was the vehicle available for personal use during off-duty hours? | | | | | | | | | | | | |
| 33 Was the vehicle used primarily by a more than 5% owner or related person? | | | | | | | | | | | | |
| 34 Is another vehicle available for personal use? | | | | | | | | | | | | |

**Section C - Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who are **not** more than 5% owners or related persons.

| | Yes | No |
|---|---|---|
| 35 Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees? | | |
| 36 Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See instructions for vehicles used by corporate officers, directors, or 1% or more owners | | |
| 37 Do you treat all use of vehicles by employees as personal use? | | |
| 38 Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? | | |
| 39 Do you meet the requirements concerning qualified automobile demonstration use? | | |

**Note:** If your answer to 35, 36, 37, 38, or 39 is "Yes," you need not complete Section B for the covered vehicles.

**Part VI** **Amortization**

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| **40** Amortization of costs that begins during your 1999 tax year: | | | | | |
| ORGANIZATIONAL COSTS | 100199 | 5,575. | 709 | 60M | 279. |
| | | | | | |
| **41** Amortization of costs that began before 1999 ..... 41 | | | | | |
| **42 Total.** Enter here and on "Other Deductions" or "Other Expenses" line of your return ..... 42 | | | | | 279. |

Form **4562** (1999)

**Depreciation and Amortization Detail** OTHER DEPRECIATION OTHER

| Asset Number | Description of property / Date placed in service | Method/ IRC sec. | Life or rate | Line No. | Cost or other basis | Basis reduction | Accumulated depreciation/amortization | Current year deduction |
|---|---|---|---|---|---|---|---|---|
| 1 | ORGANIZATIONAL COSTS | | | | | | | |
| | 100199 | 709 | 60M | 40 | 5,575. | | | 279. |
| | * TOTAL OTHER DEPRECIATION & AMORTIZATION | | | | | | | |
| | | | | | 5,575. | 0. | 0. | 279. |

# - Current year section 179 (D) - Asset disposed

Election to Amortize Organizational Expenditures

Jade Trading, LLC
546 5th Avenue, 19th Floor
New York, NY 10036

Employer Identification Number: 13-4079142

Jade Trading, LLC hereby elects, pursuant to IRC Sec. 709(b), to amortize organizational expenditures over a period of 60 months starting in October 1999, the month business commenced.

As required in Reg. Sec. 1.709-1(c), the following information has been submitted to comply with the election requirements.

Organizational Expenditures
The following organizational expenditures were incurred in the first year the business was organized:

| Description of Expenditure | Date Paid or Incurred | Amount |
|---|---|---|
| LEGAL FEES AND EXPENSES | SEP 21 | 5,575 |
| Total | | 5,575 |