ORIGINAL

FILED
JAN 9 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2164 T

(Judge Mary Ellen Coster Williams)

JADE TRADING, LLC, by and through ROBERT W. ERVIN and LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,

Plaintiffs

v.

THE UNITED STATES,

Defendant

# DEFENDANT'S MOTION FOR RELIEF UNDER RCFC 56(f) WITH RESPECT TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

EILEEN J. O'CONNOR
Assistant Attorney General

MILDRED L. SEIDMAN
DAVID GUSTAFSON
WILLIAM K. DREW
MATTHEW C. HICKS
GEORGE L. SQUIRES
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6587
(202) 307-514-9440 (facsimile)

# INDEX

Page

Defendant's motion for relief under RCFC 56(f) with respect to plaintiffs' motions for summary judgment . . . . 1

Defendant's brief in support of its motion for relief under RCFC 56(f) with respect to plaintiffs' motions for summary judgment . . . . 3

Question presented . . . . 4

Authorities involved . . . . 4

Statement:

I. Procedural background . . . . 4

II. Nature of instant proceeding and defendant's need for discovery . . . . 6

III. Plaintiffs' motions for partial summary judgment . . . . 10

Argument:

I. Rule 56(f) provides essential protection against premature summary judgment motions . . . . 11

II. Defendant is entitled to relief under RCFC 56(f) with respect to all three motions for partial summary judgment . . . . 13

A. The request for relief is authoritative and timely . . . . 13

B. Good cause exists for granting relief . . . . 13

C. Discoverable material facts exist . . . . 14

1. Addressing the validity of Treas. Reg. § 1.701-2 upon an undeveloped record is inappropriate (first motion for partial summary judgment) . . . . 15

2. The status of Jade Trading as a partnership for substantive tax law purposes cannot be decided until the record is fully developed (second motion for partial summary judgment) . . . . 17

Page

3. The question of whether the alleged currency option transactions were "Section 988 Transactions" that cannot be offset is not amenable of resolution on summary judgment at present (third motion for summary judgment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D. Discovery of facts can be accomplished within a reasonable period of time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Appendix:

Declaration of William K. Drew . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ex. 1 Testimony of IRS Commissioner Mark W. Everson before the Permanent Subcommittee on Investigations, Senate Comm. on Governmental Affairs on Abusive Tax Shelters (Nov. 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Ex. 2 IRS Chief Counsel Notice CC-2003-020 (June 25, 2003) . . . . . . . . . . . . 35

Ex. 3 IRS Notice 2000-44, 2002-2 C.B. 255 . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Ex. 4 IRS Press Release LS-831, Treasury Shuts Down "Son of BOSS" Abusive Tax Shelter (Aug. 11, 2003) . . . . . . . . . . . . . . 49

Ex. 5. Paul Braverman, Helter Skelter, The American Lawyer (Dec. 5, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## CITATIONS


Page

**Cases:**

*ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998) . . . . . . . . . . . . 15,16,18
*ASA Investerings Partnership v. Commissioner*, 76 T.C.M. (CCH) 325 (1998), *aff'd*, 201 F.3d 505 (D.C. Cir. 2000), *cert. denied*, 531 U.S. 871 (2000) . . . . . 8,9
*Andantech L.L.C. v. Commissioner*, 331 F.3d 972 (D.C. Cir. 2003) . . . . . . . . . . . . . 17,18
*Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
*Clute v. Davenport Co.*, 116 F.R.D. 599 (D. Conn. 1987) . . . . . . . . . . . . . . . . . . . . . . . 15
*Consolidated Rail Corp. v. Maddox*, 116 F.R.D. 672 (D. Del. 1987) . . . . . . . . . . . . . . . 15
*PAA Mgmt., Ltd. v. United States*, 962 F.2d 212 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . 7
*Resolution Trust Corp. v. North Bridge Assocs., Inc.*, 22 F.3d 1198 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14
*United States for the use and benefit of Greenville Equip. Co. v. United States Cas. Co.*, 180 F. Supp. 715 (D. Del. 1960) . . . . . . . . . . . . . . . 15,16
*Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795 (Fed. Cir. 1999) . 12,13

**Statutes:**

Internal Revenue Code of 1986 (26 U.S.C.):
§ 761 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,17
§ 988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,18,19
§§ 6221-6234 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§ 6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,6,7,10,14
§ 6231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§ 6233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
28 U.S.C. § 1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Page**

Miscellaneous:

Edward Brunet, Timing of Summary Judgment, 198 F.R.D. 679 (2001) . . . . . . . . . . . . 11
Rules of the United States Court of Federal Claims:
Rule 5.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Rule 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,20
Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,11-13, 20
App. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Treas. Reg. (26 C.F.R) § 1.701-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,15
10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Civ. 3d § 2728, fn.29 (2003 Pocket Part) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
IRS Notice 99-59, 1999-52 I.R.B. 761 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,24,49
IRS Notice 2000-44, 2000-2 C.B. 255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,24,47
IRS Press Release LS-831, Treasury Shuts Down "Son of BOSS" Abusive Tax Shelter (Aug. 11, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,24,49
Paul Braverman, Helter Skelter, The American Lawyer (Dec. 5, 2003) . . . . . . . . . . 24,50
Testimony of IRS Commissioner Mark W. Everson before the Permanent Subcommittee on Investigations, Senate Comm. on Governmental Affairs on Abusive Tax Shelters (Nov. 20, 2003) . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2164 T

(Judge Mary Ellen Coster Williams)

JADE TRADING, LLC, by and through ROBERT W. ERVIN
and LAURA KAVANAUGH ERVIN on behalf of ERVIN
CAPITAL, LLC, Partners Other Than the Tax Matters Partner,

Plaintiffs

v.

THE UNITED STATES,

Defendant

DEFENDANT'S MOTION FOR RELIEF UNDER RCFC 56(f) WITH
RESPECT TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Defendant, the United States, respectfully moves for relief under RCFC 56(f) with respect to plaintiffs' three motions for partial summary judgment served December 18, 2003. Specifically, defendant requests that the Court enter an order refusing these motions (without prejudice to re-submission at an appropriate time) or, in the alternative, continuing proceedings with respect thereto until after the completion of discovery, or granting such other relief as

necessary to provide defendant with an adequate opportunity to respond thereto. This motion is based upon the matters set forth in the attached brief and in the declaration of William K. Drew and its exhibits which are attached to the brief.

Respectfully submitted,

GEORGE L. SQUIRES
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Telephone: 202-307-6587
Facsimile: 202-514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
DAVID GUSTAFSON
Assistant Chief
WILLIAM K. DREW
Reviewer
MATTHEW C. HICKS
Trial Attorney

Of Counsel

January 9, 2004

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 03-2164 T

(Judge Mary Ellen Coster Williams)

JADE TRADING, LLC, by and through ROBERT W. ERVIN and LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,

Plaintiffs

v.

THE UNITED STATES,

Defendant

---

BRIEF FOR THE UNITED STATES IN SUPPORT OF ITS MOTION FOR RELIEF UNDER RCFC 56(f) WITH RESPECT TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

---

The complaint herein seeks readjustment of partnership items, under § 6226[1] of the Internal Revenue Code of 1986 (26 U.S.C.), with respect to the partnership items of Jade Trading, LLC, for the year ended December 31, 1999, which were adjusted by the IRS by a Notice of Final Partnership Administrative Adjustment (FPAA). Plaintiffs have filed three motions for partial summary judgment. Defendant, in response to those motions, moves for relief under RCFC 56(f).

---

[1] Unless otherwise stated, all section numbers cited herein refer to the Internal Revenue Code of 1986.

## QUESTION PRESENTED

Should the Court refuse plaintiffs' three motions for partial summary judgment, without prejudice to refiling, or, in the alternative, continue proceedings with respect thereto until after the completion of discovery, or grant such other relief as necessary to provide defendant with an adequate opportunity to respond the motions.

## AUTHORITIES INVOLVED

This motion is based upon RCFC 56(f), which states:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

## STATEMENT

### I

### PROCEDURAL BACKGROUND

The above-captioned matter was commenced by complaint filed September 12, 2003. (Drew Decl. ¶ 3, App. at 1.)[2] The complaint herein seeks readjustment of partnership items, under § 6226, with respect to the partnership items of Jade Trading, LLC, for the year ended December 31, 1999, which were adjusted by the IRS by a Notice of Final Partnership Administrative Adjustment (FPAA). (Drew Decl. ¶ 4, App. at 2.) Defendant filed and served its answer on November 12, 2003. (Drew Decl. ¶ 5, App. at 2.) On November 24, 2003, defendant filed and served an unopposed motion of enlargement of time of 60 days, from December 31,

[2] "Drew Decl." or "Drew Decl. Ex." references are to the declaration of William K. Drew and exhibits attached hereto as the Appendix.

2003, to and including February 29, 2004, for the filing of the joint preliminary status report (JPSR). (Drew Decl. ¶ 6, App. at 2.) By order entered December 1, 2003, the Court granted defendant's motion for enlargement of time to file the JPSR. (Drew Decl. ¶ 7, App. at 2.)

The early meeting of counsel, pursuant to RCFC, Appendix A, paragraph 3, has not yet been held and the initial disclosures required by RCFC 26(a)(1) are not yet due and have not yet been made. (Drew Decl. ¶ 8, App. at 2.) On the afternoon of December 18, 2003, defendant's then attorney of record, William K. Drew, received a telephone call from plaintiffs' attorney of record. During that telephone conversation, plaintiffs' attorney advised defendant's attorney that three motions for summary judgment for plaintiffs had been prepared. This was the first time that defendant's attorney learned that plaintiffs were contemplating the filing of summary judgment motions at this early stage of this proceeding. (Drew Decl. ¶ 9, App. at 2.) On December 19, 2003, defendant received by Federal Express copies of plaintiffs' three motions for summary judgment. (Drew Decl. ¶ 10, App. at 2.)

Because RCFC 26(d) (subject to inapplicable exceptions) bars discovery "from any source" prior to the early meeting of counsel and because defendant's attorney had no reason to contemplate a need for discovery prior to the initial disclosures, no discovery has been conducted by defendant (nor could any be conducted under the rules of the Court). (Drew Decl. ¶ 11, App. at 2.)

II

## NATURE OF INSTANT PROCEEDING AND DEFENDANT'S NEED FOR DISCOVERY

The complaint (Compl.) herein is a complaint for readjustment of partnership items under § 6226. (Compl. ¶ 1.) The Court of Federal Claims has jurisdiction over this type of proceeding pursuant to 28 U.S.C. § 1508. Thus, the instant proceeding has been commenced under Code provisions commonly referred to as the "TEFRA partnership provisions".[3]

The complaint alleges that the Jade Trading, LLC, is a limited liability company (LLC) that filed a Form 1065[4] for the year 1999. (Compl. ¶ 5.) The complaint further alleges, and the answer (Ans.) admits, that the IRS issued a Notice of Final Partnership Administrative Adjustment (FPAA) that made adjustments to "partnership items"[5] of Jade Trading with respect to the year ended December 31, 1999. (Compl. ¶ 2, Exs. A, B; Ans. ¶ 2.) Plaintiffs herein seek to have all of the adjustments to partnership items that were made by the FPAA readjusted in a manner consistent with the original reporting position on the Form 1065. (Compl. ¶ 14; prayer for relief following ¶ 17.) In the instant proceeding, the Court's jurisdiction extends to all Jade

---

[3] These provisions, which are currently set forth in Code §§ 6221-6234, were enacted in 1982 as part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, 96 Stat. 324. The TEFRA Partnership Provisions created unified, partnership-level administrative and judicial procedures applicable to most entities that are treated as partnerships for purposes of subchapter K of the Code. These procedures, in some circumstances, also apply with respect to entities that ultimately are determined not to be partnerships. § 6233.

[4] A Form 1065 is the "U.S. Return of Partnership Income".

[5] "Partnership item," for purposes of the TEFRA partnership provisions, is defined at § 6231(a)(3).

Trading partnership items for the year ended December 31, 1999, and is not limited to a review of the adjustments made by the FPAA or the stated reasons therefor. § 6226(f); *cf* PAA Mgmt., Ltd. v. United States, 962 F.2d 212, 218-219 (2d Cir. 1992).

From the matters alleged in the complaint and set forth in the attachments thereto, the instant proceeding appears to involve, in defendant's view, an abusive tax shelter of the type commonly referred to as "Son of BOSS".[6] The IRS has determined that this is a type of shelter that has been marketed to individuals who have recognized very large capital gains during a taxable year. A shelter of this type would then be exploited as a device to offset the gain by

---

[6] A "Son of BOSS" tax shelter is a variant of another type of shelter known as "BOSS", or "Bond and Option Sale Strategy," which had previously been determined by the IRS, in Notice 99-59, 1999-52 I.R.B. 761, to be abusive. (Drew Decl. Ex. 4, App. at 49. ) The IRS announced in Notice 2000-44, 2000-2 C.B. 255, that the Son of BOSS type of tax shelter also is abusive. (Drew Decl. Ex. 3, App. at 47.) In the IRS press release regarding Notice 2000-44 the IRS described a typical Son of BOSS tax shelter (Drew Decl. Ex. 4, App. at 49):

> In one variant of this transaction, a taxpayer purchases a call option and simultaneously writes a similar offsetting call option. The offsetting option positions are then transferred to a partnership. Under the position advanced by promoters of this arrangement, the taxpayer purports to have a positive basis in the partnership interest equal to the cost of the purchased call options, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. This is because they claim that the taxpayer's basis in the partnership interest is not reduced for the partnership's assumption of the taxpayer's obligation with respect to the written call options. This artificially high tax basis in the partnership is then used to claim deductible losses (that can be used to shelter other income) by immediately selling the taxpayer's partnership interest, even though the taxpayer has incurred no corresponding economic loss.

As of November 21, 2003, the IRS had identified 2,208 transactions that it considers to be Son of BOSS tax shelters, as identified in Notice 2000-44, involving a total of 5.4 billion potential tax dollars. (Drew Decl. Ex. 1, App. at 30.)

purportedly generating artificial tax losses. (Drew Decl. ¶ 12, App. at 3; Drew Decl. Exs. 1-5, App. at 27-61.)

In published judicial opinions in cases involving tax shelters that were designed to generate artificial tax losses in attempts to shelter gains, those losses have been disallowed on various grounds involving principles such as substance over form and economic substance. The issues in those cases have been very fact-intensive and have been resolved based upon consideration of all the facts and circumstances. See, e.g., ASA Investerings Partnership v. Commissioner, 76 T.C.M. (CCH) 325 (1998), aff'd, 201 F.3d 505 (D.C. Cir. 2000), cert. denied, 531 U.S. 871 (2000). The issues in the instant case likewise will need to be resolved based upon all material facts and circumstances regarding the involved transactions and activities. As noted above, the defendant has not yet had any opportunity to conduct discovery regarding these facts and circumstances. (Drew Decl. ¶ 13, App. at 3.)

In view of the current lack of any factual development in the instant litigation, the defendant has not yet been able to determine which legal theories will or will not ultimately be advanced in support of the adjustments made in the FPAA. (Drew Decl. ¶ 14, App. at 4.)

Because the involved transactions appear to be part of a "Son of BOSS" abusive tax shelter, defendant needs to conduct substantial formal discovery regarding objective facts with respect to the offering of the Jade Trading scheme to the plaintiffs and to the other persons and entities that purportedly became members of Jade Trading, and with respect to the alleged activities of Jading Trading and of its alleged members. (Drew Decl. ¶ 15, App. at 4.) Defendant needs to determine what transactions, if any, actually occurred, what the intent of the parties to the transactions were, whether any business purpose for the transactions existed, and whether any

profit motive existed for the transactions aside from the attempted sheltering of capital gains through the generation of artificial losses. (*Id.*) Depending upon the results of initial discovery efforts, once allowed, defendant may identify further matters requiring discovery. (*Id.*) Also, based upon experience with litigation involving transactions designed to shelter gains, it may be necessary to have one or more experts in financial and economic matters review materials developed during discovery and prepare opinions with respect thereto. (*Id.*) The Department of Justice has received copies of documents from the IRS with respect to Jade Trading. (*Id.*) The defendant, however, still needs to conduct discovery in order to explore all facts and circumstances with respect to the involved transactions. (*Id.*) The material facts and circumstances to be discovered likely will be similar in nature to the facts presented and relied upon in ASA Investerings, which also involved the use of a partnership in an attempt to shelter gains with artificial losses. As yet, no discovery has been permitted under the Rules of this Court and the parties have not yet formulated a discovery plan. See RCFC, App. A, ¶ 5. (*Id.*) In view of the highly abusive nature, in defendant's view, of "Son of BOSS" tax shelters (as described in the documents attached to the Drew Decl.), and in view of the Government's success in challenging shelters designed to create an artificial loss, defendant believes that the facts and circumstances, when fully developed, will demonstrate that plaintiffs are not entitled to any relief and that the tendered summary judgment motions should not be granted. (*Id.*) Defendant asks the Court, not to prejudge the case, but to observe the complexity of the case and the seriousness of the Government's position.

