IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| KLAMATH STRATEGIC INVESTMENT FUND, LLC | § | |
| VS. | § | CIVIL ACTION NO. 5:04-CV-278 |
| UNITED STATES OF AMERICA | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to Fed. R. Civ. P. 52, the court issues the following memorandum opinion and order, which constitutes the court's findings of fact and conclusions of law.[1]

**1. Introduction.**

This case involves a tax shelter known as Bond Linked Issue Premium Structure ("BLIPS"). It is a civil action by the plaintiffs against the United States under 26 U.S.C. § 6226 for readjustment of partnership items. The court holds that the loan transactions at issue must be disregarded for federal income tax purposes. The court further holds that the taxpayers are not liable for the penalties assessed against them.

**2. Parties.**

The plaintiffs are Klamath Strategic Investment Fund, LLC ("Klamath") and Kinabalu

---

1 Before trial, the plaintiffs moved the court to impose the burden of proof on the government. The court denied that motion. In light of the evidence, however, the court would have found the same facts even if the court had granted the motion.

Case 1:03-cv-02164-MCW Document 356-2 Filed 03/28/2007 Page 2 of 35


Strategic Investment Fund, LLC ("Kinabalu").[2] Klamath was owned 90% by St. Croix Ventures, LLC ("St. Croix"), a single member limited liability company. St. Croix is owned 100% by Mr. Cary Patterson ("Patterson"). The other members of Klamath were Presidio Resources LLC, which owned 9% of Klamath, and Presidio Growth LLC, which owned 1% of Klamath. Presidio Growth LLC was the managing member of Klamath. The Presidio entities are affiliates of an independent investment advisor known as Presidio Advisory Services, LLC. Klamath is treated as a partnership for Federal Income Tax Purposes.

Kinabalu shared a similar structure. It was owned 90% by Rogue Ventures, LLC ("Rogue"). Rogue is 100% owned by Mr. Harold Nix ("Nix"). The other members of Kinabalu included Presidio Resources, LLC, which owned 9% of Kinabalu, and Presidio Growth LLC, which owned 1% of Kinabalu. Presidio Growth LLC was the managing member of Kinabalu. Kinabalu is also treated as a partnership for Federal Income Tax purposes.

## 3. Factual Background.

### A. Taxpayers.

Patterson and Nix are long-time partners in the law firm of Nix, Patterson & Roach, LLP (the "Nix firm"), located in Daingerfield, Texas. (Tr. I, 39).[3] The law firm handles primarily plaintiffs' contingency cases and enjoys a reputation for being a premier plaintiffs' trial law firm. (Tr. I, 40-

---

[2] Originally, Klamath and Kinabalu filed separate actions against the government. The court consolidated the cases into the earlier-filed proceeding. *See Kinabalu Strategic Investment Fund v. United States*, 5:04-CV-279 (E.D. Tex. 2004)(#19).

[3] Although the court's findings of fact are based on the entire record, where feasible, the court has cited to particular portions of the record which support, directly or implicitly, those findings. Citations to the testimony are made to the volume and page number of the reporter's transcript. Other citations are made to the exhibits offered by the parties.

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/23/2007 Page 3 of 35


42). The Nix firm was retained, along with a select few other Texas firms, to represent the State of Texas in a case against the tobacco industry. (Tr. I, 41). This case was similar to several filed across the country, in which the States sued various tobacco companies asserting a right to reimbursement for Medicaid expenses paid on behalf of persons suffering from illnesses allegedly caused by tobacco use. *See generally State of Texas v. American Tobacco Company, et al.*, 5:96-CV-91 (E.D. Tex.).[4]

The Texas litigation was ultimately settled, as was litigation brought by other states against the tobacco industry. Attorneys for some of the states met with various Wall Street investment firms, including Goldman Sachs and Lehman Brothers, to discuss plans for securing the large amounts of future payments that were expected from the tobacco companies in settlement of the lawsuits in various states, including Texas, Mississippi, and Florida. (Tr. I, 110-111). Patterson took part in some of these discussions and through these discussions became interested in foreign currency investments. (Tr. I, 46-47). When the Texas tobacco case was settled, Nix and Patterson, as attorneys for the state, expected to receive sizeable attorneys' fees. (Tr. I, 42). They sought out possible investment opportunities for this income.

**B. Foreign Currency Investments.**

Nix and Patterson considered investing in foreign currency transactions as high risk, high reward investments. (Tr. I, 50). Even before the tobacco settlement, Nix had previously learned that some individuals had earned large profits trading in foreign currencies. (Tr. II, 173-174). In particular, Nix knew that some individuals had earned significant profits when the Mexican Peso had devalued in the mid-1990s. (Tr. II, 173-174).

---

[4] The court takes judicial notice of the dispute underlying the tobacco litigation, as the case was filed in this district and division.

Case 1:03-cv-02164-MCW Document 356-2 Filed 03/08/2007 Page 4 of 35


Patterson, after becoming interested in foreign currency transactions, visited with Mr. Ed Cox about the benefits of foreign currency trading.[5] (Tr. I, 47). Cox was no stranger to complex investment strategies. (Tr. I, 48). He followed in the footsteps of his father, for whom the Southern Methodist University School of Business is named. (Tr. I, 48). After some general discussions with Cox, Patterson reported their discussions to Nix. (Tr. I, 49-50). Thereafter, Nix and Patterson jointly decided to pursue an investment in foreign currency trading. (Tr. I, 50).

After Nix and Patterson decided to pursue foreign currency investments, they enlisted the help of their accounting firm, Pollans & Cohen. (Tr. I, 51). Pollans & Cohen is a public accounting firm located in Beaumont, Texas. (Tr. I, 50). The Nix firm had a relationship with Pollans & Cohen and had used the firm since 1997. (Tr. I, 50). The accountants at Pollans & Cohen performed all of the accounting work for the Nix firm–both to the partnership and to certain individual partners, including Nix and Patterson. (Tr. I, 51). In addition, Pollans & Cohen had provided substantial support to the Nix firm during the development and prosecution of the State of Texas's suit against the tobacco companies. (Tr. I, 50). Pollans & Cohen had represented to Nix and Patterson that the services they could provide were more than simply accounting services. (Tr. I, 51). In particular, Pollans & Cohen stated that they could provide competent investment advice, including evaluating potential investments. (Tr. I, 51). Nix and Patterson developed a great deal of confidence in Pollans & Cohen, and relied on their expertise in financial affairs. (Tr. I, 50-51). There is no indication that Pollans & Cohen had ties to any of the other parties involved in this case, including the Presidio entities. (Tr. I, 190). Because of their confidence in Pollans & Cohen, Nix and Patterson asked the accountants to help identify a firm that specialized in foreign currency trading. (Tr. I, 50-51).

---

5 Nix also discussed investing in foreign currencies with Cox. (Tr. II, 174).

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/23/2007 Page 5 of 35


### C. Dealings with Presidio.

As requested, Pollans & Cohen began an investigation into foreign currency investment opportunities. In particular, Mr. Sid Cohen, through a contact at Arthur Andersen, identified Presidio Advisory Services ("Presidio"). (Tr. I, 167). Presidio was an investment advisory firm that purported to specialize in foreign currency trading. (Tr. I, 169). Cohen conducted due diligence into Presidio and its reputation and then made the initial contact with the firm on behalf of Nix and Patterson. (Tr. I, 167-168). Most of the contact with Presidio actually occurred through Cohen, although Nix and Patterson had some direct communication with Presidio. The primary contacts at Presidio were Messrs. John Larson and Amir Makov. Cohen sought recommendations from Larson and Makov concerning foreign currency investments. (Tr. I, 167-168).

