# In the United States Court of Federal Claims

**No. 03-2164T**

**(Filed: December 21, 2007)**

| | |
|---|---|
| **JADE TRADING, LLC, by and through, ROBERT W. ERVIN AND LAURA KAVANAUGH ERVIN on behalf of ERVIN CAPITAL, LLC, Partners Other Than the Tax Matters Partner,** | **Partnership Item; Final Partnership Administrative Adjustment; 26 U.S.C. § 752; Liability; Contingent Obligation; Basis in Partnership Interest; Economic Substance Doctrine; Accuracy-related Penalties; Tax Shelter; Substantial Authority; Jurisdiction Over Reasonable Cause; Partner-Level Defenses.** |
| **Plaintiffs,** | |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

David D. Aughtry, Chamberlain, Hrdlicka, White, Williams & Martin, Atlanta, Georgia, and Linda S. Paine, Houston, Texas, for Plaintiffs.

Stuart J. Bassin, U.S. Department of Justice, Tax Division, Washington, D.C. for Defendant. Richard T. Morrison, David Gustafson, Matthew C. Hicks, and Jennifer Wilson, U.S. Department of Justice, Tax Division, Of Counsel.

## OPINION

**WILLIAMS**, Judge.

## Introduction

This tax refund case presents the issue of whether investments of $450,000 which generated over $40 million in tax losses possessed economic substance. In 1999, the Ervin brothers sold their cable business, netting over $40 million in profit. That same year, each of the three Ervin brothers, through his limited liability corporation (LLC), simultaneously purchased a euro option from AIG

for a premium of $15,000,020 and sold a euro option to AIG for a premium of $14,850,018 but only paid AIG the difference -- a net premium of $150,002. Each LLC contributed the option spread to Jade Trading, LLC (Jade), and upon exiting the partnership, claimed a basis of over $15 million in its Jade interest by including only the premium for the purchased call option and ignoring the premium for the sold call option. The artificially high basis generated a loss of almost $15 million when each LLC redeemed its partnership interest at its fair market value.

At issue in this case is whether the spread transactions contributed to Jade lacked economic substance such that they must be disregarded for tax purposes. This issue is complicated by the reality that precedent at the time of these transactions permitted each LLC to ignore the sold call option in computing its basis in its Jade interest because that option was a contingent obligation, not a liability, under section 752 of the Internal Revenue Code.[1] Poignantly at play here is the tension between technical compliance with the Internal Revenue Code and the longstanding common-law economic substance doctrine which compels courts to disregard transactions which lack economic substance despite their literal compliance with the Code. Plaintiffs characterize the tension differently, arguing that the economic substance doctrine cannot ignore "deliberately adopted rules of law," in particular, the holding in Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975), that contingent obligations do not constitute section 752 liabilities for purposes of calculating a partner's basis. According to Plaintiffs, Helmer and its progeny construed section 752 to permit taxpayers to exclude contingent obligations like the sold option in calculating basis under the theory that the sold option did not create a fixed liability because it was uncertain when, at what price, or if AIG would ever exercise the option.

Plaintiffs' theory cannot prevail in light of the Federal Circuit's decision in Coltec Industries, Inc. v. United States, 454 F.3d 1340, 1352-54 (Fed. Cir. 2006), reaffirming the vitality of the economic substance doctrine. Coltec teaches that the legitimacy of a transaction for tax purposes is not guaranteed merely because a technical interpretation of the Code would support the tax treatment. Id. at 1354. Rather, Coltec mandates additional scrutiny of the bona fides of a transaction, requiring independently that the transaction pass muster under the objective economic substance test. Id. at 1355. Further, the Coltec Court clarified the parameters for applying that test holding that the taxpayer has the burden of proving that the transaction which gave rise to the tax benefit objectively had economic substance, i.e., was a real transaction structured in a particular way to provide a tax benefit as opposed to a transaction created for tax avoidance purposes. Id.

Here, several factors compel a conclusion that Plaintiffs have not met their burden of demonstrating that the spread transactions contributed to Jade objectively had economic substance. First, their claimed losses were purely fictional -- each of the Ervins did not invest $15 million in

[1] Under section 752(b), a partnership's assumption of a partner's liability decreases the partner's basis in the partnership interest. Because the sold call options assumed by Jade were contingent obligations, not liabilities for the purpose of section 752(b), they did not lower the Ervin LLCs' basis in Jade.

the spread and did not lose $15 million when exiting Jade without exercising either option.[2] Second, although Plaintiffs contend that the spread transaction had the potential to earn a profit, that contention is belied by two factors -- the structure of the transaction itself and the large and unusual fees the LLCs were forced to pay to do the transaction. The structure of this transaction delimited the maximum net profit to some $140,000 per LLC, no matter how high the euro climbed. The fees also undercut profit potential. Each LLC paid fees of $934,100 on an investment of $150,002.[3]

Third, the spread transaction was developed as a tax avoidance mechanism and not an investment strategy. The transaction was devised and marketed by a tax accounting group, BDO Seidman's "Tax $ells" Division, as a tax product, not by an investment advisor as a vehicle to earn profit. The spread transaction was included in the chapter of BDO Seidman's Tax Product Manual entitled "Capital Gain or Ordinary Income Eliminators" and was described as being structured around "anomalies in the tax law to allow for the creation of stepped-up basis that can be used to shelter gains." Def.'s Ex. DX (DX) 665 at 019776.

Fourth, the requirement that the spread transaction be purchased outside the partnership and contributed to it had no effect whatsoever on the investment's value, quality, or profitability, except to add cost and burden. However, packaging the investment in the partnership vehicle was an absolute necessity for securing the tax benefits.

A final indicium of the lack of economic substance here, while not dispositive in and of itself, is the highly disproportionate tax advantage to the underlying monetary outlay -- the tax loss per brother, $14.9 million, was roughly 65 times greater than each LLC's $225,002 financial commitment to Jade, almost 100 times each LLC's $150,002 investment in the spread transaction which generated the loss, and approximately 100 times the $140,000 potential net profit each LLC could have earned.

In sum, this transaction's fictional loss, inability to realize a profit, lack of investment

---

[2] Rather, each LLC paid a net premium of $150,002 for the spread and contributed the offsetting options and $75,000 cash to Jade. Upon exiting Jade, each LLC received euros and Xerox stock valued at $126,122 in exchange for its partnership interest.

[3] An up-front consulting fee of $750,000 had to be paid to New Vista as a sine qua non of participation. New Vista was an entity largely owned by Jade's managing and tax matters partner, Sentinel, which did the foreign currency trading. What real value, if any, the Ervins received for this fee was never persuasively demonstrated. Rather, the $750,000 New Vista fee covered amorphous advice and training. There was another unusual fee of $84,100, -- an "account opening fee" paid to AIG which AIG did not charge any of its clients except Sentinel clients, and the value each LLC received for this fee was similarly uncertain. Finally, each LLC paid a fee of $100,000 to the law firm of Curtis Mallet, for a tax opinion blessing the tax losses generated by the spread transaction. This $934,100 tally of the fees per LLC does not take into account Sentinel's fees or any fees of the Ervins' personal accountant, Martin McElroy, or attorney, Jessie Mountjoy.

character, meaningless inclusion in a partnership, and disproportionate tax advantage as compared to the amount invested and potential return, compel a conclusion that the spread transaction objectively lacked economic substance.

The determination that the transaction lacked economic substance and the conclusion that each LLC's basis in its partnership interests must be substantially reduced requires this Court to conclude that the IRS's 40-percent penalty is applicable at this juncture. Section 6662(h). Under the Code, the 40-percent gross valuation misstatement penalty applies as a matter of computation if the misstated basis was 400 percent higher than the corrected adjusted basis. Here, each LLC's adjusted basis must be reduced from some $15 million to $225,002, -- meaning each LLC's basis was misstated by well over 400 percent. The alternative 20-percent penalties for substantial understatement of income tax and negligence are also applicable. Because only partnership items are before the Court in this proceeding, the Court lacks jurisdiction to consider the individual partners' defenses to the penalties, but these defenses may be entertained subsequently in individual partner-level proceedings.

## Findings of Fact [4]

### The Ervins

In 1980, Gary Ervin applied for a cable franchise, and Ervin Cable Construction was awarded a cable franchise in the Ervins' home town of Sturgis, Kentucky. Tr. 292-96, 322 (G. Ervin).[5] Gary

---

[4] These findings are based upon the evidentiary record developed during a fourteen-day trial -- nine days in Atlanta, Georgia, and five days in Washington, DC. This matter was stayed on April 27, 2006, pending the Federal Circuit's resolution of Coltec Industries, Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006). The stay was lifted July 19, 2006, and the parties filed supplemental briefing on the application of the Federal Circuit's decision in Coltec to the economic substance issues in this case. The parties also sought leave of the Court to file supplemental briefing on the application of Klamath Strategic Investment Fund, LLC v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007), reconsid. denied, 2007 U.S. Dist. LEXIS 24806 (E.D. Tex. Apr. 3, 2007). Plaintiffs filed their brief on March 8, 2007, and Defendant filed its response March 23, 2007. Defendant filed a Notice of Supplemental Authority on August 22, 2007, informing the Court of the Tax Court's decision in Nussdorf v. Commissioner, 129 T. C. 30 (2007).

[5] Gary Ervin saw an ad in the newspaper for a cable franchise while he was home from college and decided to apply. Although the Ervins attended college on athletic scholarships, none of the brothers obtained a college degree. Gary Ervin was a semester short of completing his degree, Robert Ervin was two classes short, and Tim Ervin was one class short. Tr. 291 (G. Ervin); Tr. 392 (R. Ervin); Tr. 434 (T. Ervin). Prior to entering the cable industry, Gary and Tim Ervin worked in coal mines. Tr. 290 (G. Ervin). Robert Ervin was too young to work in the mines, and by the time he reached an appropriate age for that type of work, his brothers' business had become established, and he joined their venture. Id. at 290-91.

Ervin and his two brothers, Robert and Tim, were equal partners in the cable business. Gary Ervin ran the office, handled the finances for the brothers, and had primary responsibility for dealing with investment advisors, bankers, lawyers, and accountants. Tr. 166-67 (Maidman); Tr. 259-60 (Pace); Tr. 304-08 (G. Ervin); Tr. 403-06 (R. Ervin); Tr. 437-38 (T. Ervin). Tim and Robert Ervin relied on Gary to make all financial decisions for the family businesses and provided Gary with general powers of attorney in 1998 which authorized Gary to manage their financial, business, and tax affairs. Pls.' Ex. (PX) 203-04; Tr. 309 (G. Ervin); Tr. 405 (R. Ervin); Tr. 440, 444, 446 (T. Ervin).

**Selling the Cable Businesses in March 1999**

In 1986 or 1987, the Ervins split their cable business into cable franchise and cable construction businesses, and in 1997 or 1998, split their businesses again, creating Apex Digital TV, Inc. (Apex). Tr. 298-99 (G. Ervin). In 1998 or 1999, the Ervins decided to sell these businesses -- Ervin Cable Construction (ECC), Apex, and Communications Systems Development (CSD). Tr. 315-18, 320-21 (G. Ervin). The Apex acquisition was structured as a reverse triangular merger, and the Ervins sold Ervin Cable Construction to Dycom in exchange for cash and Dycom stock.[6] Joint Stipulation of Facts (Stip.) ¶ 3, 4; Tr. 317-18, 439-40 (G. Ervin). In March 1999, the Ervins realized a total gain of approximately $40,248,733 on the sale, approximately $13,500,000 per brother. Joint Ex. (JX) 96 at 89, JX 97 at 59, JX 98 at 57.

Because Dycom was a publicly traded company, Dycom disclosed the acquisition of the Ervin companies to the SEC. After that disclosure, Gary was inundated with calls from investment brokers who wanted to "help" the Ervins reinvest their capital. Tr. 318-23 (G. Ervin). John Eckstrom, a former competitor in the cable industry, recommended that Gary talk to Cheyne Pace of Goldman Sachs for advice on investing the proceeds of the sale of these businesses. Tr. 324 (G. Ervin).

**The Goldman Sachs Presentation: February 1999**

In February 1999, Gary Ervin met with Cheyne Pace of Goldman Sachs in Sturgis, Kentucky. Tr. 209-10 (Pace); Tr. 324-26, 341 (G. Ervin). Pace recommended that the Ervins consider tax-advantaged investments such as oil and gas master limited partnerships (MLPs), and tax-exempt bonds. Tr. 219-20 (Pace); Tr. 327-29 (G. Ervin). Pace also recommended that the Ervins enter into "costless collars" to protect their position in Dycom stock. JX 2; Tr. 211-12 (Pace); Tr. 330-31 (G. Ervin).[7] Gary opened accounts for himself and his brothers with Goldman Sachs after his first

---

[6] The reverse triangular merger involved the Ervins swapping their Apex stock for stock in the acquiring company, Dycom. Stip. ¶¶ 3, 4. Under Securities and Exchange Commission (SEC) Rule 144, the Ervins were prohibited from selling the Dycom stock for one year, i.e., until March 2000. 17 C.F.R. § 230.144 (1998).

[7] In a collar, a put option is purchased, and a call option sold, by the investor to a bank. Tr. 131 (Maidman). In a "costless collar," the premium received on the sold option is equal to the

meeting with Pace but did not execute the collars at that time because of the black-out period imposed by SEC Rule 144. Tr. 214-17 (Pace); Tr. 345-46 (G. Ervin).[8]

**The Ervins' Referral to BDO Seidman**

Pace recommended that Gary talk with an accountant, Philip Chandler, who in turn referred the Ervins to BDO Seidman, a tax and consulting firm, for a finder's fee of $180,000. Tr. 221 (Pace); Tr. 336-37 (G. Ervin); see DX 523; see also Tr. 1503-04 (DiMuzio).[9]

In March 1999, Gary spoke with John Pridnia of BDO Seidman about BDO's proposal for tax-advantaged investments. Tr. 340-42 (G. Ervin). Pridnia and David DiMuzio, another BDO Seidman employee, knew that the Ervins had reaped a large capital gain from the sale of their business in 1999. Tr. 1557-58, 1579-80 (DiMuzio). DiMuzio believed that BDO could provide a "value-added service" to the Ervins if they could find a way to make the tax liability associated with the brothers' gain "disappear or be reduced." Tr. 1579-80 (DiMuzio). Pridnia recommended that Gary talk with Jenkens & Gilchrist, a large law firm, to discuss tax-advantaged investments. Tr. 282, 340-44, 627-28 (G. Ervin).

**The Jenkens & Gilchrist Proposal: March 1999**

On or about March 25, 1999, a telephonic conference was held among Gary, David DiMuzio and John Pridnia of BDO Seidman, Martin McElroy, the Ervins' long-time accountant, Vickie Davis, the Ervins' general counsel, and lawyers from Jenkens & Gilchrist. Stip. ¶ 8; JX 3; Tr. 279-81, 342-43 (G. Ervin).[10] BDO and Jenkens & Gilchrist presented a tax-advantaged investment based upon "a case the IRS had won," by conference call. Tr. 345, 365-66, 628, 630 (G. Ervin). The tax strategy consisted of contributing foreign currency options to an S corporation in order to create a high-basis,

premium due on the purchased option, and the proceeds from selling the call option are used to purchase the put option. Tr. 133-35 (Maidman); Tr. 212-13 (Pace).

[8] As of 1999, the Ervins each had approximately $10-12 million under the management of Cheyne Pace. DX 534 - 42. Pace characterized the bulk of the assets he managed for the Ervins -- roughly 65% -- as "very low risk." Tr. 247-48 (Pace).

[9] The date of this referral is not in the record. BDO Seidman paid the finders fee to Chandler. Tr. 1503-04 (DiMuzio). Gary had never dealt with BDO Seidman before. Tr. 337 (G. Ervin).

[10] Jesse Mountjoy, the Ervins' personal tax attorney, was not involved in any discussions with Jenkens & Gilchrist. Tr. 1661 (Mountjoy). Mountjoy received information regarding the proposal Jenkens & Gilchrist made to the Ervins "third-hand" from Martin McElroy. Id. DiMuzio does not recall this phone conference. Tr. 1505-06 (DiMuzio).

low-value asset, the sale of which could result in a capital loss in excess of the cash that was contributed. Tr. 1506-07 (DiMuzio). Gary Ervin was troubled by the fact that there was no investment advisor to advise him on what trades he ought to pursue and there was almost no consideration given to the economics. As far as Gary Ervin could see, the tax-advantaged "investment" presented by BDO Seidman and Jenkens & Gilchrist had no investment component at all because the "primary thrust of the call with Jenkens & Gilchrist. . . [was] [t]o discuss . . . the tax aspect of it." Tr. 282, 345 (G. Ervin); Tr. 1404 (McElroy). Gary testified: "there was no investment to it, or none that I saw." Tr. 345 (G. Ervin); Tr. 1404 (McElroy).

Gary Ervin concluded, on behalf of his brothers, that it did not make sense to rely on a law firm to handle an investment. Tr. 1404 (McElroy). Consequently, the proposal was never brought up again. Tr. 285, 345 (G. Ervin); Tr. 1404 (McElroy). However, DiMuzio continued to contact Gary Ervin over the next few months in the hope of acquiring Gary as a client for BDO Seidman. Tr. 1510-11, 1513 (DiMuzio).

**Dagny Maidman and the Costless Collar and STARS Transactions: April - June 1999**

On April 20, 1999, Gary opened accounts with Montgomery Securities in San Francisco in order to execute "costless collar" options. PX 202; Tr. 354-57 (G. Ervin); Tr. 128 (Maidman); JX 4.[11] On June 9, 1999, each of the Ervins, through a family LLC, entered into a set of "costless collar" options contracts with Dagny Maidman. JX 14-16; Tr. 129-33, 167 (Maidman); DX 667. These transactions had the net effect of guaranteeing the Ervins a minimum price for their Dycom stock -- thus limiting potential losses while capping their potential profit. Tr. 178-82 (Maidman). As of July 31, 1999, each brother had approximately $3.6 million dollars in Dycom stock in the costless collars. See PX 223-225.[12]

---

[11] In April 1999, Dycom was pursuing a second offering and informed Gary Ervin that the offering of new stock would significantly extend the black-out period. Tr. 349-51 (G. Ervin). Upon urging from Gary Ervin, Dycom agreed to allow the Ervins to go forward with the costless collar options provided that the Ervins did so with Bank of America, an affiliate of Dycom's bank. Tr. 351-53 (G. Ervin). Because of this agreement, Gary began working with Dagny Maidman at Montgomery Securities in San Francisco, a Bank of America affiliate. Tr. 126-27 (Maidman); Tr. 353 (G. Ervin).

[12] On June 10, 1999, the Ervins had entered into a prepaid variable forward sale, known as STARS. See JX 12-13; see also Tr. 185-86 (Maidman). STARS involved agreeing to sell stock at a set price in the future in return for a loan against that future sale price. See JX 4; see also Tr. 185-86 (Maidman). Approximately $13 million of the Ervins' stock (collectively) was involved in this transaction. See JX 12, 13; see also Tr. 3613 (G. Ervin). The Ervins also had approximately $6-7 million dollars of Dycom stock (collectively) in an escrow account related to the sale of Apex; the escrow was to be released in October, 2000. Tr. 529, 3608-10 (G. Ervin).

**The Creation of the Spread Transaction: BDO Seidman, Curtis Mallet, Sentinel and AIG**

BDO Seidman is a national accounting and tax consulting firm. Tr. 2759 (Field). BDO's tax practice division used the logo, "TAX $ELLS!" See DX 578; see also Tr. 2880 (Field). The function of the TAX $ELLS! division of BDO was to sell tax products such as "Capital Gain Eliminators," "Ordinary Income Eliminators," and "NOL [Net Operating Loss]/Capital Loss Refresher." DX 578, 593, 668; Tr. 2778 (Field). BDO priced these tax products based on the "value," or dollar amount of taxes that the product could save its purchaser. See DX 578, 665, 668; Tr. 2876 (Field). BDO Seidman likewise calculated employee bonuses on the amount of tax savings claimed or achieved by selling a given tax product. See DX 523, 668; see also Tr. 2847-48 (Field).

The tax practice team at BDO Seidman was known internally as the "Wolf Pack." DX 578; see also Tr. 2880 (Field). According to Denis Field, then the managing partner of BDO's tax practice, the "Wolf Pack" represented "cooperation, collaboration, communication, and concentration," an attempt to make BDO's tax practice more competitive and profitable. Tr. 2780, 2742-43, 2880 (Field); DX 578; Tr. 1596 (DiMuzio). As the leader of the tax practice, Denis Field described himself as the "alpha wolf." Tr. 2742-43, 2880 (Field). As the "alpha wolf," Field cultivated the TAX $ELLS! division and wolf pack ideas throughout BDO's tax practice. Tr. 2878-79 (Field).

BDO compiled and updated a "Tax Product Sales Manual" that was used for the marketing and sale of BDO's tax products. See DX 593, 665, 668; see also Tr. 2758-59, 2777-79 (Field); see also DX 600.[13]

**Sentinel Advisors**

Sentinel Advisors, LLC (Sentinel), the tax matters partner and managing member of Jade, was a hedge fund manager in New York. JX 19. Sentinel was formed in 1997, by Ari Bergmann[14]

---

[13] As of February 5, 1999, BDO's National Tax Sales Executive Group (NTSEG) was responsible for selling BDO's tax products. On October 13, 1999, the NTSEG and another BDO component, the National Tax Consulting Group, combined and were renamed the Tax Solutions Group. See DX 600; see also Tr. 2758 (Field). Like the NTSEG, the Tax Solutions Group was responsible for selling BDO's tax products. See DX 600; see also Tr. 2758-59 (Field). Denis Field, Charles Bee, and Adrian Dicker were in charge of the Tax Solutions Group, and they had overall responsibility for development of the Tax Solutions Group's business line. See DX 600; see also Tr. 2753-54 (Field); Tr. 1502 (DiMuzio). DiMuzio was also a member of the Tax Solutions Group during 1999 and 2000. Tr. 1499-1500 (DiMuzio).