III

PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

On December 18, 2003, plaintiffs served on defendant three motions for partial summary judgment. Plaintiffs' three motions for partial summary judgment address the following matters:

1. Whether Treas. Reg. § 1.701-2 (26 C.F.R.) (the partnership anti-abuse regulation) is valid.

2. Whether Jade Trading, LLC, should be recognized as a partnership under § 761 and whether it should be determined not to be a sham.

3. Whether certain alleged Eurodollar options constitute § 988 transactions that cannot be offset.

Plaintiffs assert that if all three motions were granted, the above-captioned cased would be disposed of in its entirety.[7] Defendant disagrees with the assertion that the three motions, even if allowed, would be fully dispositive of the instant case. As noted above, all partnership items for the involved taxable year are in issue in a proceeding under § 6226. Thus, rulings on specific matters raised in the explanation of adjustments in the FPAA would not necessarily resolve all issues that may be put in issue. Defendant is entitled to an opportunity to conduct discovery in order to uncover all facts and circumstances that have a bearing on the legal theories that may relate to any partnership item of Jade Trading for the year before the Court.

---

[7] It is unclear why plaintiffs simultaneously filed and served three motions for partial summary judgment instead of one motion for summary judgment. This tactic, however, appears to be used in an attempt to circumvent the page limitation that is applicable to initial briefs and memoranda. An initial brief, unless leave of Court has been granted, usually is limited to 40 pages. See RCFC 5.2(b)(1). Plaintiffs' memoranda in support of their three separate partial motions substantially exceed, in total, this page limit.

All three motions for partial summary judgment are grossly premature and, pursuant to RCFC 56(f), should be refused by the Court; or, in the alternative, either proceedings with respect thereto should be continued until after the completion of discovery, or such other relief should be granted as necessary to provide defendant with an adequate opportunity to respond to the motions.

## ARGUMENT

## I

## RULE 56(f) PROVIDES ESSENTIAL PROTECTION AGAINST PREMATURE SUMMARY JUDGMENT MOTIONS

In circumstances where a party moves for summary judgment before the opposing party has had an adequate opportunity to discover information necessary for the preparation of affidavits in opposition to the motion, RCFC 56(f)[8] authorizes the Court, upon motion of the nonmovant, to refuse the motion or to order a continuance or grant such other relief as may be appropriate. The meaning and application of the corresponding Federal Rule 56(f) are well set out and explained in the article by Edward Brunet, Timing of Summary Judgment, 198 F.R.D. 679 (2001) (Brunet Article).

The Brunet Article, after explaining that the procedural rules generally permit the early filing of summary judgment motions, discusses the importance of Rule 56(f) in guarding against

---

[8] RCFC 56(f), which parallels Fed. R. Civ. P. 56(f), provides:

> **(f) When Affidavits are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

the premature consideration of motions that are filed before an adequate opportunity for discovery has been afforded. As noted in the Brunet Article, 198 F.R.D. at 687 (footnotes omitted):

> Rule 56(f) is the product of a balancing of competing policy considerations. One such policy focuses on the importance of the availability of discovery in the summary judgment process. An opportunity to engage in meaningful discovery is the fulcrum of a notice pleading system, and the resolution of a summary judgment motion before the nonmovant has had that opportunity would undermine the system of which Rule 56 is only one part. That is because it would be patently unfair to permit a judgment to be entered against a person without affording that party the opportunity to gather and submit evidence on his or her behalf. The legal system would not permit this at trial and it should not permit it at the summary judgment stage which is a substitute for trial. For this reason, Rule 56©) refers specifically to the fruits of discovery as an appropriate element of proof in the summary judgment process. Operation of that process therefore must ensure that parties have sufficient time to gather materials to support and oppose the motion. Because the movant has the tactical advantage of choosing when to file a summary judgment motion, Rule 56(f) is designed entirely to protect the non-movant from having to respond to a summary judgment motion before he or she is able to obtain evidence to oppose the motion.

Significant factors in evaluating a motion under Rule 56(f) include whether evidence of material facts is within the control of the movant and whether the nonmovant has had an adequate opportunity to conduct discovery. See Vivid Technologies, Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795 (Fed. Cir. 1999);[9] see also Brunet Article, 198 F.R.D. at 695-702. In deciding whether to grant a motion under Rule 56(f), courts have considered whether the party moving for relief under that rule has made a proffer that: (1) is authoritative and timely, (2) demonstrates good cause for failure to have adduced essential facts previously, (3) present a plausible basis for believing that there are discoverable facts sufficient to raise a genuine and material issue, and (4)

---

[9] In Vivid Technologies, the Federal Circuit was applying the law of the First Circuit. 200 F.3d at 807.

show that the facts are discoverable in a reasonable amount of time. See, e.g., Vivid Technologies, 200 F.3d at 809.

II

DEFENDANT IS ENTITLED TO RELIEF UNDER RCFC 56(f) WITH RESPECT TO ALL THREE MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Defendant is entitled to relief under RCFC 56(f) in that all elements with respect to a motion under that rule are fully satisfied.

A. The request for relief is authoritative and timely. Defendant's request for relief under RCFC 56(f) plainly is authoritative and timely. The request is made by the formal motion accompanying this brief and is supported by a declaration executed by one of defendant's attorneys. Further, the instant motion has been filed and served prior to the expiration of the time for responding to plaintiffs' three motions for partial summary judgment. No more is required in order for the request for relief under RCFC 56(f) to be authoritative and timely. See, e.g., Resolution Trust Corp. v. North Bridge Assocs., Inc., 22 F.3d 1198 at 1204-05 (1st Cir. 1994).

B. Good cause exists for granting relief. Good cause exists for defendant's not having previously adduced material facts because discovery has not yet commenced in the instant litigation. Plaintiffs filed their motions for partial summary judgment during the time period when discovery could not be had "from any source". Defendant can hardly be said to have had an adequate opportunity to conduct discovery when it has had no opportunity at all to conduct discovery.

C. Discoverable material facts exist. As a threshold matter, the question of what facts are "material" depends upon the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In that the instant proceeding is an action for readjustment of partnership items, the ultimate question before the Court is the correctness of the partnership items of Jade Trading for the year ended December 31, 1999, subject to the adjustments made by the FPAA. § 6226(f). The instant proceeding is not for review of the IRS' reasons for making the adjustments set forth in the FPAA. Because partnership actions involving apparent tax-avoidance schemes are complicated and may involve many legal issues based upon statutes, regulations, and case law, these cases are particularly unsuited to resolution prior to the development of the record thorough discovery. "Evaluating the potential significance of unknown facts in regard to unadjudicated issues is something of a metaphysical exercise. Consequently, the threshold of materiality at this stage of a case [prior to the completion of adequate discovery] is necessarily low." Resolution Trust, 22 F.3d at 1207. "We do not believe that it is either necessary or desirable for a court to attempt to probe sophisticated issues on an undeveloped record. If, at this stage of the proceedings, lack of materiality is not apparent, then an inquiring court should err, if at all, on the side of liberality." Resolution Trust, 22 F.3d at 1208. Plaintiffs' attempt to resolve this complex litigation through piecemeal summary judgment motions, on a completely undeveloped record and ignoring the various issues that might ultimately be dispositive, should be viewed with great skepticism. Generally, the Court should decline to address legal questions in a case of this type prior to adequate development of the record and a proper framing of the issues and the subsidiary issues for decision. Thus, plaintiffs' motions are, in their entirety, ill-conceived and should be refused. Further, as

discussed below, none of the motions, individually, is properly before the Court for decision at present.

1. Addressing the validity of Treas. Reg. § 1.701-2 upon an undeveloped record is inappropriate (first motion for partial summary judgment). Plaintiffs' first motion for partial summary judgment seeks a ruling that Treas. Reg. § 1.701-2 is invalid in its entirety. Plaintiffs assert that the question of the validity of this regulation (generally known as the partnership anti-abuse rule) is a question of pure law and depends upon no facts. Notwithstanding plaintiffs' contentions, plaintiffs have not demonstrated that this legal question is, at present, before the Court for decision. Without full development of the record, it is not possible to determine whether the Court will need to address the validity of the anti-abuse rule. The anti-abuse rule certainly is not vital to defendant's case and resolving the question of the regulation's validity would not materially advance the development of this case. This is because defendant is entitled to assert all legal grounds for challenging the transactions in issue that existed prior to the adoption of the anti-abuse rule. See Treas. Reg. § 1.701-2(i); cf. ACM Partnership v. Commissioner, 157 F.3d 231, 246 fn 29 (3d Cir. 1998).

Courts have declined to rule on issues of law raised by summary judgment at an early stage of a proceeding where it appears that, upon full development of the facts and the resolution of other legal issues, the issue of law might be moot. United States for the use and benefit of Greenville Equip. Co. v. United States Cas. Co., 180 F. Supp. 715 (D.Del. 1960). See also Consolidated Rail Corp. v. Maddox, 116 F.R.D. 672 (D.Del. 1987); Clute v. Davenport Co., 116 F.R.D. 599 (D.Conn. 1987); 10A Charles A. Wright & Arthur R. Miller, Federal Practice and

Procedure Civ. 3d § 2728, fn. 29 (2003 Pocket Part). As noted in Greenville Equipment, 180 F. Supp. at 717:

> In short, a resolution of the legal questions raised by the motion will not perceptibly shorten the trial. On the other hand, a determination at trial of the fact issues may eliminate the need for deciding the legal questions which defendants' motion raises. In these circumstances, it is particularly appropriate that the Court, in the exercise of its discretion, deny the motion without prejudice.

The reasoning of Greenville Equipment applies with great force to plaintiffs' first motion for partial summary judgment. Plaintiffs ask the Court to invalidate, in its entirety, a Treasury regulation that has been in effect for nearly 10 years, even though at the present stage of the instant litigation defendant has neither asserted reliance on the anti-abuse rule nor decided whether it ultimately will rely on that regulation. Further, even if defendant does decide to rely upon the anti-abuse rule after the facts have been fully developed, the Court might well not need to address the validity of that regulation if other issues, based upon the overall facts and circumstances, make unnecessary reliance on the regulation in deciding the issues that actually are before the Court.

The decision in ACM Partnership is particularly instructive in showing the type of thorough analysis, evaluating all facts and circumstances, that must be done in a complex tax shelter case. ACM Partnership involved an attempt by a corporate taxpayer to eliminate a substantial capital gain by using a series of partnership transactions to create a large artificial loss. The Third Circuit noted that the Tax Court rejected the taxpayer's position, concluding that the transactions had been part of a pre-arranged plan and were totally lacking in economic reality. ACM Partnership, 157 F.3d at 244. The Third Circuit observed that in applying the pertinent legal principles "we must view the transactions' as a whole, and each step, from commencement

... to the consummation ... is relevant.' " 157 F.3d at 247. See also Andantech L.L.C. v. Commissioner, 331 F.3d 972, 978 (D.C. Cir. 2003) ("We stated in *ASA Investerings* that the basic inquiry in which we engage when determining whether a partnership is valid for tax purposes is 'whether, all facts considered, the parties intended to join together as partners to conduct business activity for a purpose other than tax avoidance.' ")

Clearly, resolution of the issues in the instant proceeding will require a thorough analysis of all facts and circumstances with respect to the involved transactions. A decision at this point as to whether the anti-abuse rule is valid – which has not been shown to be a necessary element of the case – would not be proper and would not advance the final resolution of the instant litigation. In these circumstances, plaintiffs' first motion for partial summary judgment should be refused or, in the alternative, further proceedings with respect thereto should be continued until after completion of discovery.

2. The status of Jade Trading as a partnership for substantive tax law purposes cannot be decided until the record is fully developed (second motion for partial summary judgment). Plaintiffs' second motion for partial summary judgment requests the Court to find that Jade Trading was a partnership within the meaning of § 761 and was not a sham. As the language from Andantech L.L.C., quoted in part II.C.1., *supra*, makes clear, however, the determination of whether a partnership is recognized for substantive tax law purposes is made considering "all facts" relevant to the intent of the "partners". Plaintiffs contend that the relevant facts are uncontroverted. These rather sparse contentions of fact (see plaintiffs' proposed findings accompanying the second motion for partial summary judgment) are based upon allegations set

forth in the complaint and in the self-serving affidavit of Ari Bergman.[10] Plaintiffs point to no admissions by defendant of any of these contentions, and defendant has not yet had the opportunity to conduct any discovery in this proceeding with respect to the alleged facts or with respect to any other facts that may be material to the determination of whether Jade Trading should be recognized as a partnership for substantive tax purposes. Defendant is entitled to a full and fair opportunity to conduct discovery with respect to material facts of the type that were developed in cases such as Andantech L.L.C., ACM Partnership, and other cases involving the exploitation of alleged partnerships for the purpose of creating artificial tax losses. Plaintiffs' attempt to obtain summary judgment on this fact-intensive question before the defendant has had any opportunity to conduct discovery is grossly improper. In these circumstances, plaintiffs' second motion for partial summary judgment should be refused or, in the alternative, further proceedings with respect thereto should be continued until after completion of discovery.

3. The question of whether the alleged currency option transactions were "Section 988 Transactions" that cannot be offset is not amenable of resolution on summary judgment at present (third motion for summary judgment). Plaintiffs' third motion for summary judgment – requesting a ruling that the alleged currency transactions were "Section 988 Transactions" that cannot be offset – is infirm on the same grounds as stated above with respect to the first summary judgment motion *and* on the same grounds as stated with respect to the second motion for summary judgment.

---

[10] Mr. Bergman states that he is the Senior Managing Member of Sentinel Advisors, LLC. (Bergman Aff. ¶ 1, attached to plaintiffs' first motion for summary judgment.) The complaint, ¶ 8, alleges that Sentinel Advisors, LLC, is the tax matters partner of Jade Trading.

Plaintiffs contend that the alleged currency option transactions (see Compl. ¶¶ 14(e), 14(I), 15(ak)-15(aq), and 15(bh)) were foreign currency transactions, within the meaning of § 988, and cannot be offset against each other. Like the issue of the validity of the anti-abuse rule (first motion for summary judgment), it is not yet clear that the Court will need to address the § 988 issue at all after the facts have been fully developed with respect to all issues. Indeed, it is doubtful that § 988 even has any applicability to the alleged facts in the instant proceeding. The pertinence of the statute, however, is best left for decision until the facts have been fully developed. Further, like the issue of Jade Trading's status as a partnership (second motion for summary judgment), plaintiffs' proposed findings regarding the § 988 issue are based upon self-serving affidavits and point to no admissions of defendant as to the truth of any of these allegations. In that the defendant has not yet had an opportunity to conduct discovery with respect to plaintiffs' allegations, the third motion for summary judgment is improper at this time. In these circumstances, plaintiffs' third motion for partial summary judgment should be refused or, in the alternative, further proceedings with respect thereto should be continued until after completion of discovery.

D. Discovery of facts can be accomplished within a reasonable period of time. Tax shelter cases generally are factually complex. Accordingly, a substantial amount of time usually is required for full development of the facts. In three tax shelter cases before this Court, considerable time for discovery has been required. In Coltec Industries, Inc. v. United States, Fed. Cl. No. 01-72T, discovery began in June 2001 and continues still. In Marriott International Resorts v. United States, Fed. Cl. Nos. 01-256T and 01-257T, discovery was conducted between November 2001, and October 2003. In Koch Industries, Inc. v. United States, Fed. Cl. No.