During the summer of 1999, after Pollans & Cohen had identified Presidio and conducted some due diligence, the accountants arranged for a meeting in Houston, Texas. (Tr. I, 168). The meeting took place at the offices of Mr. Vince Foster, an investment banker familiar to Pollans because they were former partners at Arthur Andersen. (Tr. I, 54, 168). The meeting at Foster's office addressed investments with not only Presidio, but also an IPO in a company identified as U.S. Cement.[6] (Tr. I, 52-53).

At the meeting in Houston, Larson presented his investment plan to Patterson, Nix, Pollans, and Cohen. (Tr. I, 55-58). Larson explained the Presidio investment strategy and in particular the

---

6 Foster told the participants at the meeting that he believed, initially, there would be a "pretty big gain" on the IPO stock. (Tr. I, 52-53). Ultimately, Patterson also decided to invest in the IPO. (Tr. I, 53). Although the testimony reflects that the name of the company involved in the IPO was "U.S. Cement," the public filings reflect that a company named "U.S. Concrete," headquartered in Houston, Texas, completed an initial public offering on May 28, 1999. *See* Form 10Q for U.S. Concrete, filed with the SEC on August 16, 1999. The court assumes this is the company in which Patterson invested.

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 6 of 35


possibility of making a profit through the devaluation of pegged currencies.[7] (Tr. I, 55-58). Larson identified the Argentine Peso (ARS) and the Hong Kong Dollar (HKD) as potential currencies that Presidio was examining for investment opportunities. (Tr. I, 58-59). Larson explained that the Presidio strategy was a three stage, seven year program, with the risk increasing at each stage of the program. (Tr. I, 59). Although Larson discussed that there could be tax advantages in the transaction, depending on the result of the transaction, he did not communicate what they were or their magnitude. (Tr. I, 64-65). Nix and Patterson did not decide to invest with Presidio at that time. (Tr. I, 65). Instead, they instructed Pollans and Cohen to continue their due diligence into Presidio. (Tr. I, 65).

Pollans and Cohen continued to communicate with Presidio, and received various documents explaining in greater detail the particulars of the investment strategy. (Tr. I, 65). Consistent with Larson's presentation, Presidio's documents likewise described a strategy designed to profit from foreign currency investments. (P. Exh. 1, at 7). According to the documents, Presidio sought to take advantage of the changes in value to global currencies. (P. Exh. 1, at 7). In particular, the documents described an Investment Strategy in which Presidio had "structured a three stage, seven year investment program which seeks to exploit trading opportunities in the markets for foreign debt securities and currencies." (P. Exh. 1, at 4). The three stages were differentiated by the degree of risk assumed by a Fund. (P. Exh. 1, at 4). Stage I lasted 60 days and entailed relatively low risk

---

7 Some governments, ostensibly for economic stability purposes, "peg" their currencies to a more stable currency, such as the US dollar. A peg is an artificial valuation through which the foreign government provides a guaranteed exchange rate for the foreign currency. Devaluation occurs when market forces cause the peg to break, and the currency devalues to a much lower market price. The devaluation is often dramatic. Investors who attempt to take advantage of pegged currencies attempt, in effect, to short sell the currencies at or near the time the currency is expected to break its peg.

Case 1:03-cv-02164-MCW Document 356-2 Filed 03/28/2007 Page 7 of 35


investments. (P. Exh. 1, at 7). Stage II lasted from day 60 through day 180, and the risk was somewhat higher. (P. Exh. 1, at 8). Finally, Stage III extended from day 180 through the end of the seventh year. (P. Exh. 1, at 8). Presidio touted Stage III as involving the highest risk, but also allowing for the highest return. (P. Exh. 1, at 8). Reflecting the greater degree of risk, Presidio would require substantial additional infusions of capital from the investors at each stage of the Presidio plan. (P. Exh. 1, at 4). The investors, however, retained the right to exit the investment plan at the end of Stage I and at each 60 day period thereafter. (P. Exh. 1, at 5).

After Cohen reviewed the documents received from Presidio, he met with a well-known tax attorney in Houston, Mr. George Hrdlicka. (Tr. I, 173). Cohen had Hrdlicka review the tax aspects of the investment strategy. (Tr. I, 173). After discussing the entire transaction with Hrdlicka, Cohen reported back to Nix and Patterson that Hrdlicka thought the transaction was "above board." (Tr. I, 66). At that time, Nix and Patterson had a great deal of confidence in Pollans & Cohen. (Tr. I, 66). In addition, Nix and Patterson knew that Hrdlicka was from one of the premier tax firms in the South, and they accordingly believed that any tax benefits that might flow from the transaction were proper. (Tr. I, 67).

In January 2000, Nix and Patterson met with Makov in Daingerfield for approximately half a day. (Tr. I, 67-68).[8] Makov informed them he was an economist trained at Harvard and further explained certain details concerning his predictions about the Argentine Peso and the Hong Kong Dollar. (Tr. I, 67-69). During the meeting, Makov and Nix and Patterson had no discussions of tax

[8] Patterson testified that the meeting with Makov occurred in either January or February 2000. (Tr. I, 67). The written documents, however, reflect that Klamath and Kinabalu were formed on January 18, 2000. (P. Exhs. 31, 124). Accordingly, the court finds that the meeting with Makov occurred in January 2000 before Klamath and Kinabalu were formed.

issues surrounding the investments. (Tr. I, 69). Instead, the meeting was entirely devoted to the business opportunity being presented to Nix and Patterson. (Tr. I, 69).

After the meeting with Makov, Nix and Patterson discussed the opportunity and decided to pursue the investment plan with Presidio. (Tr. I, 69-70). From the time Nix and Patterson began considering foreign currency investments until the time they decided to invest with Presidio, their primary motives had been to make a profit.[9] (Tr. I, 74-75; Tr. II, 179). They recognized the risks associated with investing in foreign currency transactions; however, they also recognized that there was a potential for a very large profit return and believed that the risks were reasonable. Based on the advice received from Presidio, Pollans & Cohen, and Hrdlicka as described above, Nix and Patterson entered the transactions marketed by Presidio.

**D. The transactions at issue.**

To implement the strategy, Presidio advised Nix and Patterson to enter into various organizational and banking transactions. (Tr. I, 70-74, 130). Those transactions were complex, but an understanding of them is essential to this case. Presidio's investment strategy was performed through limited liability companies. (Tr. I, 70). Accordingly, on January 18, 2000, Presidio formed Klamath and Kinabalu as Delaware Limited Liability Companies ("LLCs"). (P. Exhs. 31, 124). Klamath and Kinabalu elected to be treated as partnerships for federal tax purposes, and were the vehicles through which Patterson and Nix participated in the investment program. On January 20, 2000, Presidio formed St. Croix for Patterson, and Rogue for Nix. (P. Exhs. 11, 104). Both St. Croix and Rogue were single member LLCs which are disregarded for tax purposes and their

[9] Patterson and Nix began considering this transaction in 1999. If they were only seeking tax benefits, then they would have entered into the transaction in 1999 (when they also had substantial income), instead of waiting until 2000.

activities are reported directly on the tax returns of Patterson and Nix.