[14] Ari Bergmann received a Bachelor of Arts degree from Ner Israel Rabbinical College in 1981, and he is a certified public accountant. JX 19. He worked as a staff accountant at Price Waterhouse in New York from 1986-87. He then worked as an Assistant Vice President at Drexel Burnham Lambert Trading dealing in precious metal transactions, commodity trading, and derivative

and Abraham Pfeiffer.[15] See JX 19; Tr. 806 (Pfeiffer). In 1999, Sentinel's Chief Financial Officer (CFO) was Smita Conjeevaram, a certified public accountant (CPA) and former tax manager.[16] See JX 19; Tr. 2594-96 (Conjeevaram). In 1999 and 2000, Sentinel controlled a subsidiary, New Vista, LLC, which was owned 75 percent by Sentinel and 25 percent by Michael Powlen, a California-based tax attorney. See JX 18 at 14; see also Tr. 1238 (Bergmann); Tr. 2609-11 (Conjeevaram). The bulk of Sentinel's profits in 1999 arose from investments it executed for BDO. Tr. 1342 (Bergmann).

**The Genesis of the Spread Transaction**

Between January and March of 1999, Ari Bergman from Sentinel Advisors approached Charles Bee, a senior partner at BDO Seidman responsible for developing its Tax Solutions Group's business line, with the idea for the spread transaction. Tr. 2905-07 (Bee); Tr. 1234-37 (Bergman).[17]

---

arbitrage. Bergmann began work at Bankers Trust in 1989 at the U.S. Interest Rate Derivatives trading desk and managed this unit in 1992 and 1993. During this time he was active in arbitrage and in the development of structured notes, index-amortizing swaps, times swaps, binary options and other derivative products. From 1993 to 1997, he headed the Transaction Development Group, a unit that he founded. The group was active in the application of derivative techniques in the privatization of a number of European state-owned companies. The group also advised clients on mergers and acquisitions, tax transactions and hedge fund structures. Bergmann formed Sentinel in 1997, after leaving his position as Senior Managing Director at Bankers Trust Company. Id.

[15] Abraham Pfeiffer received a Bachelor of Science degree in Computer and Information Science from Brooklyn College in 1989. Pfeiffer worked for Goldman Sachs from 1989 until 1996 as a team leader for its Global Portfolio Management system and as the head of its prime brokerage support team. While at Goldman Sachs, Pfeiffer specialized in foreign trade security transaction processing, corporate action and reorganization processing, and performance measurement. JX 19; Tr. 804-07 (Pfeiffer).

[16] Smita Conjeevaram received a Bachelor of Arts in Economics from Ethiraj College, Madras, India, and a Bachelor of Science in Accounting from Butler University, Indiana. Conjeevaram served as a Tax Manager at Price Waterhouse from 1987 until 1994, concentrating on international tax issues, advising offshore investment advisors and hedge funds on tax-driven structural and financial issues. Conjeevaram then worked for Long-Term Capital Management from 1994 until 1999, as a Tax Manager in the portfolio tax group where she was responsible for monitoring compliance, initiating timely planning, and analyzing derivative products, their structure, and their taxation in the United States and Europe. Conjeevaram joined Sentinel as a principal in April 1999, serving as CFO. JX 19; Tr. 2594 (Conjeevaram).

[17] Charles Bee received a degree in Economics with a minor in Accounting from Central Michigan University in 1972. He became a certified public accountant in 1974-1975 and worked for Arthur Andersen from 1973 to 1979, and for Deloitte & Touche from 1980 to 1982. Bee joined

Bee testified:

Q. The spread transaction I'm referring to is described as involving the purchase and sale of foreign currency options creating a spread position, which is contributed to a partnership. When the investor exits the partnership, a marketable asset is received which has a high basis and a low value, the sale of which generates a loss. Now, my understanding is that the idea for the spread transaction or the concept of the spread transaction was brought to you by Ari Bergmann. Is that right?

A. Brought to BDO?

Q. Brought to BDO by Ari Bergmann.

A. By Ari Bergmann. That's correct.

Q. Could you just describe to the Judge how it is that that idea or that concept was brought to BDO Seidman in the initial development or the early stages of it, the birth as it were of the spread transaction?

A. Well, Ari Bergmann was introduced to us, and I'm not exactly sure by whom. He either came to our offices or we had a meeting at his offices, and I don't recall which. There were a few of us at the meeting, and he described an investment which we called a spread option, . . . . We had not heard -- I hadn't heard, and I don't think anyone else at that meeting had ever heard -- of the concept of a spread option or any tax benefits or other aspects of spread options at that time.

Q. And just to clarify, the time is when? Early 1999? Is that right?

A. It must have been sometime between January and March of 1999.

---

BDO Seidman in 1982 as a senior tax manager. Over the years he became a member of BDO Seidman's Tax Opinion Committee, Chairman of the BDO International Tax Committee, Head of the International Tax Specialty Group, Head of International Taxes for BDO and BDO Worldwide, and Vice Chairman of the Board of Directors. Tr. 2900-04 (Bee).

Tr. 2905-07 (Bee).

Bergmann testified as follows regarding the origin of the spread transaction:

> A. We came to them [BDO Seidman]. They were our accountants. We had big problems with phantom income the year before in 1998 that we had very, very detrimental tax treatment on the derivatives. We went to BDO Seidman, and we asked them in every derivative product that we did what was the tax treatment. We heard that the tax treatment of short options was favorable. . .
>
> Q. Okay. And there was a transaction that was described to you in your discussions with BDO involving spread options?
>
> A. To the best of my recollection it was not a transaction described. We asked them. Short options. What is the tax treatment like we asked everything else of them what was the tax treatment. That was what we asked.
>
> Q. Did you learn of an economic mismatch that could take place between the economic results of a spread transaction and the tax results of a spread transaction in your conversations with BDO?
>
> A. We learned of a different tax treatment. That is correct. A tax treatment.
>
> Q. Okay. And that produced a mismatch between the economic results and the taxable income resulting from the transaction?
>
> A. Yes.
>
> Q. And that involved a short position that is then contributed to a partnership or trading fund?
>
> A. We didn't learn that it then contributed. We learned -- that was not the gist of the conversation. The gist of the conversation was short positions. What is the value? We know the short position is a short. It has a negative value. If it's contributed to a fund, what does it do to the basis? We had heard that it does not because it is so contingent. It doesn't reach to the level of a liability. That's what we asked

them.

Q. Where had you heard this?

A. On the street. I don't even know who.

Tr. 1234-36 (Bergmann). Bee acknowledged that Bergmann had discussed tax ramifications of the spread:

Q. But Mr. Bergmann indicated that there were tax ramifications to the spread transaction, didn't he?

A. Yes, he did.

. . . .

Q. When Mr. Bergmann brought this spread transaction concept to BDO with the tax ramifications, tax benefits, what did BDO Seidman do?

A. We examined it. The first thing that struck me is that I called up a law firm that I had personally dealt with, the firm had dealt with for many years, and we had the utmost confidence in as an independent advisor and as extremely fine tax attorneys, and that is William Bricker and Curtis Mallet. Bill is an international tax specialist, and we were talking about foreign currency options and for a whole host of reasons.

Tr. 2908, 2911-12 (Bee).

**BDO Seidman's Tax Product Sales Manual's "Spread Transaction"**

Under Field's leadership, BDO's tax practice group updated the Tax Product Sales Manual. See DX 665. In August 1999, Section 250, Capital Gain Eliminators, and Section 300, Ordinary Income Eliminators, of the Tax Product Sales Manual were revised to include a tax product known as the "Spread Transaction." DX 665; Tr. 2878 (Field).[18]

According to BDO's Tax Product Sales Manual, the spread transaction was a tax product that BDO claimed could create "stepped-up basis . . . to shelter gains." DX 665. The spread transaction

---

[18] The Tax Product Sales Manual was updated on or about August 3, 1999, specifically to include the spread transaction. See DX 665 at 019775. The August 3, 1999 forwarding letter transmitted internally at BDO Seidman, stated: "Enclosed are Sections 250 and 300 of the Tax Sales Manual, which have been revised to include the Spread Transaction." Id.

was priced as a percentage of the gain to be sheltered. DX 665. Section 250 of the Tax Products Sales Manual stated that "[t]he fee for the Spread Transaction [would] typically be 8% of the gain." DX 665 at 019777.

BDO's Tax Products Sales Manual described the Spread Transaction as follows:

> There are several different transactions which might deal with capital gains. Although each is structured around different statutory provisions, and have various structural differences, they each rely on anomalies in the tax law to allow for the creation of stepped-up basis that can be used to shelter gains.
>
> Spread Transaction: This transaction requires a minimum gain of $15 million, and a taxpayer who meets certain minimum assets requirements that generally require gross assets of at least $10 million. A tax opinion is provided by a law firm on this transaction, which can be used for gains already recognized in 1999.
>
> . . . .
>
> The Spread Transaction involves the purchase and sale of foreign currency options, creating a spread position,[19] which is contributed to a partnership. When the investor exits the partnership, a marketable asset is received which has a high-basis and low value, the sale of which generates a loss.
>
> . . . .
>
> These transactions are structured around anomalies in the tax law that allow for the creation of stepped-up basis that results in an ordinary loss that can be used to shelter ordinary income . . .
>
> . . . .
>
> . . . including previously generated income in the same year.

[19] A "spread" connotes a position held on a foreign currency through the simultaneous purchase and/or sale of more than one option to create a net position. Tr. 1791-92 (Kolb); Tr. 2496 (Shoji); Tr. 3122-24 (DeRosa).

DX 665 at 019776, 019778; see also Tr. 2869-72 (Field).[20]

**Curtis Mallet**

BDO Seidman's Bee had met William Bricker, a partner at the law firm of Curtis Mallet in New York, at a lecture. Tr. 912-13 (Bricker). Over a period of several months including April, 1999, Bee and Bricker had ongoing discussions about a potential foreign-currency-options transaction that would involve Sentinel Advisors, a hedge fund manager, doing the trading because BDO was not licensed to sell securities. Tr. 915, 985-87 (Bricker); Tr. 2905-06, 2911-13, 2922-24 (Bee); JX 19.[21] Bricker and Curtis Mallet would provide tax opinion letters to investors concerning the transactions. Tr. 2941 (Bee).

BDO became a client of Curtis Mallet, and Bricker and his partner Eduardo Cukier, spoke with Ari Bergmann, Abraham Pfeiffer, and other members of Sentinel about the mechanics of the spread transaction. Tr. 913-14 (Bricker); Tr. 2709, 2713-14 (Cukier). In investigating the details of the spread transaction, Bricker spoke with employees of AIG, an investment firm, about AIG's account opening forms and fees. Tr. 920-21 (Bricker). At some point during this process, the BDO Tax Group determined that it would refer clients to Sentinel to purchase the spread transaction and to Curtis Mallet for tax opinion letters. Tr. 1562-63 (DiMuzio); Tr. 2922-25 (Bee).

Throughout the first half of 1999, Bricker and Cukier reviewed and commented on draft documents from BDO, AIG, and other law firms regarding foreign currency option exchanges for the future execution of the Spread Transaction, including transaction documents relating to currency trading, a subscription agreement, a partnership agreement, an offering memo, an agreement with New Vista to provide services, and a withdrawal/redemption letter. Tr. 921-23, 987-89 (Bricker); see also DX 559, 598. After reviewing these documents, Bricker concluded that the spread transaction would "more likely than not" create a step-up in basis of the asset and allow for reportable losses under Federal tax law and issued an opinion to that effect to clients of BDO. JX90; Tr. 943-44 (Bricker).

Bricker's opinion stated that the "transfer to the Partnership of the [option spread] should [be] viewed as a contribution of the Purchased Call Option . . . to the Partnership and the Partnership's assumption of the Sold Call Option. Thus, . . . the Partnership interest equal[s] the basis of the Purchased Call Option . . . ." JX 90 at 15-16. Interpreting Internal Revenue Code section 752, Bricker opined that the obligations created by the sold options assumed by the partnership were "contingent," because they were not exercised and therefore not a liability for purposes of lowering the basis under section 752(b). JX 90, Tr. 943, 1015-16 (Bricker).

---

[20] BDO Seidman claims to have disavowed its manual several months prior to October 1999, but is unclear when this disavowal occurred. Tr. 2935, 2947, 2957 (Bee).

[21] Bricker testified that he and Bee discussed the spread transaction "for many months, and I believe it included April of 1999." Tr. 985-86 (Bricker).

**AIG: May - June 1999**

In April or May of 1999, Bergmann met Ann Reed, the treasurer of AIG's Trading Group, and Sheldon Pang, a salesperson on the foreign exchange desk at AIG. Tr. 1670-72 (Reed). At that meeting, Bergmann proposed transactions in which Sentinel clients would buy option spreads, and AIG would be paid account opening and transaction fees. JX 112 (Pang Dep. at 139); Tr. 1177-78 (Bergmann).[22] Pang was AIG's principal contact with Sentinel on the "sales side," where he was in charge of setting up accounts for Sentinel. Tr. 1672-74 (Reed). Reed was also an AIG contact for opening and setting up accounts with Sentinel, and she met with Sentinel to establish a working relationship. Tr. 1674-75 (Reed).

Before AIG would being trading with Sentinel clients executing the Spread Transaction, a series of required steps had to be established -- these steps were recorded in a document entitled "Procedures for Transactions with AIG, Meeting at Sentinel with AIG on May 17, 1999 at 3 pm" that was prepared in conjunction with a meeting between AIG and Sentinel that day. DX 555; Tr. 1675-76 (Reed); Tr. 2631-48 (Conjeevaram).[23] These May 17, 1999 procedures set forth four primary steps required to complete each transaction and assigned responsibility for each step of the spread transaction. See DX 555; see also Tr. 2631-48 (Conjeevaram). The four steps were:

1. Trade To Be Done
2. Trade is Executed
3. Contributions into the Partnership
4. Redemption from Partnership.

DX 555. Under each of these four steps, administrative tasks were listed. Under "Contributions into the Partnership," the following steps were listed:

a. Assignment & Assumption agreement to be signed by Sentinel and Investor and sent to AIG for signature

b. Noreen to follow up with investor and AIG for signed and completed Assignment & Assumption Agreement

---

[22] The de bene esse Pang deposition and the video tape of that deposition were admitted into evidence as JX 112 and JX 113, respectively. Tr. 3637-40. Pang testified that his impression was that Bergmann's clients were "some speculative funds or high net worth individuals" and that these clients "would be net buying options." JX 112 (Pang Dep. 22-25).

[23] Plaintiffs objected to this exhibit arguing that it was not clear that this was one complete document or a series of documents. Tr. 2646. Given the testimony of Conjeevaram, the Court admitted the exhibit for the purpose of demonstrating that the document reflected the procedures used for transactions between Sentinel and AIG and accurately reflected the duties of Conjeevaram's assistants at Sentinel in processing such transactions. Tr. 2648.

c. After Assignment & Assumption is signed by all parties, Sentinel to determine the date of the revaluation of the spread and the date for the Assignment & Assumption Agreement.

d. Contribution / Revaluation date and the date of the Assignment & Assumption should be the same

e. Udai / Jeremy should inform AIG the revaluation date

f. Revaluation reviewed and checked

g. Noreen to send investor a copy of the revaluation and the signed Assignment & Assumption agreement

Id.

The following tasks were listed under step four, "Redemption from Partnership":

a. Letter from Investor

b. E-mail redemption date to Eli / Udai and Jeremy

c. E-mail assets to be redeemed to Udai / Jeremy

d. Reply to investor re. date of redemption

e. AIG to value the partnership's assets - turn-around time is approximately 2 days after request

f. Untracht & Assoc. to review investor capital account

g. Determine the assets to be redeemed

h. Letter to AIG to transfer requisite amount of currency

Id.[24]

**The Master Trading Agreements: September 15, 1999**

On September 15, 1999, the Ervin LLCs entered into a letter agreement with AIG authorizing

---

[24] The first names referenced in the document -- Noreen, Udai, Eli and Jeremy -- refer to Sentinel employees. Tr. 2631-32 (Conjeevaram).

Sentinel to act on their behalf in trading with AIG. See JX 34, JX 35, JX 36; see also Tr. 1695-96 (Reed). That same day, each Ervin LLC entered into a separate Master Trading Agreement with AIG, and Reed signed the agreements on behalf of AIG. Tr. 1679 (Reed); JX 31, JX 32, JX 33.[25] These Master Trading Agreements were developed internally at AIG, and were specific to foreign exchange trading. Tr. 1679-80 (Reed).

Provision 11.1 of each Master Trading Agreement stated in part:

> This Agreement may not be assigned by either party in whole or in part without the prior written consent of the other party. Transactions may be assigned to a new counterparty solely upon credit and legal approval of the new counterparty by AIG, such approval to occur in writing prior to any such assignment.

JX 31, JX 32, JX 33. According to Reed, this provision was intended to protect AIG's interests by prohibiting either party from randomly assigning its position to anyone else. Tr. 1681-82 (Reed).

Schedule E of the Master Trading Agreements established original margin requirements for options sold to AIG by the Ervin LLCs as follows:

> (a) For each Currency Contract, 5% of the Contract Value of that Transaction where the underlying currency pairs consist of Group A Currencies, as defined herein, and otherwise, between 10% and 20% of the Contract Value of that Transaction, as determined by AIG in its sole discretion. Except as otherwise agreed by the parties, "Group A Currencies" shall include the . . .Euro and the US Dollar.
>
> . . . .
>
> (c) For each Currency Option under which AIG is the Holder, the product of (i) 5% of the Contract Value of that Transaction where the underlying currency pairs consist of Group A Currencies, and otherwise, between 10% and 20% of the Contract Value of that Transaction, as determined by AIG in its sole discretion, and (ii) the delta for that Transaction (as determined by AIG in any commercially reasonable manner).

---

[25] The Ervin LLCs were created on September 17, 1999, two days after the Master Trading Agreements were executed. See DX 769.

JX 31-33.[26] Ann Reed testified that the purpose of Schedule E of the Master Trading Agreements was to clarify "how original margin would be held for an option which was sold to AIG." Tr. 1682-83 (Reed).

Paragraph 11.6 of the Master Trading Agreement provided: "Unless otherwise agreed, Counterpart shall, from time to time and as requested by AIG, pay to AIG a fee equal to 0.0275% multiplied by the notional amount of any Call spread or Put spread Option Transaction." JX 31, JX 32, JX 33. Bergmann testified as follows regarding the fee provision in Section 11.6:

> Now, we did with AIG something which was called either an account open fee or a facility fee because we knew that we were planning to trade these things in and out all the time, and if you would have to pay a bid offer every single time it would be very costly and onerous.[27] We had a gentlemen's agreement, an understanding with the traders, that we will pay a fee, a specific fee up front, which would be called either a facility fee or an account opening fee, whatever the terminology is, to allow us to trade reasonably a few times without having to pay additional bid offers to the tightest bid offer, which is like one-hundredth. That would allow us to trade and to make money without having to pay out every time.
>
> Q. To pay out what every time?
>
> A. A bid offer. The regular bid offers.

Tr. 1177-78.[28] Bergmann could not recall the name of the person at AIG with whom he reached the

---

[26] Dr. Kolbe, an expert for the Government in financial economics, investment, leverage, and capital market principles defined margin as the "security necessary to post on the sold call to make sure you can honor your obligation." Tr. 2367-68 (Kolbe). The amount of margin is generally calculated by reference to a percentage of the total amount at risk in a trade. See DX 501 at 13-15; DX 768 at 32-33; Tr. 3144-47 (DeRosa); Tr. 3504-06 (Kolb).

[27] Mr. Shoji defined a bid/offer spread as follows: "In the financial markets there's typically a price at which a trader or market maker would buy a particular asset and a different price, a higher price, which I will sell that asset. Tr. 2493 (Shoji). Financial institutions' profits generally arise from earning small percentages on the bid-ask spread on many transactions, so dealers for those institutions look for a counterparty who will trade in sufficient volume to generate revenue. See DX 768 at 11-14; see also Tr. 3083-91 (DeRosa).

[28] See Tr. 1370 (Bergmann) ("[The facility fee] gave you the right to instead of paying a bid offer every time you restrike it you paid a fee, and you got an agreement that you would restrike the options for a minimal, if any, bid offer.").

referenced "gentlemen's agreement." Tr. 1316 (Bergmann). He testified that provision 11.6 of the Master Trading Agreement was intended to reflect this agreement, but that the language is unclear. Tr. 1374-75, 3458-61 (Bergmann).

AIG did not normally require counterparties to pay an up-front fee prior to engaging in foreign exchange option trading. Tr. 1694-95 (Reed). Ann Reed, the Treasurer of AIG's Trading Group and the primary contact with Sentinel for drafting the Master Trading Agreement testified as follows:

> Q. Now, what is that fee for?
>
> A. I don't know.
>
> Q. Is it a standard term in AIG's multi agreement?
>
> A. It was not in the basic multi agreement as developed, no.
>
> Q. Do you know why it was included in this agreement?
>
> A. I do not.
>
> Q. Was it included in the master trading agreements for other Sentinel clients?
>
> A. Yes. Now, I can't say that they all have this, but I know that some of them did.
>
> Q. Was it included in master trading agreements other than for Sentinel's clients?
>
> A. I've never seen this provision that I recall outside of Sentinel's clients.
>
> Q. Was there a negotiation between AIG and Sentinel about the fees that were to be paid by Sentinel's clients?
>
> A. I don't know.
>
> Q. Do you know if AIG agreed to forego bid offers in favor of up front fees?
>
> A. I do not.
>
> Q. So you're not familiar with an informal agreement to that

effect?

A. I am not.

Tr. 1686-87 (Reed).

Reed sent a draft of the Master Trading Agreement to Conjeevaram by fax on July 13, 1999, that did not contain provision 11.6. DX 564; Tr. 1689-90 (Reed). Reed acknowledged that the final version of the Master Trading Agreement used for Sentinel clients did contain this provision, but did not know when it was added. Tr. 1690-92 (Reed). Neither Conjeevaram nor Pang knew how or when provision 11.6 became part of the Master Trading Agreement. Tr. 2598 (Conjeevaram). JX 112 (Pang Dep. 73-74).

Dr. David DeRosa, Defendant's expert in options and foreign exchange trading, testified that the $84,100 fee arrangement in the Master Agreement was unusual. Dr. DeRosa stated: "I've never paid such a fee, and none of the investment partnership hedge funds I've ever been associated with who I've ever heard of ever paid a fee like that." Tr. 3184 (De Rosa). He opined that the reason he never had to pay such a fee was because "[his investments] were real opportunities for the investment bank." Id. When asked why he believed the Ervin LLCs were asked to pay such a fee he stated:

> I think the answer is because the business isn't worth very much to AIG, and they had to make some money on it. But it's certainly not a normal relationship, and I -- you know, I've seen a lot of circumstances in this big world of foreign exchange, but I never saw anybody pay to play. . . .There is no way I would do this. . . . I've never heard of this. Honestly, I have never heard of this, an account opening fee before.