02-8T, discovery has been conducted from April 2002 to date. In almost all of these cases, the parties engage expert witnesses who analyze the transactions involved and testify as to issues involving economics, accounting, and/or valuation. Considerable time is often required to identify specific needs for expert assistance and testimony, identification and selection of appropriate experts, approval of funds for expert witnesses, and for preparation of expert witness reports, and deposing expert witnesses. The period required for discovery herein, therefore, likely will not be short. This is consistent with RCFC 56(f), which does not require that material facts be discovered within a short period of time, but within a reasonable period of time. In this context, reasonableness must be determined based upon the nature of the case.

In the instant case, discovery likely will take a substantial, but not unreasonable, amount of time. The exact amount of time is difficult to predict at present because plaintiffs have chosen to file summary judgment motions prior to the early meeting of counsel, prior to the filing of the JPSR (which is to include the parties' discovery plan), and prior to the initial disclosures required by RCFC 26(a)(1). Nonetheless, discovery should be amenable to completion within a reasonable amount of time for a complex tax shelter case. Further, the Government does not propose being allowed to conduct formless, unfocused discovery in hopes of finding material facts. Rather, the involved transactions, based upon the allegations in the complaint, appear to fit squarely into a well-known type of abusive tax shelter arrangement. Defendant expects to be able to pursue the discovery of facts with respect thereto, from plaintiffs and third parties, in a diligent matter once discovery has commenced. Absent intransigence by plaintiffs or by any third parties from whom discovery may be sought, necessary discovery should be completed within a reasonable amount of time.

## CONCLUSION

For the reasons set forth above, all three of plaintiffs' motions for partial summary judgment should not be considered until such time as discovery has been completed.

WHEREFORE, defendant prays that its motion be allowed and that the Court refuse these motions (without prejudice to re-submission) or, in the alternative, continue proceedings with respect thereto until after the completion of discovery, or grant such other relief as necessary to provide defendant with an adequate opportunity to respond thereto. Defendant requests that a hearing be held with respect to this motion.

Respectfully submitted,

GEORGE L. SQUIRES
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044
Telephone: 202-307-6587
Facsimile: 202-514-9440

EILEEN J. O'CONNOR
Assistant Attorney General
MILDRED L. SEIDMAN
Chief, Court of Federal Claims Section
DAVID GUSTAFSON
Assistant Chief
WILLIAM K. DREW
Reviewer
MATTHEW C. HICKS
Trial Attorney

Of Counsel

January 9, 2004

APPENDIX

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 03-2164 T

(Judge Mary Ellen Coster Williams)

JADE TRADING, LLC, by and through ROBERT W. ERVIN and LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,

Plaintiffs

v.

THE UNITED STATES,

Defendant

DECLARATION OF WILLIAM K. DREW

I, William K. Drew, declare as follows:

1. I am a Senior Trial Attorney/Reviewer with the Court of Federal Claims Section of the Tax Division of the United States Department of Justice.

2. I was the attorney of record for the United States in the above-captioned proceeding until the current attorney of record, George L. Squires, filed his notice of appearance on December 22, 2003. I continue to be of-counsel for defendant with respect to this proceeding.

3. The above-captioned matter was commenced by complaint filed September 12, 2003.

4. The complaint herein seeks readjustment of partnership items, under § 6226 of the Internal Revenue Code of 1986 (26 U.S.C.), with respect to the partnership items of Jade Trading, LLC, for the year ended December 31, 1999, which were adjusted by the IRS by a Notice of Final Partnership Administrative Adjustment (FPAA).

5. Defendant filed and served its answer herein on November 12, 2003.

6. On November 24, 2003, defendant filed and served an unopposed motion of enlargement of time of 60 days, from December 31, 2003, to and including February 29, 2004, for the filing of the joint preliminary status report (JPSR).

7. By order entered December 1, 2003, the Court granted defendant's motion for enlargement of time to file the JPSR.

8. The early meeting of counsel, pursuant to RCFC, Appendix A, ¶ 3, has not yet been held and the initial disclosures, as required by RCFC 26(a)(1), are not yet due and have not yet been made.

9. On the afternoon of December 18, 2003, I received a telephone call from plaintiffs' attorney of record. During that telephone conversation, plaintiffs' attorney advised me that three motions for summary judgment for plaintiffs had been prepared. This was the first time that I learned that plaintiffs were contemplating the filing of summary judgment motions at this early stage of this proceeding.

10. On December 19, 2003, I received by Federal Express copies of plaintiffs' three motions for summary judgment.

11. Because RCFC 26(d) (subject to exceptions not applicable here) bars discovery "from any source" prior to the early meeting of counsel and because I had no reason to contemplate any need for formal discovery prior to the initial disclosures, no discovery has yet been conducted by defendant (nor could any be conducted under the rules of the Court).

12. From the matters alleged in the complaint and set forth in the attachments thereto, the instant proceeding appears to involve an abusive tax shelter of the type commonly referred to as "Son of BOSS". The IRS has determined that this is a type of shelter that has been marketed to individuals who have recognized very large capital gains during a taxable year. A shelter of this type would then be exploited as a device to offset the gain by purportedly generating artificial tax losses. (See Testimony of IRS Commissioner Mark W. Everson before the Permanent Subcommittee on Investigations, Senate Comm. on Governmental Affairs on Abusive Tax Shelters) (Nov. 20, 2003), Ex. 1; IRS Chief Counsel Notice CC-2003-020 (regarding Notice 2000-44, Son of BOSS Tax Shelter) (June 25, 2003), Ex. 2; IRS Notice 2000-44, 2002-2 C.B. 255 (regarding Tax Avoidance Using Artificially High Basis), Ex. 3; IRS Press Release LS-831, Treasury Shuts Down "Son of BOSS" Abusive Tax Shelter (Aug. 11, 2003), Ex. 4; Paul Braverman, Helter Skelter, The American Lawyer (Dec. 5, 2003), Ex. 5.)

13. In published cases involving tax shelters that were designed to generate artificial tax losses in attempts to shelter gains, the losses have been disallowed on various grounds involving principles such as substance over form and economic substance. The issues in those cases have been very fact-intensive and have been resolved based upon consideration of all the facts and circumstances. See, e.g., ASA Investerings Partnership v. Commissioner, 76 T.C.M. (CCH) 325 (1998), aff'd, 201 F.3d 505 (D.C. Cir. 2000), cert. denied 531 U.S. 871 (2000). It

appears that the issues in the instant case will likewise need to be resolved based upon all facts and circumstances regarding the involved transactions and activities. As noted above, paragraph 11, discovery has not yet begun herein and, therefore, the defendant has not yet had any opportunity to conduct discovery regarding these facts and circumstances.

14. In view of the lack of any factual development in the instant litigation, the defendant has not yet been able to determine which legal theories will or will not ultimately be advanced in support of the adjustments made in the FPAA.

15. Because the involved transactions appear to be part of a "Son of BOSS" abusive tax shelter, defendant needs to conduct substantial formal discovery regarding objective facts with respect to the offering of the Jade Trading scheme to plaintiffs and to other persons and entities that purportedly became members of Jade Trading and with respect to the purported activities of Jade Trading and of its alleged members. Defendant needs to determine what transactions, if any, actually occurred, what the intent of the parties to the transactions were, whether any business purpose for the transactions existed, and whether any profit motive existed for the transactions other than attempting to shelter capital gains through the generation of artificial losses. Depending upon the results of initial discovery efforts, once allowed, defendant may identify further matters requiring discovery. Also, based upon experience with litigation involving transactions designed to shelter gains, it may be necessary to have one or more experts in financial and economic matters review materials developed during discovery and prepare opinions with respect thereto. The Department of Justice has received copies of documents from the IRS with respect to Jade Trading. The defendant, however, still needs to conduct discovery in order to explore all facts and circumstances with respect to the involved transactions. The

material facts and circumstances to be discovered likely will be similar in nature to the facts presented and relied upon in ASA Investerings, which involved the use of a partnership in an attempt to shelter gains with artificial losses. As yet, no discovery has been permitted under the Rules of this Court and the parties have not yet formulated a discovery plan. See RCFC, App. A, ¶ 5. In view of the highly abusive nature, in defendant's view, of "Son of BOSS" tax shelters (as described in the attached documents), and in view of the Government's success in challenging shelters designed to create an artificial loss, defendant believes that the facts and circumstances, when fully developed, will demonstrate that plaintiffs are not entitled to any relief and that the tendered summary judgment motions should not be granted.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 8, 2004, in Washington, D.C.

WILLIAM K. DREW

Search | Contents | Back to Search Results
BNA, Inc.

# TaxCore®

Friday November 21, 2003

## Primary Source Material
### Statements and Testimony

## Statements and Testimony
## Prepared Testimony of IRS Commissioner Mark Everson at Governmental Affairs Permanent Subcommittee on Investigations Hearing on Role of Accountants, Lawyers, and Financial Professionals in Tax Shelter Industry

**Document Date: November 20, 2003**

**PREPARED TESTIMONY OF**
**COMMISSIONER OF INTERNAL REVENUE**
**MARK W. EVERSON**
**BEFORE THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**COMMITTEE ON GOVERNMENTAL AFFAIRS**
**UNITED STATES SENATE**
**HEARING ON ABUSIVE TAX SHELTERS**
**NOVEMBER 20, 2003**

DEFENDANT'S EXHIBIT
1

### INTRODUCTION AND OVERVIEW

Mr. Chairman, Senator Levin and Members of the Subcommittee, thank you for inviting me to discuss the subject of abusive tax avoidance transactions. We appreciate the interest the Subcommittee has shown in this issue, particularly in examining the proliferation of these transactions. The work of the Subcommittee has highlighted the need for greater transparency with respect to potentially abusive tax avoidance transactions and the need for increased penalties on participants and promoters.

The focus of the Subcommittee's first day of hearings was the mass marketing of tax shelters by some professional advisors. Beginning in the mid-1990s, some professional firms shifted their focus from their historic role of trusted advisors to that of professional salesmen.

According to the witnesses that appeared before you on the first day of the hearing, the biggest accounting firms no longer engage in mass marketing. If this is true, we believe that IRS efforts may have played a significant role in this development. We believe some promoters and taxpayers may have recognized the increased risk of detection of tax returns claiming tax benefits from abusive tax avoidance transactions. In any event, it is my view that this problem is significant, and we need to increase our diligence and effort in this area.

The Treasury Department and the IRS have responded by taking aggressive actions against participants in and promoters of abusive tax avoidance transactions. As a core element of these efforts, the

Treasury Department and the IRS proposed in March 2002 to create a web of disclosure through a series of administrative and legislative initiatives.

The Treasury Department and the IRS didn't wait for the enactment of the legislative proposals, but moved forward with all of the administrative actions described in the March 2002 proposals, and almost all have been completed. These actions have been important steps in creating the transparency and certainty needed to combat abusive transactions. The legislative proposals would complete and reinforce these actions by simplifying the disclosure rules and imposing meaningful penalties on taxpayers and promoters who fail to provide the IRS with requested information.

One of the top priorities of the President's 2004 Budget Request for the Treasury Department was to strengthen the integrity of the nation's tax system by deterring inappropriate tax avoidance and evasion (especially among high income taxpayers).

As was made clear at the first day of the Subcommittee's hearing, issues of professional practice must be a priority. Tax professionals are vital to our system of voluntary compliance. They advise taxpayers on sophisticated legal transactions that involve complex rules and fine legal judgments. The tax laws are complex and taxpayers are permitted to take aggressive positions within the bounds of the law. Tax professionals should assist taxpayers in navigating through this challenging landscape to determine their fair share of taxes. Instead, we have seen far too many instances in which tax professionals have helped taxpayers avoid paying the taxes rightfully owed.

We are looking for ways to encourage best practices and ethical professional behavior by tax professionals, as well as discourage participation in abusive tax avoidance transactions. A key thrust in this effort is transparency, that is, the rules that the Treasury Department and the IRS have put in place to require the disclosure to the IRS of transactions that constitute abusive tax avoidance transactions or potentially abusive tax avoidance transactions.

The IRS and the Treasury Department are committed to ensuring compliance with the rules governing the promotion of tax avoidance transactions by tax professionals. The IRS is currently conducting well over 100 examinations of promoters. As part of the examinations, we are requesting investor lists and other information, and, if necessary, issuing summonses for those lists and other information. As a consequence of the examinations, we are reviewing numerous transactions to determine whether they should have been registered under section 6111 of the Internal Revenue Code, and whether investor lists should have been maintained under section 6112 of the Code.

Tax professionals, including lawyers and accountants, must comply with the law requiring registration of tax shelters and the keeping of investor lists. Many entities have provided us with the information we have sought pursuant to our requests. Others have been less forthcoming. We will continue our efforts to assure adherence to the law by promoters of potentially abusive tax avoidance transactions, including the use of summons and summons enforcement actions where necessary to obtain the information to which we are entitled. We will not hesitate to use the tools at our disposal to gather information about transactions, the taxpayers who invest in them, and the promoters who sell them.

**QUESTIONS POSED BY THE SUBCOMMITTEE**

In your letter of invitation, you asked the IRS to address four specific questions at this hearing. To the extent possible, I will address those questions in order.

> **(1) The scope of the potentially abusive and illegal tax shelter problem including the role played by professional firms, the estimated overall cost to the U.S. Treasury from these tax shelters, and the IRS' efforts to combat these tax shelters.**

Estimates vary on the size of this problem. Unfortunately, it is very difficult to make a precise determination based on the many different interpretations and definitions of abusive tax shelters. The

October 2003 GAO report on abusive tax shelters also acknowledged this difficulty. Whatever the actual volume of abusive tax shelters, we recognize that there is a significant compliance problem and we are taking aggressive action to address it, utilizing existing regulatory, administrative, and enforcement tools. For example, in our Large and Mid-Size Business Division (LMSB), we currently have 118 promoter cases open for investigation. In addition, in our Small Business/Self Employed Operating Division (SBSE) there are 41 technical tax shelter promoter investigations open. The audits began in LMSB in 2001, with 22 entities under investigation. As is apparent, we have increased the number of audits significantly. This includes large accounting firms and major law firms, as well as banks and a number of boutique and mid size promoters.

There are three ways the IRS finds out about questionable transactions. One, taxpayers and promoters are required to disclose or register questionable transactions and maintain investor lists under sections 6011, 6111 and 6112 of the Code. Two, the IRS identifies questionable transactions through its examination process. Three, the IRS and the Treasury Department learn about transactions through tips, some of which are anonymous tips through the Office of Tax Shelter Analysis ("OTSA") Hotline.

As I have indicated, disclosure is critical to our ability to identify and address abusive transactions early on. In February 2003, the IRS issued final regulations under Code Sections 6011, 6111 and 6112 to improve and enhance the disclosure of potentially abusive transactions by taxpayers, the registration of those transactions by "material advisors" (which would include "promoters"), and the maintenance of customer lists by those advisors. These regulations are designed to improve our information about potentially abusive transactions, promoters who market abusive transactions and those taxpayers who invest in abusive transactions. The regulations require taxpayers to disclose "reportable transactions" on their returns and to the IRS' Office of Tax Shelter Analysis, or OTSA. In addition the regulations require promoters to register their tax shelters with the IRS, and promoters and other persons to maintain lists of investors in their tax shelters and furnish those lists to the IRS upon its request.

A reportable transaction may not necessarily be an abusive transaction. But by subjecting a broad range of transactions to disclosure, we increase the likelihood of the IRS detecting the most abusive transactions. The increased likelihood of detection by the IRS alters the risk/reward calculus for potential investors entering into abusive transactions.

The number of disclosures received from taxpayers has increased significantly since 2001. We expect to receive more taxpayer disclosures pertaining to calendar year 2003 than with respect to any previous year.