To fund Klamath and Kinabalu, Patterson and Nix made two distinct contributions. First, through St. Croix and Rogue, Patterson and Nix contributed $1.5 million to Klamath and Kinabalu, respectively.[10] (D. Exhs. 59A, 59B). Second, on or about March 28, 2000, in separate but identical transactions, St. Croix and Rogue entered into non-recourse secured loan transactions with National Westminister Bank ("NatWest"), a foreign bank based in London. (D. Exhs. 60A, 60B). Through the transactions with NatWest, St. Croix and Rogue each received $66.7 million. (D. Exhs. 59A, 59B). The $66.7 million, referred to as the "Funding Amount" in the Credit Agreements with NatWest, was comprised of $41.7 million denominated as "Stated Principal Amount" and $25 million denominated as an "Initial Unamortized Premium amount ("premium")." (D. Exhs. 60A, 60B). The classification of the $25 million as a loan premium amount is central to this case. To facilitate the transaction with NatWest, St. Croix and Rogue executed Credit Agreements dated March 28, 2000, and Notes dated March 29, 2000. (D. Exhs. 60A, 60B, 61A, 61B). On March 29, 2000, NatWest funded the loans. (D. Exhs. 59A, 59B).

At the time of funding, the interest rate had not been determined. According to the Credit Agreements, the Interest Rate for the Stated Principal Amount was to be set at a later date by NatWest on the "Determination Date." (D. Exhs. 60A, 60B). The rate itself would be computed using a formula provided in the Credit Agreements. (D. Exhs. 60A, 60B). The parties intended the "Determination Date" to be the same date on which St. Croix and Rogue contributed the loan

---

[10] The Presidio members also made cash contributions in accordance with their respective percentages of ownership. From an investment standpoint, this was important to Nix and Patterson because it led them to believe that Presidio also had money at risk in the partnerships. (Tr. I, 72).

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 10 of 35


proceeds to Klamath and Kinabalu. (D. Exhs. 60A, 60B). This occurred on April 6, 2000, and on that date, NatWest notified St. Croix and Rogue that the interest rate on the Stated Principal amount would be 17.97%. (D. Exhs. 67A, 67B).

Also on April 6, 2000, St. Croix and Rogue contributed the proceeds from NatWest and their $1.5 million cash capital contributions to Klamath and Kinabalu, and, with NatWest's consent, assigned the loans to the partnerships. (D. Exhs. 59A, 59B, 71A, 71B). The partnerships then assumed the loans and entered into interest rate swap agreements with NatWest. (D. Exhs. 71A, 71B; P. Exhs. 53, 146). The swap agreements had a stated term of approximately seven years, and required a Final Fixed Payment (distinct from the "premium") of $25,000,000. (P. Exhs. 53, 146). The swap agreements were also made retroactive to March 29, 2000. (P. Exhs. 53, 146).

**E. Performance under the agreements.**

Klamath and Kinabalu deposited the funds received from NatWest into accounts controlled by NatWest. (Tr. III, 198, 200). The funds were used to purchase what the bank's internal documents refer to as "synthetic dollar deposits," essentially very low risk contracts on US Dollars and the Euros. (D. Exh. 299). NatWest, in turn, paid interest to Klamath and Kinabalu on those deposits, similar to interest paid on more conventional time deposits, such as certificates of deposit. (Tr. V, 14-15). The interest paid to Klamath and Kinabalu, however, was lower than the interest that Klamath and Kinabalu were obligated to pay the bank under the terms of the loans they had assumed from St. Croix and Rogue. (Tr. V, 14-15). The partnerships paid these costs, referred to as the "negative carry," out of the individual partners' original cash contributions, that were in addition to the NatWest proceeds. (Tr. III, 107).

In addition to the US Dollar and Euro "synthetic" deposits, Presidio caused the partnerships

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 11 of 35


to enter into other foreign currency trades. (P. Exhs. 53, 146). Klamath and Kinabalu made small, short term (60 to 90 day) forward contract trades in the ARS and HKD. (P. Exhs. 53, 146). In addition, Klamath and Kinabalu also engaged in a 30-day Japanese Yen option against the US dollar. (P. Exhs. 53, 146).

### F. Decision to withdraw from the partnerships.

Before the end of Stage I, Patterson and Nix decided to withdraw from Klamath and Kinabalu. To understand why Patterson and Nix withdrew when they did, one must consider briefly a development concerning one of Patterson's other investments.

Before Nix and Patterson became interested in foreign currency transactions, Patterson had invested in a local bank with a business associate, Mr. Truman Arnold. (Tr. I, 43-44). In particular, Patterson and Arnold owned stock in Century Bank of New Boston. (Tr. I, 43-44).

The federal government imposes various requirements on banks. For present purposes, it is enough to note that the Comptroller of Currency regulations require a bank to maintain a certain liquidity position. (Tr. I, 44). Significant capital calls can be made on a bank shareholder to satisfy these requirements. As the size of a bank's loan portfolio increases, so does its liquidity requirement. (Tr. I, 44).

After Nix and Patterson entered into the transactions with Presidio, Arnold visited Patterson with respect to the growth of Century Bank. (Tr. I, 79). Arnold indicated to Patterson that Arnold was certain there would be a call on the shareholders in the near future to make significant additional contributions to capital to satisfy the Comptroller of Currency's liquidity requirements. (Tr. I, 79). This was before the date that Nix and Patterson were required to decide whether to withdraw from the partnerships at the end of Stage I. (Tr. I, 78-79).

Case 1:03-cv-02164-MCW Document 356-2 Filed 03/20/2007 Page 12 of 35


As reflected above, at each stage of the investment plan, Presidio required additional capital contributions from the partners. (Tr. I, 79). With respect to Patterson and Nix, continued participation in the Presidio investment plan would require additional contributions of $750,000 each. (Tr. I, 79). As a result, Patterson became concerned about the wisdom of making an additional investment at a time when he was likely to make additional capital contributions to the bank. (Tr. I, 81). Because of this concern, when Patterson was contacted about his decision to stay in the Presidio investment for Stage II, he opted to remove himself from that investment. (Tr. I, 81). At that time, he did not have an understanding of the significant tax loss that would be generated by withdrawing at the end of the 60 day period. (Tr. I, 86).

Nix was not in the same position as Patterson, because Nix did not have to make any additional capital calls to a bank. Nevertheless, he elected to withdraw from the plan because Patterson elected to do so. (Tr. II, 183-184). Nix had strong confidence in Patterson's judgment with respect to investments outside of real estate and timber, the traditional investment vehicles used by Nix. (Tr. II, 183-184). In other words, Nix withdrew because Patterson withdrew. Like Patterson, Nix did not understand the significant tax losses that would be generated by electing to withdraw after Stage I. (Tr. II, 187). In the end, Arnold's prediction about an additional capital call was correct. In July, 2000, Patterson contributed $1,587,217.50 as additional capital to Century Bank. (Tr. I, 80; P. Exh. 60).