Tr. 3185-86 (DeRosa).

Neither Reed nor any other AIG employee assessed the creditworthiness of Sentinel's clients individually, even though AIG had an established process for making such an assessment that would not have "taken very long." Tr. 1685 (Reed). Instead, AIG relied on Sentinel's assurance that each of its clients had net assets in excess of $10 million. Tr. 3454-55, 3462 (Bergmann).[29] AIG began trading with Sentinel in June of 1999. Tr. 1675 (Reed). According to Reed, AIG provided services to more than 50 Sentinel clients in 1999. Tr. 1677 (Reed).[30]

---

[29] Sentinel did not give AIG any documentation in support of its assurance that each client had the necessary assets. Tr. 1685 (Reed).

[30] According to Pang, AIG provided foreign exchange trading services to more than ten Sentinel clients. JX 112 (Pang Dep. at 80).

**BDO Seidman's Tax Opinion Letter**

In May 1999, BDO Seidman prepared a 37-page tax opinion for potential investors in the spread transaction. The opinion briefly described the investment aspects of the spread transaction, -- the type of options to be purchased and sold, the strike price for each option, the dollar and euro value of each option, the expiration dates of the options, and profit potential of the transaction. JX 23 at 2.[31] The opinion went into great detail about the tax consequences of the transaction. The opinion began:

> THIS OPINION CONSIDERS CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF A PROPOSED INVESTMENT TRANSACTION AND IS BASED ON A HYPOTHETICAL FACT PATTERN.

JX 23 at 1. The opinion outlined four steps of the investment strategy, which were: 1) Investment in Foreign Currency, 2) Contribution to a Partnership, 3) Partnership Investments, 4) Termination of Partnership Interests. JX 23 at 2-3. The opinion explained that the investor would first "purchase a European-style call option" and at "the same time . . . sell a European-style call option." JX 23 at 2. The investor would then contribute the purchased and sold call options to a partnership that had been previously formed under Delaware law. JX 23 at 2-3. "Sentinel Advisors [would be] the investment advisor to the Partnership, and [would] charge the Partnership an investment advisory fee." JX 23 at 2. In return for the options contribution the investor would receive a "less than 50% interest in the partnership." JX 23 at 3.

In the fourth step of the BDO Spread Transaction, "Termination of Partnership Interests," the purchaser of the spread would exit the partnership, receive an asset with a claimed high-basis and low-value, and then sell that asset in order to generate a tax loss. JX 23 at 3; DX 665. The partnership would continue to exist and invest. See JX 23 at 3, § 4, ¶ 2. BDO recommended to its customers that the amount of time between the second step (entering the partnership) and the fourth step (exiting the partnership) be no less than 60 days. Tr. 2969-70 (Bee). BDO recommended this 60 day minimum for tax reasons -- to establish that purchasers of the spread transaction were "partners" for purposes of substantive tax law. Tr. 2969-71 (Bee).

The opinion summarized the federal income tax consequences of the spread transaction stating "it is more likely than not that:"

> 1. You should recognize gain on the transfer of the Purchased Call Option to the Partnership. You will not recognize any

[31] With respect to profit potential the opinion stated: "[t]he options are structured to provide you with the opportunity to earn a profit equal to 135% of your actual investment, and to limit your losses to your actual investment." JX 23 at 2. However, the opinion did not provide any further explanation of the profit potential or loss limitation. See JX 23.

loss on the contribution of the Purchased Call Option to the Partnership.

2. Your basis for the Partnership interest should be equal to your basis in the Purchased Call Option, reduced by the amount of liabilities assumed by the Partnership. The sold call option should not be considered a liability for purposes of section 752.

3. Your share of any loss incurred by the Partnership should be deductible by you, and should not be subject to the passive activity loss rules.

4. You should not recognize gain or loss on the receipt of foreign currency from the Partnership in exchange for your Partnership interest.

5. The basis of the foreign currency received in liquidation of your Partnership interest should equal your basis for the Partnership interest.

6. The gain or loss recognized on your sale of the foreign currency should be treated as ordinary income or loss.

JX 23 at 4. The opinion provided a detailed analysis of Helmer, and concluded that a "Sold Call Option contract creates no obligation to return the premium to the purchaser. Indeed, the premium represents deferred income to the seller and is not a liability." JX 23 at 13-14.

**Dimuzio Introduces the Spread Transaction to the Ervins**

On August 23, 1999, DiMuzio mailed BDO's May 1999 draft model tax opinion to Martin McElroy. Tr. 1512, 1517 (DiMuzio); JX 22, 23. McElroy reviewed this opinion and was "impressed" with it. Tr. 1626 (Mountjoy). McElroy was impressed overall with Sentinel, BDO Seidman, Curtis Mallet, and the opinions and guidance they provided on the proposed transaction. Tr. 337-38 (G. Ervin); Tr. 1409, 1411-12 (McElroy); Tr. 1626 (Mountjoy). Jesse Mountjoy also reviewed the BDO Seidman model opinion at the request of Gary Ervin and found the model opinion to be thorough, well researched, and "balanced from the standpoint of presenting both sides of legal interpretation." Tr. 1614 (Mountjoy).

**Gary Ervin's Failure to Restrike the Dycom Options: August 26, 1999**

In late August 1999, Maidman called Gary and told him that the Dycom stock price had dropped dramatically, from $48.56 per share on June 1, to $37.50 per share on August 26, 1999. Tr.

136 (Maidman); Tr. 357-58 (G. Ervin); JX 1. The Ervins' put option gave them the right to sell the Dycom Stock at $42.2859 per share and realize a gain of $4.7859 per share. JX 1 at 5; JX 14 at 2, JX 15 at 2, JX 16 at 2. Maidman explained that the Ervins could restrike the appreciated put option in each collar, leave the call option unaltered, and reap an aggregate profit that exceeded $1.5 million.[32] Tr. 136-37 (Maidman); Tr. 358 (G. Ervin). On the advice of Cheyne Pace, Gary did not restrike any of the options at this time. Tr. 359-60, 362-63 (G. Ervin); Tr. 222-23 (Pace). After the Dycom stock quickly recovered, Gary regretted that decision. Tr. 362-63 (G. Ervin). On behalf of himself and his brothers, he restruck the purchased option the next time the opportunity arose. Tr. 484 (T. Ervin); JX 1 (Nov. 1, 1999 Entry.)[33]

**The September 2, 1999 Meeting Between BDO Seidman and Gary Ervin**

On September 2, 1999, DiMuzio met with Gary Ervin, Mountjoy, and McElroy at McElroy's office in Henderson, Kentucky. Tr. 519, 522, 525, 634 (G. Ervin); Tr. 1513, 1574 (DiMuzio); see also PX 244.[34] At the meeting DiMuzio explained the substance and tax benefits of the Spread Transaction described in the model opinion letter. Tr. 1514 (DiMuzio); Tr. 520 (G. Ervin). No representative of Sentinel was present. Tr. 634 (G. Ervin); Tr. 1499, 1513, 1542 (DiMuzio). DiMuzio, McElroy, Mountjoy, and Gary Ervin discussed the model opinion letter in "pretty good detail." Tr. 1407, 1438 (McElroy).[35] Specifically, DiMuzio recommended that Gary talk to Sentinel about trading euro options as Sentinel had a group of "very successful" and "very experienced" traders, and because the "tax advantage portion" of the Spread Transaction "was very similar to [BDO's] earlier presentation." Tr. 364-65, 369-70, 372-73 (G. Ervin); Tr. 1405 (McElroy).

Gary Ervin enlisted his long-time tax attorney, Jesse Mountjoy, a former IRS attorney, to attend this meeting with BDO Seidman. Tr. 518-20 (G. Ervin). After Gary Ervin had described the Jenkens & Gilchrist deal to Mountjoy, he was skeptical, and Gary wanted him involved in the debate "to play devil's advocate." Tr. 518 (G. Ervin). Initially, Mountjoy, who is blunt, was skeptical, but

---

[32] According to Dr. Kolbe, "[a]ll restriking does is pay a fee in exchange for taking some cash out now, and in the process losing some insurance . . . . So it's not a money-maker. It's a liquidity-maker." Tr. 2356 (Kolbe).

[33] The Ervins entered into another put option agreement on or about November 1, 1999, so that they would have the protection of the "costless collar" once again. Tr. 136-37 (Maidman); Tr. 358, 505-08, 619 (G. Ervin); Tr. 835-37 (Pfeiffer); Tr. 2356 (Kolbe).

[34] PX 244 is Gary Ervin's personal calendar from December 1998 to January 2000. The calendar entry for September 2, 1999, states "David Demesio - BDO 10:00, Martin McElroy." PX 244.

[35] Tim and Robert Ervin testified that McElroy later explained the tax benefits of the spread transaction to them in the context of options on corn and soybeans. Tr. 1488-89 (McElroy); Tr. 407 (R. Ervin); Tr. 447 (T. Ervin).

by the end of the meeting Mounjoy became "convinced otherwise," and told Gary Ervin so. Tr. 520 (G. Ervin). Had Mountjoy not been convinced, Gary Ervin would not have done the spread transaction. Tr. 519 (G. Ervin). Jesse Mountjoy had represented the Ervin family since the late 1980s, and Gary Ervin had uniformly followed his advice. Tr. 517 (G. Ervin); Tr. 1637 (Mountjoy).

DiMuzio told Gary Ervin to call Bricker of Curtis Mallet for tax advice in the form of an opinion letter. Tr. 699-700 (G. Ervin); Tr. 1518-19 (DiMuzio).

**Gary Ervin's Discussion With Bricker: Late August or Early September 1999**

Following DiMuzio's suggestion, Gary Ervin contacted Bricker to discuss the spread transaction in late August or early September of 1999. Tr. 583, 699, 718 (G. Ervin); Tr. 923-24 (Bricker); Tr. 1518-19 (DiMuzio). The Ervins did not engage Mr. Bricker at that time, because they understood that they did not need to engage the law firm until they planned to exit the partnership, and they intended to retain Bricker when they left the partnership. Tr. 583, 738 (G. Ervin); Tr. 923-24 (Bricker).[36] During that initial conversation, Gary asked Bricker questions about options and commodity trading and questioned him extensively about his educational background and professional experience with options and commodity trading. Tr. 924-27 (Bricker). In Bricker's view, Gary Ervin was "conducting some sort of review or due diligence" on him and Curtis Mallet, and Bricker explained to Gary that he had 30 years of legal experience focusing on the tax consequences of commodity transactions and other issues. Bricker also gave Gary Ervin the background of Curtis Mallet, explaining that the firm "had been around a long time" and did "a lot of international work." Tr. 926 (Bricker).

---

[36] Gary Ervin testified :

> We realized that the opinion was an important part of the tax advantage part of this, to get his feel for who he was, the firm he was involved with. . . .
>
> As far as -- as far as at the time I'm entering, I knew that it was important to have an opinion written, to have the discussion with Mr. Bricker. Before entering, I thought that was equally important. . . . You know, I don't know why as far as a lot of these opinions are asked for. They are to attest what we had done was correct, was legal. I knew that this was a tax advantage investment. I knew that the taxes were part of it, and I felt it important that we had a good legal advisor to give us an opinion.

Tr. 737-38 (G. Ervin).

**DiMuzio's September 8, 1999 Letter to Gary Ervin: Information on Sentinel and its Fee, and BDO's Preparation of the Ervins' 1999 Personal Tax Returns**

In a letter dated September 8, 1999, DiMuzio informed Gary Ervin that Sentinel Advisors had agreed to a five-percent fee as long as the Ervins' transaction was at least $40 million in total. JX 24. The letter stated:

> To confirm my voice mail message, Sentinel Advisors agreed to the 5% fee, assuming a transaction of at least $40 million in total. All other fees and costs would remain the same as discussed in our meeting last Thursday.
>
> Enclosed is information on Sentinel Advisors including biographies of the partners, a list of references and an Investment Advisor Registration statement, which, by SEC regulation, is provided to prospective investors. Also enclosed is a private placement memorandum for New Wave I LLC. This will not be your investment vehicle; I simply included it to give you a sense of Sentinel's other activities.
>
> With respect to fees for preparing your personal tax returns, as I indicated, it is difficult to quote a fee without analyzing your prior year returns and knowing more about your current situation. Because time is short, we may not be able to get enough information to make a fully informed estimate. However, to resolve this issue in order to keep the transaction moving, BDO Seidman, LLP will agree to prepare tax returns for you and your brothers at a fee commensurate with your prior year returns. In other words, if your 1999 federal income tax return is substantially similar to your 1998 return except for the sale of the businesses and the proposed transaction, our fee will be no higher than what you paid last year. State returns will be prepared on the same basis.
>
> I look forward to working with you, your brothers, Martin and Jesse in completing this engagement.

JX 24.

DiMuzio vaguely testified that the "proposed transaction" mentioned in his September 8 letter referred to an "investment with a Sentinel hedge fund:"

> Q. What was the transaction though? I want -- you used the word.

A. The investment.

Q. Would you please specify that?

A. If I'm being evasive, Your Honor, I don't want to be. The Sentinel investment, the decision to invest in a Sentinel hedge fund partnership.

Q. Okay, that's an investment. This is a transaction. You used the word twice. You said let's keep the transaction moving, and then you said --

A. Yes, yes, I did.

Q. -- later in the letter, "In other words, if your 1999 federal income tax return is substantially similar to your '98 return except for the sale of the businesses and the proposed transaction."

A. That would be -- I think I was referring to the Sentinel investment in both of those cases. That's what I meant by transaction, yes.

Q. Okay. And what Sentinel Investment? Specify the transaction.

A: An investment with a Sentinel hedge fund, an investment with a Sentinel hedge fund. I think that's what I was referring to encompassing transaction.

Q. Had you been privy to the proposed transaction that the Ervins were contemplating at that time, the specific transaction, not just a general investment? I'm trying to get specifics here.

A. Oh, I was -- I attended the meeting when Smita made a presentation about -- a detailed presentation about the options, about the trading of the options inside of the partnership, about knock-out options, about the leveraging that was allowed or that was available there, about the potential returns. So that's what I was thinking about in connection with that.

Tr. 1567-69 (DiMuzio). In early September 1999, the Ervins became clients of BDO Seidman. Tr. 519-25, 634 (G. Ervin); Tr. 1512-13, (Di Muzio).

**BDO Seidman Introduces the Ervins to Sentinel: Late August or September 1999**

In late August or early September of 1999, DiMuzio gave Gary Ervin's contact information to Bergmann. Tr. 369, 3627-28 (Gary Ervin). Bergmann contacted Gary Ervin via telephone in August or September of 1999, and spoke to him for "a few hours" about possible investments and the services that Sentinel could provide. Tr. 367-69, 3627-28 (G. Ervin); Tr. 1069-72 (Bergmann). During the call Bergmann informed Gary Ervin of his professional experience in accounting and trading, provided professional background information on key personnel at Sentinel, and introduced Gary to several of the Sentinel partners. Tr. 367-69 (G. Ervin). Bergmann considered the Ervins to be "overly positioned" in Dycom stock and told Gary Ervin they needed to diversify their investments. Tr. 375 (G. Ervin). Bergmann recommended that Gary Ervin and his brothers diversify by investing in euro currency options where they could potentially make "10, 15, 20 times" their investment. Tr. 1072 (Bergmann); Tr. 375 (G. Ervin).

During Bergmann's initial phone conversation with Gary Ervin, Bergmann informed him that a unique opportunity existed to make large investment returns from the euro and that derivatives were the ideal instrument to take advantage of the euro. Tr. 381 (G. Ervin); Tr. 1071 (Bergmann). Specifically, Bergmann testified that he told Gary: "1999 was a critical year, was the year of the introduction of the euro, and you have to realize that the euro . . . was an event that seldomly happens in the lifetime, and in the lifetime of an investor the opportunities that you have to catch." Tr. 1070 (Bergmann).

During the first telephone conference, in August or September 1999, and during telephone conferences over the next 30 days, Bergmann recommended engaging in heavy trading on euro options. Tr. 381-82 (G. Ervin); Tr. 1070-71 (Bergmann). Gary Ervin recalled approximately eight different phone conversations with Bergmann during the August and September 1999 time frame. Tr. 3631-3632 (G. Ervin).

Bergmann recommended that the Ervins combine "two regular options in [their] trade called an option spread." Tr. 1080 (Bergmann). Bergmann also recommended acquiring "reverse knock-out options." Tr. 1077-79 (Bergmann); Tr. 382 (G. Ervin). Options like knockout options are often described as exotic strategies. Tr. 2509 (Shoji); See Tr. 3118 (DeRosa). One type of exotic option is a "barrier" option, which has a "price barrier" which, if hit, causes the option to expire immediately. Tr. 3118 (DeRosa). A knockout option has a barrier set below the strike price; if the currency ever trades at or below the barrier, the option immediately expires worthless. See DX 501 at 7-8; Tr. 3119-20 (DeRosa); DX 768 at 39.[37]

[37] A reverse knockout option has a barrier set above the strike price; if the currency ever trades at or above the barrier, the option immediately expires worthless. See DX 501 at 7-8; Tr. 3119-20 (DeRosa); DX 768 at 39. Reverse knockout options are generally much less expensive than

Bergmann testified about how he described the reverse knockout to Gary Ervin during their initial phone conversation:

> The reverse knock-out allows you to have a multiple up to 38 to 1 if you are right, and if worse comes to worse you could lose your premium. You could lose your premium if the euro goes lower, or you can lose your premium if the euro goes too high. We thought it was an ideal instrument to present, and that's what I told Gary.
>
> . . . .
>
> And we told him, listen, if you want to do now an investment to get you a return, which is also levered [sic], not as levered [sic] and as tailored as a reverse knock-out, but also has a very good characteristic, is combining two regular options in your trade called an option spread.
>
> . . . .
>
> He will basically double his money, not exactly, but around doubling his money.

Tr. 1079-80 (Bergmann); see Tr. 385 (G. Ervin). Bergmann also told Gary Ervin that, based on a Swiss Franc study, the Ervins stood a one in five chance to reap an average return of 14:1 with the reverse knockout options. Tr. 385 (G. Ervin); Tr. 1367-68 (Bergmann).

Sentinel sent the Ervins copies of a Sentinel brochure, a Sentinel reference list (which listed clients such as Merrill Lynch, Morgan Stanley, PricewaterhouseCoopers, Dewey Balantine, and BDO Seidman), examples of restriking pairs of options at a profit, a euro knock-out explanation, the Confidential Offering Memorandum of Jade Trading, LLC, and the book Understanding Options by Dr. Robert W. Kolb. Tr. 578-79 (G. Ervin); Tr. 1141 (Bergmann); JX 21. The Sentinel brochure outlined the trading background of Sentinel's principals and traders. JX 19; PX 227; Tr. 578-79 (G. Ervin). The other materials explained how option trading works, and more specifically, how the foreign currency investments that the Ervins were contemplating would work. Tr. 572-79 (G. Ervin); Tr. 1140-41 (Bergmann). The Sentinel marketing materials included the monthly historic returns for Sentinel's Citadel fund from August 1997 to July 1999, and examples of how spreads could be restricken and profits could be earned on knockout options. JX 20, PX 232, 228; Tr. 667-68 (G.

---

standard options because the closer the option gets to a maximum payoff, the more likely the option is to be extinguished by virtue of hitting the barrier. Tr. 3180-81 (DeRosa).

Ervin).[38]

After speaking with Bergmann and reviewing the materials he was provided by BDO and Sentinel, Gary Ervin concluded that Bergmann was more knowledgeable and experienced in this area than Maidman and Pace. Gary Ervin was impressed with Bergmann and his group at Sentinel. Tr. 372-74, 563-64 (G. Ervin).

**<u>Gary Ervin's Inquiries About Sentinel</u>**

Gary Ervin asked both Pace and Maidman about Sentinel and its recommendations on the euro. Tr. 137-40 (Maidman); Tr. 225-26 (Pace); Tr. 491-93 (G. Ervin). Maidman also asked the "appropriate people around [her] department in New York," about Sentinel but did not do a detailed background check. Tr. 199 (Maidman). Maidman told Gary that she knew of nothing negative about Sentinel, and said that her bank's position on the euro was positive. Tr. 139-40, 203 (Maidman); Tr. 492-94 (G. Ervin).[39]

Gary Ervin also asked Pace about his view on Sentinel, and Pace told Gary that the Sentinel principals had "distinguished backgrounds" and there was nothing negative to report. Tr. 224-25 (Pace); Tr. 515-16 (G. Ervin); JX 19. Pace informed Gary that he was positive on the euro. Tr. 226-27 (Pace); Tr. 516 (G. Ervin).

**<u>The Formation of the Ervin Single-Member LLCs: September 17, 1999</u>**

Gary, Robert, and Tim Ervin formed Ervin Holdings, LLC, Ervin Capital, LLC , and Ervin Investments, LLC, respectively, on September 17, 1999, as single-member limited liability companies under Delaware law. JX 28-30; DX 769; Tr. 3632-33 (G. Ervin). According to Gary Ervin, the Ervins formed the LLCs to execute the spread transaction based on the advice of William Bricker in order to limit their personal liability if the spread options were ever "split apart." Tr. 552-53 (G. Ervin). Gary believed that if they did not form LLCs and the spread options were separated in a manner beyond the Ervins' control, he and his brothers would lose their $15 million premiums in the purchased call options and would also be personally liable for the $300 million "total premium amount" of the sold call options. Tr. 553 (G. Ervin).

By fax dated September 21, 1999, Conjeevaram advised Gary Ervin:

---

[38] The range of monthly returns for the Citadel Master Fund from August 1997 to July 1999 was (-11.64) to 5.96. PX 232.

[39] Gary Ervin also asked Maidman about fees that would be charged on certain Sentinel trades, and she told him that fees up to five percent were allowed on options and common stock under the National Association of Securities Dealers, Inc.'s (NASD) rules, but could be higher if the services involved complex trades. Tr. 140-41 (Maidman).

> Enclosed for your information is a copy of the business card for the attorney's [sic] that are working on the documentation for the three single-member LLCs that [were] formed for the transactions. The names used for the three are Ervin Capital, LLC, Ervin Investments, LLC and Ervin Holdings, LLC. We should have the LLC operating agreements from the attorneys later this morning.
>
> . . . .
>
> If you are happy with the names of the LLC's I will have AIG work on revising the Master Trading Agreement. Please let me know.
>
> I will call you later this morning to confirm our meeting on Thursday in Evansville. Either my partner, Ari Bergmann or I will meet with you.