**Coordination with the States**

Another way in which we are combating abusive transactions is through our work with the States. The IRS and state tax officials announced a new nationwide partnership to combat abusive transactions in September 2003. Under agreements with individual states, known as Memoranda of Understanding, the IRS and states will share information on abusive transactions and those taxpayers who participate in them. The agreements creating this partnership are designed to enable both state and federal governments to move more aggressively in the fight to ensure all taxpayers pay their fair share of tax. As of November 12, 2003, forty-two states, the District of Columbia, and the New York City Department of Finance have agreed to partner with the IRS on this initiative.

Under the initiative, the IRS and states will exchange information about a range of abusive tax avoidance transactions. This will allow the IRS and state agencies to avoid duplication and to piggyback on the results of each other's work. The states and the IRS will then share information on any resulting tax adjustments, reducing the need for duplicating lengthy taxpayer examinations by both a state and the IRS.

In addition to greater cooperation in sharing leads in the area of abusive transactions, the partnership with the states includes joint outreach and education activities to more effectively counter the claims of those marketing tax schemes and scams.

Initial data provided by the California Franchise Tax Board in response to an IRS request for state information relative to a high profile transaction the IRS currently is examining resulted in the identification of additional participants the IRS had not yet identified. As a result, the IRS will be able to protect statutes of limitations and bring additional participants into compliance.

Over the recent past, the IRS has taken a number of other noteworthy actions to combat abusive transactions. You are probably familiar to varying degrees with most or all of these actions. They center on greater transparency and developing and using a web of information to curb these transactions at the front end.

**(2) With respect to BLIPS, OPIS, FLIP, SC2, COBRA, BOSS, and Son of BOSS, since 1995, the approximate total number of persons who have used each tax product and total amount of tax revenues lost as the result of each tax product.**

It is difficult for us to identify the total number of persons who have used each tax product. We are, however, using examinations of promoters to secure investor lists to identify the participants. We have received a number of disclosures and, as the changes in the disclosure regulations take full effect and the number of listed transactions increases, we anticipate receiving more. There will be those who do not disclose, however, which will make it more difficult for us to get a complete picture. That some may choose not to disclose is why it is important for Congress to enact the change to the registration rules proposed by Treasury and IRS that will complete the information web on which the IRS relies to assist in finding non-disclosing taxpayers. That is also why it is important that the IRS maintain and strengthen its examination program so it continues to be capable of detecting undisclosed transactions.

Within our Operating Divisions, we have management information systems that track the activity on cases of known investors. Within our Office of Tax Shelter Analysis (OTSA), we can track the activity on cases of known investors through all sources.

We can provide the following data on specific transactions:

*Notice 99-59* —The OTSA database contains transactions totaling $356 million in potential tax dollars.

*Notice 2000-44*— The OTSA database contains 2,208 transactions totaling $5.4 billion in potential tax dollars.

*Notice 2001-45* — The OTSA database contains 322 transactions totaling $631 million in potential tax dollars.

**(3) Whether, to your knowledge, professional firms are now routinely developing and marketing complex tax products for sale to multiple clients and, if so, the impact and implications of mass marketing these tax products, including whether professional firms may be, at times, misleading taxpayers regarding the legal validity of the products they are selling, and whether IRS oversight of tax professionals selling generic tax products poses new and different enforcement issues than reviewing the tax returns reflecting individualized tax planning advice.**

Our promoter investigations have established that organized and comprehensive marketing strategies have been utilized by professional firms to sell abusive tax products that have been developed. These include transactions that were structured for the use of, and were marketed to, multiple investors, rather than a single investor. We have also seen indications that abusive transactions have moved "down market" through more widely-marketed promotions by lesser known professional firms to less affluent

taxpayers. Such a development increases the likelihood that taxpayers may be misled or may be inadequately equipped to assess the tax avoidance proposals presented to them.

While circumstances differ from transaction to transaction, information received from investors suggests that some of these transactions, which are complex, may not have been fully understood by taxpayers, who consequently may have relied on the representations of the promoter.

A significant priority in the Service's efforts to curb abusive transactions is our focus on promoters.

Initiatives focused on promoters can provide a number of benefits. Promoters are required to maintain investor lists that identify taxpayers who participate in or purchase potentially abusive tax avoidance transactions that are "reportable" or "listed" under the Service's rules. By auditing the promoters and obtaining investor lists and following up with audits of those investors, we can deter the promotion of as well as the interest in such products. That is, these activities alter the risk/reward ratio for potential investors.

The IRS has included accounting and law firms in its investigations of tax shelters and related promoters. The IRS has included these firms because it believes that, in the instances in which the IRS has acted, these firms were acting as promoters of tax shelters, and not simply as tax or legal advisers.

Where the IRS believes a firm has failed to comply with the registration or list-keeping rules, the Service will not hesitate to audit.

The IRS conducts promoter examinations to determine whether a promoter has complied with regulations requiring identification of potentially abusive transactions by registering such transactions and maintaining and providing investor lists to the IRS upon request.

Through the promoter audits, we have shown that we are willing to use the tools at our disposal to obtain the information promoters are obligated to provide to us. Through the disclosure regime, including transactions and investor identities, generated by these efforts, we are demonstrating that the risk of detection and audit is serious and must be factored into the risk-reward calculus by promoters and investors alike. Mr. Chairman, we believe we can do more in this area and you can expect us to continue our efforts.

In regard to this question, I further want to point out several noteworthy actions we have taken in connection with our promoter efforts.

*KPMG/BDO Seidman*

In July 2002, the Justice Department, on behalf of the IRS, filed suit in federal court in Washington, D.C. against KPMG LLP, asking the court to compel the firm to disclose information to the IRS about tax shelters it had marketed since 1998.

In a similar suit filed in Chicago, the Department asked the federal court there to enforce summonses issued to another firm, BDO Seidman, LLP, for information related to its marketing of tax shelters since 1995.

*Jenkens & Gilchrist*

Earlier this year, the Department of Justice on behalf of the IRS petitioned the United States District Court, Northern District of Illinois, for enforcement of five administrative summonses and a John Doe summons served on Jenkens & Gilchrist. The summonses ask the law firm to provide information on certain listed transactions or other potentially abusive transactions organized or sold by the firm's Chicago office and to identify taxpayers who may have invested in them.

This was the first case of its kind involving a law firm.

**Sidley Austin Brown & Wood LLP**

In October, the IRS received approval from the United States District Court, Northern District of Illinois to serve a John Doe summons on Sidley Austin Brown & Wood, asking the law firm to identify taxpayers who may have invested in listed transactions or other potentially abusive transactions organized or sold by the firm.

**Grant Thornton**

On September 17, 2003, the Department of Justice, on behalf of the IRS, filed a petition in the U.S. District Court, District of Columbia, to enforce nine administrative summonses issued to the accounting firm, Grant Thornton LLP.

The summonses were issued as part of an IRS examination to determine Grant Thornton's compliance with tax shelter registration and list maintenance requirements, including identifying taxpayers who may have invested in potentially abusive transactions organized and sold by the firm.

Finally, the IRS has entered into closing agreements with professional service firms resolving issues related to those firms' compliance with the registration and list maintenance requirements that apply to the marketing of tax shelters. The agreements required payments to the IRS to resolve the issues. More important, however, the agreements require procedures that will prevent the future occurrence of the kind of practices that led to the IRS's audits and to the payments to the IRS to resolve the issues. In particular, the agreements ensure ongoing compliance with the registration and list maintenance provisions of the Internal Revenue Code and regulations. One of the agreements provides for the firm to implement a Quality and Integrity Program to ensure the highest standards of practice and ongoing compliance with the law and regulations. The IRS may, upon its request, review documents prepared as part of this program.

We are pleased with the full cooperation the IRS has been afforded by the firms that have entered into closing agreements in resolving these matters. This represents a real breakthrough and is a good working model for future agreements with practitioners.

*Disclosure Initiative*

In December 2001, the IRS announced a 120-day disclosure initiative that ended on April 23, 2002. The initiative provided taxpayers an opportunity to disclose questionable transactions to the IRS. Under the terms of the initiative, if taxpayers provided all relevant information about the disclosed transactions or items, including the identity of the promoter of the transaction, the IRS would waive certain accuracy-related penalties that might apply to those transactions and other questionable items that resulted in an underpayment of tax.

The IRS has used the disclosures to identify tax shelter promoters and to connect promoters to particular listed transactions. We are examining the activities of these promoters to determine whether they complied with their legal obligations to register certain transactions and maintain investor lists. Upon receipt of the investor lists from promoters, the IRS will be able to identify other taxpayers who participated in abusive transactions and failed to disclose them.

**(4) Any recommendations you may have to ensure that professional firms develop and market generic tax products that comply with the law, the IRS learns of potentially abusive tax products marketed by professional firms to multiple clients, potential buyers are fully**

**Informed of risks associated with such tax products, or to address other tax shelter development, marketing, or implementation concerns.**

As I indicated previously, we believe transparency is a key element in addressing abusive tax transactions. Transparency includes the disclosure of information *by* taxpayers and promoters and the disclosure of information *to* taxpayers and promoters.

In terms of disclosure of information by taxpayers and promoters, we will continue to rely on regulatory requirements for registration, disclosure, and maintenance of investor lists to provide the information we need to identify and monitor potentially abusive transactions. Transparency is critical to our early identification and would be significantly enhanced by the legislative change proposed by the Treasury Department that would expand the scope of the registration rules. We need to ensure that questionable transactions are registered and subject to IRS review. This is critical to our ability to identify and address abusive tax practices early on. The majority of taxpayers are honest and want to comply with the tax laws. By providing quicker guidance on tax transactions, we can enhance voluntary compliance.

I believe that tax professionals are an integral part of our effort to ensure that the Internal Revenue Code is administered fairly and appropriately. The majority of tax professionals recognize their obligations to the system as well as their obligations to their clients, and they have expressed dismay about the inappropriate behavior of some of their colleagues. I have asked the Deputy Commissioner for Services and Enforcement to develop and coordinate a unified strategy for improving confidence in the integrity of tax professionals, a strategy that will encourage best practices and deter improper and unethical practices.

The Treasury Department and the IRS intend to make changes to Circular 230, which governs professional conduct. Among the subjects we are closely examining in this regard are the standards employed in legal opinions regarding tax shelter transactions. I have asked the new Deputy Commissioner for Services and Enforcement, to make the strengthening of Circular 230 one of his priorities.

Moreover, the Treasury Department has solicited support for a number of legislative proposals intended to curb abusive transactions. We appreciate that these proposals have been included in several Senate bills. If the IRS or Treasury Department identify the need for additional legislation, we will bring those areas to the attention of Congress. We appreciate this Subcommittee's efforts to secure passage of that legislation.

In terms of disclosure of information to taxpayers and promoters, the Service intends to continue to emphasize its provision of published guidance. The published guidance program is an important tool that the IRS can use to increase disclosure and compliance. The IRS has in recent years made significant progress in accelerating and increasing its issuance of published guidance and our intention is to continue to improve our performance in this area.

Informing taxpayers through published guidance of abusive transactions will discourage participation in them. And there is another side to the coin -- a very positive one that is sometimes forgotten. Some transactions that are worthy of IRS scrutiny may nevertheless prove to be sound under the law. Our willingness to indicate transactions that the Service believes are permitted under the tax law should encourage promoters and taxpayers to come to us with transactions that they believe are technically sound. In addition, through published guidance in non-shelter areas, we can save audit resources that we can then devote to areas with higher risk of noncompliance.

**CONCLUSION**

Mr. Chairman, we are firmly committed to curbing abusive tax transactions. They are an affront to honest taxpayers and practitioners and undermine confidence in the fairness of our tax system. The Congress and our taxpayers have every right to expect diligence, care and professionalism from the IRS

in this effort, and I will do my utmost to see that those qualities are applied to our effort, and that there is no compromise of taxpayer rights.

Abusive transactions can and will continue to pose a threat to the integrity of our tax administration system. We cannot tolerate the promotion of or participation in abusive transactions. The stakes are too high and the effects of an insufficient response are too corrosive. We have put in place the foundation and structure to begin to attack these transactions in a systematic way. Certainly we will need to do more and we will need to do it better.

If professional service firms have in fact curtailed their marketing activities, as indicated in the testimony on the first day of the Subcommittee's hearing, we think it likely that IRS efforts played a significant role in this development. Some promoters and some taxpayers may be recognizing the increased risk of detection and audit of tax returns claiming tax benefits from abusive tax avoidance transactions. In any event, we must continue to be diligent.

Senate Finance Committee Chairman Grassley recently said, "The IRS should be able to enforce the tax code and respect taxpayers' rights at the same time. We can't have people abusing the tax code, and we can't have the IRS abusing taxpayers. It's as simple as that." I heartily agree. The IRS must demonstrate and execute a balanced approach if taxpayers are to remain faithful to our system of self-assessment. I believe the IRS has made progress in meeting these concerns.

I would be very pleased to answer any questions Members of the Subcommittee might have.

---

Contact customer relations at: customercare@bna.com or 1-800-372-1033

Copyright © 2003, The Bureau of National Affairs, Inc.
Copyright FAQs | Internet Privacy Policy | BNA Accessibility Statement | License

Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy, http://www.bna.com/corp/index.html#V

Previous Doc | Next Doc | Search | Contents | Back to Search Results

Department of the Treasury | Internal Revenue Service | Office of Chief Counsel

# Notice

CC-2003-020

June 25, 2003

Notice 2000-44
Subject:: Son of Boss Tax Shelter | Cancellation Date: Upon Incorporation Into CCDM

## Purpose

The purpose of this Notice is to assist Chief Counsel attorneys in advising field personnel in the development of cases involving the type of transaction described in the second fact pattern of Notice 2000-44, 2000-2 C.B. 255, and substantially similar transactions (referred to herein as Son of Boss transactions).

## Summary

The Son of Boss transaction involves the contribution of a purchased option to a partnership and the assumption by the partnership of a separate written option which the taxpayer incurred. A taxpayer engaged in a Son of Boss transaction claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call option but is not reduced under Internal Revenue Code § 752 for the assumption of the obligation under the written call option. Subsequently, taxpayer claims a loss on the disposition of the partnership interest even though taxpayer has incurred no corresponding economic loss. It is the position of Counsel that:

(1) For written options assumed by partnerships after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T of the Income Tax Regulations to reduce the

Filing Instructions: Binders ________ Master Sets: NO X RO ___
NO: Circulate ___ Distribute X to: All Personnel ___ Attorneys X In: all divisions
RO: Circulate ___ Distribute X to: All Personnel ___ Attorneys X In: all divisions
Other National FOIA Reading Room
Electronic Filename: son of boss .pdf Original signed copy in: CC:FM:PM:P

DEFENDANT'S EXHIBIT 2

outside basis in the partnership of the taxpayer from whom the written call option was assumed.[1]

In a Son of Boss transaction that involves the assumption of a short sale obligation by a partnership, the Service will continue to follow Rev. Rul. 95-26, 1995-1 C.B. 131. Revenue Ruling 95-26 provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. Further, for Son of Boss transactions in which the short sale obligation was assumed by a partnership after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer from whom the short sale was assumed.

(2) The Service may apply § 1.701-2 to a partnership formed or availed of in connection with a Son of Boss transaction as the principal purpose of the transaction is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. The Service may determine, based on the facts and circumstances, that to achieve results that are consistent with the intent of subchapter K the purported partnership should be disregarded in whole or in part, one or more of the purported partners of the partnership should not be treated as a partner, the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income, the partnership's items of income, gain, loss, deduction, or credit should be reallocated, or the claimed tax treatment should otherwise be adjusted or modified. In the case of a partnership formed in connection with a Son of Boss transaction, disregarding the partnership is also consistent with existing case law. ASA Investerings P'ship v. Commissioner, 201 F.3d 505 (D.C. Cir. 2000).

(3) For an individual partner, the loss that a partner claims resulting from the artificial inflation of the partner's outside basis in a partnership used in a Son of Boss transaction may be disallowed under § 165(c)(2) because the partner lacked the requisite economic profit objective.

(4) Under § 465(b)(4), taxpayers are not considered at risk for amounts invested in the economically offsetting option positions contributed to and assumed by a partnerships formed or availed of in connection with a Son of Boss transaction as such amounts are protected against loss.