**G. Opinions of Counsel.**

Near the end of 2000, in a meeting with Pollans & Cohen, Patterson and Nix became aware of the significant tax losses that had been generated through their participation in the Presidio investment plan. (Tr. I, 86). They did not know the extent of these benefits until after they withdrew

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 13 of 35


from the partnerships. (Tr. I, 86; Tr. II, 187). Patterson, on behalf of himself and Nix, began investigating a law firm known as Holland & Hart to assess whether that firm could advise them as to the propriety of claiming the very large tax losses that are in dispute in this case. (Tr. I, 89). Patterson did so through other attorneys he had become familiar with in the tobacco litigation. (Tr. I, 89). In addition, as alluded to above, Cohen had sought Hrdlicka's advice at the time he originally performed due diligence into Presidio. (Tr. I, 173). Cohen had previously communicated a favorable report to Patterson, and Patterson took comfort in the fact that Hrdlicka was considered to be an outstanding lawyer on tax and investment matters. (Tr. I, 67).

In connection with Holland & Hart, Patterson was advised that the firm represented Presidio. (Tr. I, 90-91). Patterson considered whether Holland & Hart had any conflicts of interest that would preclude the firm from advising Nix and Patterson, and he satisfied himself that no conflicts existed. (Tr. I, 90-91). This is because Patterson considered his interests and Presidio's interests to be aligned with respect to the tax questions. (Tr. I, 91). Ultimately, Patterson retained Holland & Hart to write a detailed opinion letter on behalf of Patterson and Nix.[11] (Tr. I, 89). It was reasonable and necessary for Nix and Patterson to seek advice from qualified tax attorneys concerning the propriety of the transaction under the applicable law.

**H. Tax Reporting.**

On their income tax returns for 2000, 2001, and 2002, Nix and Patterson reported ordinary losses arising from their withdrawal from the partnerships. Patterson treated the 67,341.88 Euros

---

[11] Mr. Bruce Lemons was a partner at Holland & Hart who worked on the preparation of the Holland & Hart opinion. (Tr. I, 96; P. Exh. 202, at 32). Lemons left Holland & Hart before the opinion was completed. (P. Exh. 202, at 33-34). For purposes of completeness, Lemons's new firm, Olson Lemons, also provided a detailed opinion to Nix and Patterson. (Tr. I, 97; P. Exh. 202, at 34-35).

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 14 of 35


he received when he withdrew from Klamath as having a tax basis of $25,316,393, calculated as follows:

| | |
|---|---|
| Premium amount | 25,000,000 |
| Cash contribution | 1,500,000 |
| Interest Income | 91,307 |
| Advisory fee to Pollans & Cohen | 250,000 |
| Cash Distribution from Klamath Partnership | (359,635) |
| Klamath Partnership Loss | (1,165,279) |
| **Basis** | **25,316,393** |

(D. Exh. 32).

Nix calculated a similar basis in the 67,341.88 Euros distributed from Kinabalu to him through Rogue. (Tr. I, 213).

Over the course of the next three years, Nix and Patterson claimed tax losses arising from the sales of Euros distributed to them by the partnerships. (Tr. I, 213). The 67,341.88 Euros distributed to Nix and Patterson had a basis per Euro of $375.94. (D. Exh. 32). Because of the large basis in the Euros, the sales of Euros created large tax losses. (Tr. I, 213, 215). At various times during tax years 2000, 2001, and 2002, Patterson sold his Euros and claimed total losses on his tax returns of $25,277,202 from those sales as follows: $9,156,216 loss in 2000; $9,000,528 loss in 2001; and $7,120,458 in 2002. (Tr. I, 213, 215; D. Exhs. 169, 170, 171). Likewise, at various times during tax years 2000, 2001, and 2002, Nix sold his Euros and claimed total losses on his tax returns of $25,272,344 from those Euros as follows: $8,714,266 loss in 2000; $8,645,240 loss in 2001; and $7,912,838 loss in 2002. (Tr. I, 213, 215; D. Exhs. 174, 175, 176).

It is not disputed that the losses on the Euros are attributable to the claim that Patterson and Nix were not required to reduce their tax bases in Klamath and Kinabalu by the full amount of the

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 15 of 35


funds disbursed by NatWest–$66.7 million. The IRS challenged the claimed losses and, on July 19, 2004, issued Notices of Final Partnership Administrative Adjustments ("FPAAs") to Klamath and Kinabalu proposing to deny the tax benefits claimed to have been generated by the participation in Presidio's investment plan. (D. Exhs. 167, 168). The IRS determined that the partners should have treated the entire $66.7 million Funding Amount (including the premium) received from NatWest as a liability. Had the partners treated the entire Funding Amount as a liability, they would have had to reduce their basis in the Euros accordingly. Alternatively, the IRS urged that the transactions were shams or lacked economic substance and should be disregarded for tax purposes. The court's summary judgment ruling determined that the tax treatment and accounting technically complied with Section 752 and that the IRS could not give a recent regulation retroactive effect. At issue still is whether the transactions were shams or lacked economic substance and, if so, whether penalties are proper.

## 4. Legal Principles.

### A. Tax liability issues.

#### 1. General Rules.

It is a first principle of tax law that taxpayers are entitled to structure their business transactions in a manner that produces the least amount of tax. *See Compaq Computer Corp. v. Comm'r*, 277 F.3d 778, 781-82 (5th Cir. 2001). "[W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 16 of 35


(1978); *see Holladay v. Comm'r*, 649 F.2d 1176, 1179 (5th Cir. Unit B Jul.1981) ("[T]he existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations.").

**2. Sham/Economic Substance Issues.**

In *Compaq*, the court noted that a two prong test applied to determine whether a transaction had economic substance. The first prong considers whether the transaction "has no economic substance because no reasonable possibility of a profit exists." *Compaq*, 277 F.3d at 781-82. The second prong considers whether there existed a tax-independent business purpose for the transaction (a subjective inquiry). The Fifth Circuit explained that a court must consider both the economic substance of a transaction as well as its business purpose. The court declined, however, to consider whether a court must invalidate a transaction that fails only one of the prongs of the test. *Id.* at 781-82.

When applying the economic substance doctrine, courts emphasize that the transaction to be analyzed is the particular transaction that gives rise to the tax benefit, and not collateral transactions which do not produce tax benefits. *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356-57 (Fed. Cir. 2006); *Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 283-84 (2d Cir. 2002); *ACM P'ship v. Comm'r*, 157 F.3d 231, 260 (3d Cir. 1998). In the present case, the transactions that provide the cornerstone for the tax benefits are the loan agreements with NatWest. If these transactions fail the economic substance test, then the court will disregard those transactions for federal tax purposes. The court now examines that issue.