JX 25.

**Gary Ervin's September 23, 1999 Meeting with Sentinel's CFO**

Gary Ervin recalled meeting with Conjeevaram, Sentinel's CFO, twice before investing with Sentinel, but Conjeevaram only recalled one meeting. Tr. 638 (G. Ervin); Tr. 2608-09; 2669-71 (Conjeevaram). Neither Bergmann nor Pfeiffer ever met with Gary in person prior to the Ervins' investment in Jade -- their contact was strictly on the phone. See Tr. 638-39 (G. Ervin); Tr. 1301 (Bergmann). Conjeevaram never worked as a foreign currency trader, and had a heavy tax and accounting background. Tr. 2590-94 (Conjeevaram).[40]

On September 23, 1999, Gary Ervin and Martin McElroy met with Conjeevaram at the airport in Evansville, Illinois. JX 26; Tr. 638, 3636 (G. Ervin); Tr. 1408 (McElroy). McElroy

---

[40] Conjeevaram testified regarding her duties at Sentinel as follows:

> I really helped with the marketing, with the documentation, making sure things were signed, things were filed; you know, adequate records were maintained; monies moved the way they should have; amounts were correct. I was also involved with, you know, meeting with potential and current investors, you know, to walk them through any of the documentation that is necessary, any -- you know, what they really needed to do in order for them to participate in the hedge fund.

Tr. 2595 (Conjeevaram).

testified that the meeting was primarily a presentation of Sentinel "investments and the opportunities in the euros and their strategies on options," and also included information regarding "big multiples on some other strategies that they were recommending." Tr. 1408 (McElroy).

**The Formation of Jade: September 23, 1999**

Jade was formed by Sentinel and Banque Safra on September 23, 1999. JX 47, 84; Tr. 1092-93, 1223-24 (Bergmann). At some point during September 1999, Sentinel gave the Ervins copies of a "Confidential Private Offering Memorandum of Jade Trading, LLC," which stated:

> The investment objective of the Company is to realize short- and medium-term capital appreciation from the application of derivative trading strategies to a variety of investments in the foreign exchange and general fixed income global markets. The Company will seek to provide returns which are not correlated to the general fixed income and equity markets. Current income is not a primary objective.

JX 47 at 1; Tr. 572-73, 579 (G. Ervin); Tr. 1156-57 (Bergmann); Stip. ¶ 28.

Jade's Limited Liability Company Agreement described Jade's purposes as follows:

> Sec. 1.06 Purposes of the Company. The Company is organized for the purposes of investing substantially all of its assets in Securities . . . and engaging in all activities and transactions as the Managing Member may deem necessary or advisable in connection therewith, including, without limitation:
>
> (a) to invest, on margin or otherwise, in securities and other financial instruments of U.S. and foreign entities, including, without limitation: capital stock; shares of beneficial interest; partnership interests and similar financial instruments . . . .

JX 60 - 62; Tr. 1186-88 (Bergmann). This agreement was drafted by Sentinel. JX 60-62; JX 47 at 1; Tr. 572-73 (G. Ervin); Tr. 1156-57; 1186-87 (Bergmann). According to the BDO opinion letter provided by DiMuzio to the Ervins, Jade was formed for the "purpose of acquiring financial investments, buying and selling call options on foreign currency, and conducting other investment activities." JX 23 at 2.

Sentinel, the managing member and tax matters partner of Jade, held a profit interest, management fee, and incentive allocation that grew with the appreciation of Jade's capital. Tr. 1221-23 (Bergmann). At the end of each accounting period, any net capital appreciation or depreciation of Jade would be allocated to Sentinel and the other members of Jade in proportion to each member's capital account at the beginning of the accounting period. JX 47 at 000080. The

management fee paid to Sentinel by the non-managing members, was an annualized two percent of the value of each non-managing member's capital account balance on the first day of each quarter, or 0.5% each quarter. JX 47 at 000065. In addition, "[o]n June 30th and December 31st of each year . . . an amount equal to 20% of any net capital appreciation allocated to the capital account of each Non-Managing Member . . . [was to be] debited . . . [as an] 'Incentive Allocation.'" JX 47 at 000063. Further, a partner "would be subject to a withdrawal fee equal to five percent of the value of the partner's capital account on the date of withdrawal" for withdrawing prior to 12 months from entering the partnership. JX 89 at 7; see DX 665.

**The Ervins' Spread Transaction: September 29, 1999**

One day after Gary Ervin's meeting with Conjeeveram and the formation of Jade, September 24, 1999, the Ervin LLCs attempted to enter into the first set of euro options Sentinel was recommending. Tr. 561 (G. Ervin); 1145 (Bergmann). Their efforts were thwarted because the funds were not transferred, due to problems with the Ervins' funds being wired to Sentinel -- they sat in an AIG account for a few days before Sentinel actually received them. Tr. 560-61 (G. Ervin). Gary Ervin said there was a "misfiring" of the wiring process. Id.

On September 29, 1999, the Ervin LLCs each established a spread option position on the euro with AIG. See JX 38 - 43.[41] The Ervins purchased the option spread on the advice of Sentinel/New Vista, although they did not yet have any consulting agreement with either entity. Tr. 1146 (Bergmann); compare JX 38-43 with JX 48-50.

The terms of the option spreads purchased by each Ervin LLC were identical except for a 10-pip[42] difference in the strike price:

| | Face amount | Strike price |
|---|---|---|
| Purchased Option | €290,540,000 | 1.084 |
| Sold Option | €290,540,000 | 1.085 |

Tr. 1173-75 (Bergmann); JX 38-43. The premium to be paid by each Ervin LLC on the option purchased from AIG was $15,000,020. See JX 38-40. The premium to be received by each Ervin LLC on the option sold to AIG was $14,850,018. See JX 41-43. These premiums were netted, and each Ervin LLC actually paid AIG $150,002 -- not $15,000,020. JX 44-46. The expiration date of all six options was September 29, 2000, at 10:00 a.m. New York time. See JX 38-43. The options purchased by the Ervin LLCs were European options that typically can only be exercised at the

[41] A "spread" connotes a position held on a foreign currency through the simultaneous purchase and/or sale of more than one option to create a net position. Tr. 1791-92 (Kolb); Tr. 2496 (Shoji); Tr. 3122-24 (DeRosa).

[42] "One pip is one one-hundredth of a cent. Ten pips is 10 one-hundredths or one-tenth of one cent." Tr. 3134 (DeRosa).

expiration date. Tr. 1101, 1163 (Bergmann); Tr. 2486 (Shoji).[43]

AIG did not require margin from the Ervin LLCs because the most the Ervin LLCs could lose was their initial purchase price, $150,002, the approximate difference in price between the two options in the spread. Tr. 2535-39 (Shoji); see also Tr. 3135 (DeRosa); Tr. 1701-02 (Reed).[44] From AIG's perspective, the spread transaction was free of credit risk because under no circumstances would the Ervin LLCs owe AIG any money on the options. DX 501 at 11. However, AIG's credit protection would disappear if the option components were separated or assigned to other parties. Id. Although the Ervin LLCs were prohibited from assigning their option strategies by paragraph 11.1 of the Master Trading Agreements, if the options were somehow split or assigned, AIG would have required the Ervin LLCs to post original margin. Tr. 1702-03 (Reed). Dr. DeRosa, Dr. Kolbe, and Dr. Kolb calculated that the original margin on the call options sold by the Ervin LLCs to AIG would have been approximately $8.4 million. DX 501 at 13-14; Tr. 3146 (DeRosa); Tr. 2367 (Kolbe); Tr. 3506 (Kolb). If the Ervin LLCs had separated the spread or assigned their obligations on the sold call options, AIG would have required the LLCs to pay the $15,000,020 premium for each call option purchased by the LLCs from AIG, plus the $8.4 million original margin for each call option sold by the LLCs to AIG. DX 501 at 13-14; Tr. 1702-03 (Reed); Tr. 2367-72 (Kolbe); Tr. 3506 (Kolb).

The Ervin LLCs each paid AIG $84,110 pursuant to provision 11.6 of the Master Trading Agreements in connection with their acquisition of the option spreads. Stip. ¶ 26.

**The New Vista Consulting Agreement: October 3, 1999**

Each Ervin LLC entered into a consulting agreement with New Vista on October 2, 1999. JX 48-50. The consulting agreements obligated New Vista to

> advise the [Ervin LLCs] with respect to Risk Management, including, without limitation, in connection with the sale, pledge, loan, conveyance, assignment, transfer or other disposition of any instrument or investments, and the creation of hedging positions to preserve or limit the loss of value of any positions or otherwise

---

[43] An American-style option can be exercised at any time during the life of the option, whereas a European-style option typically can only be exercised on the expiration date or at maturity. Tr. 2486 (Shoji). However, a European option "can always be sold to the bank that originally sold the option to you, so it is not as if by purchasing a European option you're stuck with it for a year." Id.

[44] When executing offsetting spread options, margin is generally not required because "the two halves of the position are much less risky when held by a single counterparty" and the proceeds of one option can be used "to offset the other as to cost." Tr. 2366-67 (Kolbe). In essence, "there's no risk to the counterparty because the counterparty has both halves of the spread." Id. at 2367.

> through the use of one or more interest rate, currency, or other derivative products, including, without limitation: (i) swaps, options, warrants, caps, collars, floors and forward rate agreements; (ii) spot and forward currency transactions; and (iii) agreements relating to or securing such transactions. The Consultant will also (i) give advice regarding macroeconomic issues in structuring transactions and (ii) provide derivatives expertise training to the Client and/or any of the Client's employees.

JX 48 at 1-2; 49 at 1-2; 50 at 1-2.

Gary understood that if the Ervins did not pay the New Vista fee they would not be admitted as partners in Jade. Tr. 567, 569-70 (G. Ervin). Although the Ervins were required to pay the New Vista fee as a prerequisite for entering Jade, Sentinel did not pay a fee. Tr. 1315 (Bergmann).

**Legal and Consulting Fees**

Each Ervin LLC paid the following fees in addition to the $150,002 premium paid to AIG:

| Fee | Amount |
|---|---|
| New Vista consulting fee | $750,000[45] |
| AIG account opening fee | $ 84,100 |
| Curtis Mallet legal fees | $100,000 |
| Total | $934,100 |

JX 26, 37, 48-50, 85-87; Tr. 928 (Bricker); Tr. 1650-51 (Mountjoy). In addition to the fees listed above, the Ervins were also required to pay Sentinel a two-percent management fee of the net asset value of their contribution in Jade Trading ($225,002 per brother) and 20 percent of any profits earned by Jade. Tr. 1314-15 (Bergmann); see JX 57-59.

It is unclear what value the Ervins received for the $750,000 consulting fee. New Vista provided the Ervin LLCs with reports on foreign exchange and other financial markets as well as investment periodicals reporting on different European investments. These brief reports covered the current market conditions in the foreign exchange market. Tr. 3193-96 (DeRosa); JX 69. DeRosa testified as follows regarding the New Vista fee and services provided to the Ervin LLCs:

> I cannot for the life of me understand why any fees would go to New Vista at all. It doesn't make any sense to me whatsoever. Those are big numbers. Three-quarters of a million times three? And the

[45] 40 percent of the $750,000 -- or $300,000 -- was remitted by New Vista to BDO Seidman for a "tax planning fee," pursuant to BDO's agreement with Sentinel and New Vista. Tr. 1090-91, 1371 (Bergmann); Tr. 1584-85 (Dimuzio).

> purported thing is buying research -- well, research is free. . . . there are any number of foreign exchange dealers that supply research continuously to market participants. I haven't traded in a long time. I still get fully covered by research from the major houses. I get inundated with it.

Tr. 3191-92 (DeRosa).

Dr. DeRosa opined:

> It is not clear to me, however, that New Vista provided any meaningful or useful consulting to the Ervin LLCs. For example, New Vista was not even retained at the time the Ervin LLCs did their only significant foreign exchange transaction, when they entered into the spread strategies. New Vista was not on board when the Ervin LLCs theoretically ought to have needed its assistance the most. The documents I have reviewed (that New Vista supplied to the Ervin LLCs) and the comments made by Mr. Bergmann in his deposition lead me to believe that New Vista's services were of practically no use to the Ervin LLCs. Furthermore, after the Ervin LLCs contributed their spread strategies to Jade, the only trading that they did was to liquidate the final distribution from Jade. Thus whatever advice New Vista had to offer would have been wasted on the Ervin LLCs in this regard.

DX 501 at 21-22.

The $84,100 paid to AIG covered the costs associated with opening a new account. JX 26, 37. Ari Bergmann testified that he negotiated this fee with AIG as a "gentlemen's agreement" in lieu of having to pay "bid offers" every time Sentinel clients did a trade with AIG. Tr. 1177 (Bergmann). However, this gentlemen's agreement was wholly uncorroborated.

Reed was unaware of who at AIG negotiated the fee arrangement with Sentinel, although she presumed it might have been Pang. Pang likewise professed ignorance regarding the origin of the $84,100 fee, testifying that fees were "not [his] area," and that he thought the fee arrangement was "odd." JX 112 (Pang Dep. 73-74). Pang testified that AIG published research reports on foreign exchange trading "daily," sent them to customers to generate business, and "typically" did not charge customers for those reports. JX 112 (Pang Dep. 81).

Each Ervin LLC paid $100,000 to Curtis Mallet for a tax opinion letter. The opinion letter was requested to cover "certain aspects of United States Federal income tax in connection with (i) investments in foreign currency that [the Ervins had] made and (ii) transactions in which [they] engaged with a partnership that . . . trades in foreign currency . . . ." JX 89 at 1. The $100,000 fee

was a one-time fee for each LLC. Gary Ervin believed the fee of $100,000 per LLC was excessive since the opinion was going to be essentially the same opinion for each LLC, but he was unsuccessful in negotiating a lower fee with Bricker. See Tr. 584-86 (G. Ervin), 928-29 (Bricker), 1651-53 (Mountjoy).

The Ervins also incurred fees from their long-time accountant McElroy and outside attorney Mountjoy for services rendered regarding the spread transaction, although the amount of fees paid to these advisors is not in the record. Tr. 432-33 (T. Ervin); Tr. 517-18 (G. Ervin).

**<u>The Ervins' Entry Into Jade: October 6, 1999</u>**

On October 6, 1999, the three Ervin LLCs entered Jade. In total there were five partners in Jade -- the Ervin LLCs, Sentinel Advisors, and Banque Safra.[46] Tr. (G. Ervin) 286-87; JX 57-59, 84. Gary testified that the Ervin LLCs entered Jade Trading because Bergmann had told him that he planned to actively trade on behalf of the Ervin LLCs and if the LLCs were members of the partnership, Bergmann had the ability to get better terms on behalf of the LLCs. Tr. 566-68 (G. Ervin). Specifically, Gary testified:

> Q. Please, can you explain what you were told?
>
> A. There were I guess volume. [Bergmann] could trade for all the partners instead of doing it individually in different accounts. It was the trading, you know. He was going to do the knock-outs and the more aggressive type of trading. It was going to be, you know, I understood be very actively traded. I guess his ability to have discretion and to trade actively into that partnership. That was my understanding.

Tr. 567-68 (G. Ervin).

Bergmann testified that by entering Jade, the Ervin LLCs were able to pool assets and make larger more diverse trades than they would be able to execute on their own, and they were also able to obtain lower "institutional pricing" on trades executed by the partnership. Tr. 1151-54 (Bergmann). Specifically, Bergmann testified as follows:

> Q. Excuse me. Are you saying getting into the partnership you get superior pricing?
>
> A. Yes, you get what's called the institutional pricing.

---

[46] Banque Safra is a financial institution located in Luxemburg. Tr. 817 (Pfeiffer). Each Ervin LLC owned 30.7 percent of Jade, Banque Safra owned 7.5 percent, and Sentinel owned approximately .5 percent. <u>See</u> JX 84; Stip. ¶ 32.

> . . . .
>
> A. Second thing is when a partnership, because there are more assets an investor is able to achieve diversification.

Tr. 1151, 1153 (Bergmann).

On that same date, each Ervin LLC transferred its spread to Jade executing an "Assignment and Assumption Agreement."[47] JX 54-59.

Dr. DeRosa testified that it was "highly unusual" for the Ervin LLCs to purchase the spread options and later contribute them to Jade. Tr. 3385-86 (DeRosa). DeRosa testified that it was common practice in the business world for investors to invest cash in a fund or a partnership, but not a "pair of unusual options." Tr. 3386 (DeRosa). Specifically, Dr. DeRosa testified:

> I don't understand what the advantage to them is. I assume when people do -- you know, it's a complex transaction involving three LLCs, and then a partnership. I don't understand why they would buy them on their own and then contribute them to Jade, to a partnership. So I'm just a little bit mystified. If somebody wanted to trade, they would just keep trading in the LLCs. But I don't see any advantage to them of taking these options that they bought, the three LLCs have bought, and then going to the whole trouble of getting permission and all that, assigning them and then dumping them into the partnership.

Tr. 3410-11 (DeRosa).

Each Ervin LLC also contributed $75,000 cash to Jade. See JX 51-53.[48]

---

[47] The parties to the assignment and assumption agreements were the three Ervin LLCs as assignors and Jade Trading, LLC as the assignee. JX 54-56. AIG's Vice President and Treasurer, Ann Reed, also signed the assignment and assumption agreements confirming that AIG consented to the transfer of the option spread to Jade. Id. AIG did not assess the creditworthiness of Jade before entering into the assignment and assumption agreements. AIG had few credit concerns when the options were assigned to Jade because they were assigned as an option spread. Tr. 1710-11 (Reed).

[48] The $75,000 checks were written on September 30, 1999, the day after each Ervin LLC established its spread position, and roughly a week before each Ervin LLC entered Jade. JX 38-43, 57-59.

**Trading Activities While In Jade**

Jade engaged in a number of foreign currency trades from October 6, 1999, when the Ervins entered Jade, until December 2, 1999, when the last Ervin LLC provided notice that it intended to withdraw from Jade. See JX 67. However, only the October 13, 1999 reverse knockout transaction was of any significance, and the majority of the trades executed by Jade during that two-month period were short-term trades and not profit generators. See JX 67, 68; PX 281 at 21; Tr. 1833 (Kolb); Tr. 3189-90 (DeRosa).

The reverse knockout option invested in by Jade had the following features:

| | |
|---|---|
| Strike price: | 1.0770 |
| Barrier price: | 1.1309 |
| Expiration date: | November 3, 2000 |
| Number of euros: | 62,140,483.00 |
| Number of dollars: | 66,925,300.19 |
| Purchase Price: | $103, 015 |

JX 68. The October 13, 1999 knockout option had a maximum payoff potential of $3,343,158, resulting in a best-case scenario profit potential of $3,240,143 after the option premium was paid. See DX 501 at 8; PX 281 at 17. The likelihood of hitting this maximum payoff, however, was very small. In fact, it was highly unlikely that the knockout would yield any net profit at all. DX 501. Dr. Kolbe explained that the knockout option transaction engaged in by Jade only "paid off if (1) the exchange rate did not reach $1.1309 per euro . . ., *and* (2) the exchange rate was . . . above the $1.077 per euro exercise price at option expiration." DX 505 at 16 (emphasis in original). Dr. Kolbe opined that the "odds of getting *any* positive payout" from the knockout option were "small." Id. (emphasis in original).

**Movement of The Euro in October - November 1999**

The euro began a sharp decline in value on October 18, 1999, and in late October 1999, Sentinel and Bergmann changed their positions on the euro. Tr. 575-77 (G. Ervin). In trader parlance, the euro failed. JX 111; Tr. 1203-04 (Bergmann). Through November, the euro continued to decline, nearing what is called "parity" by the end of the month. Parity is a currency trading term that refers to a 1:1 ratio between the euro and the U.S. dollar. Tr. 1211 (Bergmann). The euro had not previously dropped that low, and in the downward trend, the euro threatened to run below parity. Parity is a significant benchmark that threatened to trigger a "sell-off" of the euro, compounding its decline. Tr. 1210-11 (Bergmann).

After losing one-half of the initial investment, Gary Ervin lost faith in Sentinel, New Vista, and the euro. Tr. 555, 577 (G. Ervin). Gary testified that he decided that he and his brothers should cut their losses and salvage any available tax benefits. As Robert specifically recalls, Gary told him they needed to get out of Jade because "it's going south, . . . and we need to get out." 408 (R. Ervin).

Robert and Tim followed their brother's advice. Tr. 408 (R. Ervin); 577 (G. Ervin); 1410-11 (McElroy).

**Exiting Jade: November 30, 1999**

As of November 10, 1999, BDO Seidman was instructing members of the Tax Solutions Group, including DiMuzio, to ensure that "everyone who has entered into partnerships managed by Sentinel understands that they need to give notice soon if they want to withdraw this year." JX 517; Tr. 1524-27 (DiMuzio). By November 18, 1999, 43 days after the Ervins had entered Jade, DiMuzio was working with Gary Ervin and McElroy to calculate the amount of the Ervins' capital and ordinary losses. JX 57-59; DX 519; Tr. 693-94 (G. Ervin); Tr. 1529-30, 1570-71 (DiMuzio); Tr. 1410-11, 1416 (McElroy).

Each Ervin brother sent a nearly identical letter to Sentinel's Conjeevaram formally requesting withdrawal from Jade effective December 15, 1999, approximately 60 days after the Ervin LLCs purchased the three option spreads and transferred them to Jade. See JX 72-74. On November 30, Gary formally requested redemption, and on December 2, 1999, Robert and Tim Ervin formally requested redemption. [94]

On December 17, 1999, Sentinel sent each Ervin brother a letter stating that the Ervins' withdrawal proceeds would be sent to them in a combination of "currency and equity securities." See JX 78-80. On December 21, 1999, Sentinel sent each Ervin brother a letter valuing his interest in the partnership at approximately $126,122. JX 81-83. The letter also indicated that, in redemption of each brother's interest, Sentinel had sent each brother a combination of euros and Xerox stock with a total market value of approximately $126,122. See JX 81-83; see also DX 503 at 13.

The Ervin brothers sold a substantial portion of the Xerox stock before December 31, 1999. Tr. 696 (G. Ervin).