Background

---

[1] The Temporary regulations are effective for this period. § 1.752-6T(d). Proposed regulations also have been issued that apply to assumptions of liabilities by partnerships on or after June 24, 2003. As described in the preamble to § 1.752-1 of the proposed regulations, the definition of liability contained in the proposed regulations does not follow Helmer v. Commissioner, T.C. Memo 1975-160.

On September 5, 2000, the Service issued Notice 2000-44, 2000-2 C.B. 255, listing the Son of Boss transaction as an abusive tax shelter. In the second fact pattern in Notice 2000-44, a taxpayer purchases call options for a cost of $1,000X and simultaneously writes call options which virtually economically offset the purchased call options in exchange for a premium of slightly less than $1,000X. The written call options have a slightly higher strike price but the same expiration date as the purchased options. The purchased and written option positions are then transferred to a partnership that, using additional amounts contributed to the partnership, engages in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752(b) as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in these facts), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest is nominal or zero. On the disposition of the taxpayer's partnership interest, the taxpayer claims a tax loss ($1,000X in these facts), even though neither the taxpayer nor the partnership has incurred a corresponding economic loss. In a variation of this transaction, the partnership distributes an asset to a partner in complete liquidation of his interest in the partnership. Under § 732(b) the distributed asset picks up the artificially increased outside basis. On the subsequent sale of the distributed asset, the partner claims a loss.[2]

Discussion

1. Section 752 applies to the Son of Boss transaction to reduce the partner's basis in the partnership.

A. For Son of Boss transactions involving the contribution of offsetting option positions after October 18, 1999, but before June 24, 2003, the Service will apply § 1.752-6T to reduce the outside basis in the partnership of the taxpayer who contributed the options.

---

[2] The facts presented in this memo describe the loss generation type Son of Boss transaction. Some Son of Boss transactions are structured as gain elimination transactions rather than as loss generation transactions. In a gain elimination transaction, the partner contributes an asset with significant built in gain to the partnership and, following the closing of the option positions, the partnership distributes the asset to the partner in a liquidating transaction. Under § 732(b), the contributed asset picks up the artificially increased outside basis. The effect of this is that the gain in the contributed asset is eliminated. In gain elimination Son of Boss transactions, the Service will assert the same arguments as will be presented in the loss generation Son of Boss transaction except that the § 165 and § 465 arguments can not be asserted in those transactions in which no loss is generated.

Section 1.752-6T(a) provides that if, in a transaction described in § 721(a), a partnership assumes a liability (defined in § 358(h)(3)) of a partner (other than a liability to which § 752(a) and (b) apply), then, after application of § 752(a) and (b), the partner's basis in the partnership is reduced (but not below the adjusted value of such interest) by the amount (determined as of the date of the exchange) of the liability. For purposes of § 1.752-6T, the adjusted value of a partner's interest in a partnership is the fair market value of that interest increased by the partner's share of partnership liabilities under § 1.752-1 through § 1.752-5. Section 358(h)(3) defines liability to include any fixed or contingent obligation to make a payment, without regard to whether the obligation is otherwise taken into account for federal tax purposes. Under § 1.752-6T, the reduction in a partner's basis is not required after an assumption of a liability to which § 752(a) and (b) do not apply, if the trade or business with which the liability is associated is transferred to the partnership assuming the liability as part of the transaction. However, the Son of Boss transaction described above does not involve the transfer of a trade or business and therefore, does not meet the exception.

In addition, § 1.752-6T(b)(1) includes another exception contained in § 358(h)(2)(B), which provides that the reduction in basis is not required after an assumption of a liability (described in § 358(h)(3)) if substantially all of the assets with which the liability is associated are transferred to the person assuming the liability as part of the exchange. This exception does not apply to Son of Boss transactions. § 1.752-6T(b)(2).

In a Son of Boss transaction involving the purchase and sale of economically offsetting option positions, each contribution of a written call option to the partnership after October 18, 1999, but before June 24, 2003, is an assumption of liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T(a).

B. <u>For Son of Boss transactions involving the contribution of a short sale to a partnership, § 752 and the regulations thereunder apply to adjust the partner's basis in a manner that eliminates the artificial loss.</u>

In Son of Boss transactions involving short sales, § 752 applies to treat the short sale obligation as a § 752 liability. Revenue Ruling 95-26, 1995-1 C.B. 131, provides that a short sale of securities creates an obligation on the part of the partnership to deliver identical securities to close out the short sale and concludes that the short sale described in the ruling creates a partnership liability under § 752. In <u>Salina Partnership v. Commissioner</u>, T.C. Memo 2000-352, the Tax Court held that the partnership's obligation to close its short sale by replacing the Treasury bills that it borrowed represented a partnership liability within the meaning of § 752. The effect of treating the short sale obligation as a § 752 liability will be that on the satisfaction of the obligation, the partners will be deemed to have received a distribution equal to the amount received for selling short. The deemed distribution will cause a reduction in the partner's basis in the partnership under § 705(a)(2). This reduction in basis will eliminate the artificial loss.

Alternatively, under § 1.752-6T, in a Son of Boss transaction involving the contribution of a partner's short sale obligation by the partnership, each short sale obligation contributed after October 18, 1999, but before June 24, 2003, is a liability that reduces the basis in the partnership of the partner who contributed the liability, to the extent of the amount of the liability but not below the adjusted value of the partner's interest. § 1.752-6T(a). As discussed above, the exception to the application of § 1.752-6T that applies in the event of the transfer of a trade or business to a partnership that assumes a liability associated with the trade or business as part of the transaction does not apply to the facts presented. Similarly, the substantially all the assets exception in § 358(h)(2)(B) does not apply to the contribution of a short sale obligation to the partnership in a Son of Boss transaction.

2. The Service may recast a Son of Boss transaction involving a partnership formed or availed of in connection with such transaction to achieve results that are consistent with the intent of subchapter K.

Section 1.701-2(a), the partnership anti-abuse rule, provides in pertinent part that subchapter K is intended to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax. Implicit in the intent of subchapter K are the following requirements:

(1) the partnership must be bona fide and each partnership transaction or series of related transactions (individually or collectively, the transaction) must be entered into for a substantial business purpose;

(2) the form of each partnership transaction must be respected under substance over form principles; and

(3) except as otherwise provided, the tax consequences under subchapter K to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partners' economic agreement and clearly reflect the partner's income.

Section 1.701-2(b) provides that the provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in § 1.701-2(a). Accordingly, if a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Service can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances. Thus, even though the transaction may fall within the literal words of a particular statutory or regulatory provision, the Service can determine, based on the particular facts and circumstances, that to achieve tax results that are consistent with the intent of subchapter K:

(1) the purported partnership should be disregarded in whole or in part, and the partnership's assets and activities should be considered, in whole or in part, to be owned and conducted, respectively, by one or more of its purported partners; (2) one or more of the purported partners of the partnership should not be treated as a partner; (3) the methods of accounting used by the partnership or a partner should be adjusted to reflect clearly the partnership's or the partner's income; (4) the partnership's items of income, gain, loss, deduction or credit should be reallocated; or (5) the claimed tax treatment should otherwise be adjusted or modified.

Section 1.701-2(c) provides that whether a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is determined based on all of the facts and circumstances, including a comparison of the purported business purpose for a transaction and the claimed tax benefits resulting from the transaction. Section 1.701-2(c) lists factors that may be considered in making the determination but those factors do not create a presumption that a partnership was or was not used in a manner inconsistent with subchapter K.

One of the factors on the list indicative of a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K is that the present value of the partners' aggregate federal tax liability is substantially less than had the partners owned the partnership assets and conducted the partnership's activities directly. The loss generated (or the gain eliminated) in a Son of Boss transaction is achieved through the inflated outside basis in the partnership. This inflated basis is not supported by the underlying economics of the transaction. Thus, if the investors in a Son of Boss transaction held the options and engaged in the minor investment activities outside the partnership, the tax loss would not have been generated. This is true whether the partnership was formed to engage in a Son of Boss transaction or an existing partnership was used to engage in the Son of Boss transaction.

A partnership formed or availed of in connection with a Son of Boss transaction does not operate in a manner consistent with the intent of subchapter K. First, the requirement that each partnership transaction or series of related transactions be entered into with a substantial business purpose is not met. A partnership formed or availed of in connection with a Son of Boss transaction engages in minor investment activities. The partnership engages in the investment transactions to generate the appearance of a business purpose in the event the transaction is challenged. The real purpose of the partnership is the generation of the loss or elimination of gain through the Son of Boss transaction. Although establishment of substantial business purpose is a fact specific inquiry, the reasonably expected pre-tax profit from both the economically offsetting option positions and the investment transactions is minimal when compared to the purported reduction in tax liability achieved through the Son of Boss transaction.

Second, the requirement that the tax consequences to each partner of the partnership operations and of transactions between the partnership and the partner must accurately reflect the partner's income is not met. In a Son of Boss transaction, a large tax loss is generated through an inflated basis in the partnership interests received by the contribution of offsetting option positions to a partnership. The interest is later sold for a loss, or the property that is distributed and acquires the artificially high outside basis is later sold for a loss. For the tax consequences of a Son of Boss transaction to clearly reflect the partners' income, the partners or the partnership would have to have experienced a net economic loss at least equal to the claimed tax loss or the tax loss would need to be clearly contemplated by a provision in the Code or regulations. The tax loss generated in the transaction does not accurately reflect an underlying economic loss experienced by either the partners or the partnership. Further, no provision in subchapter K contemplates the creation of the large non-economic losses generated in the Son of Boss transaction.

Section 1.701-2(b) gives the Service broad authority to recast a transaction or series of transactions in the event that a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K. In light of this, the partnership anti-abuse rule should be applied either to disregard the partnership or some of the partners, to disregard the contributions of the options to the partnership, or to reduce the partners' bases in the partnership to the net amount invested in the options, depending on the particular facts of the transaction.

If a partnership is formed in connection with a Son of Boss transaction, the Service may disregard the partnership and recast the transaction in a manner that is consistent with the partners engaging in the activities directly. This approach will eliminate the discrepancy between outside basis and inside basis, and eliminate the purported loss (or restore the purportedly eliminated gain).

Other authorities support the Service's disregarding of the purported partnership. Under § 761 a partnership includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. See also, § 7701(a)(2). The Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, 742 (1949), stated that a partnership is created for federal income tax purposes if:

> [C]onsidering all the facts -- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent -- the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

The Tax Court in Luna v. Commissioner, 42 T.C. 1067, 1077-78 (1964) set forth the following nonexclusive list of factors relevant to the consideration of whether a partnership is created:

> The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party had made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and co-proprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over the assumed mutual responsibilities for the enterprise.

In ASA Investerings P'ship v. Commissioner, the Court of Appeals for the D.C. Circuit found that a partnership formed for a tax purpose and which engages in de minimis business activity in furtherance of that tax purpose is not a valid partnership. ASA at 512; See also Boca Investerings P'ship v. United States, 2003 U.S. App. LEXIS 429. Moreover, the ASA Court stated that whether "the 'sham' be in the entity or the transaction . . . the absence of a nontax business purpose is fatal." Id.

Applying this analysis to the facts before it, the court of appeals in ASA found that even though the "investment in LIBOR Notes might have had a business purpose, the prior three-week investment in and subsequent sale of the private placement notes (PPNs) was . . . a business activity merely conducted for tax purposes." Id. at 513. The court of appeals realized that the taxpayer may have had an interest in potential gain from its investments, but those interests were "dwarfed by its interest in the tax benefit." Id. at 513. In concluding that ASA Investerings was not a legitimate partnership, the court further clarified that "[a]lthough a taxpayer may structure a transaction so that it satisfies the formal requirements of the Internal Revenue Code, the Commissioner may deny legal effect to a transaction if its sole purpose is to evade taxation." Id. (quoting, Zamuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984)). Hence, the standard in the D.C. Circuit is that a de minimis business purpose will not validate a partnership whose true purpose is the pursuit of tax benefits. Rather, the relevant legal inquiry, as found by the Court of Appeals for the D.C. Circuit, is a comparison of the purported business purpose to the expected tax benefit. Id. at 513. The weight placed upon this legal factor led the D.C. Circuit to disregard the partnership entity. Id. at 516.

On the issue of risk, the court of appeals in ASA allowed for the existence of de minimis risk in the transaction noting that "no investment is entirely without risk." Id. at 514. The court of appeals further concluded that a carve out of de minimis risk is consistent with the Supreme Court's view that "a transaction will be disregarded if it did 'not appreciably affect [taxpayer's]

beneficial interest except to reduce his tax.'" Id. (quoting Knetsch v. United States, 364 U.S. 361, 366 (1960)).

As with the transactions in ASA and Boca, de minimis risk exists in the Son of Boss transactions. The Son of Boss transactions are structured specifically to generate a tax benefit while limiting each partner's risk of loss to the difference between the premium received for writing the option and the premium paid for the long option. The minor investment activities engaged in by the partnerships are de minimis compared to the amount of the claimed tax savings. Further, the modicum of business purpose asserted by the promoters for the formation of the partnership in a Son of Boss transaction does not alter the fact that the true purpose for the partnership is the reduction of tax liability. Thus, the partnership entity should be disregarded.

In cases in which an operating partnership engages in a Son of Boss transaction it may not be appropriate to disregard the partnership. In these cases, § 1.701-2 applies to permit the Service to recast the transaction in a manner consistent with the intent of subchapter K.

A Son of Boss transaction, whether engaged in through a partnership formed primarily for use in the transaction or through a previously operating partnership, reduces substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K. The fact that such reduction was a principal purpose of engaging in the transaction is apparent from the lack of legitimate economic purpose for the transaction. As noted above, a comparison of the tax gain generated by the transaction to the economic benefit that the transaction could be reasonably expected to generate, as well as the fact that the exposure to risk is limited in a Son of Boss transaction, are significant factors indicating that the principal, if not sole, purpose for engaging in a Son of Boss transaction is the tax reduction generated by the transaction.

It follows from this that the Service may recast either by, among other things, treating the offsetting option positions as though they were not contributed to the partnership or reducing the partners' bases in their partnership interests to reflect the net investment in the offsetting option positions. In either case, the purported tax loss generated by the Son of Boss transaction will be eliminated.

3. Individual taxpayers may not claim losses from investments in partnerships unless such investments are made with an economic profit objective.

Section 165(a) allows as a deduction any loss sustained during the year and not compensated by insurance or otherwise.

Losses claimed by individuals, other than casualty losses, are limited by § 165(c) to (1) losses incurred in a trade or business and (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business. The requirements of § 165(c)(2) were applied

to certain straddle transactions in Fox v. Commissioner, 82 T.C. 1001 (1984). The Tax Court there found that § 165(c)(2) required that the taxpayer enter into the transaction "primarily for profit." 82 T.C. at 1019-21. See also Dewees v. Commissioner, 870 F.2d 21, 33 (1st Cir. 1989), and the cases cited therein. This "primarily profit" motive test has its origins in the Supreme Court decision, Helvering v. National Grocery Co., 304 U.S. 282 (1938), which interpreted a predecessor of § 165(c).

The application of § 165(c) does not require a finding that the transaction lacks economic substance. For example, the Tax Court in Fox found that because the taxpayer did not meet the requirements of § 165(c)(2), it did not have to find that the transaction was a sham. See also Smith v. Commissioner, 78 T.C. 350 (1982), aff'd without published opinion, 820 F.2d 1220 (4th Cir. 1987), where the Tax Court found certain straddles not to be shams, but at the same time disallowed the resulting losses because the taxpayers lacked the requisite economic profit objective under § 165(c)(2). In applying § 165(c), we may look to the individual taxpayer's motivation for entering the partnership, see Howell v. Commissioner, 41 T.C. 13 (1963), aff'd, 332 F.2d 428 (3d Cir. 1964), or we may look at the motivation for entering the specific transactions. See Andros v. Commissioner, T.C. Memo 1996-133.

If an individual invests in a Son of Boss transaction, any loss generated either through the disposition of the partnership interest or through the disposition of assets distributed to the individual in complete liquidation of the individual's partnership interest may be limited or denied under § 165(c)(2) because of the lack of an economic profit objective.