**3. Application.**

Plaintiffs argue that the loan agreements at issue had economic substance because they were

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 17 of 35


intended to provide and did provide leverage to the partnerships to enter into foreign currency transactions. The court disagrees. The court must judge the economic substance of these transactions by what the entire record reflects, as opposed to the terms of the written agreements. Despite the literal terms of the documents, the court finds that Presidio, as the agent of and on behalf of Klamath and Kinabalu, entered into additional understandings and agreements with NatWest concerning the expected duration of NatWest's lending relationship with individual investors, including Nix and Patterson. In addition, Presidio and NatWest understood that the Funding Amounts would not be used to provide leverage for foreign currency transactions. Finally, Presidio's fee structure strongly suggests that Presidio's goal was not to earn a profit, but rather to secure large tax losses for its investors. In light of these findings, although Nix and Patterson possessed the intent to make a profit through trading in foreign currencies, Presidio and the bank understood that the Funding Amounts provided by NatWest would not be used to further that objective. Viewed in the context of the entire record in this case, the loan transactions lacked economic substance. They are disregarded.

First, the documents produced from NatWest confirm that neither Presidio nor the bank intended to facilitate a seven year investment plan. Rather, Presidio and NatWest intended all investors to exit at the end of Stage I. This is made plain by the bank's internal memoranda describing the expected time frame of the bank's relationship with an investor as well as the structure and the economic pressures the bank could inflict on a given investor. In light of the language of the memoranda, the court finds that Presidio shared these understandings; however, Presidio did not reveal these agreements and understandings to Nix and Patterson. Nix and Patterson had no knowledge of such agreements and understandings at any time relevant to the court's analysis of the

transactions.

To illustrate this point, an internal memorandum of the bank dated February 16, 2000, described a similar transaction and stated:

> The Investor *will* (as explained below) choose to exit the investment strategy at the earliest possible opportunity (in effect Day 67 - being 60 days after LLC2 takes the assignment). [We have the right to get out immediately but will (absent some credit event) wait five further days - to provide "daylight."].

(D. Exh. 299, at 2-3 (emphasis added)). Elsewhere in the same memorandum, NatWest referred to the Note as having a *"nominal* 7 year life." (D. Exh. 299, at 6 (emphasis added)). The bank, however, was "highly confident that the Note (and all other transactions) will be closed out on Day 72 following subscription . . . ." (D. Exh. 299, at 6). These statements reflect the intent and understanding of NatWest and Presidio that the transactions would not last beyond Stage I.

In addition, NatWest and Presidio understood that the bank could use economic pressure to force the investor to exit at the end of Stage I. The terms of the Credit Agreements required the borrowers to maintain collateral on deposit at NatWest that exceeded the value of the maximum obligations owed to the bank. At the time the funds were provided by NatWest, this amount would have been at least 101.25% of the total $66.7 million Funding Amount. (D. Exhs. 60A, 60B, Section 8(k)(defining Event of Default). In addition, the Credit Agreements allowed NatWest to determine whether the ratio was satisfied. (*See* D. Exhs. 60A, 60B, Section 1.01, defining Maximum Obligations, Permitted Investments, and Value). Presidio and NatWest understood that NatWest could use its discretion granted by the agreements to declare a default should the bank desire to force the investor to withdraw from the partnership. (D. Exh. 299 at 5)(observing that bank has the right to accelerate if the ratio of Collateral Value to Maximum Obligations falls below 101.25%). The

same exhibit reflects that the bank calculates "Value" and "Maximum Obligations" in its own discretion and that the bank would use its own inputs to calculate the value at risk. (D. Exh. 299, at 5). Finally, if an investor failed to exit after 60 days, the bank would create economic pressure designed to force an investor to withdraw from the relationships. (D. Exh. 299, at 6)("While [investor] might theoretically wait until 31st December 2000 to crystallise his loss, he will almost certainly prefer to use the explicit 60 day exit entitlement under the terms of the Fund (i.e. LLC2): Continuation would simply increase his spread costs - not least because *NWB would be deciding* what rates to offer on ongoing deposits; . . . .")(emphasis added). This evidence supports a finding that the bank could use economic pressure to force an investor to withdraw from the plan at the end of Stage I.

Second, the evidence supports a conclusion that NatWest did not intend the Funding Amounts to be used to facilitate foreign currency trades. Despite provisions in the written documents that might allow the funds to be used to invest in the high risk foreign currency transactions marketed by Presidio, the government's proof confirms that the bank and Presidio understood that the Funding Amount provided by NatWest would never be put to such uses. The internal bank documents confirm that NatWest would never allow the Funding Amounts to be put at risk, stating:

> NWB's protection comes from the limited scope of "Permitted Investments" and the "Collateral Value" acceleration trigger.
>
> As to Permitted Investments:
>
> - *It exercises full control, custody and security over all assets of the LLC*;
> - LLC can generally only transact with NWB

Case 1:03-cv-02164-MCW Document 356-2 Filed 03/23/2007 Page 20 of 35


- It may invest, but only through us and subject to our security, in 90 day maturing fixed rate $ or Euro AAA or AA+ securities). However, we can operate as a *de facto bar because we have the right to claim prudential or other risk concentration limits. In any event the negative spread implications are such that in practice they will only invest in time deposits with us.*

. . . .

(D. Exh. 299, at 5)(emphasis added). Thus, NatWest and Presidio understood that the bank would hold the Funding Amounts in relatively risk-free time deposits and would not allow them to be used as leverage for high risk foreign currency trading.

Finally, Presidio's fee arrangement supports the court's finding that there was no reasonable expectation that the loan transactions would produce a profit. In hearings before the Senate Subcommittee on Investigations, Larson testified that Presidio's management fee was calculated as a percentage of the loss generated by the investment plan. (D. Exh. 333, at 126)("Q: And the greater that loss would be, the greater your premium would be, the greater your fee would be, is that not correct? A: That is correct."); *see also id.* at 127 ("Q: . . . Your fee is a percentage of what the taxpayer was able to write off, is that correct? . . . A: Yes"). This testimony supports the court's finding that Presidio structured the loan transactions to create a tax loss, rather than a profit, for the investors.

NatWest and Presidio viewed the loan transactions as involving zero credit risks. Based on the evidence before it, the court finds that, in truth, NatWest did not make any loans and therefore the court determines that there was no reasonable expectation that the loans would yield a profit. Instead, because of the structure of the agreements and the tacit understandings between the bank and Presidio, all of the investors would cease their participation in the plan at the end of 60 days or

very soon thereafter. In light of the restrictions on the use of the collateral and the collateral value ratio required by the bank, there is no reasonable possibility that these plaintiffs could have used the loan proceeds for leverage in foreign currency trading transactions, as Presidio had represented they could. The loan transactions lacked economic substance.

Under *Compaq*, the court must also consider whether a tax-independent business purpose existed for the transaction (a subjective inquiry). On this record, in light of the findings made above, the court holds there was no tax-independent business purpose for Presidio to recommend and structure the loan transactions. Instead, the only reason for the loans, including the premiums, and their subsequent contributions to Klamath and Kinabalu was to generate tax losses in the amounts of the premiums.

The plaintiffs devoted much of their trial time and a large portion of the briefing to the task of demonstrating that the language of the Credit Agreements coupled with the swap transactions had economic substance. Their expert suggested legitimate business reasons for both. Viewed in light of all of the evidence, however, the court rejects these arguments. The loans, as found by the court, were not loans at all because, notwithstanding the terms of the documents, Presidio and NatWest understood that the loan proceeds would never be used to facilitate Presidio's investment plan. Likewise, any economic benefits that might inure from the swap agreements were made illusory by the understanding between Presidio and NatWest that the investors would withdraw from the investments at the end of Stage I. The weight of the credible evidence counsels the court to find that the loan transactions lacked economic substance. The court makes this finding without considering the question whether adverse inferences should be drawn against the plaintiffs arising from the failure of Larson and Makov to testify. Resolution of that issue is unnecessary.