**Curtis Mallet Opinion Letters to the Ervins: July 7, 2000**

Prior to July 7, 2000, Bricker sent the Ervins a draft opinion letter asking them to confirm

---

[49] DiMuzio received a template for this redemption letter from Sentinel and sent it to his clients, including Gary Ervin. Tr. 1586, 1608-09 (DiMuzio). The next day, December 1, 1999, Sentinel's Conjeevaram e-mailed Bee a redemption letter template similar to the redemption letter that Gary Ervin had sent the day before, which had been revised by Curtis Mallet, adding that the "ability to be redeemed is at the discretion of the managing partner." DX 559. Conjeevaram informed Bee that both Curtis Mallet and Sentinel wanted investors to use this revised draft of the redemption letter, even for "investors not using Curtis," and requested BDO to use the revised version. See DX 559. The second paragraphs of Robert and Tim Ervin's redemption letters reflected Curtis Mallet's revisions. See JX 73-74.

the factual representations in the letter. Tr. 953 (Bricker). After discussing this draft opinion letter with Davis, McElroy, and Mountjoy, the Ervins did not suggest any changes, and Bricker assumed the facts were correct. Tr. 588-90, 706 (G. Ervin); Tr. 954-55 (Bricker).

On July 7, 2000, Curtis Mallet issued identical opinion letters to each Ervin brother regarding the substantive tax treatment of the Spread Transaction, accompanied by three identical 124-page memoranda of law. See JX 89, 90.[50] The Curtis Mallet opinion letters stated that the Ervins decided to invest in Jade after determining that their "profit potential from [their] investment in the Partnership was in excess of all fees, transaction costs and expenses associated with or attributable to such investments in the Partnership (including any advisory fees under the [New Vista] Consulting Agreement which may be attributable to the investment in the Partnership)." See JX 89 at 7. The opinion stated:

> Your trading strategy in establishing the European Call Options was to earn a profit on the expected appreciation of the Euro via-a-vis the U.S. dollar while limiting your economic risk to your actual investment. To this end, your currency positions were heavily leveraged (which was intended to increase the potential return on investment). You reasonably anticipated that the European Call Options would provide the opportunity to earn a profit in the range of 50% to 100% of the actual investment, which returns would be in excess of all fees and costs incurred by you in connection with the European Call Options.

JX 89 at 3.

In addressing the profit potential of the Ervins' transactions in the opinion letters, Bricker stated that he considered: (1) the AIG account opening fees and other "related fees" AIG may have charged; (2) the Sentinel two-percent management and 20-percent performance fees; and (3) the legal fees for the opinion letters. Tr. 934-35 (Bricker). Bricker did not consider all of the New Vista fees in evaluating profit potential, and he could not say what portion of the fees, if any, he did

---

[50] Some of the legal analysis in the Curtis Mallet memoranda was substantially similar to the legal analysis found in the BDO opinion letter provided to the Ervins on August 23, 1999, by DiMuzio and appears to have been copied verbatim from the BDO opinion letter. Compare JX 90 at 1-2 with JX 23 at 5; compare JX 90 at 7 with JX 23 at 6; compare JX 90 at 15-17 with JX 23 at 8; compare JX 90 at 19 with JX 23 at 9; compare JX 90 at 23 with JX 23 at 12; compare JX 90 at 25-27 with JX 23 at 13; compare JX 90 at 46 with JX 23 at 15; compare JX 90 at 49 with JX 23 at 16; compare JX 90 at 62 with JX 23 at 20; compare JX 90 at 67 with JX 23 at 21; compare JX 90 at 68 with JX 23 at 22; compare JX 90 at 70 with JX 23 at 23; compare JX 90 at 86-87 with JX 23 at 26; compare JX 90 at 89 with JX 23 at 27; compare JX 90 at 100 with JX 23 at 28; compare JX 90 at 104-05 with JX 23 at 30; compare JX 90 at 107-10 with JX 23 at 31-32.

consider.[51] Tr. 935-38; 940 (Bricker). The tax benefits offered by the spread transaction were available only if the spread was purchased outside the partnership and then contributed to it. See JX 23; JX 90 at 2-5; Tr. 851-52 (Pfeiffer).

Bricker concluded in the opinion letters that it was more likely than not that no penalties would apply due to the Ervins' reporting losses relating to the "currency option program," stating:

> 1. You did not recognize gain on the transfer of the Purchased Call Option by the [Ervin Family] LLC to [Jade] and you did not recognize any loss on the assumption of the Sold Call Option by [Jade];
>
> 2. Your basis for the [Jade] Partnership interest that the [Ervin Family] LLC acquired in the Partnership exchange for the transfer of the Purchased Call Option equaled the basis in the Purchased Call Option transferred by the [Ervin Family] LLC to the Partnership ($15,000,020.00) plus the amount of cash contributed to the Partnership, reduced by the amount of liabilities assumed by the Partnership, and that a Sold Call Option would not be considered a liability for purposes of Section 752;
>
> 3. All income or loss recognized by you, the [Ervin Family] LLC or the Partnership on foreign currency contracts was ordinary income or loss (as opposed to capital gain or loss);
>
> 4. Your distributive share of any loss incurred by the Partnership was deductible, and should not have been subject to the passive activity loss rules;

---

[51] Bricker testified:

> Since the New Vista fee related to many things, it wasn't clear what portion -- how you allocated that or apportioned that between the investment and the partnership and the other contemplated activities.
>
> [W]e felt that even if for some reason you allocated all the New Vista fee[s], you still had an opportunity for economic profit. We didn't think -- if you're paying a fee for five different things, or multiple things, to allocate the fee all to one we didn't think was [fair]. But on the other hand there is no science as to how you allocate it.

Tr. 937-38 (Bricker).

> 5. Upon the [Ervin Family] LLC's withdrawal from the Partnership, you did not recognize gain or loss on the receipt of foreign currency and publicly traded stock that the Partnership transferred to the [Ervin Family] LLC in exchange (redemption) of its Partnership interest. It is more likely than not that your combined interest in the foreign currency and publicly traded stock received in liquidation of the [Ervin Family] LLC's Partnership interest equaled your basis in such Partnership interest. It is more likely than not that any income or loss that you recognized on the sale of such foreign currency was treated as ordinary gain or loss. It is more likely than not that any income or loss that you recognized on the sale of such publicly traded stock was treated as capital gain or loss;
>
> 6. The case law doctrines known as the Step Transaction Doctrine and the Sham Transaction Doctrine that the Internal Revenue Service (the "IRS") and courts have used to deny certain tax outcomes did not apply to the transactions; and
>
> 7. The Anti-Abuse Regulations under Treas. Reg. § 1.701-2 did not apply to the transaction.

JX 89 at 11-13, see JX 91; see also Tr. 943-44 (Bricker).

The Curtis Mallet opinion extensively reviewed case law on the economic substance doctrine and concluded:

> You engaged in these transactions with the expectation that fluctuations in the market value of the foreign currencies would provide you with the opportunity to earn a reasonable profit. Based on this profit motive, it is more likely than not that your transactions described above will not be treated as sham transactions.
>
> . . . .
>
> . . . [Y]ou determined that the investments in foreign currencies, including the European Call Options, had a reasonable possibility of returning significant profits (independent of any tax benefits) to you in excess of all fees and costs incurred by you in connection with each respective investment, including the investment in the Partnership, even if fees related to the investments (including the fees under the

> Consulting Agreement even if such fees are attributable to your Partnership interest) were taken into account. Accordingly, it is more likely than not that the transactions had "economic substance . . . .
>
> . . . .
>
> You determined that its investments in foreign currency, foreign currency options, and the Partnership had a reasonable possibility for profit after expenses and fees . . . Therefore, it is more likely than not that the transactions had a subjective business purpose. Because your transactions had objective economic substance and you had a non-tax business purpose in entering the transactions, it is more likely than not that the transactions would not be recharacterized . . . .

JX 90 at 87, 91-92.

**The Experts' Views on the Profitability of the Spread Transaction**

The experts for Plaintiffs and the Government agreed that the profit potential of the Spread Transaction was limited. Plaintiffs' expert in trading foreign exchange options, Mr. Shoji, testified that the Ervins could have profited from the spread transaction on any appreciation of the euro above 1.0840, but only up to a rate of 1.0850 -- the Ervins would not have profited from any increases above 1.0850. Tr. 2462-63, 2473, 2534-39; (Shoji); PX 283 at 7.[52] Mr. Shoji explained that the maximum net profit potential of the Spread Transaction under all circumstances was $140,538, and the maximum loss was the net premium amount, $150,002 -- if the euro did not rise above 1.0840. Tr. 2534-39 (Shoji); PX 283 at 7.

Similarly, Defendant's expert in economics and finance and foreign exchange options Dr. DeRosa, calculated that the maximum profit from the spread would have been $140,538 if the euro was trading at 1.0850 at the option's expiration date. DX 501; Tr. 3058 (DeRosa).[53] This profit figure does not take into account the fees paid by each Ervin LLC. Dr. DeRosa concluded that when including the fees paid by each Ervin LLC, it was unlikely that the Ervins would have made any

---

[52] Mr. Shoji holds an art history degree from the University on Edinburgh in Scotland, and a Masters in Business Administration from Harvard Business School. Tr. 2461-63 (Shoji). He began working in options' trading in 1986. Tr. 2473 (Shoji).

[53] Dr. DeRosa holds a Ph.D. in economics and finance from the Graduate School of Business of the University of Chicago, and a Bachelors degree in economics from the University of Chicago. Tr. 3035 (DeRosa). Since 1996, Dr. DeRosa has been an adjunct professor of finance at the Yale School of Management where he teaches courses on the foreign exchange market and derivatives. Tr. 3036-37 (DeRosa). Dr. DeRosa authored Managing Foreign Exchange Risk, a book on foreign exchange trading. Tr. 3033-42 (DeRosa).

profit at all. DX 501. Specifically, Dr. DeRosa testified: "The money that these people [the Ervins] have invested in this, the fees they've paid, dwarf any of these trading profits, these phantom trading profits that they never tried to do anyway." Tr. 3252 (DeRosa).

Dr. Kolbe, Defendant's expert in the areas of financial economics, risk return, valuation, investment and leverage, and capital market principles, opined that the expected rate of return of the Spread Transaction executed by each Ervin LLC was "a negative $929,000," or a "negative 80.2 percent rate of return" based on total outlays. Tr. 2319 (Kolbe).[54]

Dr. Kolbe concluded that each Ervin LLC's total cost to execute the Jade Spread Transaction was approximately $1.17 million counting the cost of the spread option and the $75,000 contributed to Jade and $940,000 in required fees. DX 505 at 3 (Kolbe). He explained:

> To break even on these outlays absent the claimed tax deduction, [each Ervin LLC] needed a rate of return on their Jade contributions . . . of . . . 420 percent . . . . It is wholly unrealistic to expect such a rate of return on the contribution to Jade.

Id.[55]

**Jade's Partnership Return**

Jade filed its 1999 Form 1065 Partnership Income Return on March 23, 2000. See JX 84. Jade's partnership return for tax year 1999 was prepared by Untracht & Associates (Untracht), Sentinel's accounting firm. JX 84; Tr. 2632 (Conjeevaram). The return was signed by Untracht & Associates. JX 84 at 000009. The return treated the Ervin LLCs as partners in Jade and reflected that each Ervin brother contributed capital of approximately $236,918, received assets worth approximately $132,760 in redemption, and lost approximately $104,158 in their participation in Jade. See JX 84 at 000028 (Ervin Holdings, LLC ); JX 84 at 000032 (Ervin Investments, LLC); JX 84 at 000040 (Ervin Capital, LLC).

---

[54] Dr. Kolbe received his bachelors in economics from the U.S. Air Force Academy and has a Ph.D. in economics from the Massachusetts Institute of Technology. Tr. 2181 (Kolbe); DX 505.

[55] When Sentinel's management fees were included, the necessary rate of return to break even would be closer to 500 percent, -- a rate of return well in excess of other industry benchmark rates of return, compared to Sentinel's Citadel fund's average of 4 percent return from 1997 to 1999, and a hedge fund once described as the "envy of Wall Street," Long-Term Capital Management's average return of just over 40% from 1994-1998. Tr. 2302-03, 2305, 2308-09 (Kolbe); DX 505 at 6-12; DX 767 at 9.

**The Ervins' Individual Returns**

Although McElroy prepared the Ervins' individual and business tax returns every year from the mid to late 1980s forward, BDO Seidman prepared their 1999 and 2000 individual returns. Tr. 1436-37 (McElroy). Gary Ervin testified that he wanted the reputation of BDO to "stand behind the advice that they had given" with respect to tax planning for the spread transaction. Tr. 738 (G. Ervin). When Dimuzio was asked why he prepared and signed the 1999 returns, he responded:

> Initially we talked about the complexity of the transactions that they had undertaken in 1999, the sale of the business, the collaring of the stock, all of the rest of it, and whether or not Martin McElroy may have been overwhelmed and whether or not they wanted BDO Seidman . . . a larger organization, a national organization, to take over the preparation of the return. That was the basis of the discussion. It turned out ultimately that Martin [McElroy] really carried the laboring oar there ultimately.

Tr. 1565-66 (DiMuzio). DiMuzio's testimony on this is inconsistent with McElroy's. McElroy testified that his role with respect to the Ervins' 1999 tax returns was limited to gathering the necessary information and providing it to DiMuzio so that he could prepare the returns. Tr. 1413-15 (McElroy).[56]

The Ervins filed their individual 1999 tax returns on August 15, 2000. Tr. 1436 (McElroy); see JX 96-98. Schedule D of Gary Ervin's 1999 Form 1040 reflects a short-term capital loss of $10,447,107 described as "Salomon Smith Barney" with an acquired date of "VARIOUS," a sold date of December 23, 1999, a price of $90,043, and a cost of $10,537,150. JX 96 at 147.[57] Schedule D of Robert Ervin's 1999 Form 1040 reflects a short term capital loss $10,447,107 described as "[Salomon] Smith Barney" with an acquired date of September 29, 1999, a sold date of December 29, 1999, a price of $90,043, and a cost of $10,537,150. JX 97 at 114. Schedule D of Tim Ervin's 1999 Form 1040 reflects a short term capital loss of $10,447,107 described as "S[a]lomon Smith Barney" with an acquired date of "VARIOUS," a sold date of December 23, 1999, a price of $90,043, and a cost of $10,537,150. JX 98 at 115. Gary and Robert Ervin listed a long-term capital gain on their 1999 Form 1040s of $8,727,759 under the description of "Ervin Cable Const Inc.

---

[56] Based upon the demeanor of the witnesses, the Court finds McElroy's testimony credible. Moreover, DiMuzio's testimony that McElroy carried the laboring oar on the preparation of the Ervins' tax returns conflicts with DiMuzio's letter of September 8 wherein he stated BDO Seidman agreed to prepare the returns and discussed the fee.

[57] These capital losses described as "Salomon Smith Barney" reflect the 1999 sale of Xerox stock received by the Ervin LLCs when they redeemed their partnership interest in Jade in December 1999.

(KY)." Tim Ervin listed a long-term capital gain of $8,727,760 under the same description. JX 96 at 149; JX 97 at 115; JX 98 at 117. Form 4797 of Gary's, Robert's, and Tim's 1999 Form 1040 reflect ordinary losses of $776,746 for "foreign currency trades." JX 96 at 155, JX 97 at 86, JX 98 at 85. Schedule D of Gary's, Robert's, and Tim's 2000 Form 1040 reflects a long-term capital loss described as "Salomon Smith Barney" of $3,717,779, $3,717,779, and $3,717,778, respectively. PX 260 at 77, 259 at 203, 261 at 62.[58] In total, each Ervin brother claimed approximately $14,941,632 in losses and expenses from the execution of the spread transaction and involvement in Jade.

**IRS Notice 2000-44**

IRS Notice 2000-44 was issued on August 11, 2000, and published in the Internal Revenue Bulletin on September 5, 2000. JX 95; Notice 2000-44, 2000-36 I.R.B. 255. The Notice warned taxpayers of transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership. Under the position advanced by the promoters of the arrangement, once the partnership held the offsetting options the taxpayer claimed that the basis in his partnership interest increased by the cost of the purchased option, but was not reduced under section 752 by the partnership's assumption of the sold option. The Notice determined that the purported losses from such offsetting option transactions did not represent bona fide losses reflecting actual economic consequences, and that the purported losses were not allowable for federal tax purposes. The Notice also warned taxpayers that penalties might be imposed on the participants and promoters of such transactions, including accuracy-related penalties under section 6662.

Notice 2000-44 was issued several days prior to August 14 and 15, 2000, the dates the Ervins and their spouses signed and filed their 1999 federal tax returns. Stip. ¶ 56; see JX 96-98. DiMuzio called McElroy several weeks after the Ervins filed their tax returns and informed him of the Notice. Tr. 1428 (McElroy). On August 16, 2000, Curtis Mallet issued a memorandum to clients potentially engaged in activities covered by the Notice summarizing the Notice and stating that the firm was analyzing its ramifications. JX 99. Once made aware of Notice 2000-44, Gary Ervin spoke with McElroy, Mountjoy, Davis, and BDO Seidman regarding its ramifications. Tr. 593-94 (G. Ervin). Gary also re-engaged Curtis Mallet and requested that counsel review their previous opinion letters of July 2000. Tr. 593 (G. Ervin); see JX 89-91. Curtis Mallet provided a supplemental memorandum dated October 11, 2000, addressing Notice 2000-44, stating that the Ervins' spread transaction investments were "possibly" distinguishable from Notice 2000-44 and that it was more likely than not the Notice did not change the substantive law regarding the Ervins' spread transaction or impact conclusions set forth in Curtis Mallet's previous opinion letters. JX 102-104. McElroy and Mountjoy concurred with the conclusions in Curtis Mallet's supplemental memorandum. Tr. 594-95 (G. Ervin). As a result, the Ervins did not amend their 1999 tax returns in light of the Notice.

[58] These capital losses described as "Salomon Smith Barney" reflect the 2000 sale of Xerox stock received by the Ervin LLCs when they redeemed their partnership interest in Jade in December 1999.

Tr. 710-11 (G. Ervin).

**The Audit**

In June 2002, the IRS initiated an audit of the Ervins' 1999 individual returns. Tr. 1934-35 (Hogue). On December 16, 2002, the IRS initiated a partnership-level audit of Jade's 1999 return. Tr. 1935 (Hogue); JX 105-108. Revenue Agent Jim Hogue handled both audits. Tr. 1934 (Hogue). As part of the audit, Hogue interviewed the Ervins on April 9, 2003, at the IRS office in Owensboro, Kentucky. Tr. 3001-02 (Hogue). The Ervins, their representatives, and Revenue Agent Janice Ambrose of the IRS's Owensboro office attended the interview. Tr. 3001-02 (Hogue).

**The FPAA**

On April 15, 2003, the IRS issued a Final Partnership Administrative Adjustment (FPAA) to Jade Trading with respect to Jade's partnership items for the 1999 tax year. JX 109; Stip. ¶ 62. The FPAA disallowed the deductions claimed for losses purportedly incurred from the spread transaction. Specifically, the FPAA made the following determinations regarding Jade:

> 1. It is determined that Jade Trading, LLC, is a sham and, under [Treasury Regulation] § 1.701-2, was formed or availed of in connection with a transaction or transactions in taxable year 1999, a principal purpose of which was to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of Subchapter K of the Internal Revenue Code. It is consequently determined that the partnership is disregarded and that all transactions engaged by Jade Trading, LLC, are treated as engaged in directly by the purported partners. This includes the determination that the euros and Xerox stock purportedly acquired by the partnership were acquired directly by purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.
>
> 2. It is determined that, under §1.701-2 of the Treasury Regulations, euro currency options, purportedly contributed to or assumed by the partnership, are treated as never having been contributed to or assumed by the partnership and any gains or losses purportedly realized by the partnership on the options are treated as having been realized by the purported partners Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC.
>
> 3. It is further determined that, under § 1.701-2 of the Treasury Regulations, Ervin Holdings, LLC, Ervin Capital, LLC, and Ervin Investments, LLC, should be treated as not being partners in the partnership.

> 4. It is further determined that, under § 1.701-2 of the Treasury Regulations, contributions to the partnership will be adjusted to reflect clearly the partnership's or partners' income.
>
> 5. Even if euro currency options were to be treated as contributed to the partnership, the bases of the options are reduced, both in the hands of the contributing partners and the partnership, by any amount received by the contributing partner from the contemporaneous sale of a substantially similar option to the same counter-party. Thus, any amount treated as an increase in outside basis from the contribution of euro currency options is disallowed.

JX 109.

## **Discussion**

### **Jurisdiction**

This Court has "jurisdiction to hear and to render judgment upon any petition under section 6226 . . . of the Internal Revenue Code . . . ." 28 U.S.C. § 1508. Section 6226(f) gives this Court

> jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the notice of final partnership administrative adjustment relates, the proper allocation of such items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item.

26 U.S.C. § 6226(f).[59]

Invoking section 6226, Plaintiffs bring this partnership tax refund action seeking judicial review of the FPAA issued to Jade which adjusted partnership items relating to the spread transaction. JX 109.[60] The Court's jurisdiction over partnership items is explained by the Tax

---

[59] Unless indicated otherwise, all short form citations to the U.S. Code refer to Title 26 as codified in 2000.

[60] To invoke this Court's jurisdiction to review an FPAA, the partner filing the petition must first deposit, with the Secretary of the Treasury, the amount of the tax liability at issue. Section 6226(e). Plaintiffs satisfied the requirements of Section 6226(e) by depositing $4,110,812 with the Internal Revenue Service.

The partner designated by the partnership as the "tax matters partner" has the exclusive right to challenge the FPAA, by filing a petition for readjustment of the "partnership items," either in the

Equity and Fiscal Responsibility Act of 1982 (TEFRA), which added sections 6221-6231 to the Internal Revenue Code.[61]

TEFRA was enacted "to provide a method of uniformly adjusting items of partnership income, loss, deduction, or credit that affect each partner." Roberts v. Comm'r, 94 T.C. 853, 859 (1990). Prior to TEFRA's passage, tax liability adjustments of individual partners based on the operations of the partnership were rendered at the partner-level, often resulting in duplication of administrative and judicial resources and inconsistent results among audited partners. Callaway v. Comm'r, 231 F.3d 106, 107 (2d Cir. 2000).