4. The losses that a taxpayer sustains and deducts are limited by § 465 to the amount for which the taxpayer is at risk.

Section 465(a)(1) provides that in the case of an individual engaged in an activity identified in § 465(c), any loss from the activity for the taxable year is allowed only to the extent of the aggregate amount with respect to which the taxpayer is at-risk for such activity at the close of the taxable year. Section 465(c)(3) provides that § 465 applies to each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.

Section 465(b)(1) provides that a taxpayer is considered at-risk for an activity with respect to amounts including the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity and amounts borrowed with respect to such activity. Under § 465(b)(2), a taxpayer is considered at risk for an activity with respect to amounts including amounts borrowed for use in an activity to the extent that the taxpayer either is personally liable for the repayment of such amounts, or has pledged property, other than property used in such activity, as security for such borrowed amount.

Section 465(b)(4) provides that notwithstanding the other provisions of § 465, a taxpayer is not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. Under

44

§ 465(b)(4), the legislative history provides that in evaluating the amount at-risk, it should be assumed that a loss-protection guarantee, repurchase agreement or other loss limiting mechanism will be fully paid to the taxpayer. Id. (citing S.Rep. No. 938, 94th Cong., 2d Sess. 50 n.6 (1976)); see also, Moser v. Commissioner, 914 F.2d 1040 (8th Cir. 1990) (A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of [465(b)(4)].; Levien v. Commissioner, 103 T.C. 120 (1994)).

The case law is not in complete accord on this issue. In Emershaw v. Commissioner, 949 F.2d 841, 845 (6th Cir. 1991), the court adopted a worst-case scenario approach and determined that the issue of whether a taxpayer is "at risk" for purposes of § 465(b)(4) "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt." quoting Levy v. Commissioner, 91 T.C. 838, 869 (1988).

In contrast, the Second, Eighth, Ninth, and Eleventh Circuits look to the underlying economic substance of the arrangements under § 465(b)(4). Waters v. Commissioner, 978 F.2d 1310, 1316 (2nd Cir. 1992) (citing American Principals, 904 F.2d at 483; Young v. Commissioner, 926 F.2d 1083, 1089 (11th Cir. 1991); Moser, 914 F.2d at 1048-49.) The view, as adopted by the Second, Eighth, Ninth, and Eleventh Circuits is that, in determining who has the ultimate liability for an obligation, the economic substance and the commercial realities of the transaction control. See Waters, 978 F.2d at 1316; Levien, 103 T.C. 120; Thornock v. Commissioner, 94 T.C. 439, 448 (1990), Bussing v. Commissioner, 89 T.C. 1050, 1057 (1987). To determine whether a taxpayer is protected from ultimate liability, a transaction should be examined to see if it "is structured - by whatever method - to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." American Principals, 904 F.2d at 483, see Young, 926 F.2d at 1088, Thornock, 94 T.C. at 448-49, Owens v. United States, 818 F. Supp. 1089, 1097 (E.D. Tenn. 1993), Bussing, 89 T.C. at 1057-58. "[A] binding contract is not necessary for [465(b)(4)] to apply." American Principals, 904 F.2d at 482-83. In addition, "the substance and commercial realities of the financing arrangements presented . . . by each transaction" should be taken into account under § 465(b)(4). Thornock, 94 T.C. at 449. To avoid the application of § 465(b)(4), there must be more than "a theoretical possibility that the taxpayer will suffer economic loss." American Principals, 904 F.2d at 483.

In presenting a § 465 argument, it is important that the Service address Laureys v. Commissioner, 92 T.C. 101 (1989), nonacq. 1990-2 C.B. 1. Laureys dealt with an individual who traded straddles rather than options. The Laureys Court limited the application of § 465(b)(4) in cases involving straddles on the basis that a separate regime exists for the regulation of straddle transactions and that it is unlikely that Congress intended to include straddles in the term "similar arrangement" given the other provisions of the Code regulating straddles.

For three reasons, the Service may assert § 465(b)(4) in Son of Boss cases even in light of Laureys. First, depending on the facts of the case, the virtually offsetting option positions may not constitute a straddle. Section 1092 provides that the term straddle means offsetting option positions with respect to actively traded personal property. In some cases, the economically offsetting option positions may not meet the definition provided in § 1092(c) or may qualify for an exception provided in § 1092(d) or the regulations.

Second, even if the option positions do constitute a straddle, the loss which the Son of Boss transaction generates is not the type of loss to which § 1092 is directed. Section 1092 addresses the timing of recognition of the loss generated on one leg of a straddle. The loss generated in a Son of Boss transaction is related to the artificial increase in a partner's outside basis. In this way, Laureys is not applicable to the Son of Boss transaction.

Third, the Service has a longstanding position that the decision in Laureys with regard to § 465(b)(4) is erroneous. See nonacq. at 1990-2 C.B. 1. Thus, even in cases in which the virtually offsetting option positions constitute a straddle, the Service will challenge the Laureys Court's holding that § 465(b)(4) does not apply to straddle transactions.

In a Son of Boss transaction, the investor purchases and writes economically offsetting option positions and contributes the option positions to a partnership. The effect of this structure is that through the partnership, the investor in a Son of Boss transaction is exposed to risk only to the extent of the cash contributed and the difference between the premium paid for the purchased option and the premium received for the written option. Because the values of the options move in opposite directions in economically offsetting amounts, the amount that can be lost by an investor in a Son of Boss transaction is fixed at the time the options are written and purchased. Which one of the offsetting options finishes in the money is irrelevant to determining the maximum amount that the investor can lose. As a result, in Son of Boss cases, the Service will treat the economically offsetting option positions as an arrangement under § 465(b)(4) to limit the taxpayers' exposure to risk of loss.

This notice may be updated in accordance with future published guidance.

If you have any questions concerning this notice, please contact James M. Gergurich, Passthroughs and Special Industries, at (202) 622-3070.

/s/
HEATHER MALOY
Associate Chief Counsel
(Passthroughs & Special Industries)

## Tax Avoidance Using Artificially High Basis

## Notice 2000–44

In Notice 99–59, 1999–52 I.R.B. 761, the Internal Revenue Service and the Treasury Department described certain transactions that were being marketed to taxpayers for the purpose of generating artificial tax losses. This notice concerns other similar transactions that purport to generate tax losses for taxpayers.

As stated in Notice 99–59, a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. See *ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017 (1999) ("Tax losses such as these . . . which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); § 1.165–1(b) of the Income Tax Regulations ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.").

Notice 99–59 describes an arrangement that purported to give rise to deductible losses on disposition of stock by applying the rules relating to distributions of encumbered property to shareholders in order to create artificially high basis in the stock. The Service and the Treasury have become aware of similar arrangements that have been designed to produce noneconomic tax losses on the disposition of partnership interests. These arrangements purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests.

One variation involves a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness. As an example of this variation, a taxpayer may receive $3,000X in cash from a lender under a loan agreement that provides for an inflated stated rate of interest and a stated principal amount of only $2,000X. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness. The partnership thereafter engages in investment activities. At a later time, the taxpayer sells the partnership interest.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership that is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under § 752 of the Internal Revenue Code. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. In this example, the taxpayer purports to have a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer has incurred no corresponding economic loss.

In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes. The purported tax benefits from these transactions may also be subject to disallowance under other provisions of the Code and regulations. In particular, the transactions may be subject to challenge under § 752, or under § 1.701–2 or other anti-abuse rules. In addition, in the case of individuals, these transactions may be subject to challenge under § 165(c)(2). See *Fox v. Commissioner*, 82 T.C. 1001 (1984). Furthermore, tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions for federal income tax purposes.

Appropriate penalties may be imposed on participants in these transactions or, as applicable, on persons who participate in the promotion or reporting of these transactions, including the accuracy-related

DEFENDANT'S EXHIBIT

47

penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

Transactions that are the same as or substantially similar to the transactions described in this Notice 2000-44 are identified as "listed transactions" for the purposes of § 1.6011-4T(b)(2) of the Temporary Income Tax Regulations and § 301.6111- 2T(b)(2) of the Temporary Procedure and Administration Regulations. See also § 301.6112-1T, A-4. It should be noted that, independent of their classification as "listed transactions" for purposes of §§ 1.6011-4T(b)(2) and 301.6111-2T(b)(2), the transactions described in this Notice 2000-44 may already be subject to the tax shelter registration and list maintenance requirements of §§ 6111 and 6112 under the regulations issued in February 2000 (§§ 301.6111-2T and 301.6112-1T, A-4), as well as the regulations issued in 1984 and amended in 1986 (§§ 301.6111-1T and 301.6112-1T, A-3). Persons required to register these tax shelters who have failed to register the shelters may be subject to the penalty under § 6707(a) and to the penalty under § 6708(a) if the requirements of § 6112 are not satisfied.

In addition, the Service and the Treasury have learned that certain persons who have promoted participation in transactions described in this notice have encouraged individual taxpayers to participate in such transactions in a manner designed to avoid the reporting of large capital gains from unrelated transactions on their individual income tax returns (Form 1040). Certain promoters have recommended that taxpayers participate in these transactions through grantor trusts and use the same grantor trusts as vehicles to realize the capital gains. Further, although each separate capital gain and loss attributable to a portion of a trust that is treated as owned by a grantor under the grantor trust provisions of the Code (§ 671 and following) is properly reported as a separate item on the grantor's individual income tax return (see § 1.671-2(c) and the Instructions to Form 1041, U.S. Income Tax Return for Estates and Trusts), the Service and the Treasury understand that these promoters have advised that the capital gains and losses from these transactions may be netted, so that only a small net capital gain or loss is reported on the taxpayer's individual income tax return. In addition to other penalties, any person who willfully conceals the amount of capital gains and losses in this manner, or who willfully counsels or advises such concealment, may be guilty of a criminal offense under §§ 7201, 7203, 7206, or 7212(a) or other provisions of federal law.

The principal authors of this notice are David A. Shulman of the Office of Associate Chief Counsel (Passthroughs and Special Industries) and Victoria S. Balacek of the Office of Associate Chief Counsel (Financial Instruments and Products). For further information regarding this notice, contact Mr. Shulman at (202) 622-3080 or Ms. Balacek at (202) 622-3930 (not toll free calls).

---

## List of Plants, Grown in Commercial Quantities in the United States, Having a Preproductive Period in Excess of Two Years Based on the Nationwide Weighted Average Preproductive Period for Such Plant

## Notice 2000-45

PURPOSE

This notice provides guidance to taxpayers engaged in the trade or business of farming in determining whether a plant has a preproductive period in excess of 2 years for purposes of § 263A(d) of the Internal Revenue Code. This guidance is derived from the nationwide weighted average preproductive period for various plants grown in commercial quantities in the United States.

BACKGROUND

Section 263A requires generally that the direct costs and an allocable share of indirect costs of real or tangible personal property produced by a taxpayer be capitalized. Under § 263A, taxpayers generally are required to capitalize the costs of producing property in a farming business (including animals and plants without regard to the length of their preproductive period).

Sections 263A(d) and (e) set forth special rules for property produced in the trade or business of farming. Under § 263A(d)(1) and § 1.263A-4(a)(2) of the Income Tax Regulations, taxpayers neither required by § 447 to use an accrual method nor prohibited by § 448(a)(3) from using the cash method ("qualified taxpayers") are not required to capitalize the costs of producing plants that have a preproductive period of 2 years or less or animals. In addition, under § 263A(d)(3) and § 1.263A-4(d), a qualified taxpayer may elect to have § 263A not apply to the cost of producing plants in a farming business. Thus, unless an election is made to have § 263A not apply in accordance with § 263A(d)(3), qualified taxpayers generally are required to capitalize the costs of producing plants that have a preproductive period in excess of 2 years.

Section 263A(e)(3)(B) and § 1.263A-4(b)(2)(i)(B) provide that, for purposes of determining whether a plant has a preproductive period in excess of 2 years, the preproductive period of plants grown in commercial quantities in the United States must be based on the nationwide weighted average preproductive period for such plants. The legislative history of § 263A explains that Congress expected the Treasury Department to periodically publish a list of the preproductive periods of various plants based on the nationwide weighted averages for such plants. *See* H.R. Rep. No. 426, 99th Cong., 1st Sess. 628 (1985), 1986-3 (Vol. 2) C.B. 628. A proposed list was included in the preamble of the proposed § 1.263A-4 regulations (62 FR 44542). The Internal Revenue Service and Treasury Department received and considered comment letters relating to this proposed list.

Based upon information provided by the United States Department of Agriculture, the Service Treasury Department have determined that plants producing the following crops or yields have a nationwide weighted average preproductive period in excess of 2 years:

almonds, apples, apricots, avocados, blackberries, blueberries, cherries, chestnuts, coffee beans, currants, dates, figs, grapefruit, grapes, guavas, kiwifruit, kumquats, lemons, limes, macadamia nuts, mangoes, nectarines, olives, oranges, papayas, peaches, pears, pecans, persimmons, pistachio nuts, plums, pomegranates, prunes, raspberries, tangelos, tangerines, tangors, and walnuts.

FROM THE OFFICE OF PUBLIC AFFAIRS

August 11, 2000
LS-831

## TREASURY SHUTS DOWN "SON OF BOSS" ABUSIVE TAX SHELTER

The Treasury Department and the Internal Revenue Service on Friday issued a notice to shut down another abusive tax shelter that is being marketed and sold. This new scheme is similar in design to the so-called Bond and Option Sales Strategy, or BOSS tax shelter, which the Treasury and IRS shut down last December with Notice 99-59.

"Despite these steps, the use of abusive tax schemes will continue to unfairly raise the tax burden on the American people," Treasury Secretary Lawrence H. Summers said. "Until we have an overall legislative solution in place, we are sure to see further generations of this and other abusive tax shelters."

As in the BOSS shelter, this new scheme uses a series of contrived steps (in this case involving interests in a partnership) to generate artificial tax losses designed to offset income from other transactions. Notice 2000-44 issued today would deny taxpayers the purported losses resulting from this shelter transaction because they do not represent bona fide losses reflecting actual economic consequences as required under the tax law. The notice informs taxpayers and promoters that appropriate penalties may be imposed on participants in these transactions. The notice also warns that taxpayers and promoters who participate in these transactions and willfully conceal their efforts on tax returns may be subject to criminal penalties.

**Background**

In one variant of this transaction, a taxpayer purchases a call option and simultaneously writes a similar offsetting call option. The offsetting option positions are then transferred to a partnership. Under the position advanced by the promoters of this arrangement, the taxpayer purports to have a positive basis in the partnership interest equal to the cost of the purchased call options, even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. This is because they claim that the taxpayer's basis in the partnership interest is not reduced for the partnership's assumption of the taxpayer's obligation with respect to the written call options. This artificially high tax basis in the partnership is then used to claim deductible losses (that can be used to shelter other income) by immediately selling the taxpayer's partnership interest, even though the taxpayer has incurred no corresponding economic loss.

DEFENDANT'S EXHIBIT
4

49

LAW.COM

Select 'Print' in your browser menu to print this document.

©2003 Law.com
Page printed from: http://www.law.com

---

Back to Article

**Helter Shelter**

Paul Braverman
The American Lawyer
12-05-2003

James Haber made a business proposal to Paul Daugerdas in 1997. Haber is president of The Diversified Group Inc. (DGI), a New York company that makes and sells tax shelters. At the time, Daugerdas was a partner in the tax department at Chicago's Altheimer & Gray. The two had known each other since the early 1990s.

Haber had an idea for a tax shelter that he wanted Daugerdas to help create. Daugerdas expressed interest. Haber sent him some materials about the shelter so he could "get comfortable" with the deal.

The two subsequently entered into a business arrangement, described by Haber this way: Daugerdas would work with Haber to develop and sell the shelter, eventually called COBRA. Daugerdas would then write opinion letters for the buyers, giving them legal backing for the deal. The pair would split the profits fifty-fifty. When asked later what Daugerdas thought about the arrangement, Haber recalled, "I believe he said 'that sounds reasonable' to him, because he is 'a reasonable man.' He often said that."