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 22 of 35


**B. Penalty Issues.**

The court now turns to the question of penalties. Pursuant to 28 U.S.C. § 1346(e) and 26 U.S.C. § 6226(f), this court has jurisdiction to determine the applicability of any penalty which relates to an adjustment to a partnership issue.[12] The government has asserted the following four accuracy-related penalties in this case:

1) a 40% penalty for gross valuation misstatement. 26 U.S.C. § 6662(b)(3) and (h);

2) a 20% penalty for substantial valuation misstatement. 26 U.S.C. § 6662(b)(3) and (e);

3) a 20% penalty for substantial understatement of income tax. 26 U.S.C. § 6662(b)(2) and (d); and

4) a 20% penalty for negligence or disregard of rules and regulations. 26 U.S.C. §

---

[12] 28 U.S.C. § 1346(a)(1) provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal revenue laws; . . . .

26 U.S.C. § 6226(f) provides:

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount with relates to an adjustment to a partnership item.

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 23 of 35


6662(b)(1).

The court now addresses the applicability of the penalties.

**1. Gross Valuation Misstatement.**

The IRS may impose a 40% penalty "to the extent that a portion of the underpayment to which [§ 6662] applies is attributable to one or more gross valuation misstatements." 26 U.S.C. § 6662(h)(1). A gross valuation misstatement occurs if the value of any property (or the adjusted basis of any property) claimed on any return is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. 26 U.S.C. § 6662(h)(2).

The government argues that the 400 percent threshold is met because the taxpayers' true basis in the Euros was $316,393 instead of the $25,316,393 claimed on their tax returns. According to the government, the understatement of basis satisfies the 400 percent ratio and the IRS properly asserted the penalty in the FPAAs.

The plaintiffs argue that the court has already determined that the plaintiffs properly applied Section 752 in determining their basis, and, therefore, any underpayment would not be attributable to an overstatement of basis. In addition, the plaintiffs argue that, as a matter of law, an overvaluation penalty cannot apply when the IRS totally disallows a deduction or credit, and that this case is similar to the situation in which the IRS totally disallows a deduction or credit. *Heasley v. Commissioner*, 902 F.2d 380, 383 (5th Cir. 1990); *Weiner v. U.S.*, 389 F.3d 152, 161-62 (5th Cir. 2004). According to the plaintiffs, if the court disregards the loan transactions because the transaction lacks economic substance, then the underpayment of tax is not "attributable to" any gross valuation misstatement. Instead, the underpayment would be attributable to the disregard of the transactions. The court agrees with this latter argument.

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 24 of 35


In *Heasley*, the taxpayers took an investment tax credit based on a valuation of some equipment they purchased. 902 F.2d at 381-82. The IRS totally disallowed the credit. *Id.* at 382. The IRS also applied a valuation overstatement penalty because the taxpayers overvalued the basis of the equipment. *Id.*

The taxpayers did not dispute the disallowance, but challenged the imposition of penalties. *Id.* The court concluded that the valuation overstatement penalty did not apply. *Id.* at 383. The court reasoned that the underpayment of tax was attributable to an improper deduction or credit, not the valuation overstatement. *Id.* Specifically, the court stated "[w]henever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit." *Id.*

*Heasley* controls this case. Although the rule in the Fifth Circuit differs from the rule in other circuits, *Zfass v. Commissioner*, 118 F.3d 184, 190 (4th Cir. 1997),[13] this court is bound to follow the law in the Fifth Circuit. Accordingly, the penalty for a gross valuation misstatement does not apply when the IRS totally disregards a transaction as lacking economic substance.

**2. Substantial Valuation Misstatement.**

For essentially the same reasons set forth in the preceding section of this opinion, the penalty for substantial valuation misstatement does not apply to this case.

**3. Substantial Understatement of Income Tax.**

The court now turns to the penalty imposed for substantial understatement of income tax. The IRS may impose a 20% penalty for a substantial understatement of income tax. A "substantial

---

[13] Other circuits have ruled that a deduction disallowed due to lack of economic substance is subject to the penalty for overvaluation of value. *Zfass*, 118 F.3d at 190.

understatement of income tax" occurs if the amount of understatement exceeds the greater of 1) 10 percent of the tax required to be shown on the return, or 2) $5,000. 26 U.S.C. § 6662(d). Notwithstanding the mathematical test, the statute provides an exception to the penalty. "The amount of the understatement . . . shall be reduced by that portion of the understatement which is attributable to . . . the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment." 26 U.S.C. § 6662(d)(2)(B)(i).

In this case, the government argues that the facts satisfy the mathematical test because the amount of understatement was greater than 10 percent of the required tax. As a result, the government urges that the penalty applies in this case.

The plaintiffs argue that there was "substantial authority" for the treatment of the plaintiffs' tax position. The plaintiffs contend that the input and advice of Cohen and Hrdlicka, together with the legal opinions obtained by St. Croix and Rogue (through Patterson and Nix, respectively) provide substantial authority for the tax treatment at issue. The plaintiffs bolster their argument by pointing to the court's partial summary judgment opinion.[14]

The court now turns to the plaintiffs' "substantial authority" claim. "The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard." Treas. Reg. § 1.6662-4(d)(2).

---

[14] The government attempts to impose amendments, enacted in 2004, that eliminate the substantial authority exception altogether in cases involving tax shelters. *See* 26 U.S.C.A. § 6662(d)(2)(C)(West Supp. 2005). The amendment, however, is not effective for the tax years at issue. *See* Pub. L. 108-357, Title VIII, § 812(f), Oct. 22, 2004, 118 Stat. 1580.

Case 1:03-cv-02164-MCW Document 35-2 Filed 03/23/2007 Page 26 of 35


For substantial authority to exist, "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i); *see also Custom Chrome, Inc. v. Commissioner*, 217 F.3d 1117, 1127-28 (9th Cir. 2000). Opinions rendered by tax professionals are not authority. Treas. Reg. § 1.6662-4(d)(3)(iii). The authorities underlying such opinions, if applicable to the facts of a particular case, may give rise to substantial authority for the tax treatment of an item. *Id.*

In addition, in a case involving a tax shelter, the "substantial authority" exception does not apply unless the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. 26 U.S.C. § 6662(d)(2)(C)(i)(II). A "tax shelter" includes, among other things, a partnership or an investment plan "if a significant purpose of such . . . is the avoidance or evasion of Federal income tax." 26 U.S.C. § 6662(d)(2)(C)(iii).