With the enactment of TEFRA came a "single unified procedure for determining the tax treatment of all partnership items at the partnership-level, rather than separately at the partner-level." AD Global Fund, LLC v. United States, 67 Fed. Cl. 657, 660 (2005), aff'd, 481 F.3d 1351 (Fed. Cir. 2007) (quoting Callaway, 231 F.3d at 108). TEFRA's process allows for one proceeding to determine all "partnership items," and the result of this proceeding then applies to each individual partner's tax returns. AD Global, 67 Fed. Cl. at 660; Roberts, 94 T.C. at 859-60.[62]

A "partnership item" is defined by statute as "any item required to be taken into account for

---

United States Tax Court, the United States Court of Federal Claims, or a United States District Court, within 90 days of the mailing of the FPAA. Section 6226(a). If the tax matters partner does not file a petition within the requisite 90 day period, other partners are afforded an additional 60 days to file a petition for readjustment. Section 6226(b)(1). Here, Plaintiffs, Jade Trading, LLC, by and through Robert W. Ervin and Laura Kavanaugh Ervin on behalf of Ervin Capital, LLC -- not the tax matters partner, Sentinel, -- timely filed a complaint contesting the FPAA's adjustment of partnership items. The tax matters partner did not opt to intervene in this action. See Rules of the United States Court of Federal Claims (RCFC), App. F, Rule 4.

[61] While partnerships themselves do not pay federal income taxes, TEFRA requires a partnership to file an annual information return that reports its partners' distributive shares of income, gains, deductions, and credits. Partners are individually responsible for reporting their pro rata share of tax on their personal income tax returns.

[62] In a TEFRA proceeding, items fall into one of three categories -- partnership items, nonpartnership items, and affected items. Partnership items must be adjusted at the partnership-level and may not be adjusted at the individual partner-level. Nonpartnership items may not be adjusted at the TEFRA partnership-level and must be adjusted at the individual partner-level. An affected item is defined in section 6231(a)(5) as "any item to the extent such item is affected by a partnership item." An affected item is a nonpartnership item but to the extent a determination of a partnership item affects the item, the determination at the partnership-level is conclusive at the partner-level. See generally, William S. McKee, William F. Nelson, Robert L. Whitmire, Federal Taxation of Partnerships and Partners (4th ed. 2007) ¶ 10.02.

the partnership's taxable year under any provision of subtitle A to the extent . . . such item is more appropriately determined at the partnership-level than at the partner-level." Section 6231(a)(3). More commonly, partnership items are "items of income[,] gain, loss, deduction, or credit of the partnership." AD Global, 67 Fed. Cl. at 661 n.2 (quoting Callaway, 231 F.3d at 108). In essence, partnership items are those items a partnership is required to determine for purposes of its books and records or for purposes of furnishing information to a partner.

Further guidance on what constitutes a partnership item can be gleaned from Treasury Regulation § 301.6231(a)(3)-1(a), which defines the following items as partnership items:

> (1) The partnership aggregate and each partner's share of each of the following:
>
> (i) Items of income, gain, loss, deduction, or credit of the partnership;
>
> . . . .
>
> (v) Partnership liabilities (including determinations with respect to the amount of the liabilities, whether the liabilities are nonrecourse, and changes from the preceding taxable year) . . .
>
> . . . .
>
> (4) Items relating to the following transactions, to the extent that a determination of such items can be made from determinations that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for purposes of furnishing information to a partner:
>
> (i) Contributions to the partnership;
>
> (ii) Distributions from the partnership . . .

Treas. Reg. § 301.6231(a)(3)-1(a). The regulation further provides that the term partnership item includes "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Treas. Reg. § 301.6231(a)(3)-1(b).

The regulation goes on to state that with respect to contributions, the partnership needs to determine "[t]he character of the amount received from a partner" and "[t]he basis to the partnership of contributed property (including necessary preliminary determinations, such as the partners' basis in the contributed property)." Treas. Reg. § 301.6231(a)(3)-1(c)(2). Similarly, with respect to

distributions, the regulation specifies that the partnership needs to determine "the adjusted basis to the partnership of distributed property" and "the character of partnership property." Treas. Reg. § 301.6231(a)3-1(c)(3).

In Nussdorf v. Commissioner, 129 T.C. 30, 44 (2007), an action also involving the contribution of offsetting options to a purported partnership, the Tax Court held that the character of the property the partnership received from each member "such as whether any such property received from each member was a contribution . . . and whether any such property should be aggregated with other property received from each such member, and the basis to [the partnership] of any property contributed to it by each member, including necessary preliminary determinations, such as the basis of each such member in such property" were partnership items. The Tax Court reasoned that the partnership there, Evergreen Trading, was required to make determinations regarding these matters for purposes of its books or records or furnishing information to partners. Id. at 43. The Nussdorf Court further recognized that whether the property received from each member was a contribution or a liability -- was also a partnership item. Id. at 44 n.16. The Tax Court stated:

> determining whether any property that Evergreen Trading received from each member was a contribution or a liability, Evergreen Trading was required to determine whether the so-called obligation leg (i.e., the short position) of the Euro options in question was a liability that Evergreen assumed.

Id. Similarly here, because Jade had to make the underlying determinations regarding the Ervin LLCs' contributions to Jade and the distributions to them for purposes of its books and records and furnishing information to its partners, these are partnership items.

In sum, the matters addressed in the FPAA here are partnership items and must be determined at the partnership-level. As such, this Court's jurisdiction extends to determining the tax treatment of those items. 26 U.S.C. §§ 6221, 6226; see AD Global, 481 F.3d at 1354-1355; Conway v. United States, 326 F.3d 1268, 1271 (Fed. Cir. 2003); Transpac Drilling Venture v. United States, 83 F.3d 1410, 1412 (Fed. Cir. 1996); Santa Monica Pictures, L.L.C. v. Comm'r, 89 T.C.M. (CCH) 1157, 1224 (2005); Long Term Capital Holdings v. United States, 330 F. Supp. 2d 122, 166 (D. Conn. 2004), aff'd, 150 Fed. Appx. 40 (2d Cir. 2005).

**Standard of Review**

This Court makes a de novo determination regarding the partnership items of Jade that were adjusted by the FPAA. Atlantic Richfield Co. v. Dept. of the Treasury, No. 96-2867 1996 U.S. Dist. LEXIS 19891 at 3 (D.D.C. 1996) ("A court hearing plaintiff's [FPAA] readjustment petition would have jurisdiction to determine de novo [a partnership's] taxable income, deductions, and credits . . .").

**Although the Spread Transactions Contributed to Jade Literally Complied With the Code They Lacked Economic Substance**

**Literal Compliance With the Code**

In 1999, the Ervins realized a gain of approximately $40 million on the sale of their cable companies -- approximately $13.5 million per brother. After consulting with BDO Seidman, Sentinel, and Curtis Mallet and their personal attorneys and accountant, Plaintiffs simultaneously bought and sold offsetting pairs of euro options, creating a spread position. The premium paid by each Ervin LLC on the options purchased from AIG was $15,000,020 and on the options sold to AIG was $14,850,018. These premium amounts were netted, and each Ervin LLC actually paid AIG $150,002 -- not $15,000,020. Each LLC then transferred the option spread to Jade and contributed $75,000 cash to the partnership. Some 60 days after entering Jade, the LLCs exited the partnership and received euros and Xerox stock in exchange for their partnership interests.

Plaintiffs claim that their bases in their Jade partnership interests increased by the value of the purchased option but did not decrease by the value of the sold option assumed by the partnership.[63] Section 722 addresses partnership basis, stating:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution . . . .

At issue here is whether each Ervin LLC was required to reduce its basis in its partnership interest by the sold option assumed by Jade, or whether this type of "liability" was too uncertain to fit within the parameters of a "liability" within the meaning of section 752. The statute itself does not define liability or address this issue in haec verba. Section 752(b) states:

> Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

Plaintiffs argue that the sold options assumed by Jade were contingent obligations, not liabilities for purposes of lowering the basis in the Ervin LLCs' partnership interests under section 752(b). In so arguing, Plaintiffs seize upon the construction of section 752 by the Tax Court in

[63] Plaintiffs did not realize any gain or loss from the contribution of the option spread to Jade. Section 721(a) states that "[n]o gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."

Helmer v. Commissioner, 34 T.C.M. (CCH) 727 (1975), which at the time of their transactions was good law.[64]

In Helmer, the Tax Court held that a contingent obligation such as an option was not a liability under section 752 because a partnership's obligation under the option does not become fixed until the option is exercised. Helmer's reasoning that contingent obligations are not liabilities was applied in subsequent cases. Salina P'ship L.P. v. Comm'r, 80 T.C.M. (CCH) 686, 697 (2000). (recognizing Helmer stands for the general proposition that amounts owed or paid to a partnership in an open transaction for tax purposes do not generate adjustments to the partners' bases in their partnership interests until the transaction is closed and the tax characteristics of the transaction can be determined.); see also LaRue v. Comm'r, 90 T.C. 465, 479-80 (1988) (non-fixed obligations of a partnership could not be used to adjust the partners' bases under section 752); Long v. Comm'r, 71 T.C. 1 (1978) (stating that contested or contingent liabilities such as claims were not liabilities within the meaning of section 752); see generally CEMCO Investors, LLC v. United States, No. 04-8211 2007 U.S. Dist. LEXIS 22246 (N.D. Ill. Mar. 27, 2007), appeal docketed, No. 07-2220 (7th Cir. May 25, 2007) (recognizing that Helmer was good law prior to Notice 2000-44, permitting a taxpayer to ignore a short option as a liability under section 752).[65]

Thus, under Helmer and its progeny, the sold call option contributed to Jade would not be

---

[64] On August 13, 2000, the IRS issued Notice 2000-44 announcing its intention to challenge transactions similar to the spread transaction at issue here. On June 24, 2003, the IRS issued new Temporary Regulations under section 752 with a retroactive effective date of October 18, 1999 -- after the Ervin LLCs' contributed the spread to Jade. Treas. Reg. § 1.752-6T (2003). Under those regulations, the sold short option would be treated as a liability. The preamble to this regulation states: "The definition of a liability contained in these proposed regulations does not follow Helmer v. Commissioner, T.C. Memo 1975-160." 68 Fed. Reg. 37434 (June 24, 2003).

[65] Plaintiffs further rely on an internal IRS memorandum known as the "Helmer/Cram Memo" drafted by former IRS attorney Richard Starke interpreting the decision in Helmer. PX 201. Two pages of this memorandum were inadvertently produced in Marriott Int'l Resorts. L.P. v. United States, 63 Fed. Cl. 144, 145-46 (2004), resulting in a subject-matter waiver of the entire document. See Tr. Apr. 6, 2005, at 10-13. The IRS memorandum concludes that an option is not a liability for tax purposes, stating:

> Existing authority is contrary to a position that options create liabilities. Helmer held that no partnership liability is created upon receipt of option payments by a partnership; payments received were without restrictions except that upon exercise of the options the amounts would be applied against the purchase price.

PX 201 at 010811.

considered a liability for purposes of section 752 and the inflated bases resulting from the Ervin LLCs' contribution of the spread transaction to Jade complied with section 752.

Nonetheless, under Coltec, such compliance with the Code is insufficient in and of itself for Jade to reap the tax benefits claimed here. Coltec, 454 F.3d at 1355. Rather, the transaction must also meet the objective economic substance test.

**The Economic Substance Doctrine In the Federal Circuit**

The Federal Circuit in Coltec put to rest any question about the continued vitality of the economic substance doctrine. The Coltec Court disregarded a transaction for tax purposes despite its literal compliance with the Code on the ground it lacked economic substance. The Federal Circuit described the economic substance doctrine as "a judicial effort to enforce the statutory purpose of the tax code" stating:

> From its inception, the economic substance doctrine has been used to prevent taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit.

Coltec, 454 F.3d at 1353-54.[66] Transactions are considered to have economic substance when "imbued with tax-independent considerations, and . . . not shaped solely by tax-avoidance features . . . ." Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978).

In unequivocally confirming the viability of the economic substance doctrine, the Federal Circuit articulated five general principles espoused by the doctrine:

- First, the law does not permit the taxpayer to reap tax benefits from a transaction that lacks economic reality.
- Second, it is the taxpayer who bears the burden of proving that the transaction has economic substance.
- Third, the economic substance of a transaction must be viewed objectively.
- Fourth, the only transaction to be analyzed is the one that gave rise to the alleged tax benefit.
- Finally, arrangements with subsidiaries that do not affect the economic interests

---

[66] As the Federal Circuit recognized, the economic substance doctrine has its origin in cases such as Gregory v. Helvering, 293 U.S. 465 (1935), Knetsch v. United States, 364 U.S. 361 (1960), and Frank Lyon Co. v. United States, 435 U.S. 561 (1978). Coltec, 454 F.3d at 1352.

of independent third parties deserve particularly close scrutiny.

Coltec, 454 F.3d at 1355-57. This Court applies each of these principles in turn.

**1. Did the Spread Transaction Lack Economic Reality?**

As articulated by the Federal Circuit, the economic substance doctrine subsumes an overarching principle -- although a taxpayer has an unquestioned right to decrease or avoid his taxes by means which the law permits, the law does not permit a taxpayer to reap tax benefits from a transaction that lacks economic reality. The Ervins' spread transaction clearly fits within the scope of this prohibition.

Although the Ervins purchased a euro option from AIG for a premium of $15,000,020 and sold a euro option to AIG for a premium of $14,850,018, they only paid AIG the difference -- a net premium of $150,002. They contributed the spread to Jade, and upon exiting the partnership, claimed a basis of over $15 million in their Jade interests by including only the premium for the purchased call option, and ignoring the premium for the sold call option, viewing it as a contingent obligation, not a liability. The artificially high basis generated a $14.9 million tax loss, but the loss was purely fictional. Each Ervin LLC did not invest $15 million in the spread transaction contributed to Jade and did not lose almost $15 million upon exiting Jade without exercising either option. As the District Court for the Northern District of Illinois recognized in characterizing a similar transaction in CEMCO, "it is important to highlight one point upon which [the parties] agree: the loss of $3,563,211.71 claimed on CEMCO's . . . return was fictional." CEMCO, 2007 U.S. Dist. LEXIS 22246 at 9.

Further, the formation of the Jade partnership as the vehicle through which to make investments had no real economic purpose. Funneling the trades through the partnership did nothing to enhance the investment potential of the spread transaction or the other trades Jade did, but it was crucial for tax purposes to have the individual partners contribute the spreads to Jade and redeem the unexercised spreads from Jade in order to generate the inflated bases. Absent the partnership, the spreads would have had no meaningful economic consequences -- other than the cost of playing. As Dr. DeRosa recognized, there was no economic reason for the Ervin LLCs of going to the trouble of structuring these transactions as they did. He testified: "If somebody wanted to trade they would just keep trading in the LLCs. But I don't see any advantage to them of taking these options that they bought . . . and then going to the whole trouble of getting permission and all that, assigning them and then dumping them into the partnership." Tr. 3410-11 (DeRosa).

**2. The Taxpayer Has the Burden to Prove Economic Substance**

The Coltec Court held that the taxpayer has the burden of proving that a transaction has economic substance, dispelling any notion that the Government is required to demonstrate a

transaction's lack of economic substance. Coltec, 454 F.3d at 1355.[67] In explaining the nature of this burden, the Federal Circuit harked backed to Rothschild v. United States, 407 F.2d 404 (Ct. Cl. 1969), a decision of its predecessor, the Court of Claims, and quoted that decision's fundamental recognition:

> Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance (citation omitted).

407 F.2d at 411.[68]

Plaintiffs have attempted to shift this burden to Defendant to prove that their transaction lacked economic substance under section 7491. Pls.' Post-Trial Br. at 7-8; Pls.' Reply to Def.'s Post-Trial Br. at 27. Under section 7491, the burden of proof will shift to the Government with respect to any factual issue relevant to ascertaining the liability of the taxpayer if: (1) the taxpayer introduces credible evidence with respect to such issue; (2) the taxpayer has complied with all applicable substantiation requirements; (3) the taxpayer has maintained all records otherwise required by the Internal Revenue Code; (4) the taxpayer has cooperated with reasonable requests by the Service for meetings, interviews, witnesses, information and documents; and (5) the taxpayer, if not an individual, satisfies the net worth requirements described in section 7430(c)(4)(A)(ii). Section 7491(a)(1)-(2). The taxpayer has the burden of establishing that the requirements of section 7491 have been met. Long Term Capital Holdings, 330 F. Supp. 2d at 166.

Plaintiffs seek to shift the burden of proof to the Government with respect to four issues:

1. Whether Jade was formed and operated as a partnership entity;

---

[67] See also Newman v. Comm'r, 902 F.2d 159, 162-63 (2d Cir. 1990); Compaq Computer Corp. v. Comm'r, 277 F.3d 778, 780-81 (5th Cir. 2001); Am. Elec. Power Co. v. United States, 326 F.3d 737, 742 (6th Cir. 2003); Sacks v. Comm'r, 69 F.3d 982, 986 (9th Cir. 1995); J. B. N. Tel. Co. v. United States, 638 F.2d 227, 232 (10th Cir. 1981).

[68] In Rothschild, the Court of Claims disregarded a transaction and disallowed an interest deduction where the transaction did not appreciably affect the taxpayer's beneficial interest except to reduce his tax. The transaction at issue in Rothschild could not have "made a profit, except for the tax reduction." 407 F.2d at 417. Recognizing the then prevalent confusion in the state of the law on the various common law doctrines addressing the substance of transactions which yielded tax advantages -- the sham transaction doctrine and business purpose test -- the Court held that "regardless of the standard or combination of standards one might use, the taxpayer in the instant case has failed to show that he is entitled to the interest deduction." Id.

2. Whether the investors contributed and assigned separately purchased and sold call options and cash to Jade;

3. Whether the partners' transfer of such options to Jade had economic substance; and

4. Whether Jade and its partners had the potential to earn pre-tax profits.

Pls.' Post-Trial Br. at 12-19; Pls.' Reply to Def.'s Post-Trial Br. at 25-28.

Because these are legal, not factual issues, the Court does not shift the burden of proof. First, whether Jade Trading was formed and operated as a partnership entity is an ultimate legal issue. Second, whether the offsetting options contributed to Jade by its members were, for federal tax purposes, separately purchased and sold call options, or are a single position also implicates a question of law. What transpired as a matter of fact with regard to the purchase and sale of offsetting options is not disputed -- it is the legal import of those transactions -- their characterization and treatment for tax purposes which is at issue -- a legal question. See Frank Lyon, 435 U.S. at 581 n.16 ("The general characterization of a transaction for tax purposes is a question of law. . . ."). Third, whether the partners' transfer of such options to Jade had economic substance is a component of the ultimate issue before the Court -- it addresses one step in the challenged transaction. The fourth issue on which Plaintiffs seek to shift the burden does have some factual elements -- the potential of Jade and its partners to earn pre-tax profits. However, that issue is no longer a relevant inquiry in light of Coltec. It matters not whether Jade and its partners had the potential to earn pre-tax profits in all of their endeavors. What matters is whether the single transaction which gave rise to the tax benefits -- here the spread transaction contributed to Jade -- had the ability to earn pre-tax profits. Coltec, 454 F.3d at 1356 (stating "the transaction to be analyzed is the one that gave rise to the alleged tax benefit."). In sum, the burden of proof clearly remains on Plaintiffs to establish the economic substance of the spread transaction contributed to Jade.

### 3. The Economic Substance of a Transaction Must Be Viewed Objectively Rather Than Subjectively

The Federal Circuit has clarified that in applying the economic substance doctrine, the "objective economic reality of the transaction" is paramount. The Court explained:

> The Supreme Court cases and our predecessor court's cases have repeatedly looked to the objective economic reality of the transaction in applying the economic substance doctrine. Gregory, 293 U.S. at 469-70, 55 S. Ct. 266; Frank Lyon Co., 435 U.S. at 584. . . . While the taxpayer's subjective motivation may be pertinent to the existence of a tax avoidance purpose, all courts have looked to the objective reality of the transaction is assessing its economic substance. See, e.g., Black & Decker, 436 F.3d at 441-42 (noting that economic

> substance inquiry requires an "objective determination of whether a reasonable possibility of profit from the transaction existed") . . .; Dow Chem. Co., 435 F.3d at 599; In re CM Holdings, Inc., 301 F.3d at 103 (stating that the objective economic substance inquiry is "whether the transaction affected the taxpayer's financial position in any way"); United Parcel Serv. of Am., Inc., 254 F.3d at 1018; Rice's Toyota World, Inc. v. Comm'r of Internal Revenue, 752 F.2d 89, 94 (4th Cir. 1985).

Coltec, 454 F.3d at 1356 n.16 (citations omitted in part). Thus, a determination of the objective reality of contributing the spread transaction to Jade requires assessing the transaction itself -- its reasonable possibility of profit and its effect on the Ervins' financial positions. The inquiry is not whether the Ervins believed the Jade transaction was a real investment capable of making a profit, but whether the Jade transaction in fact objectively was a real investment capable of making a profit and altering their financial positions.[69]

### 4. The Only Transaction to Be Analyzed for Economic Substance Is the One That Gave Rise to the Tax Benefit

Plaintiffs characterize the Ervins' investment in Jade as a bet that the euro would rise. This is an inaccurate picture of what Jade did. While there was extensive testimony regarding the Ervins' decision to invest in the euro, including the persuasive sales pitch from Sentinel about the unique opportunity for investing in a newly offered foreign currency and "exotic options" like the reverse knockout options with potential returns of 38-to-1, this hype was a red herring since the investment in offsetting options was a hedge -- the Ervins were protected and their gains and losses limited no matter how the euro performed. Under Coltec, the spread transaction which gave rise to the inflated basis and the large tax benefit is the only transaction to be scrutinized. As such, Plaintiffs' claims that they could have increased profitability by executing the reverse knockout option and other trades in Jade cannot be considered because these transactions did not give rise to the tax benefit.[70] Here, both the structure of the spread transaction and the unusually high fees

---

[69] The trial in this case was conducted before the Federal Circuit's opinion in Coltec was issued, and the record includes much evidence on the beliefs of the Ervin brothers that their activities in Jade could be profitable based upon Bergmann's sales pitch. In the context of assessing objective economic substance, Coltec has relegated this type of evidence to a back seat recognizing the taxpayer's "subjective motivation may be pertinent to the existence of a tax avoidance purpose." 454 F.3d at 1356. Rather, the lack of economic reality of the transaction itself is the primary consideration as this is sufficient to disregard the transaction.

[70] In any event, Plaintiffs have not established the profitability of the knockout. Jade purchased the reverse knockout option on October 13, 1999, for $103, 015, which according to Dr. DeRosa, was approximately three times the value of what the reverse knockout option should have cost. JX 68; DX 501 at 27; Tr. 3172-73 (DeRosa). DeRosa calculated the fair market value of the

required for participation ensured that no matter what the euro did, the spread transaction did not have a reasonable profit potential.