The venture seems to have been a success. In 1997 Haber wrote to Daugerdas: "I want to express my sincere and heartfelt gratitude for the manner in which we have worked together over the past year. I greatly appreciate the mutual respect and trust that we have developed for each other, and look forward to greater successes with you in the future."

But in 2000 DGI sued Daugerdas, claiming that he was using DGI's idea but not giving DGI its cut. Daugerdas, who had since moved to Jenkens & Gilchrist, responded that no agreement prohibited him from using the shelter, adding that it was based on a nonproprietary strategy that anyone familiar with the tax code could figure out.

Defining Daugerdas' role became a key issue in the case. At his deposition, Haber referred to Daugerdas as both his "marketing partner" and his lawyer. "We would have conversations at least weekly, maybe more frequently, in which we would discuss where we were in the marketing of that particular idea," testified Haber.

DEFENDANT'S EXHIBIT 5

50

For his part, Daugerdas denied that he was either a "tax shelter salesman" or DGI's lawyer. Any money he made on the deal, he testified, was from fees paid by people for whom he wrote opinion letters.

The case settled in 2001 after a payment by Jenkens' malpractice carrier, and most of the case file was sealed. Last summer *The American Lawyer* asked Judge Shira Scheindlin of the Southern District of New York to unseal the record. The motion was granted. This article is based, in part, on documents obtained as a result of that motion.

It's no wonder Haber wanted a piece of the action. Daugerdas' efforts resulted in the sale of at least 600 COBRA-style shelters while he was at Jenkens. Sources at the Internal Revenue Service and the U.S. Department of Justice, both of which are investigating Daugerdas, estimate that the fees he charged ran into the hundreds of millions. Some of those fees were paid to Treasurex Financial Ltd., a corporation controlled by Daugerdas that, he would later testify, no one at Jenkens knew about at the time.

Several of the people who bought a COBRA (which stands for Currency Options Bring Reward Alternatives) are now suing Daugerdas and Jenkens, claiming that the shelter was a mere gimmick cooked up to avoid taxes, not the kind of legitimate technique they had been assured would pass muster in court. The IRS says that a COBRA is the "same or substantially similar" to an earlier, discredited shelter. Independent experts who reviewed Jenkens' own descriptions of the shelter at the request of *The American Lawyer* reached the same conclusion.

The plaintiffs also allege that Daugerdas, because he had a stake in both making and selling shelters, violated his professional ethics when he advised them to buy it. Ethics experts contacted by *The American Lawyer*, relying on materials prepared by the IRS and the plaintiffs, reached similar conclusions.

The government is looking into Daugerdas' actions as well. For more than a year, the IRS has been serving summonses (the rough equivalent of subpoenas from other agencies) on Jenkens, seeking the names of people who bought a COBRA. The firm has refused to provide those names, and the matter is currently in federal court in Illinois. The IRS is also trying to find out if Jenkens has been complying with rules that require tax shelter promoters to register their products and keep lists of their clients.

The litigation risks facing the firm were magnified in September when the firm's malpractice insurance carrier filed a declaratory judgment action, claiming that it's not liable for any further damages arising out of the tax shelter controversy.

A firm spokesman said Daugerdas declined repeated requests for an interview. The spokesman said that Daugerdas "continues to believe the tax advice was sound." He added that the private lawsuits are "without merit" and that the attorney-client privilege requires the firm to resist the IRS's summonses, but the firm refused to discuss any particulars regarding Daugerdas' tax work.

Before the mid-1990s, lawyers in big firms such as Jenkens didn't work on tax shelters. To this day, traditional tax practitioners scorn the practice, casting shelter lawyers as salespeople peddling a dubious product. They try to draw a sharp line between that business and their own work -- giving individualized advice about corporate transactions. Tax shelter lawyers are "a different breed, different by experience, temperament, reputation, and calling," is the way Peter Canellos of Wachtell, Lipton, Rosen & Katz, a leader of the old school, put it in a 2001 article in the *Southern Methodist University Law Review*.

But a new generation of tax lawyers has blurred the line. They work closely with tax shelter "promoters" -- accounting firms, investment banks and insurance companies -- to organize and sell shelters. They may still be a minority of the tax bar, but their number has been growing steadily since the mid-1990s, and they now occupy positions of prominence at top firms. DGI, for example, worked on tax shelters with Sidley Austin Brown & Wood and Proskauer Rose, as well as Altheimer and Jenkens.

It would be hard to overstate the magnitude of their work. Shelters have become commonplace, spreading beyond the *Fortune* 500 companies that have been using esoteric tax schemes for the past decade, to smaller companies and wealthy individuals. A recent report by an IRS consultant estimated that illegal tax shelters cost the government $14 billion to $18 billion in lost revenue in 1999.

Daugerdas is a leading figure in this new generation. Former partners of his at Altheimer (since defunct) and Jenkens paint the picture of an aggressive lawyer who has been working to transform the once-staid tax practice since 1994, when he left accounting giant Arthur Andersen LLP and joined Altheimer.

At the time Daugerdas made the jump, most of the shelters being sold were fairly conservative. The customers were mostly major corporations, and they had in-house legal staff and outside counsel on retainer to review any proposed deals. Those lawyers tended to shy away from aggressive schemes, and their reluctance to sign off on cutting-edge maneuvers usually killed the sale, because a company wouldn't close a deal without a favorable opinion letter from tax counsel. And if its regular tax counsel refused, a corporation usually had difficulty finding another firm to write an opinion. As a rule, big-firm lawyers wouldn't give opinions to companies with whom they didn't have a relationship.

The reluctance of others was a business opportunity for Daugerdas. When he joined Altheimer, the firm had a traditional tax practice, where tax lawyers handled the relevant end of business transactions that originated elsewhere in the firm. That work had little appeal for Daugerdas, according to former Altheimer partners. "He was interested in the business-generation side of the business, and in project-oriented billing, not charging by the hour," says Laurence Bronska, who was on Altheimer's steering committee.

Daugerdas changed the focus to a "tax products" practice. A products practice essentially inverts the customary lawyer-client relationship, where a client needing legal advice or services goes to a lawyer who charges for his or her time. The "products" lawyer creates something, then goes looking for someone to buy it. Accountants had been doing this for years, but the practice put Altheimer on the cutting edge among law firms. Daugerdas eventually became chairman of the tax department.

The new practice meant a new, aggressive approach to marketing. Referring to one shelter sold by Daugerdas while he was at Altheimer in 1996, which involved the short sale of securities from the U.S. Department of the Treasury, Haber testified:

"The Internal Revenue Service issued two revenue rulings directly on point in 1995 relevant to the use of Treasuries and the short sale of Treasuries in transactions similar to the one that Paul was using. So, from a marketing perspective, he was marketing directly opposed to revenue rules. It is my understanding that if he is not the only [lawyer] in the country that would have rendered a more-likely-than-not tax opinion involving the short sale of the Treasuries, then he certainly was, then he was certainly within only two or three that would have."

52

A lawyer gives a "more-likely-than-not" opinion if he or she believes a court is likely to approve the shelter. Sheldon Pollack, a professor of business law at the University of Delaware and a leading expert on tax shelters, reviewed a description of the shelter in an opinion by Judge Scheindlin. "Daugerdas took a position directly contrary to that of the IRS, as well as an old decision of the Supreme Court from 1940," says Pollack. "And he claims it was 'more likely than not' that the investor would prevail if challenged by the tax authorities? Amazing."

Questions raised about the shelter's legitimacy also touch on what his accusers say were Daugerdas' multiple roles. Daugerdas, they say, acted as both lawyer and promoter, and the dual role resulted in conflicts of interest. However that claim is decided, the DGI material makes clear that Daugerdas has been performing the same roles for many years. According to sworn testimony by DGI president Haber, Daugerdas was working with DGI to create and sell shelters, then writing opinion letters for the buyers, as far back as 1996.

An opinion letter is an essential part of virtually every tax deal. Generally speaking, there are two types. One is written by a lawyer working for the taxpayer who uses the shelter. It is written at the close of the deal and specifies the tax treatment that person should expect to receive (i.e., it's "more likely than not" that a court will approve the shelter). It's these letters that are the source of much of the controversy surrounding Daugerdas. The second type of opinion is written by a lawyer hired by a promoter to help build the shelter. Called a "marketing letter," it not only gives the lawyer's view about the validity of the shelter, it is also used as a sales tool with potential buyers.

Until a few years ago, it was unheard of for the same lawyer to write both a marketing letter and a final opinion letter. Ethics experts contacted by *The American Lawyer* say the practice improperly conflates the role of "lawyer" with that of "promoter."

Daugerdas made a lot of money at Altheimer, but his work made the firm's leaders nervous. So when he began agitating for more, Altheimer didn't fight hard to keep him. "He was entitled to a lot more than he got," says one former partner. "But, to their credit, firm management had qualms about his practice."

In 1998, according to Jenkens chairman William Durbin Jr., Daugerdas and some other Altheimer lawyers read an article in *The National Law Journal* that billed Jenkens as the fastest-growing firm in the country. They called the firm, and a few months later Jenkens' Chicago office was born. At some point, DGI opened a Chicago office in the same building. Among the lawyers making the jump from Altheimer were Donna Zak Guerin and Erwin Mayer. Along with Daugerdas, they are the central figures in Jenkens' tax shelter practice, according to the IRS. They also declined requests for interviews.

Former Jenkens partners Stephen Fox of Dallas and Keith McGlamery of Washington, D.C., say the firm knew Daugerdas' practice was unusual, and that there were concerns about potential liabilities when he was hired. But after discussions pro and con, the firm decided to go ahead. Firm chairman Durbin confirms that Daugerdas received "special attention," but declines to offer specifics.

From the start, Daugerdas was the focal point of the Chicago office. "The office was built on his visions, his ideas," says Michael Nutter, who was an associate in the office and is now with Michael Best & Friedrich. Until last spring Daugerdas was the managing shareholder in Chicago. He has also identified himself as the head of the Structured Investment Practice and the Tax & Estate Planning Group, although a firm spokesman says he doesn't currently hold any of those positions.

53

Daugerdas, a resident of the fancy North Shore suburb of Wilmette, not only set the business agenda, he was also the office's most visible personality; a big, gregarious guy with strong opinions and a willingness to express them. He pushed for a commitment to pro bono work and was very active in local charities, such as the Make-A-Wish Foundation of Illinois, where he is chairman of the board. He frequented charity auctions and gave purchases to associates, recalls Nutter, who once received a pair of courtside seats to a Chicago Bulls basketball game.

Soon after Daugerdas got to Jenkens, according to his testimony, he started selling a shelter he called COBRA. (Slight variations on the same shelter go by different names. DGI, which claimed it had invented the shelter, called it Option Partnership Strategy. According to the IRS, they're both similar to a discredited transaction it calls "son of BOSS," which in turn is a variation on Bond and Option Sales Strategy [see "The Cobra Uncoiled"]).

COBRA was a team effort. Members included accountants Ernst & Young, L.L.P.; KPMG L.L.P.; and BDO Seidman, LLP, according to the IRS. On board to handle the necessary currency options was Deutsche Bank Securities Inc. These firms weren't clients of Daugerdas, they were co-promoters, according to E&Y partner Robert Coplan. E&Y has been named as a defendant in each of the suits brought against Jenkens. In an unrelated action, that firm recently entered into a $15 million settlement with the IRS after an investigation of its tax shelter work.

The division of labor was clear, according to E&Y's Coplan: Daugerdas was responsible for creating the shelter, and he took lead responsibility for putting each one together. The accountants were salespeople. Daugerdas had been selling the shelter before E&Y got involved, according to Coplan. And each time one was sold, Jenkens created the necessary entities and filed the paperwork, according to Coplan and people who bought the shelters. The division of labor was also reflected in the fees -- 3 percent of the promised business loss for Daugerdas, 1.5 percent to the accounting firm.

COBRA was a hit. The shelter is designed to offset capital gains, and many people were getting big ones, thanks to the tech explosion and the late-1990s stock market bubble. The accounting firms were perfectly situated to identify those customers.

Details are available about 11 shelters, as a result of the IRS investigation and the lawsuits filed against Jenkens and Daugerdas. Those 11 shelters were supposed to produce business losses totaling $173.8 million. To get those deductions, the buyers, all of whom say they never met or even spoke to Daugerdas or any other Jenkens lawyer, paid him a total of about $5 million in fees.

Those numbers represent a small fraction of Daugerdas' tax shelter business. Between 1999 and 2002 Daugerdas handled at least 600 shelters, according to an audit Jenkens conducted of its files pursuant to an IRS summons, and the IRS says it has "reason to believe" he handled 100 more on top of that. Those shelters generated hundreds of millions in fees and billions of dollars in tax savings, according to sources at the IRS, which is currently questioning the legitimacy of those savings.

David Deary of Shore Deary in Dallas and Blair Fensterstock of New York have, between them, spoken with about 70 of these COBRA buyers. Both have suits pending against Daugerdas and Jenkens. The lawyers tell remarkably similar stories when talking about people who bought the shelter:

54

- Buyers were required to use Jenkens, the firm that created the shelter. E&Y insisted that each sign a confidentiality agreement not to disclose the marketing materials to anyone except "internal personnel," a group that didn't include independent tax lawyers. For Jenkens, people who wanted to use COBRA were a captive market.

- They each received a nearly identical opinion letter. Like most shelters, once the COBRA structure was completed and a template opinion letter was written, setting up each additional shelter required little new work.

- They each paid a fee to Jenkens equal to 3 percent of the promised tax loss.

Henry Camferdam is a typical plaintiff. Now represented by Deary in a suit against Daugerdas and Jenkens, Camferdam is an Indiana businessman who sold his software company in August 1999 for about $70 million. A few months later, he got a call from an E&Y representative who told him that the firm had a plan that would make that capital gain disappear. Camferdam agreed to a meeting at the E&Y offices in Indianapolis.

When he arrived, the first order of business was the execution of very restrictive confidentiality agreements. "They acted like it had been cooked up in an underground lab in North Dakota. They were paranoid about somebody else finding out about it," says Camferdam. He was then shown an hour-long PowerPoint presentation extolling the virtues of a COBRA, and he was given a form to fill out, asking how much of a loss he wanted to create.

Camferdam says he was initially skeptical. But E&Y had been acting as auditors and consultants for him and his company for years. "I knew them, I trusted them," he says. A key selling point, says Camferdam, was that the shelter was backed up by an opinion from a leading law firm -- Jenkens. The E&Y representatives told him that the opinion would be "insurance" in the case of an audit, meaning that he wouldn't be penalized if the IRS disallowed the shelter. Brown & Wood (now Sidley Austin Brown & Wood) would supply a second opinion "just to make sure."

Camferdam says he hadn't heard of Jenkens, but there was never a question about which law firm to use. Like most COBRA buyers, Camferdam didn't have a large legal staff or a team of tax lawyers on retainer to review the transaction. (Few lawyers could understand the mind-numbingly complex details of the transaction, anyway.) He says E&Y refused to let a tax specialist from Camferdam's regular firm, Indianapolis' Ice Miller, even look at the shelter. Nor would they let him make copies of the paperwork to take with him.

A few days after seeing the presentation, Camferdam again met with the E&Y representatives, signed all the necessary paperwork, and the deal was under way. A few weeks later, he wired slightly more than $2 million to Jenkens.

As Camferdam describes the sales pitch, what's most remarkable is what he says he was not told. He was not told that Jenkens was offering an opinion about a shelter that it had created. He was not told that the firm had entered into a cooperative business arrangement with E&Y and Deutsche Bank that depended on the sale of those shelters for its success. He says he never met or spoke with Daugerdas or any other Jenkens lawyer.

Like Camferdam, the approximately 70 people who have consulted with Deary and Fensterstock say they've never had contact with a Jenkens lawyer. That fact is proving troublesome for the firm. Last June the firm tried to use the attorney-client privilege to fend off an IRS summons served on Wachovia Corporation seeking the identity of COBRA users. North Carolina Federal District Court Judge Lacy Thornburg rejected the argument,

ruling that Jenkens "merely sold a package [to the plaintiffs], which contained a description of the transaction and a memorandum as to the potential tax consequences. ... Nor is there any evidence that any individual taxpayer ever had so much as a conversation with an attorney at J&G."