This court may assume, *arguendo*, that the Klamath and Kinabalu partnerships (or investment plans) were tax shelters within the definition. The record supports a finding that substantial authority existed. The plaintiffs obtained comprehensive opinions of counsel before they filed their returns. The Holland & Hart and Olson Lemons opinion letters relied on the relevant authority at the time. (P. Exhs. 78, 81, 176, 179). In fact, this court reached some of the same conclusions when it found that the taxpayers' liabilities were properly calculated under Section 752. Furthermore, Mr. Stuart Smith provided expert opinion and testimony that substantial authority supported the tax treatment at issue in this case. Smith's experience includes over 40 years as a tax lawyer, both as Tax Assistant to the Solicitor General in the Department of Justice and now in private practice. (Tr. II, 118-125). After examining the material issues identified in the Holland & Hart and Olson Lemons opinions, Smith concluded that the opinions provide an objective analysis of law and its application

to the relevant facts. (Tr. II, 135-36). The court agrees with Smith's opinions and concludes that the Holland & Hart and Olson Lemons opinions provide "substantial authority" for the plaintiffs' treatment of their basis in their respective partnerships.

The record also supports a finding that the taxpayers reasonably believed that the tax treatment applied to the loan transactions was more likely than not the proper treatment. The plaintiffs sought advice from Pollans, Cohen and Hrdlicka before deciding to perform these transactions. (Tr. I, 66). Although they are experienced attorneys, Patterson and Nix are not qualified tax lawyers. They sought to make a profit from the investment plan when they entered the pertinent transactions. (Tr. I, 74-75; Tr. II, 179). Based on all of the record evidence, the court finds that they were unaware of the understandings and agreements between Presidio and NatWest when they decided to enter the transactions and when they filed their returns. Accordingly, the substantial understatement penalty does not apply.

**4. Negligence or Disregard of Rules or Regulations.**

**a. Negligence.**

The IRS imposed a fourth penalty–for negligence or disregard of rules or regulations. Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. 26 U.S.C. § 6662(c); Treas. Reg. § 1.6662-3(b)(1). It also includes the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Heasley*, 902 F.2d at 383. Negligence is strongly indicated if a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction or credit which would seem "too good to be true" to a reasonable and prudent person. Treas. Reg. § 1.6662-3(b)(1)(ii).

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/08/2007 Page 28 of 35


There can be no finding of negligence if there was a reasonable basis for a return position. Treas. Reg. § 1.6662-3(b)(1). Reasonable basis is a significantly higher standard than not frivolous or not patently improper; it cannot be a merely arguable or a merely colorable claim. Treas. Reg. § 1.6662-3(b)(3). Reasonable basis requires reliance on legal authorities and not on opinions rendered by tax professionals. *Id.*; Treas. Reg. § 1.6662-4(d)(3)(iii). The court may, however, examine the authorities relied upon in a tax opinion to determine if a reasonable basis exists. Treas. Reg. § 1.6662-4(d)(3)(iii).

The "reasonable basis" standard for reliance on opinions is lower than the "substantial authority" standard. Treas. Reg. § 1.6662-4(d)(2). As discussed in the previous section, there was "substantial authority" to rely on the Holland & Hart and Olson Lemons opinions, and, therefore, the "reasonable basis" standard has been met. Accordingly, a penalty for negligence is not applicable in this case.

**b. Disregard of Rules and Regulations.**

The negligence-type penalty contains a disjunctive. As a result, in addition to negligence, the IRS may impose a penalty against a taxpayer for the intentional disregard of rules and regulations. The government argues the plaintiffs intentionally disregarded Notice 2000-44, which describes using a loan to a partnership to create a tax loss without a corresponding economic loss. The IRS published Notice 2000-44 in September 2000. As a result, the government urges that the filing of the returns amounted to disregard of Notice 2000-44. This argument is rejected. In the first place, the plaintiffs decided to enter these transactions before the government issued Notice 2000-44. In addition, the plaintiffs have complied with all of the notices received from the IRS in connection with the challenge to this transaction. (Tr. I, 102, 230; D. Exh. 32). They sought advice from

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/23/2007 Page 29 of 35


qualified tax professionals before filing the returns, and they promptly responded to the IRS when the IRS requested information from them concerning the transactions. Contrary to the government's approach with respect to many of the other BLIPS investors, the IRS did not even bother to interview the taxpayers before it asserted the penalties. (Tr. II, 214). The court finds that no penalty should apply for disregard of rules or regulations.

### 5. Reasonable Cause and Good Faith Defense.

Finally, the court turns to the reasonable cause and good faith issues. Notwithstanding the specific requirements of the penalties discussed above, a taxpayer may defeat the imposition of any of those penalties if he demonstrates reasonable cause. The defense, found in 26 U.S.C. § 6664(c), provides:

> No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

There is a preliminary dispute concerning the extent to which the court has jurisdiction over the reasonable cause defense. The government raised the issue for the first time in a motion in limine, filed prior to trial. The court now addresses that issue.

This case is governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), 26 U.S.C. §§ 6221-6233. Under TEFRA, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." 26 U.S.C. § 6221. A "partnership item" generally includes items that are "more appropriately determined at the partnership level than

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 30 of 35


at the partner level." 26 U.S.C. § 6231(a)(3).[15] A "partnership item" can be distinguished from an "affected item," which is defined as any item affected by a "partnership item." 26 U.S.C. § 6231(a)(5).

The scope of judicial review in a TEFRA proceeding is set forth in 26 U.S.C. § 6226(f):

> A court with which a petition is filed in accordance with this section shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, *and the applicability of any penalty, addition to tax, or additional amount with relates to an adjustment to a partnership item.*

(emphasis added).

Prior to filing their petitions in this court and in accordance with 26 U.S.C. § 6226(e)(1), the partners in this case deposited with the Internal Revenue Service the amount by which their tax liability would be increased if the partnership items on their tax returns were made consistent with the treatment of partnership items on the partnership return, as adjusted by the final partnership administrative adjustment. Accordingly, pursuant to 28 U.S.C. § 1346(e) and 26 U.S.C. § 6226(f), this court has jurisdiction to determine all partnership items and the applicability of any penalty "which relates to an adjustment to a partnership item."

The government challenges this court's jurisdiction to consider whether Nix and Patterson acted in good faith and whether there was a reasonable cause for the underpayments. According to the government, this court's jurisdiction is limited to assessing partnership-level items. That

---

15 Prior to The Taxpayer Relief Act of 1997, penalties were not "partnership items" and could not be considered until the completion of partnership-level proceedings. *Crystal Beach Development of Destin Ltd. v. Commissioner*, 79 T.C.M. (CCH) 2068, 2000 WL 669972, *3 (2000).

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 31 of 35


jurisdiction, according to the government, extends only to determining the initial applicability of penalties to the partnership as a whole. Whether a particular partner had a reasonable cause or acted in good faith are questions for subsequent administrative proceedings, brought under 26 U.S.C. § 6230(c), or a suit in court, brought under 26 U.S.C. § 6230(c)(3)&(4)(authorizing a partner to bring a suit and to assert any "partner level defenses that may apply."). According to the government, the reasonable cause defense is a "partner level defense," and TEFRA provides that the exclusive forum for asserting such defenses is through a refund proceeding.

The plaintiffs counter that the TEFRA refund provision (§ 6230(c)(4)) is permissive, rather than mandatory. The plaintiffs observe that in the present case, the IRS based the FPAAs on loan transactions entered by the *partners*. As a result, the partnership items to be determined in this case are the proper bases of St. Croix and Rogue in Klamath and Kinabalu, respectively. According to the plaintiffs, because the court has jurisdiction to determine the applicability of any penalties related to any adjustment to these partnership items, it may consider whether the reasonable cause exception applies to the activities of St. Croix and Rogue.