The objective economic substance test requires that a taxpayer prove that a transaction had a "realistic financial benefit" beyond tax avoidance. Coltec, 454 F.3d at 1356 n.16 (quoting Rothschild, 407 F.2d at 411); see also ACM P'ship v. Comm'r, 157 F.3d 231, 251 (3d Cir. 1998). More precisely, the economic substance inquiry requires an objective determination of whether a reasonable possibility of profit from the transaction existed, exclusive of tax benefits. Coltec, 454 F.3d at 1356 (citing Black & Decker Corp. v. United States, 436 F.3d 431, 441-442 (4th Cir. 2006)); see also Gilman v. Comm'r, 933 F.2d 143, 146 (2d Cir. 1991); Lerman v. Comm'r, 939 F.2d 44, 49 (3d Cir. 1991); Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 91 (4th Cir. 1985); IES Indus. v. United States, 253 F.3d 350, 353 (8th Cir. 2001).

Several courts have analyzed economic substance objectively by viewing an investment transaction through the eyes of a "prudent investor" at the time of the transaction -- asking whether a prudent investor would engage in the transaction with a belief that profits could be earned. See Gilman, 933 F.2d at 146-47 (requiring the plaintiff to demonstrate that a prudent investor could have concluded that there was a realistic opportunity for a profit); Estate of Strober v. Comm'r, 63 T.C.M. (CCH) 3158, 3160 (1992) ("We conclude that . . .a prudent investor, relying upon independently obtained appraisals and research, would not have concluded that [the] transaction offered a reasonable opportunity for economic gain exclusive of tax benefits."); Long Term Capital Holdings, 330 F. Supp. 2d at 172 (finding that the transaction lacked economic substance because, "at the time the transaction was entered into, a prudent investor would have concluded that there was no chance to earn a non-tax based profit return in excess of the costs of the transaction.").

Plaintiffs' and Defendant's experts, Mr. Shoji and Dr. DeRosa, agreed the maximum profit potential on the spread at expiration, on its face, was roughly $140,000, no matter how high the euro climbed. See JX 38-43; Tr. 2536-2539 (Shoji); Tr. 3129 (DeRosa); DX 501 at 27. Dr. DeRosa testified:

> The only thing that can happen is you come up to the counter. You plop down $150,000. If you're lucky, you're going to win net $140,000. You're never going to get more than that. You could get less than that because if it's in between the strikes the payoff won't be

---

reverse knockout option at the time of purchase by Jade to be approximately $33,000. Id. Jade sold the reverse knockout option back to AIG on December 10, 2000 for approximately $77,000, experiencing a loss on the transaction. Tr. 3174 (DeRosa); DX 501 at 28.

Further, although the potential maximum payoff of the reverse knockout option was $3,343,158, resulting in a best-case scenario profit potential of $3,240,142 after the premium was paid, the likelihood of experiencing any profit on the transaction was extremely low. See DX 501 at 8, 28; DX 505 at 16; PX 281 at 17; Tr. 3172-74 (DeRosa).

> the whole $140,000, but if it's at 1.0840 or less say goodbye to your $150,000. It's gone. It looks enormous, but net it's trivially small.

Tr. 3130-31 (DeRosa). Further, according to Mr. Shoji, based on how the spread transaction was structured, AIG would never have exercised the sold call option and the Ervins would never have owed any additional funds to AIG. Tr. 2538 (Shoji). The exercise of any option would have required "a delivery of euro 290,540,000, an underlying value or notional amount about 20 times larger than the value of the option itself." PX 281 at 18; Tr. 2538 (Shoji).

Moreover, the unusual fees paid by the Ervins which far exceeded the potential return on the investments, virtually ensured that the transaction could not be profitable. Each Ervin brother "invested" $225,002 in Jade -- $150,002 as a payment for the spread, and an additional $75,000 in cash, but also paid the following fees in order to do the spread transaction:

| Fee | Amount |
|---|---|
| New Vista consulting fee | $750,000 |
| AIG account opening fee | $ 84,100 |
| Curtis Mallet fee | $100,000 |
| Total | $934,100 |

JX 26, 37, 48-50, 85-87; Tr. 928 (Bricker); Tr. 1650-51 (Mountjoy). The New Vista fee covered amorphous investment advice and training, but it was unclear that the Ervins received any value for the New Vista fee. New Vista is largely owned by Sentinel -- the tax matters and managing partner of Jade, and payment of the New Vista fee was a sine qua non of the deal. The AIG fee was highly unusual, only charged to Sentinel clients, and there was no cogent explanation as to why this fee was required. Finally, Curtis Mallet charged each brother $100,000 for an identical legal opinion and refused to discount its fee.

The $934,100 does not include fees paid for forming the Ervin LLCs, fees paid to Ervin advisors Martin McElroy and Jesse Mountjoy, Sentinel's two-percent management fee or its 20 percent incentive fee, or the five-percent penalty for early withdrawal from Jade.[71] In addition, the Ervins incurred unnecessary costs by structuring their investment in Jade as they did. They contributed options instead of cash to Jade, subjecting their investments to Sentinel's incentive fee of 20 percent, and took their distribution from Jade in Xerox stock and euros, incurring additional transaction costs to sell this stock. Tr. 2321-22 (Kolbe); See DX 505 at 19-20; DX 767 at 15. Moreover, just breaking even on this investment, that is, exiting Jade with the $225,002 invested and enough to cover the over $934,100 in fees, would have required at least an annualized 420 percent rate of return on that $225,002 investment. DX 505 at 3, 7; see Tr. 2302-03 (Kolbe); DX

[71] The Ervin LLCs were subject to a withdrawal fee equal to five percent of the value of their capital accounts on the date of withdrawal if the LLCs withdrew prior to 12 months from entering the partnership. JX 47.

767 at 7.[72]

The fact that the Ervins had to spend over $934,000 to obtain an investment return of $140,000, establishes that no reasonable investor would engage in such a transaction to earn a profit. As Dr. Kolbe testified, the Ervins' investment "was not even equivalent to buying a lottery ticket or placing a wager in a casino. Absent the tax motivation, there was no economically rational reason to undertake these transactions, and no economically rational investor would have done so." DX 505 at 20. To quote the Court in Long Term Capital Holdings, 330 F. Supp. 2d at 172, "at the time the transaction was entered into, a prudent investor would have concluded that there was no chance to earn a non-tax based profit return in excess of the costs of the transaction."

In addition to its inherent lack of potential profitability, the spread transaction was developed as a tax avoidance mechanism and not an investment strategy. The transaction was devised and marketed by a tax accounting group, BDO Seidman's "Tax $ells" Division, a/k/a the Wolf Pack. Although BDO Seidman witnesses claim that Bergmann brought them the idea for the spread transaction, these witnesses acknowledged that BDO Seidman investigated the tax ramifications of the spread transaction, added the spread transaction to its Tax Product Sales Manual, prepared a marketing letter describing the tax benefits of the spread transaction, joined forces with Curtis Mallet and sold the spread transaction concept to clients as a tax product, while leaving the execution of the transactions to Sentinel.

Plaintiffs make much of the fact that Gary Ervin "rejected the Jenkens & Gilchrist proposal for want of an investment purpose." Pls.' Br. Regarding Application of Coltec at 7. However, according to DiMuzio, the Jenkens & Gilchrist proposal was remarkably similar to the spread transaction -- it involved the contribution of foreign currency options to an S corporation in order to create a high-basis, low-value asset, the sale of which would result in a capital loss in excess of the amount contributed. Tr. 1506-07 (DiMuzio). The tax strategy which Gary Ervin rejected for wholly lacking an investment component based upon his reaction to Jenkins & Gilchrist was objectively no different from the deal the Ervins ultimately signed onto, after hearing Bergmann's telephonic promotion.

Plaintiffs further argue that the spread transaction had economic substance because the euro option purchased from AIG and the euro option sold to AIG represented two distinct legal entitlements which should not be recast as one. Pls.' Post-Trial Br. at 2, 6, 41. In Plaintiffs' view, the sold euro option should be deemed a contingent obligation, not a liability, which would not affect partnership basis and permit the basis in the purchased call option to be inflated, yielding a large tax loss. Pls.' Post-Trial Br. at 50-51. However, the economic realities of the spread transaction contributed to Jade made it impossible to delink the option pairs.

---

[72] This rate of return does not include Sentinel's fees for managing Jade -- two percent of assets under management and 20 percent of net profits -- or the five-percent Jade withdrawal fee. When Sentinel's management fees are included, the necessary rate of return to break even would be closer to 500 percent. Tr. 2302-03 (Kolbe).

If the Ervin LLCs had wished to hold only the long position -- that is, the option they purchased from AIG -- they would have faced the prospect of theoretically unlimited gain. They would have benefitted from any rise of the euro above 1.084, not capped in any way. Tr. 2545-46 (Shoji). To obtain that position, the Ervin LLCs would have been required to pay AIG the full face amount of the premium, about $15 million each, to purchase the options. Tr. 2545-46 (Shoji); Tr. 3144 (DeRosa). Neither the Ervin LLCs nor Jade ever had sufficient funds to make such a payment. See PX 292, 293, 294. Moreover, under this scenario, the entire amount would have been at risk; had the euro not risen to 1.084, each Ervin LLC would have lost the entire $15 million premium it paid to AIG. Tr. 2545-46 (Shoji).

Had the Ervin LLCs wished to hold only the short option sold to AIG they would have faced the prospect of theoretically unlimited loss, as AIG would have benefitted in any rise of the euro above 1.085, not capped in any way. Tr. 2546 (Shoji). Because such a transaction would be uncovered, AIG would have had extensive credit concerns. Tr. 1702-03 (Reed); Tr. 2366-67 (Kolbe); DX 767 at 29-30; Tr. 3147 (DeRosa). The Ervin LLCs would not have received the premiums to which they would be theoretically entitled, because AIG would have retained those premium payments as margin because AIG would not have had the spread's protection from loss. Tr. 3303 (DeRosa); Tr. 3508 (Kolb). AIG would have required that the Ervins post margin in the amount of at least $8 million each.[73] In sum, under the agreement with AIG, the Ervins could not separate the components of the spread without AIG's permission which would not likely have been forthcoming without the required margin. See JX 31-33; see also DX 501 at 13-15; DX 767 at 29-30; Tr. 3144-47 (DeRosa); Tr. 3504-06 (Kolb); Tr. 2367 (Kolbe).

Plaintiffs contend that longstanding precedent has rejected creative attempts by the IRS to collapse "roughly counterbalancing positions" such as vertical spread options, silver straddles, soybean straddles, mortgage swaps, sale/leasebacks, and other offsetting transactions. In so arguing Plaintiffs rely on six decisions in which courts refused to collapse such dual transactions, Cottage Savings Association v. Commissioner, 499 U.S. 554 (1991), Frank Lyon Co. v. United States, 435 U.S. 561 (1978), Valley Waste Mills v. Page, 115 F.2d 466 (5th Cir. 1940), Laureys v. Commissioner, 92 T.C. 101 (1989), Smith v. Commissioner, 78 T.C. 350 (1982), Maloney v. Commissioner, 25 T.C. 1219 (1956). However, these decisions are distinguishable from the instant case because the so-called counterbalancing positions were legally distinct and clearly not inextricably linked as are the options comprising the spread transaction here.[74] In contrast to the

[73] That amount, which is calculated according to the Master Trading Agreement, is undisputed. DX 501 at 13-15; DX 768 at 32-33; Tr. 3144-47 (DeRosa); Tr. 3504-06 (Kolb); Tr. 2367 (Kolbe).

[74] In Cottage Savings, the Commissioner disallowed loses stemming from an exchange of two groups of mortgages, finding that the property exchanged was not sufficiently different to constitute a true disposition of property. 499 U.S. at 559-60. The Supreme Court allowed the deduction, holding the two groups of mortgages exchanged were "materially different" and "legally distinct entitlements." Id. at 566.

transactions in the Cottage Savings line of cases where transactions could not be collapsed because they were independent, the transactions here cannot be separated because they were totally dependent on one another from an economic and pragmatic standpoint.[75]

### 5. Arrangements That Do Not Affect the Economic Interests of Independent Third Parties Deserve Particularly Close Scrutiny

In Coltec, the Federal Circuit directed that arrangements with subsidiaries that do not affect economic interests of independent third parties deserve particularly close scrutiny. Although Jade

---

In Frank Lyon, because a bank was prohibited by regulations from purchasing and maintaining title to a building outright, it sold the building to the taxpayer, and the taxpayer leased the building back to the bank for business use. 435 U.S. at 565. The taxpayer claimed deductions that were disallowed by the Commissioner on the ground that the bank, not the taxpayer, was the true owner of the building. Id. at 568-69. The Supreme Court determined that the transaction was a genuine multi-party transaction with economic substance, compelled by regulatory realities, imbued with tax independent considerations, and not shaped solely by tax avoidance. Id. at 583-84.

In Laureys, the taxpayer -- an options trader -- engaged in various stock option spread transactions and reported large losses, which were disallowed by the Commissioner for lacking an economic or profit motive because the taxpayer was never truly at risk due to the offsetting nature of the options. 92 T.C. at 119-20. The Tax Court found that the spread options were two separate and distinct transactions because there was no direct evidence of tax planning or motivation on the part of the taxpayer and the transactions at issue were consistent with the taxpayer's overall portfolio strategy to make a profit. Id. at 133.

In Smith, the Tax Court disallowed claimed losses determining that offsetting silver options were separate and distinct as they had a different price and different delivery months and were not treated as offsetting by the applicable rules and regulations of the commodity exchange. 78 T.C. at 376.

In Maloney, the Tax Court refused to recast a taxpayer's simultaneous sale and purchase of soy bean futures as the same transaction because the transactions were comprised of entirely different commodities traded in separate sections of the commodities exchange, were separately recorded, accounted for and cleared, had a price differential, different commission charges, and different investors. 25 T.C. at 1227.

In Valley Waste Mills, the Fifth Circuit refused to net offsetting exchanges of cotton options where the taxpayer had treated the transactions as separate in its corporate books.

[75] Plaintiffs also argue that the options comprising the spread transaction were "separate and distinct contracts" because the options were similar to the offsetting options in "costless collars" the Ervins executed with Dagny Maidman in June 1999. Pls.' Post-Trial Brief at 39; Pls.' Reply to Def.'s Post-Trial Br. at 56. However, the collars were not similar to the spread -- they were common, routine transactions the Ervins entered to reduce their risk in the Dycom stock and to protect them from dramatic swings in the stock's value. Tr. 212 (Pace); Tr. 2519 (Shoji); Tr. 2354 (Kolbe).

does not involve an inter-company transfer among affiliated entities, the Coltec Court's directive regarding independent third parties also pertains here. The Jade partners decided to contribute and redeem the spread transaction "for [their] own separate purposes" and not as genuine multi-party transactions. See Coltec, 454 F.3d at 1357. As these transactions were structured, AIG had nothing to gain or lose beyond its fee. Further, in the context of analyzing whether the transaction affected third-party interests, the Coltec Court looked to whether the transaction was the "consummation of a preconceived plan" as in Gregory or a "foregone conclusion." Id. The spread transaction as depicted in BDO Seidman's marketing letter and Tax $ells Manual, Curtis Mallet's opinion letter, and the AIG procedures for executing Sentinel transactions, was a preordained plan. Just as in Gregory, the Ervins' transfer of the spread transaction to Jade and their exit from Jade some 60 days later lacked economic substance because this machination was "the consummation of a preconceived plan," not to earn profits speculating on a new currency, but to enter and exit the partnership, using one leg of the spread to generate grossly inflated basis. 293 U.S. at 469. In sum, under the economic substance doctrine as applied in the Federal Circuit, the Jade spread transaction lacked economic reality and must be disregarded.

**Penalties Imposed by the FPAA**

The FPAA issued to Jade imposed four penalties:

1. A 40-percent gross valuation misstatement penalty;

2. Alternatively, a 20-percent negligence penalty;

3. Alternatively, a 20-percent substantial understatement of income tax penalty;

4. Alternatively, a 20-percent "substantial understatement of income tax [penalty] because the transaction is a tax shelter, no substantial authority has been established for the position taken, and there was no reasonable belief upon the filing of the return that the position taken was more likely than not the correct treatment of the transaction."

JX 109.

**Jurisdiction Over Penalties**

Section 6221 establishes that the applicability of penalties arising out of a partnership return is properly determined at the partnership-level in a TEFRA partnership proceeding. Section 6226(f) confers jurisdiction on this Court to determine the "applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item." Section 6226(f). Further, because any penalty imposed in the FPAA is premised upon the conduct of the partnership, courts may determine, at the partnership-level, "all the legal and factual determinations that underlie the determination of any penalty . . ." Treas. Reg. § 301.6221-1T(c) (1999); see also Long Term Capital Holdings, 330 F. Supp. 2d at 199-204; Santa Monica Pictures, 89 T.C.M. (CCH) at 1225.

**Gross Valuation Misstatement Penalty**

The FPAA imposed a 40-percent penalty on the underpayment of income tax due to the gross valuation misstatement of the Ervin LLCs' adjusted bases in their partnership interests in Jade, and in their consequent bases in the Xerox stock and euros received upon withdrawing from Jade. Section 6662 contains two distinct penalties for the underpayment of tax due to a valuation misstatement -- a 20-percent "substantial valuation misstatement" and a 40-percent "gross valuation misstatement." Section 6662(e),(h). A substantial valuation misstatement occurs when the adjusted basis of any property claimed on any tax return is 200 percent or more of the amount determined to be the correct adjusted basis, and a gross valuation misstatement occurs when the adjusted basis is 400 percent or more of the amount determined to be correct. Section 6662(e)(1)(A), (h)(1)-(2).

Section 6662(h) makes the application of the 40-percent penalty mandatory, stating: "[t]o the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation misstatements, [a valuation misstatement penalty] shall be applied with respect to such portion [of underpayment of tax] . . .'" Section 6662(h)(1) (emphasis added); Long Term Capital Holdings, 330 F. Supp. 2d at 204 ("penalties, such as valuation misstatement, are intended to apply in mechanical fashion, inquiring only as to the magnitude of error in the taxpayer's claimed value or adjusted basis. . . ."); see Gilman, 933 F.2d at 149 ("The amount of the [valuation misstatement] penalty is a percentage of the underpayment; the applicable percentage is based on the degree of overvaluation.").

Although each Ervin LLC treated its partnership interest in Jade as having a basis of approximately $15 million, this Court determined that each Ervin LLC's basis in its partnership interest should have been $225,002.[76] Since the Ervin LLCs' claimed adjusted bases in their Jade partnership interests for the 1999 tax year exceeded their adjusted bases in their Jade partnership interests by more than 400 percent, the 40-percent gross valuation misstatement penalty must be applied.

Plaintiffs raise several challenges to the imposition of the gross valuation misstatement penalty. First, Plaintiffs argue that the gross valuation penalty only applies to property expressly enumerated in Treasury Regulation § 1.6662-5(e)(3) -- which does not include a partner's basis in a partnership interest or in stock or currency received from the partnership. Treasury Regulation § 1.6662-5(e)(3) defines property for the purposes of a valuation misstatement penalty as "both tangible and intangible property." The regulation continues:

---

[76] In total, each Ervin brother claimed an approximate basis of $15,000,000 from the spread transaction on their 1999 and 2000 personal tax returns. See JX 96-98; PX 259-261. Each Ervins' 1999 tax return claimed a total basis of approximately $11,300,000 (10,500,000 in Xerox stock and $783,000 in euros). See JX 96-98. Each Ervins' 2000 tax return claimed a total basis of approximately $3,700,000 in Xerox stock. See PX 259-61.

> Tangible property includes property such as land, buildings, fixtures and inventory. Intangible property includes property such as goodwill, covenants not to compete, leaseholds, patents, contract rights, debts and choses in action.

Treas. Reg. § 1.6662-5(e)(3).

Thus, the regulation does not purport to contain an exhaustive litany of the type of property to which the penalty may be applied. More importantly, the Code itself, section 6662(e)(1)(A), expressly provides that a valuation misstatement includes a misstatement of "the adjusted basis of any property claimed on any return of tax imposed by chapter 1."[77] See also CEMCO, 2007 U.S. Dist. LEXIS 22246 at 29 ("the clear statutory language of section 6662 . . . states that valuation misstatements include highly inflated adjusted bases. I.R.C. § 6662(e)(1)(A)."); Santa Monica Pictures, 89 T.C.M. (CCH) at 1226 ("Congress did not limit the definition of a "'valuation misstatement'" to instances involving inflated valuations [of property] but included within that definition instances involving inflated adjusted bases."); Treas. Reg. § 1.6662-5(e)(2) (defining a gross valuation misstatement as a claimed adjusted basis of any property on a tax return which is "400 percent or more of the correct amount.").[78]

Secondly, Plaintiffs contend that as a matter of law, no gross valuation misstatement penalty applies where the underlying transaction is disregarded for lack of economic substance. Plaintiffs rely primarily on Klamath Strategic Investment Fund, LLC v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007), reconsid. denied, 2007 U.S. Dist. LEXIS 24806 (E.D. Tex. Apr. 3, 2007) for this proposition. In Klamath, a partnership-level action, members of the partnership challenged both the Commissioner's determination that several loan transactions lacked economic substance and the imposition of accuracy-related penalties. The Court agreed that the transactions lacked economic substance, but determined that the gross valuation misstatement did not apply. The Klamath Court recognized that under section 6662(h), the 40-percent penalty applies if the underpayment of tax is "attributable to" a gross valuation misstatement. The Klamath Court interpreted the "attributable to" language as follows: "if [a] court disregards [a transaction] because

---

[77] Chapter 1 of the Internal Revenue Code contains provisions for imposing federal income tax on individuals and taxable entities, including partnerships.