Camferdam's deal was a small piece of a big problem. The amount of money tied up in tax shelters grew throughout the 1990s. In 1998 Stanford Law School professor Joseph Bankman created a bit of a stir when *Forbes* quoted his estimate that the government was losing $10 billion in revenue per year to illegal shelters. In 2000 Treasury secretary Lawrence Summers said that "abusive tax shelters are the most serious problem in the U.S. tax system."

Around that time the IRS began receiving anonymous, plain-paper packages. Inside were promoters' marketing materials, sent to tip off the agency about illegal shelters. An investigation began in 2000, but because it depended on voluntary cooperation from promoters, it didn't get far, according to Roland Barral, counsel to the IRS and the man in charge of the promoter side of the investigation.

In 2002 the IRS gave up on the idea of voluntary cooperation and began serving summonses. More than 100 promoters have been served, including five to eight law firms, Jenkens among them. The IRS wants to know, first, whether the firms are complying with rules that required promoters to register their shelters and keep lists of their clients. Second, the agency tried to find their clients and collect taxes that may have been wrongfully avoided.

E&Y was one of the firms that got a summons. In June 2002 the firm wrote to Camferdam, telling him that the IRS wanted the names of everyone who bought a COBRA. Did he have any objection? He did, as a matter of fact, and told the firm not to release the information. But a few months later, E&Y did so, anyway.

That December, Camferdam was notified that the IRS would be auditing his 1999 return, an audit that is ongoing today. He says the IRS told him that it's likely to declare the shelter invalid, and he may be liable for back taxes, interest and possibly penalties.

(Camferdam may find some company down at the IRS office. Promoters often use their own shelters. A firm spokesman would only say that Daugerdas declined to discuss his personal tax returns.)

Also in December 2002, Camferdam sued Daugerdas, Jenkens, E&Y, Sidley and others, seeking reimbursement of the $6 million in fees he had paid for a COBRA. Like the other plaintiffs, he has alleged conspiracy and racketeering by Jenkens, and is seeking treble damages under the Racketeer Influenced and Corrupt Organizations Act. He's also seeking reimbursement of any penalties and interest he is forced to pay the IRS.

Camferdam might find some sympathy from an influential source -- Sen. Chuck Grassley, R-Iowa, the Senate's leading proponent of tax shelter reform. In an interview about the state of enforcement, Grassley notes that the current regime leans heavily on taxpayers and lets promoters off too easily. Although he didn't refer specifically to Camferdam or Jenkens, Grassley did complain about "lawyers who sell illegitimate shelters, then go running off into the woods like snake-oil salesmen, leaving the taxpayer holding the bag."

Camferdam's suit, like virtually all pending tax shelter litigation, turns on whether the shelters had "economic substance" and a "nontax business purpose." Those judicial doctrines are designed to make sure that, even if a shelter manages to tiptoe through the

56

tax code's technicalities, it won't be considered legitimate if it's just a ploy concocted to avoid taxes.

Most shelters today involve purely financial instruments. In that context, "economic substance" is synonymous with risk -- a deal has economic substance if there's a chance that the taxpayer could lose his or her investment. Camferdam alleges that the result of his investment in currency options was preordained, hence there was no risk, hence the shelter was no good.

That issue may ultimately be decided in a courtroom. In the meantime, *The American Lawyer* asked professors Bankman and Pollack to review a summary of the transaction prepared by Jenkens. Both believe that the shelter lacks economic substance, as does the IRS and a chorus of former Treasury officials and private practitioners. Camferdam couldn't lose money, they say, because his investment was almost perfectly hedged. And although E&Y promised him that he could make money on the deal, that possibility was so remote -- especially given the fees he paid Daugerdas and the other promoters -- that no reasonable person would have done it if not for the tax benefits. In truth, say the experts, a COBRA is about nothing but saving taxes.

The professors say this conclusion was inescapable after the IRS issued notices in 1999 and 2000 holding that the shelters known as BOSS and son of BOSS were "abusive" and invalid. Referring to COBRA, Bankman says, "This is just son of BOSS in slightly different dress."

Nonetheless, one of the plaintiffs says he received a positive opinion about a COBRA in 2001. It's not clear when, if ever, Daugerdas stopped issuing those opinions. In February 2003 B. John Williams Jr., chief counsel for the IRS, told a tax panel of the Chicago Bar Association that he was "very concerned" that promoters were still selling son of BOSS-style shelters. Williams, who has since left the IRS and joined Shearman & Sterling in Washington, D.C., could not be reached for comment.

Jenkens' Durbin refuses to address the pending litigation over COBRA, saying only that it's "without merit." He adds that the tax code is ambiguous, and that the IRS is punishing people who took advantage of that ambiguity.

In addition to attacking the shelter itself, Camferdam alleges that Daugerdas' relationships with the accounting firms and Deutsche Bank compromised his independence, leaving him unfit to render an opinion about it.

*The American Lawyer* asked experts on legal ethics to review materials prepared by the IRS and the private litigants. On the basis of those documents, they concluded that Daugerdas violated the applicable rules of professional ethics. Given his participation in the joint marketing effort with the accounting firms and investment bank, they say, Daugerdas had a stake in the business of making and selling shelters. As described, that stake conflicts with the duty he owed to clients who sought his advice on whether the shelter worked. "Pretty outrageous stuff," says Tanina Rostain of New York Law School, who has written on ethics and tax shelters.

At a minimum, say the experts, a great deal of disclosure was called for. "If Jenkens created the shelter, it's opining on its own work," says Mary Daly, an ethics professor at Fordham Law School. "If you were the client, wouldn't you want to know that?"

Tax lawyers divide the world in two -- the tax bar and the tax shelter bar -- as if the twain have never met. "Two cultures," is how Andrew Berg of Debevoise & Plimpton describes it.

In that view, one culture gives considered, individualized advice about corporate transactions; the other writes what Barral of the IRS describes as "cookie-cutter" opinions that are nothing more than thinly veiled contrivances to justify a promoter's questionable schemes.

The line, however, isn't as bright as the old guard would like to think. Daugerdas may have been an early adopter, but an increasing number of lawyers have followed him. The secrecy surrounding the tax shelter business makes it hard to know who and how many. Shelters are marketed to a select group. The first step in virtually any shelter deal is the execution of very restrictive confidentiality agreements. And no one involved in a shelter transaction -- seller, buyer or lawyer -- has any interest in having the IRS find out about it.

When asked for an estimate, one old-line tax lawyer says about 20 firms in The Am Law 100 are doing tax shelter work. Stanford's Bankman puts the number closer to 10: "But you have to remember, the line has moved for everybody. Every firm, even if it hasn't stepped over the line as it's drawn today, is still doing work it wouldn't have done 10 years ago."

Barral says while relatively few law firms are actually promoting shelters, many more firms are in bed with shelter promoters, and the work has compromised their independence. Grassley refers to it as "collusion" among law firms, accounting firms and investment banks.

In those rare instances when secrecy is lifted, a surprising roster of lawyers can be found. DGI, for example, worked with Sidley and Proskauer, as well as Jenkens. A privilege log produced by the company shows communications with Davis Polk & Wardwell; Skadden, Arps, Slate, Meagher & Flom; Piper Marbury (now Piper Rudnick); and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo. Davis Polk did not return phone calls seeking comment, and the other firms denied that they ever represented DGI.

An early example of the changed nature of the tax bar was the controversy surrounding a shelter used by Colgate-Palmolive Company in 1989. As with COBRA, big promoters were involved -- Price Waterhouse (now PricewaterhouseCoopers) and Merrill Lynch & Co. Inc. Big law firms were also involved -- King & Spalding wrote a marketing letter for Merrill (author Mark Kuller, now with McKee Nelson, calls it a "technical memorandum"); Skadden defended Colgate when the IRS challenged the shelter. And, as with COBRA, the IRS found that the shelter lacked economic substance. Eleven of the shelters were sold. Some of the taxpayers settled with the IRS, some are still in court.

Why are major firms doing the tax work they used to turn away? Some responsibility lies with clients. In the 1990s corporate financial officers became more comfortable with aggressive tax positions. They balanced the upside -- savings that could run into the hundreds of millions of dollars -- against minimal risk of an audit. Taking an aggressive position became known as "playing the audit lottery," and the financial types knew the odds were stacked in their favor. They also knew that if they lost, there was little chance they'd be penalized. All they had to show was a "reasonable basis" for their position, and an opinion letter from a major law firm was almost always enough to meet that burden. Opinion letters became known as "get out of jail free cards."

So they began to ask their lawyers to take more and more aggressive positions. The requests came with an implicit threat: "If you won't do it, I'll go down the street to someone who will." The number of firms willing to say no dwindled. And as the sale of shelters moved downmarket, to smaller companies and individuals, the pool of potential

customers increased. Lawyers moved to meet the demand.

The move was made easier by the lack of deterrence from the IRS. As the number of shelters grew in the 1990s, the IRS budget was being cut, its enforcement powers curtailed. [See "Watchdog Defanged," below] Since 1992, the number of IRS tax investigations has fallen by 37 percent, and the number of prosecutions for tax crimes is down by more than half, according to a study by Syracuse University's Transactional Records Access Clearinghouse.

But there's little doubt that money is the biggest motivator. Tax shelter work is "premium billing" par excellence. Compared with traditional by-the-hour work, astonishing amounts of money can be made. Not only can fees reach into the millions for each deal, but once a shelter is put together and a template opinion letter is written, additional deals can be done as fast as they can be sold. When asked to estimate the fees Daugerdas brought in during his time at Jenkens, people at the IRS, Justice Department, and elsewhere put the number in the hundreds of millions of dollars. And the work isn't hard to find. Lots of tax lawyers get lots of calls from shelter promoters, asking them to work on their deals.

Where all that money went is another question. In 1999 Daugerdas was a new lawyer, in a new office, far from Jenkens' Dallas headquarters. Former partners McGlamery and Fox say that Daugerdas negotiated a special compensation arrangement when he joined the firm, and his revenue was tracked separately. According to them, as few as three people may have been privy to the details.

Some of those fees were paid to Treasurex, an Illinois corporation of which Daugerdas is the president. At his deposition, Daugerdas said that nobody at either Altheimer or Jenkens knew about Treasurex, agreeing with the statement that "it just wasn't something that needed to be disclosed."

The DGI case file contains five invoices with Treasurex letterhead mailed to DGI in 1998 and 1999 totaling $2.67 million. Those charges relate to a deal that took place about the time Daugerdas moved from Altheimer to Jenkens. When asked about it, he testified: "Treasurex acted as an intermediary and arranged a buyer and a seller to come together and was compensated for that. As part of the same transaction, one law firm I was associated with did corporate legal work on behalf of the purchaser, and another law firm I was associated with rendered a tax opinion to the purchaser."

But during the *DGI v. Daugerdas* case, Haber made the following declaration: "At no time did Diversified receive services from Treasurex. At no time did Daugerdas suggest to Diversified that he was performing services on behalf of Treasurex."

Durbin would say only that Treasurex is an "internal matter" and that the issue has been resolved.

Durbin also defends Jenkens' financial performance. According to the 2003 Am Law 100 survey, the firm lost 69 lawyers, and revenue dropped 5 percent from the previous year. Since those numbers were compiled, dozens more lawyers have left. Those who were interviewed say their move wasn't a result of the controversy surrounding Daugerdas, but a barrage of headlines, civil suits and government investigations isn't much of a selling point, to either clients or potential laterals. Durbin says the reduction in firm size is part of a strategic plan, and the firm's revenue and profits are exceeding projections.

Those declining numbers, along with the litigation and government investigations, have prompted much speculation about the survival of the firm among former Jenkens partners

and observers of the Dallas legal scene. That speculation is likely to intensify when word gets out that its malpractice insurance carrier, Executive Risk Indemnity Inc., brought a declaratory judgment action against the firm in federal court in Illinois at the end of September. The insurer claims that it's not liable for any damages arising from the firm's tax shelter work. It argues, first, that the policy has already been drawn on for the *DGI v. Daugerdas* settlement and, second, the policy doesn't cover the firm if it has to reimburse its customers for tax penalties and interest.

Attention has focused on the tax shelter controversy ever since Enron Corp.'s aggressive schemes were made public early this year, and the controversy surrounding Jenkens has helped keep it in the spotlight. It has also highlighted the weakness of the enforcement regime, and the need for reform.

Existing enforcement procedures are so toothless, they must look like an invitation to a lawyer considering tax shelter work. Current rules require a promoter to register certain transactions and keep lists of customers who use them. But if a promoter has a "good faith" belief that his or her shelter is different, the disclosure rules don't apply. For a tax shelter lawyer, drawing those fine distinctions is as easy as finding a free drink in Vegas.

Efforts at improvement have repeatedly run into what Sen. Grassley calls "powerful K Street interests" -- lobbyists for the law firms, accounting firms and investment banks. Bills to strengthen the economic substance doctrine, to increase disclosure and to stiffen penalties have all died on Capitol Hill. For years Grassley has been pushing a measure that would crack down on illegal shelters, but it was rejected as recently as last spring.

Some progress, however, may be in the works. Grassley's bill has once again cleared the Senate Finance Committee (for the fourth time) and will soon be considered by the full Senate. Grassley says action is expected by March. And new IRS rules tightening the disclosure requirements have taken effect.

But the new rules may cause problems of their own. Hundreds of thousands of new disclosures will pour in, according to Stanford's Bankman. For the IRS, the abusive shelters will be needles in a haystack, he says. In addition, lawyers and other promoters are likely to shift their efforts to devising shelters that avoid the disclosure requirements. Bankman compares them to a bunch of underground chemists trying to design a new recipe for Ecstasy that skirts existing drug laws.

Of course, audits, penalties and fines aren't the front line in the fight against tax cheating. In our system, people and corporations are expected to pay their fair share of taxes voluntarily, and most do. But the belief that it's the right thing to do is eroding, according to a recent IRS study. Daugerdas' practices certainly aren't helping matters.

**Editors' correction note:** Laurence Bronska was originally misidentified in an earlier version of this story. He was on Altheimer & Gray's steering committee, but was never its managing partner. We regret the error.

**Watchdog Defanged**

Congress has cut the budget of the Internal Revenue Service, with audits and prosecutions both dropping as a result.

Percentage increase in number of business tax returns filed, 1996-2001: 17

Percentage drop in IRS staff, 1996-2001: 8

Percentage drop in fraud penalties assessed, 1994-2002: 75

Percentage drop in tax prosecutions: 46

Estimated tax revenue lost as a result of abusive shelters, 1993-2002: $85 billion

Percentage drop in audits for corporations with more than 250 million in assets 1994-2002: 38

Fine paid By Ernst & Young, L.L.P., to IRS to settle shelter investigation: $15 million

Percentage drop in corporate tax revenue collected by the IRS, 1999-2002: 34

Percentage increase in number of transactions listed by the IRS as abusive, 1999-2002: 40

Estimated number of firms promoting abusive transactions: 300

Estimated number of investors, including individuals and corporations, that bought abusive shelters: 6,400

*Sources: General Accounting Office, IRS, Transactional Records Access Clearinghouse*

CERTIFICATE OF SERVICE

I certify that service of the foregoing document has, this 9th day of January 2004, been made on opposing counsel and on the tax matters partner by mailing copies thereof, in postage prepaid envelopes, to the following addresses:

David D. Aughtry, Esquire
Chamberlain Hrdlicka White
Williams & Martin
191 Peachtree Street, N.E.
Ninth Floor
Atlanta, Georgia 30303

Sentinel Advisors, LLC
Tax Matters Partner
Jade Trading, LLC
546 Fifth Avenue
New York, New York 10036

Sentinel Advisors, LLC
Tax Matters Partner
Jade Trading, LLC
68 Carman Avenue
Cedarhurst, New York 11516

Katie M. Stevens

U. S. Department of Justice
Tax Division
Court of Federal Claims Section
Post Office Box 26
Ben Franklin Station
Washington, D. C. 20044
202-307-6440