The regulations provide that "[p]artner-level defenses are limited to those that are personal to the partner or dependent on the partner's separate return and cannot be determined at the partnership level." Treas. Reg. § 301.6221-1(d). Examples of partner-level defenses include the applicable threshold underpayment of tax with respect to a partner or whether a partner has met the criteria under the reasonable cause exception. *Id.*

The regulation suggests that the reasonable cause exception is a "partner-level defense." The case law, however, does not read the statute and regulation as narrowly as the government. In the circumstances of a given case, the reasonable cause exception may be considered at the partnership-

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 32 of 35


level if it involves actions by the managing member partner. *See Santa Monica Pictures v. Commissioner*, 89 T.C.M. (CCH) 1157, 2005 WL 1111792, *94-*112 (2005). In *Santa Monica Pictures*, Santa Monica Pictures ("SMP") through its tax matters partner, Perry Lerner, contested adjustments made by the IRS to SMP's tax returns. *Id.* at *2. In evaluating the applicability of defenses to accuracy-related penalties, such as the reasonable cause exception, the tax court considered the experience of Mr. Lerner and the opinions he relied upon as the tax matters partner. *Id.* at *100-*104.

Similarly, this case involves claims by Klamath and Kinabalu through St. Croix and Rogue. The FPAAs were based, in part, on the agreements between St. Croix and Rogue, on the one hand, and NatWest, on the other. The determination of the partners' proper bases in the partnership is affected by the court's decision that the loans must be disregarded–a decision that all concede the court has jurisdiction to make. The FPAAs for Klamath and Kinabalu implicate the information and advice received by St. Croix and Rogue. It is also undisputed that the IRS delved into these taxpayers' defenses to penalties during the administrative process preceding these adjustments. (Tr. II, 212-214). As a result, no administrative benefit would be gained by requiring additional proceedings. The court, therefore, determines that the reasonable cause defenses involving St. Croix and Rogue may be considered in connection with "the applicability of any penalty, addition to tax, or additional amount which relates to a partnership item." 26 U.S.C. § 6226(f).

**b. Reasonable Cause and Good Faith.**

The plaintiffs bear the burden of production and proof on their reasonable cause defenses. *Long Term Capital Holdings, Ltd. v. U.S.*, 330 F.Supp. 2d 122, 205 (D. Conn. 2004) (citing H.R. Conf. Rep. 105-599 at 241); *Montgomery v. Commissioner*, 127 T.C. 43, 66 (2006). The most

important factor is the extent of the taxpayer's effort to assess his proper tax liability in light of all the circumstances. Treas. Reg. § 1.6664-4(b). Reliance on the advice of a professional tax advisor does not necessarily demonstrate reasonable cause and good faith. *Id.* However, a taxpayer is not required to challenge the advisor's conclusions, seek a second opinion, or check the advice himself. *U.S. v. Boyle*, 469 U.S. 241, 250-51 (1985).

The validity of the reliance turns on "the quality and objectivity of the professional advice obtained." *Swayze v. Commissioner*, 785 F.2d 715, 719 (9th Cir. 1986). If the adviser is not familiar with the business in which the taxpayer invested, reliance on that advice is not justified. *David v. Commissioner*, 43 F.3d 788, 789-90 (2d Cir. 1995); *see also Stanford v. Commissioner*, 152 F.3d 450, 461 (5th Cir. 1998). Furthermore, a taxpayer cannot reasonably rely on the advice of one who has an inherent conflict of interest. *Goldman v. Commissioner*, 39 F.3d 402, 407-08 (2d Cir. 1994). Reliance is also unreasonable if the taxpayer failed to supply the professional with all the necessary information to assess the tax matter. *Neonatology Associates v. Commissioner*, 299 F.3d 221, 234 (3rd Cir. 2002); *see also* Treas. Reg. § 1.6664-4(c); *Boyle*, 469 U.S. at 250-51.

The government argues that the plaintiffs failed to inquire about the profit performance of prior BLIPS deals and knew about the tax benefits, from Cohen's memorandum, prior to entering into the deal. The government further argues that the authors of the legal opinions, Holland & Hart and Olson Lemons, had an inherent conflict of interest because they represented Presidio on tax matters concerning the BLIPS transactions. In addition, the government contends that the opinions contained factual errors leading one to believe that these opinions were part of a "cookie-cutter process." Finally, the government contends that the plaintiffs never communicated the facts about the transaction to the two law firms and, instead, the two law firms accepted the facts as represented

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 34 of 35


by Presidio.

The plaintiffs argue that, at their request, Cohen investigated the Presidio investment strategy, which included consulting with Hrdlicka, a tax advisor for another taxpayer making similar investments with Presidio. The plaintiffs also argue that Holland & Hart and Olson Lemons had access to all the relevant transactional documents which were reviewed by Presidio for accuracy. Furthermore, the plaintiffs point out that Cohen reviewed the legal opinions and concluded that the plaintiffs could reasonably rely on them.

Contrary to the government's argument, Patterson and Nix developed an understanding of the tax benefits available to them only after they elected not to stay in the investment at the end of the first 60-day period. (Tr. I, 86). Because of the complexity of the tax treatment, it was necessary for Patterson and Nix to seek advice from qualified tax attorneys concerning the applicable law to the facts of their investment and the resulting tax deductions. Patterson also concluded that there would be no conflict of interest with Holland & Hart's representation of Presidio because their interests in the tax treatment of their investments were the same. (Tr. I, 90-91). Therefore, Patterson and Nix engaged Holland & Hart to write the tax opinion. (P. Exhs. 77, 175).

The detailed opinions of Holland & Hart and Olson Lemons (addressed to Patterson at St. Croix and Nix at Rogue) provided a reasonable interpretation of the law. The plaintiffs' tax expert, Mr. Smith, also concluded that the opinions complied with standards common to the profession and with administrative standards established by Treasury Circular 230, which addresses conduct of practitioners who provide tax opinions. (Tr. II, 131-133). The court agrees with the opinions expressed by Smith.

The plaintiffs have proven, by a preponderance of the evidence, their good faith in relying

Case 1:03-cv-02164-MCW Document 358-2 Filed 03/28/2007 Page 35 of 35


on the advice of qualified tax accountants and tax lawyers. It bears mention that, although the Presidio investment plan suggested the formation of a grantor trust (which might have been used to conceal the transaction from the IRS), these taxpayers reported the use of the grantor trust directly on their tax returns, pursuant to the advice of their accountants to disclose the tax treatment to the IRS. Accordingly, they have fulfilled the criteria under the reasonable cause exception of 26 U.S.C. § 6664(c), and no accuracy-related penalties are to be imposed.

**5. Conclusion.**

The court finds that the loan transactions lacked economic substance and are, therefore, disregarded for federal income tax purposes. The court also finds that no penalties are applicable. The parties are directed to confer and submit, within 15 days, a proposed form of judgment (agreed if possible) consistent with this opinion. The parties shall take into account their apparent agreement that the plaintiffs are entitled to deduct operational expenses.

SIGNED this 31st day of January, 2007.

T. John Ward

T. JOHN WARD
UNITED STATES DISTRICT JUDGE