[78] Plaintiffs also suggest that the determination of whether the Ervins improperly stated the basis of the Xerox stock and euros they received upon withdrawing from Jade must be made at the individual partner-level, not at this partnership-level proceeding. Pls.' Post-Trial Br. at 67. The Court disagrees. The Court may review "all the legal and factual determinations that underlie the determination of any penalty," which would include the Ervins' bases in the Xerox stock and euros received. Treas. Reg.§ 301.6221-1T(c) (1999). The FPAA determined that the gross valuation misstatement penalty is applicable because the Ervin LLCs misstated the value of the bases of their Jade partnership interests, and consequently misstated the value of the bases of the Xerox stock and euros they received upon withdrawing from Jade. JX 109.

the transaction lacks economic substance, then the underpayment of tax is not 'attributable to' any gross valuation misstatement. Instead, the underpayment would be attributable to the disregard of the transaction." Klamath, 472 F. Supp. 2d at 900. This Court does not interpret the statute in that fashion in this context. Here, the underpayment of tax directly and exclusively was "attributable to" the overstatement of each Ervin LLC's basis -- it was not "attributable to" the subsequent independent action of the court disregarding the transaction.[79]

Third, Plaintiffs argue that the penalty "by definition, can only apply to those situations where a taxpayer intentionally overvalues property to generate larger tax deductions, not situations such as this involving a reasonable interpretation of the law." Pls.' Post-Trial Br. at 67-70; Pls.' Reply to Def.'s Post-Trial Br. at 102-04. Plaintiffs contend that there was no intentional overvaluation of property in the Ervin LLCs' partnership interests in Jade, "only a legal debate as to whether the sold call option constitutes a contingent liability under Helmer, et al." Pls.' Post-Trial Br. at 68. The Court is not persuaded by this argument. Once a gross valuation misstatement has occurred, the penalty applies mechanically, regardless of the intent of the taxpayers in executing the transaction or their reliance on legal authority. See Merino v. Comm'r, 196 F.3d 147 (3d Cir. 1999); Zfass v. Comm'r, 118 F.3d 184 (4th Cir. 1997); Illes v. Comm'r, 982 F.2d 163 (6th Cir. 1992); Massengill v. Comm'r, 876 F.2d 616 (8th Cir. 1989); Gilman v. Comm'r, 933 F.2d 143 (2d Cir. 1991); Long Term Capital Holdings, 330 F. Supp. 2d at 199; Santa Monica Pictures, 89 T.C.M. (CCH) at 1225-26.

---

[79] Moreover, the Klamath Court followed Fifth Circuit precedent not binding on this Court -- Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990) and Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), holding that the IRS may not penalize the taxpayer for a valuation overstatement included in a disallowed deduction or credit because the underpayment of tax is not "attributable to" the valuation overstatement, but the improper deduction or credit. The majority of other Circuits and the Tax Court have departed from the Fifth Circuit's reasoning and held that when a transaction lacks economic substance, the resulting underpayment of tax is "attributable to" a valuation misstatement, and the valuation misstatement penalty is applied. See Merino v. Comm'r, 196 F.3d 147, 155 (3d Cir. 1999) (stating that "whenever a taxpayer knowingly invests in a tax avoidance entity which the taxpayer should know has no economic substance, the valuation overstatement penalty is applied as a matter of course."); Zfass v. Comm'r, 118 F.3d 184, 190 (4th Cir. 1997) (holding that "when an underpayment stems from deductions that are disallowed due to a lack of economic substance, the deficiency is attributable to an overstatement of value and is subject to penalty"); Illes v. Comm'r, 982 F.2d 163, 167 (6th Cir. 1992) (holding that the tax benefit generated was directly dependent upon the valuation overstatement); Massengill v. Comm'r, 876 F.2d 616, 619-20 (8th Cir. 1989) (holding that when underpayments of tax stem from deductions which are disallowed due to a lack of economic substance, the deficiency is attributable to overstatement of value); Gilman v. Comm'r, 933 F.2d 143, 152 (2d Cir. 1991) (recognizing that a transaction that lacks economic substance "generally reflects an arrangement in which the basis of the property was misvalued in the context of the transaction."); Long Term Capital Holdings, 330 F. Supp. 2d at 199; Santa Monica Pictures, 89 T.C.M. (CCH) at 1227.

**Negligence**

Alternatively, the FPAA imposed a 20-percent penalty under section 6662(b)(1) for any portion of the underpayment of income tax for the taxable year of 1999 due to "negligence or a disregard of rules and regulations." JX 109. Negligence is defined by section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]."[80] Treasury Regulation § 1.6662-3(b)(1)(ii) explains a taxpayer is negligent if he fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem "too good to be true" under the circumstances to a reasonable and prudent person. The negligence standard is an objective one, requiring a finding of "the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances" Goldman v. Comm'r, 39 F.3d 402, 407 (2d Cir. 1994) (quoting Allen v. Comm'r, 925 F.2d 348, 353 (9th Cir. 1991); accord Pasternak, 990 F.2d 893, 902 (6th Cir. 1993); Marcello v. Comm'r, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Comm'r, 85 T.C. 934, 947 (1985).

In Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221, 234 (3d Cir. 2002), the Third Circuit found that when "a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." See also Van Scoten v. Comm'r, 439 F.3d 1243, 1260 (10th Cir. 2006) (upholding negligence-related penalties where the plaintiffs' actions in relation to their investment and the tax claims were objectively unreasonable); Pasternak, 990 F.2d at 902 ("petitioners were aware that they were buying a program that consisted primarily of 'window dressings' for tax benefits and either negligently or intentionally disregarded the law.").

The applicability of the negligence penalty in this TEFRA proceeding depends upon the conduct of Jade, its managing member and tax matters partner, Sentinel, as well as the parties here -- the Ervins. Sentinel's principal, Ari Bergmann, stands in a different posture than the Ervins both with respect to his sophistication in the realm of tax matters and his role in the spread transaction. Given Bergmann's status as the managing member and tax matters partner of Jade, it is appropriate for the Court to assess the reasonableness of his conduct in considering the applicability of the negligence penalty. Santa Monica Pictures, 89 T.C.M. (CCH) at 1228. In Santa Monica Pictures, the Tax Court found the negligence penalty applicable at the partnership-level, examining the sophistication and conduct of the tax matters partner, a tax attorney who engineered the transaction found to be lacking in economic substance. The Tax Court stated:

> Mr. Lerner is a highly educated, sophisticated tax attorney. He worked for many years at O'Melveny & Myers; at one point, he established and ran the firm's London office. Mr. Lerner also worked as a clerk/attorney-advisor with the U.S. Tax Court and as an attorney advisor for the U.S. Treasury Department.

---

[80] The term "disregard of rules or regulations" includes any "careless, reckless, or intentional disregard." Section 6662(c).

> Mr. Lerner personally engineered a plan to transfer the built-in losses in the defunct MGM Group Holdings from Generale Bank and CLIS to the Ackerman group. This transaction had no economic substance for Federal tax purposes. . . . Under the circumstances, we believe that a reasonable and prudent person would recognize that these tax losses were "'too good to be true,'" . . .
>
> Petitioner seeks to hide behind formal compliance with the partnership tax rules. As an experienced tax attorney, Mr. Lerner should have known that mere formal compliance with statutory provisions would not sustain transactions that have no economic substance and that are mere contrivances designed solely to exploit tax benefits. Under the circumstances, we conclude that reasonably prudent persons with Mr. Lerner's tax experience would not have conducted themselves as he did in reporting the bases in the . . . receivables and the substantial losses from the transactions . . .

Id.

Similarly, in the instant case, Sentinel's principal, Bergmann, while not an attorney, was a CPA with tax experience, having headed the Transaction Development Group at Bankers Trust which, inter alia, advised clients on tax transactions and hedge fund structures. Bergmann was instrumental in developing the spread transaction with BDO Seidmann and paramount in marketing the transaction to the Ervins. It was Bergmann's pitch, along with BDO Seidman's and Curtis Mallet's recommendations, which persuaded the Ervins to do the deal. Further, while Sentinel and Bergmann were to do the trading, that was not their only role -- Sentinel's CFO, Conjeeveram, prepared the paperwork for the Ervin LLCs and worked with AIG devising the procedures to be followed -- using Sentinel personnel and its accounting firm, Untracht. Sentinel was involved not only in executing the spread transaction but also in facilitating contributions to and redemptions from the partnership, including valuing the partnership assets and determining the assets to be redeemed.[81] Finally, Sentinel's accounting firm, Untracht, prepared and signed Jade's 1999 tax return.

The spread transaction contributed to Jade was structured to yield and did yield tax benefits which Bergmann should have recognized as being "too good to be true." The Ervin LLCs only had to "invest" $150,002 to purchase the spread options but in return received approximately $15 million each in taxable losses. The Ervin LLCs were protected from realizing any significant

[81] Smita Conjeeveram is also a CPA, and before joining Sentinel was a Tax Manager at Price Waterhouse, concentrating on international tax issues. She had also been a Tax Manager at Long Term Capital in the portfolio tax group where she analyzed the structure and taxation of derivative products.

financial losses as they could lose no more than their initial investment in Jade. The transaction which Bergmann brought to BDO Seidman from the street was an elaborate fictional construct with no economic consequences other than tax benefits. A reasonably prudent investor with Bergmann's hedge fund and market experience would have known there was no investment and no potential for profit in the spread transaction. A reasonably prudent person with Bergmann's CPA background and tax experience would not have conducted himself as Bergmann did here in reporting such substantial tax losses from a fictional transaction.

Nor does Sentinel's reliance on Curtis Mallet and BDO Seidman defeat the partnership's negligence penalty here. "While it is true that actual reliance on the tax advice of an independent, competent professional may negate a finding of negligence . . . the reliance itself must be objectively reasonable in the sense that the taxpayer supplied the professional with all the necessary information to assess the tax matter and that the professional himself does not suffer from a conflict of interest or lack of expertise that the taxpayer knew of or should have known about." Neonatology Assoc's, 299 F.3d at 234. Both BDO Seidman's model opinion and Curtis Mallet's opinion were premised on the fallacy that the spread transaction could generate a profit. Moreover, Jade itself did not obtain an opinion from Curtis Mallet, only the Ervins did.[82] Nor does Sentinel's and the Ervins' reliance on BDO Seidman advance their cause. "It is well established that taxpayers generally cannot reasonably rely on the professional advice of a tax shelter promoter." Edwards v. Comm'r, T.C. Memo 2002-169 (2002); see also Goldman, 39 F.3d at 408 ("Appellants cannot reasonably rely for professional advice on someone they know to be burdened with an inherent conflict of interest."); Neonatology Assoc's, P. A. v. Comm'r, 115 T.C. 43, 98 (2000) ("Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."). As such, the alternative 20-percent negligence penalty is applicable.

**Substantial Understatement**

The FPAA imposed alternative 20-percent penalties under section 6662(b)(2) for the underpayment of tax for 1999 due to a "substantial understatement of income tax" and for a "substantial understatement of income tax because the transaction is a tax shelter, no substantial authority has been established for the position taken, and there was no reasonable belief upon the filing of the return that the position taken was more likely than not the correct treatment of the transaction." JX 109.

An understatement exists if the correct tax exceeds the reported tax, section 6662(d)(2)(A), and an understatement is substantial if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Section 6222(d)(1)(A). A taxpayer may obtain relief from the penalty

---

[82] While the Ervins also relied upon the advice of their long-time personal accountant and tax attorney -- and would not have entered the transaction without attorney Jesse Mountjoy's approval -- their reliance on professionals cannot save the partnership from the negligence penalty given Jade's managing member Sentinel's major role in the transaction.

if it makes the showing in section 6662(d)(2)(B), that there was "substantial authority" for its position. That relief is limited, however, where the understatement is "attributable to a tax shelter." Section 6662(d)(2)(C). Section 6662(d)(2)(C)(iii) defines a tax shelter as "a partnership or other entity, any investment plan or arrangement, or any other plan or arrangement, if a significant purpose" of such an entity "is the avoidance or evasion of Federal income tax." If the understatement is attributable to a tax shelter, the taxpayer, in addition to demonstrating substantial authority for its position, must also prove that it "reasonably believed that [its position] was more likely than not the proper treatment." Section 6662(d)(2)(C)(i)(II).

As explained above, an objective scrutiny of the spread transaction contributed to Jade leads ineluctably to the conclusion that the spread transaction wholly lacked economic reality and concomitantly that tax avoidance was a significant purpose of this transaction.[83] As such, the transaction meets the definition of a tax shelter, and Plaintiffs may avoid imposition of the substantial understatement penalty only if they show both that their reporting position was supported by "substantial authority" and that they "reasonably believed that the tax treatment of such item . . . was more likely than not the proper treatment." Section 6662(d)(2)(C)(i)(II); see Long Term Capital Holdings, 330 F. Supp. 2d at 200 ("the reduction rules are modified 'in the case of any item of a taxpayer other than a corporation which is attributable to a tax shelter' . . . no reduction is available for adequate disclosure and, to be entitled to a reduction on grounds of substantial authority for any item, the taxpayer must also have 'reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment.'") (quoting Section 6662(d)(2)(C)(I)-(II); In re CM Holdings, Inc., 254 B.R. 578, 649 (D. Del. 2000) ("If [plaintiff's] loan interest deductions are tax shelter items, in order for this exception to apply, the taxpayer must, at a minimum, satisfy an 'authority requirement' and a 'belief requirement.'").

---

[83] Plaintiffs' Jade transactions fit within the parameters of the "Son of BOSS" tax shelter. A "Son of BOSS" transaction is defined as

> a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities, and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large-but not out-of-pocket-losses on their individual tax returns.

Salman Ranch Ltd. v. United States, 79 Fed. Cl. 189, 192, n. 5 (2007) (quoting Kligfeld Holdings v. Comm'r, 128 T.C. 192, 194 (2007)).

The taxpayer bears the burden of proving substantial authority. Norgaard v. Comm'r, 939 F.2d 874, 877-78 (9th Cir. 1999). Substantial authority for tax treatment exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i). Substantial authority is an "objective standard involving an analysis of the law and application of the law to relevant facts." Treas. Reg. § 1.6662-4(d)(2). "[T]he taxpayer's belief that there is substantial authority for the tax treatment of an item is not relevant in determining whether there is substantial authority for that treatment." Treas. Reg. § 1.6662-4(d)(3)(i) (1998). Pertinent authorities for a substantial authority analysis include the Internal Revenue Code, other statutory provisions, regulations, revenue rulings, and court decisions, but not opinions rendered by tax professionals. Treas. Reg. § 1.6662-4(d)(3)(iii).

Plaintiffs argue that substantial authority existed for the tax treatment of the spread transaction based on Helmer. Plaintiffs are correct that at the time the spread transaction was executed, Helmer supported the premise that a sold call option would not constitute a liability under section 752 for purposes of calculating a partner's basis in its partnership interest. Indeed, recently in CEMCO the District Court for the Northern District of Illinois recognized that Helmer was good law prior to Notice 2000-44, stating:

> In Helmer v. Commissioner, T.C. Memo 1975-160, 34 T.C.M. (CCH) 727 (1975), the Tax Court held that a contingent obligation, such as a short or sold option, is not a liability under section 752 because a partnership's obligation under the option does not become fixed until the option is exercised. This principle was affirmed in multiple subsequent cases under section 752. See, e.g., Long v. Comm'r, 71 T.C. 1, 6-7 (1978), aff'd in part, 660 F.2d 416 (10th Cir. 1981) (holding that contingent obligations are not liabilities for purposes of increasing partnership basis until they become fixed or liquidated); La Rue v. Comm'r, 90 T.C. 465, 478 (1988) (obligations that are fixed but remain contingent are not liabilities under section 752); Gibson Prods. Co. v. United States, 637 F.2d 1041, 1049 (5th Cir. 1981) (contingent nature of a partnership obligation precludes treatment as a liability for tax purposes). For many years, the Helmer rule served as the definition of liability under section 752. See Assumption of Partnership Liabilities, 68 Fed. Reg. 37434 (June 24, 2003) ("There is no statutory or regulatory definition of liabilities for purposes of section 752."). Thus, under Helmer and its progeny, it would have been proper for CIP to ignore the short, or sold, option as a liability under section 752.

CEMCO, 2007 U.S. Dist. LEXIS 22246 at 10-11.

The question of whether there was "substantial authority" for the positions taken by Jade here requires an examination of several legal theories. There was clearly authority under Helmer

and its progeny for the proposition that contingent obligations were not liabilities within the meaning of section 752 of the Code. There was also some authority that the two legs of the spread transaction could be viewed separately, but the weight of both factual and legal authorities demonstrate that the options here could not be separated. More importantly, there is an overarching legal doctrine -- the economic substance doctrine -- which must be considered in evaluating whether Helmer was substantial authority for Jade's position. As the Federal Circuit in Coltec recognized, "[o]ver the last seventy years, the economic substance doctrine has required disregarding for tax purposes, transactions that comply with the literal terms of the tax code, but lack economic reality." 454 F.3d at 1352. The Federal Circuit traced the roots of this doctrine to Supreme Court cases and noted that the Federal Circuit's predecessor had repeatedly applied the doctrine over the years and that "various tax treatises also recognize the doctrine's continued viability." Id. At bottom, the fictional nature of the transaction and its lack of economic reality outweigh Helmer in the substantial authority assessment.

Because this Court finds that, on balance, substantial authority did not exist for the tax treatment of the spread transaction in Jade, it is not necessary to analyze whether the taxpayers reasonably believed at the time the return was filed that the tax treatment of the spread transaction was "more likely than not the proper treatment." See Treas. Reg. § 1.6662-4(g)(1)(i)(B). As such, the alternative 20-percent substantial understatement penalties of section 6662(b)(2) were properly imposed by the Commissioner.[84]

**Reasonable Cause Exception**

The reasonable cause exception codified in section 6664(c) states "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." See also Treas. Reg. § 1.6664-4(a). Plaintiffs argue that Defendant may not impose any penalties against them under section 6662 as they proceeded in "good faith based on reasonable cause" within the meaning of section 6664. Pls.' Post-Trial Br. at 11-12, 57-72.

As stated above, this is a partnership-level action under TEFRA. Partner-level defenses to any penalty that relates to the adjustment of a partnership item in a partnership-level proceeding cannot be litigated in this proceeding. Treasury Regulation § 301.6221-1T(d) (1999) states:

> Partner-level defenses to any penalty . . . that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but may be asserted through separate refund actions

---

[84] The Government may not stack or compound these alternatively imposed penalties to impose a penalty greater than the maximum penalty of 20 percent on any given portion of an underpayment, or 40 percent if such portion is attributable to a gross valuation misstatement. Treas. Reg. § 1.6662-2(c) (1998); CEMCO, 2007 U.S. Dist. LEXIS 22246 at 28; Keller v. Comm'r, 91 T.C.M. (CCH) 1292, 1298 (2006); Jaroff v. Comm'r, T.C.M. (CCH) 569, 573 (2004).

> following assessment and payment. . . . Partner-level defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return, and cannot be determined at the partnership-level. . . . Examples of these determinations are . . . . section 6664(c)(1) (reasonable cause exception). . . .[85]

Because the regulation expressly cites the reasonable cause exception as an example of a partner-level defense, the Ervin LLCs are barred from raising the reasonable cause defense in this partnership-level action and may only raise such defense in a subsequent refund action at the partner-level. See also Fears v. Comm'r, 129 T.C. No. 2 (2007).

Plaintiffs agree that Treasury Regulation § 301.6221-1T(d) (1999), on its face, bars individual partners from raising the reasonable cause defense in a partnership action, but contend that the regulation itself is invalid. Plaintiffs claim this regulation violates both the section 6444 prohibition against imposing penalties where reasonable cause exists and the section 6221 mandate that the "applicability of penalties" relating to "partnership items" shall be determined at the partnership-level. Pls.' Reply to Def.'s Post-Trial Br. at 100-01.

Section 6444 does prohibit imposing penalties if "it is shown that there was reasonable cause" for the underpayment of tax. The regulation prevents the Ervins from attempting to show their reasonable cause here, while the statute nonetheless requires the Court to determine the "applicability" of the penalty at the partnership-level. The upshot is that the Ervins must pay the penalty and file individual refund actions in order to litigate reasonable cause. Section 6230(c)(4). While this is burdensome on the taxpayer, it is not reason to invalidate the regulation. The regulation does not deprive a taxpayer from ever being able to show reasonable cause -- it merely delays the adjudication of that defense until the partner-level proceeding, recognizing that the reasonable cause defense may differ from partner to partner depending upon individual circumstances. The individual partners may still avail themselves of section 6664's protection and defeat the penalties if they can show the requisite reasonable cause and good faith. This is consistent with TEFRA's purpose of litigating all common partnership items at the partnership-level and deferring the unique individual defenses to the partner-level proceeding. As such, the regulation implements the Code in a reasonable manner and is valid and controlling. See Rowan Cos. v. United States, 452 U.S. 247, 252 (1981); United States v. Correll, 389 U.S. 299, 307 (U.S. 1967); Nat'l Muffler Dealers Ass'n. v. United States, 440 U.S. 472, 477 (1979).

Plaintiffs also rely on Klamath for the proposition that partners may raise a partner-level reasonable cause defense at a partnership-level proceeding. Pls.' Memo on Application of Klamath

---

[85] This regulation was a temporary regulation that applied to all partnership years ending after August 5, 1997. The final regulation, Treasury Regulation § 301.6221-1, applies to all partnership taxable years beginning on or after October 4, 2001. Treasury Regulation § 301.6221-1T (1999) was in effect at the time of the Jade partnership years at issue and applies to the current action. The temporary and final versions of the regulation are substantively identical.

at 16. The Klamath Court held that the partner-level reasonable cause defense could be raised in a partnership-level action because it involved actions by the managing member and the IRS had delved into the potential defenses of the partners during the administrative process. Klamath, 472 F. Supp. 2d at 904. However, none of the Ervin LLCs was the managing member, and they did not prepare Jade's tax returns -- Sentinel's accounting firm did.

In Long Term Capital Holdings, 330 F. Supp. 2d at 205, the Court considered the reasonable cause defense at the entity-level, examining whether the entity, Long Term, had reasonable cause in claiming large losses. So too, in Santa Monica Pictures, the Tax Court considered the reasonable cause defense at the entity-level, considering advisory opinions on which the managing member partner relied in preparing the partnerships tax returns. 89 T.C.M. (CCH) at 1229-30. Plaintiffs here do not ask this Court to apply the reasonable cause defense to the actions of Jade, but instead to those of the Ervin LLCs as partners in Jade. Pls.' Post-Trial Br. at 11-12, 57-72. Because the reasonable cause defenses are unique to the individual Ervin LLCs, these defenses must be litigated in partner-level proceedings.

## Conclusion

Plaintiffs' petition for readjustment of the partnership items of Jade is **DENIED**. This Court lacks jurisdiction to consider partner-level reasonable cause defenses in this proceeding. The Commissioner's application of penalties at the partnership-level is affirmed without consideration of the reasonable cause defenses, which may be raised in any partner-level proceedings.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**